UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

CHARLES BRYANT, individually and as next friend and guardian
of D.B., AVA GEORGE, individually and as next friend and
guardian of B.G., CHANIN HOUSTON-JOSEPHAT, individually
and as next friend and guardian of A.J., LISA HUGHES, individually
and as next friend and guardian of J.R., CARMEN PENA,
individually and as next friend and guardian of G.T., VIVIAN
PRESLEY, individually and as next friend and guardian of D.P., and
JAMIE TAM, individually and as next friend and guardian of S.T.,

        Plaintiffs,

v.                                                 No. _____

NEW YORK STATE EDUCATION DEPARTMENT,
DAVID M. STEINER, in his capacity as Commissioner of Education
of the New York State Education Department, and
THE NEW YORK STATE BOARD OF REGENTS,

        Defendants.

---

# COMPLAINT

## INTRODUCTION

Plaintiffs, by their counsel, hereby file this Complaint for injunctive and declaratory

relief.  Plaintiffs bring this action to seek relief and avoid further immediate and irreparable harm

from Defendants' violations of the Individuals with Disabilities Education Act ("IDEA"), the

Rehabilitation Act, and the United States and New York Constitutions.  In particular, Plaintiffs

challenge and seek to enjoin certain regulations that Defendants promulgated, adopted, and

enforce that deny them any access to safe and effective treatment that is necessary for their

unique educational needs.

{K0398704.7}

## PARTIES

1.      Charles Bryant, who resides in Saranac Lake, New York, is the parent and legal guardian of D.B.

2.      D.B. is a male New York resident who was born in October 1994.  D.B.'s local school district, Saranac Lake Central School District, has identified him as disabled and in need of residential, special education services to receive a free appropriate public education ("FAPE"). D.B.'s individualized educational program ("IEP") specifies the Judge Rotenberg Educational Center, Inc. ("JRC") as the recommended placement.

3.      Ava George, who resides in Brooklyn, New York, is the mother and legal guardian of B.G.

4.      B.G. is a male New York State resident who was born in June 1996.  B.G.'s local school district, District 17 of the New York City Department of Education ("NYCDOE"), Region 6, has identified him as disabled and in need of residential, special education services to receive a FAPE.  B.G.'s IEP specifies JRC as the recommended placement.

5.      Chanin Houston-Josephat, who resides in the Bronx, New York, is the parent and legal guardian of A.J.

6.      A.J. is a female New York State resident who was born in July 1994.  A.J.'s local school district, District 16 of NYCDOE, Region 8, has identified her as disabled and in need of residential, special education services to receive a FAPE.  A.J.'s IEP specifies JRC as the recommended placement.

7.      Lisa Hughes, who resides in New York, New York, is the parent and legal guardian of J.R.

8.      J.R. is a male New York State resident who was born in May 1997. J.R.'s local school district, District 4 of NYCDOE, Region 9, has identified him as disabled and in need of residential, special education services to receive a FAPE.

9.      Carmen Pena, who resides in the Bronx, New York, is the mother and legal guardian of G.T.

10.     G.T. is a male New York State resident who was born in January 1994. G.T.'s local school district, District 11 of NYCDOE, Region 2, has identified him as disabled and in need of residential, special education services to receive a FAPE. G.T.'s IEP specifies JRC as the recommended placement.

11.     Vivian Presley, who resides in Brooklyn, New York, is the aunt and legal guardian of D.P.

12.     D.P. is a male New York State resident who was born in January 1991. D.P.'s local school district, District 17 of NYCDOE, Region 6, has identified him as disabled and in need of residential, special education services to receive a FAPE.

13.     Jamie Tam, who resides in Brooklyn, New York, is the mother and legal guardian of S.T.

14.     S.T. is a male school-aged New York resident who was born in December 1993. S.T.'s local school district, District 21 of NYCDOE, Region 7, has identified him as disabled and in need of residential, special education services to receive a FAPE.

15.     Defendant New York State Education Department ("NYSED") is an agency of the State of New York. NYSED is responsible for regulating educational services and programs for New York State residents. Upon information and belief, NYSED's principal offices are located at 89 Washington Avenue in Albany, New York.

16.     Defendant Dr. David M. Steiner is the Commissioner of NYSED.  Upon information and belief, Dr. Steiner maintains a principal place of business at 89 Washington Avenue in Albany, New York.

17.     Defendant The New York State Board of Regents ("Board of Regents") oversees and maintains responsibility for education in New York State, including the setting of educational policies, standards, and rules, as well as the promulgation, adoption, and enforcement of regulations by NYSED.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the Federal claims pursuant to 28 U.S.C. § 1331 and over the state law claims under the principles of supplemental jurisdiction.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because all Defendants reside within the Northern District of New York and a substantial part of the events giving rise to Plaintiffs' claims occurred in the Northern District of New York.

## FACTUAL BACKGROUND

### The Students and their Severe Behavior Disorders

20.     Although their particular conditions and needs are each unique, D.B., B.G., A.J., J.R., G.T., D.P., and S.T. (collectively, the "Students") share certain common circumstances. Each Student has a long and well-documented history of severe behavioral problems, including aggressive, self-injurious, destructive, disruptive, and otherwise non-compliant behavior.  These behaviors have prevented their educational and development progress.  For example, some of the Students have:

- pulled out their own teeth by force;

- attempted to stab themselves, tied ropes around their necks, and used their finger nails to slice their own tongue;

- repeatedly banged their heads against hard objects;

- physically assaulted teachers and staff members, including choking attempts by hand and with clothing; and

- clawed and scratched at teachers and staff members, resulting in a corneal laceration.

21.    Collectively, the Students have previously undergone years of unsuccessful treatment for their behavior disorders, including, but not limited, to special education, placement in day and residential program, psychiatric hospitalizations, counseling, restraint, paraprofessional support, home instruction, the use of sensory tents, or behavior modification treatment using "positive-only" procedures.

22.    All of the Students have been prescribed heavy dosages of anti-psychotic and other psychotropic medications, such as: Abilify, Cogentin, Lithium, Neurontin, Paxil, Risperdal, Seroquel, Thorazine, Zoloft, or Zyprexa.  These medications can have serious and long-lasting side effects, such as severe weight gain, Tardive Dyskinesia, life-shortening metabolic effects, and damage to their internal organs.

23.    The above methods failed to properly treat the Students' severe behavior disorders that continued to pose physical risks to themselves and others.  As a result, the Students have been expelled from or denied admission to public schools and private institutions, or were confined in psychiatric wards or detention facilities and did not receive a FAPE.

24.    Because the Students' prior placements and treatment were inadequate and denied them a FAPE, the Students now attend the JRC where they receive, *inter alia*, special education coupled with behavior modification treatment.

***The Judge Rotenberg Educational Center, Inc.***

25.    JRC is a not-for-profit, special education facility located in Canton, Massachusetts.  JRC is licensed by the Massachusetts Department of Developmental Services

("MA DDS"), formerly known as the Department of Mental Retardation, and Massachusetts Department of Early Education and Care ("MA EEC"). JRC's educational program is approved, *inter alia*, by the Massachusetts Department of Elementary and Secondary Education ("MA DESE"), formerly known as the Department of Education, NYSED, the Illinois Department of Education, the New Jersey Department of Education, and the Washington D.C. Department of Education.

26.    Founded in the 1970's, JRC provides residential, respite, and day services to children and adults with severe behavior disorders. JRC often serves as a placement of last resort for individuals who have proven resistant to other forms of psychological and psychiatric treatment and for whom no other placement can educate and keep safe.

27.    Typically, a student at JRC has engaged in behaviors that are self-injurious, aggressive, destructive, and disruptive in nature. Some examples include pulling out one's own teeth, eye gouging, head hitting, smearing feces, throwing furniture, and indiscriminate screaming or yelling. These behaviors risk life-threatening injuries and prevent the student from receiving a FAPE.

28.    JRC offers intensive behavioral treatment based on peer-reviewed and accepted methods and principles of behavioral psychology. JRC and its staff design individualized treatment plans to address each student's particular behavior.

29.    For nearly four decades, JRC and its behavior modification treatment program has helped thousands of individuals, including hundreds of New York State special education students.

30.    At JRC, each student starts with a non-intrusive, "positive" treatment program. JRC students receive carefully-designed rewards (e.g., treats, videogames, music, field trips)

when they engage in targeted positive behaviors (e.g., academics) or refrain from targeted

negative behaviors (e.g., self-mutilation, overturning desks).   Conversely, students receive

carefully-designed negative consequences (e.g., fines or loss of a privilege) when they engage in

problematic behaviors.  Similarly, JRC employs a point/token system that enables students to

earn or lose points or tokens based upon their behaviors.  Students can use their accumulated

points or tokens to earn rewards of their choice, including trips to favorite destinations such as

sporting events, shopping malls, or restaurants.

31.     Overall, these "positive" only methods have proven successful with

approximately 70% of JRC's school-age students.  When positive-only behavioral interventions

are not sufficiently effective alone to treat a student's severe behavior disorders, JRC may seek

to supplement the positive procedures with aversive behavior modification techniques or

"aversive interventions."

***Aversive Interventions***

32.     At JRC, an "aversive intervention" or "aversive" is a carefully-designed

decelerating consequence (*i.e.*, a consequence that causes a behavior to decrease) that is safe,

effective, and used only in pre-determined circumstances.  JRC has used aversive interventions

to address individual, specifically-defined behaviors that pose significant dangers to the student

or others, or that significantly interfere with or harm a student's education, development, or other

appropriate behavior.  JRC's use of aversive interventions has been based upon peer-reviewed

and accepted methods of behavioral psychology, as well as years of first-hand experience.

33.     JRC uses supplemental aversive interventions to treat a student's serious

problematic behaviors including aggressive, self-injurious, destructive, disruptive, and non-

compliant behaviors.  Effective deceleration or removal of a student's problematic behaviors is

often necessary so that the student has access to an education, can receive a FAPE, and achieve the educational and behavioral goals set forth in his or her IEP. At the same time, it promotes the student's safety and well-being. It also allows the Student to develop basic self-help and social skills that are critical for daily-living. Furthermore, the use of aversive interventions helps ensure a productive educational environment where the student has access to a teacher, other students, teaching materials, and a classroom. This enables student to develop valuable skills such as listening, reading, class participation, math, English, and social studies.

34.     In addition, reduction of problematic behaviors with aversive interventions helps students learn, develop, or hone the basic skills necessary for daily life—such as control of their bodily fluids and functions—which are also typical IEP goals. These appropriate behaviors and beneficial skills help replace the aggressive, self-abusive, destructive, disruptive, and other serious problematic behaviors.

35.     Effective aversive interventions have enabled many JRC students to participate in activities with peers, such as field trips to the movies, restaurants, or stores. They have also helped some JRC students attend college, join the armed forces, and obtain meaningful employment outside of JRC. In addition, aversive interventions have made it possible for other JRC students to safely enjoy extended home visits with their families and loved ones.

36.     JRC employs various protocols and safeguards to ensure the careful, controlled, and circumscribed use of aversive interventions. Specifically:

- after a careful and detailed consideration of the pertinent facts and circumstances, the personnel supervising the student's care—including a qualified, doctoral-level treating clinician—must determine that aversive interventions are appropriate for that particular student;

- the student's parent or guardian must consent, in writing, to the use of aversive interventions (the parent is free to

withdraw such consent at any time, immediately halting the use of aversive interventions with that child);

- the use of aversive interventions is tailored to the student's particular behaviors, needs, education goals, and circumstances. In particular, JRC staff involved in the student's care—including the qualified, doctoral-level treating clinician—develop, implement, and oversee the student's individualized behavior modification treatment plan that: (1) identifies the specific behaviors to be treated with aversive interventions; (2) lays out the treatment's rationale, goals, duration, and conditions; and (3) includes a monitoring plan to evaluate its efficacy; *see* 115 MASS. CODE REGS. § 5.14(4)(c);

- an independent, board-certified physician—such as Dr. Edward Sassaman, a Harvard Medical School graduate, New York Department of Health-appointed Expert Reviewer for pediatrics, and clinical instructor at the University of Rochester Medical School—must examine the student to determine whether any medical reasons prohibit the use aversive interventions on that particular student;

- a Human Rights Committee and a Peer Review Committee must separately approve the use of aversive interventions for that particular Student;

- the pertinent school district must recommend the use of aversive interventions in the student's IEP; and

- a Massachusetts Probate Court judge—after assigning an independent attorney to represent each student's interests and funding an expert retained by that attorney—reviews each student's individual circumstances and, after holding a hearing, approves the use of aversive interventions with that student.

37.     MA DDS and MA EEC regulate and closely monitor the use of aversive interventions at JRC, including the use of skin shock. JRC goes through periodic rigorous reviews (at least every two years) by MA DDS to remain certified to use "Level III" treatment

procedures. Level III procedures include the use of aversive interventions. *See* 115 MASS. CODE

REGS. § 5.14 *et. seq.*;  102 MASS. CODE REGS. § 3.06(11).

38.     The principal form of aversive intervention used by JRC is the Graduated

Electronic Decelerator device (the "GED").  The United States Food and Drug Administration

has cleared the GED and JRC is its FDA-registered manufacturer.

39.     The GED consists of a transmitter operated by the JRC staff and a

receiver/stimulator worn by a student.  The receiver/stimulator delivers a low-level surface

application of electrical current to a small area of the student's skin (usually an arm or leg) only

upon command from the transmitter.  The GED has the following factory-fixed settings: a

current of 15 milliamperes RMS; a duration of 2 seconds; a rectangular, unipolar waveform with

a duty cycle of 25%; and a pulse repetition frequency of 80 per second (80 hz).

40.     Although every JRC student receives individualized care, a student who has the

GED as a component of their overall treatment receives, on average, less than one GED

application per week.  Pursuant to a fading protocol, use of the GED can be removed entirely

from a student's treatment program, or reduced to very minimal usage, when his or her behavior

improves sufficiently.

41.     The use of the GED has proven extremely effective in treating students' severe

problematic behavior.  These behaviors often drop rapidly to zero or near zero levels once

treatment with the GED begins.  Typically, a student who is otherwise too disruptive to make

meaningful academic progress will begin making substantial progress shortly after skin shock

treatment becomes a supplement to his or her behavioral plan.

42.     In JRC's experience, students exhibit few and very minor, if any, adverse

consequences from treatment with the GED.  The possible side effects may be a temporary

reddening or dark mark on the skin, both of which clear up within a few minutes or, at most, a few days.  On very rare occasions, a small blister may appear if the device is not making full contact with the skin.

43.     JRC has used other aversive interventions when a student exhibits severe problematic behavior.  For example, JRC has used a stronger version of the GED known as the GED-4.  JRC has also used a specially-designed helmet equipped with a faceguard or similar mechanism that prevents its removal.  Similarly, JRC staff have utilized manual or mechanical movement limitations.

44.     JRC has also employed carefully-controlled food programs that enable students to earn certain foods by exhibiting certain behaviors or refraining from inappropriate behaviors.  A nutritionist oversees the meals provided at JRC and ensures that each JRC student receives an appropriate caloric intake and maintains a proper weight.  In addition, JRC medical staff—including a licensed, board-certified physician—also regularly monitor students' weight, health, and overall well-being.

45.     These measures are used for treatment purposes so that a student is able to receive a FAPE, develop basic self-help and social skills inherent in daily-life, and engage in meaningful educational, vocational, and social opportunities.

***The Students Continue to Exhibit Severe Problematic Behaviors and Require Aversive Interventions to Address their Particular Circumstances.***

46.     D.B. has been diagnosed with Intermittent Explosive Disorder, Pervasive Developmental Disorder NOS, and mild mental retardation.  D.B. has a history of dangerous and disruptive behaviors, such as physical assaults upon family members, classmates, and treatment staff; spitting at others; and tantrums in the middle of a busy road.  D.B. has also engaged in destructive, disruptive, and non-compliant behaviors, such as: destruction of

computer and other equipment; screaming, yelling, and swearing; and refusals to follow basic directions from staff.

47.     Prior to his admission at JRC, D.B.'s treatment included: psychiatric hospitalizations and counseling; special education programs at public and private schools; applied behavior analysis; the use of "time out" rooms; play therapy; individual teaching assistance; and 1-1 staffing.   D.B. was also prescribed anti-psychotic and psychotropic medications, such as Ativan, Inapsene, Neurontin, Paxil, Risperdal, Seroquel, Tenex, and Zoloft. These treatments were unsuccessful in treating D.B.'s severe behavior disorders and he continued to exhibit aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors.  As a result, D.B. failed to make educational progress and his behaviors prevented him from receiving a FAPE.

48.     D.B. has attended JRC since September 2004 where he has received positive-only treatment, including intensive educational instruction, ongoing functional behavioral assessment, behavioral counseling, group counseling, programmed learning opportunities, and reinforcement behavior contracts.  However, D.B. has continued to exhibit severe problematic behaviors that prevent D.B. from making meaningful educational, behavioral, or developmental progress.  For example, he has engaged in head-banging, attempted to strangle himself, disrobed in public, physically assaulted staff and others, and destroyed JRC property.  These behaviors prevent D.B. from receiving a meaningful education and FAPE.

49.     B.G. has been diagnosed with Autism and Mental Retardation.  B.G. has a history of dangerous and disruptive behaviors, such as head-banging, punching, other physical assaults upon himself and others, and throwing objects at people.  For example, B.G. repeatedly pulled his younger brother—while sleeping—out of the bed at night and physically assaulted him,

forcing B.G.'s mother and younger brother to sleep in a locked room to ensure their safety.  B.G. has also been hospitalized on more than one occasion for similarly violent and aggressive behavior.

50.     Prior to his admission at JRC, B.G.'s treatment included:  special education programs; use of a sensory tent; home-schooling with an aide seven days a week; and psychiatric hospitalizations.  B.G. was also prescribed anti-psychotic and psychotropic medications, such as Clonidine, Cogentin, Risperdal, and Seroquel.  These treatments were unsuccessful in treating B.G.'s severe behavior disorders and he continued to exhibit aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors.  For instance, B.G.'s mother has reported that B.G.'s home aide refused to return due to fear of B.G.'s problematic behaviors.  As a result, B.G. failed to make educational progress and, at times, had to be isolated from his classmates to ensure their safety.  B.G.'s behaviors also prevented him from receiving a FAPE

51.     B.G. has attended JRC since September 2008 where he has received positive-only treatment, including working with a behavior management paraprofessional on a 1:1 basis for up to 16 hours a day, as well as speech and language therapy sessions.  However, B.G. has continued to exhibit severe problematic behaviors that prevent B.G. from making meaningful educational, behavioral, or developmental progress.  For example, B.G. has forcefully grabbed and head-butt staff members on numerous occasions, ripping their clothing in the process, and grabbed eyeglasses off of staff members' faces.  Other staff members injured themselves when attempting to block or parry B.G.'s repeated punches.  B.G. has also engaged in destructive, disruptive, and non-compliant behaviors, such as: disrobing and masturbating in public; inappropriate release of bodily fluids; and refusing to follow directions or prompts.  These behaviors prevent B.G. from receiving a meaningful education and FAPE.

52.     A.J. has been diagnosed with Autism and Mental Retardation.  A.J. has a history of dangerous and disruptive behaviors, such as picking at her gums to the point of bleeding, lacerating her tongue with her finger nails, and punching and scratching staff members in the head, face, and eye.  A.J. has also engaged in destructive, disruptive, and non-compliant behaviors, such as: banging on walls; disrobing at inappropriate times; yelling; and spitting at others.

53.     Prior to her admission at JRC, A.J.'s treatment included: special education services in public and private schools; instruction in self-contained classrooms; in-home consultations; speech and occupational therapy; and psychiatric hospitalization.  A.J. was also prescribed psychotropic medications, such as Abilify, Klonopin, Risperdal, Seroquel, Thorazine, Topomax, and Zyprexa.  These treatments were unsuccessful in treating A.J.'s severe behavior disorders and she continued to exhibit aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors.  A.J. also experienced increased appetite and weight gain while on psychotropic medications.  As a result, A.J. failed to make educational progress and her behaviors prevented her from receiving a FAPE.

54.     A.J. has attended JRC since March 2007 where she has received positive-only treatment, including included working with a behavior management paraprofessional on a 1:1 basis for up to 16 hours a day, as well as speech therapy sessions.  However, A.J. has continued to exhibit severe problematic behaviors that prevent A.J. from making meaningful educational, behavioral, or developmental progress.  For example, A.J. has: grabbed, kicked, bitten, scratched, and head-butted JRC staff; attempted to eat inedible objects, such as fecal matter; engaged in head-banging; and poked herself in the eye.  These behaviors prevent A.J. from receiving a meaningful education and FAPE.

55.     D.P. has been diagnosed with Mood Disorder NOS.  D.P. has a history of dangerous and disruptive behaviors, such as physical assaults upon family members and staff; attempts to choke staff and others; punching a window; and throwing objects at others.  D.P. has also engaged in destructive, disruptive, and non-compliant behaviors, such as: running away from staff; attempts to set a ceiling on fire; and property destruction.

56.     Prior to his admission at JRC, D.P.'s treatment included: out-patient psychiatric consultations; counseling; quiet rooms; multiple psychiatric hospitalizations; and stays at residential rehabilitation centers.  D.P. was also prescribed anti-psychotic medication such as Seroquel and psychotropic medication like Depakote.  These treatments were unsuccessful in treating D.P.'s severe behavior disorders and he continued to exhibit aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors.  As a result, D.P. failed to make educational progress and his behaviors prevented from receiving a FAPE.

57.     D.P. has attended JRC since December 2008 where he has received positive-only treatment, including behavioral counseling, behavioral contracts, staffing on a 1:1 basis, and the use of individual classrooms / conference rooms.  However, D.P. has continued to exhibit severe problematic behaviors that prevent D.P. from making meaningful educational, behavioral, or developmental progress.  For example, D.P. has punched and attempted to choke JRC staff with sufficient force to require staff medical attention, defaced JRC property, and engaged in intentional and inappropriate urination.  These behaviors prevent D.P. from receiving a meaningful education and FAPE.

58.     J.R. has been diagnosed with Pervasive Developmental Disorder—Asperger's Disorder and Intermittent Explosive Disorder.  J.R. has a history of dangerous and disruptive behaviors, such as head-banging, attempts to stab himself, and physical attacks upon family

members, classmates, and others.  J.R. has also engaged in destructive, disruptive, and non-compliant behaviors, such as: property destruction; screaming, swearing, and spitting upon others; and intentional and inappropriate urination.

59.     Prior to his admission at JRC, J.R.'s treatment included: group and individual counseling; the use of a crisis paraprofessional; occupational and speech therapy; stays in day and residential facilities; and psychiatric hospitalizations.  J.R. was also prescribed psychotropic medications, such as Abilify, Depakote, Lithium, Seroquel, and Tenex.  These treatments were unsuccessful in treating J.R.'s severe behavior disorders and he continued to exhibit aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors.  As a result, J.R. failed to make educational progress and his behaviors prevented him from receiving a FAPE.

60.     J.R. has attended JRC since October 2008 where he has received positive-only treatment, including staffing on a 1:1 basis and highly-restrictive residences.  However, J.R. has continued to exhibit severe problematic behaviors that prevent J.R. from making meaningful education, behavioral, or developmental progress.  For example, he has attacked younger and small classmates, both by hand and with blunt objects; bitten JRC staff with sufficient severity to require staff medical attention; attempted to stab JRC staff with sharp objects; and caused thousands of dollars in damage to JRC property by, among other things, punching holes in walls. These behaviors prevent J.R. from receiving a meaningful education and FAPE.

61.     S.T. has been diagnosed with Autism and Moderate Mental Retardation.  S.T. has a history of dangerous and disruptive behaviors, such as forcing his hand down his throat; head-banging; and physical assaults upon himself, family members, and others.  In particular, S.T. has repeatedly pulled out of his teeth by sheer brute force to the point where S.T. only has 8 permanent teeth, while a person typically has 32 permanent teeth.  S.T. has also engaged in

destructive, disruptive, and non-compliant behaviors, such as: property destruction; yelling; and refusals to follow directions.

62.     Prior to his admission at JRC, S.T.'s treatment included: special education services; placement at a residential facility; speech and occupational therapy; Applied Behavior Analysis services; and staffing on a 1:1 basis.  S.T. was also prescribed anti-psychotic medication, such as Zyprexa.  These treatments were unsuccessful in treating S.T.'s severe behavior disorders and he continued to exhibit aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors.  As a result, S.T. failed to make educational progress and his behaviors prevented him from receiving a FAPE.

63.     S.T. has attended JRC since March 2009 where he has received positive-only treatment, including placement in residences and classrooms with a low ratio of staff to students, and the use of arm splints.  However, S.T. has continued to exhibit severe problematic behaviors that prevent S.T. from making meaningful educational, behavioral, or developmental progress. For example, S.T. has repeatedly shoved his hand down his throat and attempted to pull out his teeth.  S.T. has also engaged in public masturbation and property destruction.  These behaviors prevent S.T. from receiving a meaningful education and FAPE.

64.     G.T. has been diagnosed with Autism and Mental Retardation.  G.T. has a history of dangerous and disruptive behaviors, such as: head-banging with sufficient force to cause a stroke and permanent scar tissue on his head and threaten a fatal hemorrhage; hitting himself in the chest; and physical assaults upon others.  G.T. has also engaged in destructive, disruptive, and non-compliant behaviors, such as disrobing, property destruction, and punching of walls.

65.     Prior to his admission at JRC, G.T.'s treatment included various residential placements both in and out of New York State.  G.T. was also prescribed psychotropic

medications, such as Abilify, Catepres, and Klonopin. These treatments were unsuccessful in treating G.T.'s severe behavior disorders and he continued to exhibit aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors. As a result, G.T. failed to make educational progress and his behaviors prevented from receiving a FAPE.

66.     G.T. has attended JRC since February 2008 where he has received positive-only treatment, including a crisis paraprofessional, individual and group therapy, speech and language therapy, occupational therapy, and staffing with a low student-to-staff ratio. However, G.T. has continued to exhibit severe problematic behaviors that prevent G.T. from making meaningful educational, behavioral, or developmental progress. For example, he has banged his head against a wall and desk with sufficient force to cause large swelling in his head and face. In July 2009, G.T. was hospitalized after his excessive head-banging resulted in a stroke and a permanent abnormality in his gait. G.T. has also slammed his wrists against a desk, cutting his hand. These behaviors prevent G.T. from receiving a meaningful education and FAPE.

67.     Trained clinicians—based upon their professional judgment, first-hand experience with each Student, and review of the Student's behaviors and responses to other treatment—have determined that it is necessary to supplement the Students' ongoing educational and treatment program with aversive interventions. They have also concluded that all prior treatments, including heavy dosages of potent psychotropic medications, have not successfully treated the Students' severe behavior disorders. The lack of effective treatment has prevented the Students from receiving a FAPE. As a result, the Students must now have access to aversive interventions to make meaningful academic progress in the least-restrictive environment available to them and to receive a FAPE.

***Defendants promulgated Regulations that Deny Plaintiffs Any Access to Aversive
Interventions***

68.     Defendants, however, have embarked on a deliberate and systematic effort to

deny the Students any access to aversive interventions to treat their severe problematic behaviors

effectively.  Such arbitrary, capricious, and meritless actions contradict the individual

educational needs of the Students, the express wish of Plaintiffs, and the recommendations of

JRC staff who are intimately involved with the Student's education, care, and well-being.  The

Regulations place the Students at risk of physical harm and prevent their receipt of a FAPE.

69.     JRC has been an approved, out-of-state placement for New York State students

since the 1970s.  Over the years, NYSED has monitored JRC's behavioral treatment program

closely and conducted regular and far-reaching quality assurance reviews of JRC, its staff, its

policies, and its procedures, including JRC's use of aversive interventions.

70.     Defendants abruptly changed their position on aversive interventions in 2006 and

have since severely restricted and prohibited the use of aversive interventions.  On June 23,

2006, Defendants promulgated new regulations that radically curtailed the use of aversive

interventions (collectively, the "Regulations").  *See* Notice of Emergency Adoption and

Proposed Rule Making, dated June 20, 2006.

71.     Peer-reviewed scientific literature supports the use of aversive interventions and

their vital role in providing a FAPE to students with severe behavior disorders.  Peer-reviewed

scientific literature does not support the Regulations' restrictions and ban on the use of aversive

interventions.

72.     For example, when the Regulations were adopted, Defendants cited a handful of

scientific literature articles for support, such as an article by Dorothea C. Lerman and Christina

M. Vorndran entitled, "On the Status of Knowledge for Using Punishment:  Implications for

Treating Behavior Disorders" that appeared in the Journal of Applied Behavior Analysis. *See* 28

N.Y. REG. at 12 (July 12, 2006). A review of the cited literature reveals that they do <u>not</u> support

the Regulations, despite Defendants' attempts to distort their contents. For example, Defendants

asserted that the Lerman and Vorndran article supports the limited use of aversive interventions

to treat only a narrow set of behaviors (*i.e.*, "aggressive" and "self-injurious" behaviors). The

actual article, however, does not support such limited use of aversive interventions.

73.     The Regulations arbitrarily declare that aversive interventions can only be used to

treat "self-injurious" and "aggressive" behavior. *See* 8 N.Y.C.R.R. § 200.22(e)(1). The

Regulations, however, offer no meaningful guidance as to what constitutes a "self-injurious" or

"aggressive" behavior. Moreover, they give no consideration to the severity of an individual's

circumstances, their unique educational needs, or their lack of other effective alternatives.

74.     The Regulations further prohibit the use of physical or mechanical restraint with

aversive interventions, without exception. *See id.*, § 200.22(f)(2)(ix). This contradicts a

fundamental principle of behavioral psychology, namely that appropriate treatment should be

administered as soon as possible once problematic behaviors occur. Furthermore, it

compromises the ability of staff to address severe behavior in a safe, efficient, and controlled

fashion. The Regulations also ban the use of any automated aversive conditioning device under

any circumstances, contradicting the Lerman and Vorndran article entitled, "On the Status of

Knowledge for Using Punishment: Implications for Treating Behavior Disorders." *See id.*, §

200.22(f)(2)(viii).

75.     The Regulations further require school districts to consult panels about whether a

student is entitled to a "child-specific exception" that allows the use of aversive interventions.

*See id.*, § 200.22(e)(4). The Regulations, however, do not require—let alone ensure—that the

panels have the necessary background, training, and experience required for such critical

determinations.  The panels do not meet, interview, or examine the individual or those charged

with his or her education, treatment, and care.  The Regulations do not require that the panels

review all the necessary information, including the full educational, medical, and treatment

records.  *See id.*, § 200.22(e)(5).

76.    The Regulations contain other unprecedented provisions concerning the use of

aversive interventions that are not necessary for their safe and effective application, such as:

- limiting them to the shortest duration and lowest intensity possible;

- requiring prior testing and approval by the United States Food and Drug Administration; and

- insisting upon clinical peer-reviewed studies regarding the safety and effectiveness of their magnitude, frequency, and duration.

*See id.*, § 200.22(f)(2)(vii) and (viii).  Defendants impose no comparable restrictions or

regulations upon the administration of anti-psychotic or other psychotropic medications, despite

their widely-known risks.  Because aversive interventions are typically used for the rarest and

most severe cases of behavior disorders, these Regulations serve no purpose other than to make it

difficult, if not impossible, to use aversive interventions.

77.    Although the Regulations are generally applicable, they have targeted New York

State students with severe behavior disorders who cannot be effectively treated by other means

and require aversive interventions to receive a FAPE, many of whom attend JRC.

78.    Defendants adopted all of the Regulations on an "emergency" basis, announcing

that:

Emergency action to adopt the proposed rule is necessary for the
preservation of the public health and safety in order to minimize

> the risk of physical injury and/or emotional harm to students who
> are subject to aversive behavioral interventions that inflict pain or
> discomfort [.]

28 N.Y. REG. at 11 (July 12, 2006).

79.    Defendants further announced draconian penalties for violations of the

Regulations, whether real or alleged.  *See* 8 N.Y.C.R.R. § 200.7(a)(3)(IV).

80.    Every New York State student attending JRC in the Summer of 2006 was

subjected to the Regulations when they became effective on June 23, 2006.  Those Regulations

severely harmed New York State students by negatively affecting their educational and

developmental progress and denying them a FAPE.  As one New York State impartial hearing

officer wrote:

> Student's remarkable progress at [JRC] came to an abrupt and
> unfortunate halt upon the issuance of the [Regulations] … and the
> immediate stoppage by [JRC] of its aversive therapies, in late June
> of 2006, as they related to Student's Disruptive, Destructive and
> Non-Compliant behaviors ….  The contrast between Student's
> availability for academic instruction when Level III aversives are
> employed and his non-availability when they are not could not be
> more clear.  When [JRC] is able to utilize aversive interventions,
> Student makes "tremendous" and "exceptional" academic
> progress.  When aversives are not employed, [Student] does not.

Findings of Fact and Decision, Case No. 109017, dated Aug. 15, 2007, at 15 (discussing a former

JRC student from New York State).

81.    Defendants later revised the Regulations unilaterally without scheduling or

convening any public hearing.  *See* 28 N.Y. REG. at 13-18 (Nov. 15, 2006).  Among the new

provisions was the requirement that only "appropriately licensed professionals"—a phrase the

Regulations never defined—or "certified special education teachers" can administer aversive

interventions or directly supervise those who do.  *See* 8 N.Y.C.R.R. § 200.22(f)(4).  This

Regulation is unnecessary for the safe and effective application of aversive interventions and only serves to make the treatment more expensive and difficult to provide.

      82.    Defendants also announced a ban on aversive interventions after June 30, 2009, stating that:

> A child-specific exception to the prohibition of the use of aversive interventions … may be granted for a school-age student … only during the 2006-2007, 2007-2008 and 2008-2009 school years [.]

8 N.Y.C.R.R. § 200.22(e).  Defendants have made it impossible for the Students to receive aversive interventions for <u>any</u> behaviors either now or in the future, regardless of their severity, intensity, or their interference with the Students' receipt of a FAPE.

### The Regulations Have Been Flawed from the Outset and Lack Professional Merit, as Evidenced by NYSED's Own Personnel

      83.    Before the Regulations were adopted, NYSED claimed that they were necessary in light of "serious problems" it had uncovered.  For example, NYSED urged that the Board of Regents' adoption of the Regulations on an "emergency" basis was "necessary for the preservation of the public health and safety [.]"  Memorandum from Rebecca H. Cort, NYSED Deputy Commissioner, to the Board of Regents' EMSC-VESID Committee, dated June 6, 2006, at p. 4.  NYSED further claimed that such unilateral action was needed to "minimize the risk of physical injury and/or emotional harm to students who are subject to aversive behavioral interventions that inflict pain or discomfort [.]"  *Id.*  NYSED also took unusual steps to announce and herald publicly its "serious concerns for the health, safety, privacy and dignity" of students attending JRC.  NYSED Press Release, dated June 14, 2006.

      84.    Months later, NYSED personnel involved in promulgating the Regulations acknowledged, under oath, that these professed "concerns" lacked factual substance.  Similarly,

NYSED personnel were unaware of <u>any</u> student who suffered <u>any</u> long-term adverse effects from aversive interventions.

85.     Defendants later designated a psychologist to address "the justification for and propriety of" the Regulations.  That hand-picked expert admitted that the Regulations lack scientific support and are fueled by philosophical concerns.  That expert was personally aware of "several dozen" peer-reviewed, professional articles on the use of skin shock, such as the GED.

86.     Defendants' expert further disputed several fundamental provisions of the Regulations.  For example, Defendants' expert:

- agreed that limiting treatment such as aversive interventions to only "self-injurious" and "aggressive" behaviors is inconsistent with professional standards;

- conceded that the use of automatic aversive conditioning devices may be appropriate to treat severe behaviors and is supported by peer-reviewed, published literature;

- recognized the importance of treating the broader range of behaviors (such as destructive, disruptive, or non-compliant actions) that interfere with a student's participation in school and community activities;

- acknowledged that the combined use of restraint and aversive interventions does not contradict any professional standards and, to the contrary, may be appropriate under the circumstances; and

- has his own direct care staff administer aversive intervention-like treatment techniques, even though they lack any license or certification and often administer the treatment without direct observation from a supervisor.

87.     More importantly, Defendants' own expert unequivocally rejected the Regulations' outright ban on aversive interventions.

88.     The Students require aversive interventions to address their severe problematic behaviors effectively, to receive a FAPE, and to make meaningful education, developmental, and

behavioral progress.  One Student recently told his father that the Student cannot control his behavior, that aversive interventions would help him, and expressly wished that aversive interventions were part of his overall treatment.

89.     Each and every Plaintiff: (a) has been fully informed about the nature of aversive interventions and their proposed use with his or her child; (b) supports the use and availability of aversive interventions to address all of the Students' individual needs; (c) has consented, in writing, to such use of aversive interventions; and (d) opposes the Regulations and their restrictions on the availability and use of aversive interventions to address all of their children's individual needs.

90.     Defendants and their Regulations have prevented the Students from receiving any treatment with aversive interventions, which is necessary for their individualized educational and behavioral needs.  Defendants' conduct has also denied Plaintiffs access to a FAPE.  Since Defendants have denied them any meaningful relief, Plaintiffs now bring this action.

## COUNT I
### (Violations of the Individuals with Disabilities Education Act ("IDEA"))

91.     Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through 90 as though each were separately and specifically set forth herein.

92.     The IDEA guarantees that "[a] free appropriate education is available to all children with disabilities."  20 U.S.C. § 1400(d)(1)(A).  Under the IDEA, the Students are children with disabilities.  *See id.*, § 1401(3).

93.     By their actions, Defendants are denying the Students a FAPE in the least-restrictive environment by prohibiting their access to safe, effective treatment for their particular needs.  In addition, Defendants are denying Plaintiffs with the meaningful opportunity to participate in the development of an IEP for their child that is likely to yield progress.

94.     As a result, Plaintiffs have suffered and are suffering irreparable harm, have no adequate remedy at law, and are entitled to injunctive relief.

**COUNT II**
**(Violations of the IDEA)**

95.     Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through 94 as though each were separately and specifically set forth herein.

96.     When the State acts under the IDEA, it must comply with certain substantive and procedural guidelines. *See* 20 U.S.C. § 1407(a).  "[A]ny State rules, regulations, and policies relating to [the IDEA]" must conform to the IDEA's purposes. *Id.*, § 1407(a)(1).  When a State promulgates any regulations that are not required by the IDEA, they are required to provide notice to the Secretary of the United States of the Department of Education. *See id.*, § 1407(a)(2).  Further, States are cautioned to minimize the number of regulations to which local educational agencies and schools are subject to under the IDEA. *See id.*, § 1407(a)(3).

97.     An integral purpose of the IDEA is to, among other things, "ensure that all children with disabilities have available to them a [FAPE] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]" *Id.*, § 1400(d)(1)(A) (emphasis added).

98.     State regulations must comply with the State's obligation to provide all children with disabilities a free appropriate public education.  The state regulations must assure that the requisite FAPE is tailored to meet the individual needs of each child, as reflected in his or her IEP. *See id.*, § 1414(d); *see also* § 1401(9).

99.     By adopting regulations that make across-the-board decisions regarding the appropriate treatment for children with disabilities, which are not individualized or based upon

each child's unique needs, Defendants have acted in abrogation of the IDEA's purpose and in a manner which is in contradiction to the provisions of the IDEA.

100.    In addition to being in contradiction to the provisions of the IDEA, the Regulations are not required by the IDEA.  Further, by enacting the Regulations, Defendants have failed to appropriately minimize the number of regulations to which local educational agencies are subject to under the IDEA.

101.    As a result, Defendants have exceeded their rulemaking authority under the IDEA.

102.    Accordingly, Plaintiffs are entitled to a declaration that the Regulations are unlawful, *ultra vires*, invalid, and unenforceable as inconsistent with and in violation of the provisions of the IDEA.  *See id.* § 1407(a).

103.    As a result, Plaintiffs have suffered and are suffering irreparable harm, have no adequate remedy at law, and are entitled to injunctive relief.

## COUNT III
### (Violations of Substantive Due Process Rights)

104.    Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through 103 as though each were separately and specifically set forth herein.

105.    The Constitutions of the United States and New York, as well as New York law, provide the Students with rights concerning their education, habilitation, and treatment.

106.    By their actions, Defendants are violating the Students' rights to education, habilitation, and treatment by depriving them of necessary education and treatment.

107.    By their actions, Defendants have acted in a manner devoid of sound professional judgment by, *inter alia*, failing to consider the individual educational needs of the Students and harm and other consequences of their actions.

108.    By their actions, Defendants have unlawfully deprived the Students of safe and effective psychological treatment that is necessary for their health, well-being, and educational progress.

109.    As a result, Plaintiffs have suffered and are suffering irreparable harm, have no adequate remedy at law, and are entitled to injunctive relief.

**COUNT IV**
**(Violations of the Rehabilitation Act)**

110.    Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through 109 as though each were separately and specifically set forth herein.

111.    All New York students—including disabled children—are entitled to a FAPE under the state Constitution.  *See* NY Const. Art. XI, § 1.  The State must also ensure that each child is provided with an educational program appropriate to his or her needs.

112.    The Rehabilitation Act, 29 U.S.C. § 701, *et seq*., protects disabled individuals from discrimination in public services.  NYSED and the Board are recipients of Federal financial assistance.

113.    The Students are disabled due to their cognitive, psychological, and psychiatric impairments that require treatment with aversives to control their behaviors and enable them to receive a FAPE.

114.    By their actions set forth above, Defendants have discriminated against the Students on the basis of their disability in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, as amended by the Civil Rights Restoration Act of 1987.

115.    As a result, Plaintiffs have suffered and are suffering irreparable harm, have no adequate remedy at law, and are entitled to injunctive relief.

## COUNT V
### (Violations of Equal Protection Rights)

116.    Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through 115 as though each were separately and specifically set forth herein.

117.    The Fourteenth Amendment to the United States Constitution and the New York State Constitution provide that "[n]o person shall be denied the equal protection of the laws." NY Const. Art. I § 11.

118.    The Students and Parents are all New York residents.  All New York students have a right to free public education under the New York Constitution.  *See id.*, Art. XI, § 1.

119.    By their actions set forth above, Defendants have violated the Equal Protection rights of the Students by impermissibly treating them differently than other New York students and other disabled New York students, including those whom Defendants allow to receive aversive interventions to treat their severe problematic behaviors by virtue of a "grandfather" clause in the Regulations.  Defendants have also acted arbitrarily, capriciously, unreasonably, and in bad faith.

120.    As a result, Plaintiffs have suffered and are suffering irreparable harm, have no adequate remedy at law, and are entitled to injunctive relief.

## COUNT VI
### (Violations of Procedural Due Process Rights)

121.    Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through 120 as though each were separately and specifically set forth herein.

122.    The Due Process Clause of both the United States Constitution and the New York State Constitution states that no person "shall be deprived of life, liberty or property without due process of law."  U.S. Const. Amend. XIV;  N.Y. Const. Art. I, § 6.

123.    By their actions set forth above, Defendants have failed and continue to fail to provide the Parents and Students with notice and an opportunity to be heard regarding the Defendants' ban and/or restrictions on the use of aversives.  The enactment and implementation of the Regulations by Defendants violate the Due Process Clauses of the Fourteenth Amendment of the United States Constitution and Article I, § 6 of the New York State Constitution.

124.    As a result, Plaintiffs have suffered and are suffering irreparable harm, have no adequate remedy at law, and are entitled to injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

(a)    Preliminarily and permanently enjoining Defendants—together with their employees, agents, and all persons acting in concert with or on behalf of them—from directly or indirectly enforcing the Regulations;

(b)    Declaring the Regulations invalid on the grounds that they violate the Individuals with Disabilities Education Act, as well as New York Education Law and Regulations;

(c)    Declaring the Regulations invalid on the grounds that they violate Plaintiffs' substantive due process rights under Federal and state law;

(d)    Declaring the Regulations invalid on the grounds that they violate the Rehabilitation Act;

(e)    Declaring the Regulations invalid on the grounds that they violate Plaintiffs' equal protection rights under both the Fourteenth Amendment to the U.S. Constitution and the New York Constitution;

(f)    Declaring the Regulations invalid on the grounds that they violate the Plaintiffs' constitutional procedural due process rights;

(g)    Granting Plaintiffs their attorneys' fees, together with interest and costs; and

(h)     Granting such other and further relief as this Court may deem just and proper.


Date:  January 8, 2010              Attorneys for PLAINTIFFS,


By:  s/ Michael P. Flammia
Michael P. Flammia (Bar Roll No. 106355)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
Two International Place, 16th Floor
Boston, Massachusetts 02110
617.342.6800

Jeffrey J. Sherrin (Bar Roll No. 102601)
O'CONNELL AND ARONOWITZ, P.C.
54 State Street
Albany, New York 12207-2501
518.462.5601

Meredith H. Savitt (Bar Roll No. 601191)
LAW OFFICE OF MEREDITH SAVITT, P.C.
636 Delaware Avenue
Delmar, New York 12054
518.475.9844