# EXHIBIT 13

## FINDINGS OF FACT AND DECISION

Case Number:              109017

Student's Name:           S███ F███-T███

Date of Birth:            ████████████

District:                 #15

Hearing Requested by:     Parent

Dates of Hearing:         March 16, 2007
                          May 14, 2007
                          June 13, 2007
                          June 25, 2007
                          June 28, 2007
                          July 17, 2007
                          July 26, 2007

Hearing Officer:          James P. Walsh, Esq.

Impartial Hearing Officer's Decision
Case No.  109017

2

---

## NAMES AND TITLES OF PERSONS WHO APPEARED ON MARCH 16, 2007

| | | |
|---|---|---|
| Anton Papahkin | Attorney | Parent |
| Ralph Antonelli | Director of Quality Control, Judge Rotenberg Educational Center | Parent |
| Patricia Collins | Chairperson Designee CSE Region 8 | Department of Education |
| Beatrice Duarte | Interpreter | Impartial Hearing Office |

## NAMES AND TITLES OF PERSONS WHO APPEARED ON MAY 14, 2007

| | | |
|---|---|---|
| Anton Papahkin | Attorney | Parent |
| L███H██████ | Parent | |
| Andre Vlok (Via Telephone) | Clinician Judge Rotenberg Educational Center | Parent |
| Patricia Collins | Chairperson Designee, CSE Region 8 | Department of Education |
| Andrew Rona | Interpreter | Impartial Hearing Office |

## NAMES AND TITLES OF PERSONS WHO APPEARED ON JUNE 13, 2007

| | | |
|---|---|---|
| Anton Papahkin | Attorney | Parent |
| Andre Vlok (Via Telephone) | Clinician Judge Rotenberg Educational Center | Parent |
| Patricia Collins | Chairperson Designee CSE Region 8 | Department of Education |

## NAMES AND TITLES OF PERSONS WHO APPEARED ON JUNE 25, 2007

| | | |
|---|---|---|
| Anton Papahkin | Attorney | Parent |
| Patricia Collins | Chairperson Designee CSE Region 8 | Department of Education |
| Fred Alvarez | School Social Worker | Department of Education |

## NAMES AND TITLES OF PERSONS WHO APPEARED ON JUNE 28, 2007

| | | |
|---|---|---|
| Anton Papahkin | Attorney | Parent |
| Patricia Collins | Chairperson Designee CSE Region 8 | DOE |
| Fred Alvarez | School Social Worker | Department of Education |

## NAMES AND TITLES OF PERSONS WHO APPEARED ON JULY 17, 2007

| | | |
|---|---|---|
| Anton Papahkin | Attorney | Parent |
| Patricia Collins | Chairperson Designee CSE Region 8 | Department of Education |
| Lourdes Licea | School Psychologist | Department of Education |

Impartial Hearing Officer's Decision
Case No.  109017                                                                                              3

---

## NAMES AND TITLES OF PERSONS WHO APPEARED ON JULY 26, 2007

Anton Papahkin               Attorney                      Parent
Patricia Collins             Chairperson Designee          Department of Education
                             CSE Region 8

Impartial Hearing Officer's Decision                                                                 4
Case No. 109017

---

The Matter of S██████F-T., (hereinafter referred to as "Student"), first came before me for determination in accordance with the provisions of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §1415(f)(1) and Article 89 of the Education Law of the State of New York on March 16, 2007, and thereafter on May 14, 2007, June 13, 2007, June 25, 2007, June 28, 2007, July 17, 2007 and July 26, 2007. At the conclusion of proceedings, the representative of the New York City Department of Education requested time to prepare and submit a Post-Hearing Memorandum for my consideration. Such request was granted and the Record Close Date of August 8, 2007 was established. Department's Post-Hearing Memorandum was timely submitted and has been reviewed.

The proceeding was commenced on behalf of Parent by correspondence from Educational Advocacy Service to the Impartial Hearing Office, dated January 16, 2007, and received by the Impartial Hearing Office on January 17, 2007. The undersigned was appointed by the Impartial Hearing Office of the Department of Education of the City of New York to preside over this matter by notification also dated January 18, 2007.

The proceeding was commenced by Parent to challenge the appropriateness of the action taken by District's Committee on Special Education (CSE), that, on November 21, 2006, amended Student's previously-enacted Individualized Education Program, (IEP), dated June 7, 2006, so as to delete there from the provisions contained in Student's then Behavior Modification Plan that permitted the utilization of the Level III interventions of Movement Limitation Procedures and the Graduated Electronic Decelerator (GED) as aversive therapy.

The Parent moved, on March 16, 2007, for an Interim Pendency Order so as to determine the services to which Student was entitled to receive during the pendency of this administrative proceeding. On March 19, 2007, such Interim Order was issued, directing Student's school, the Judge Rotenberg Educational Center (JRC), to continue the implementation of Student's last-agreed-upon IEP, including the use of the Level III interventions of Movement Limitation Procedures and the Graduated Electronic Decelerator. Such Interim Order remains in effect.

Student is presently sixteen years eight months of age, having been born on ███████████. According to the record (Exhibit I), Student was one of twelve children. At the age of four, according to such record, Student was taken from his

biological mother because of negligence and drug abuse. However, according to the
testimony of Witness H█████, Student, at the age of two, was placed with a Child-
Protection agency, at which time Ms H█████, Student's grandmother, and her husband
became his foster parents. When Student was six years old, his grandparents formally
adopted Student. At about the same time, Student began displaying inappropriate conduct
at school, including fighting with other children, leaving the school without permission to
play in the park and becoming truant. In Sixth Grade, Student was placed in a special
school for students displaying behavioral problems, P. 369, where his inappropriate
behaviors continued, including his fighting with other students and truancy. While there
are no exhibits before me that relate to the programs provided to Student during these
years, Student, according to Parent, somehow was not permitted to attend at that facility
(Tr. at 81); so that Student remained home with Parents. According to Parent, Student's
behavior became even more problematical when Student's biological parent sought to
resume contact with Student. Such contact lasted a brief week, when Student's biological
parent found that she was unable to control Student and returned him to Parent. At this
time, according to Parent's testimony, Student was impossible to control. Student
constantly demanded money from his grandfather, who, at that time, was dying of cancer.
When his demands were rebuffed, Student would beat or choke his grandparent until his
demands were met.

Apparently the District and its CSE was working with Parent, because there was,
at some point, discussion with Parent regarding Student's placement at a residential
facility. Parent was furnished with informational pamphlets regarding possible
placements and, favoring a placement far from her residence and at a site where Student
could not easily return home, contacted the Judge Rotenberg Educational Center
regarding possible placement of Student at that facility. Such facility is located in Canton,
Massachusetts, a suburb of Boston. The Judge Rotenberg Educational Center is a New
York State-approved facility for students exhibiting severe emotional and behavioral
problems. Pursuant to a Psychological Evaluation completed in 2004, District's CSE
recommended Student be placed in the residential program at The Judge Rotenberg
Educational Center. Student began attending such Center on █████████, 2004 (Exhibit
I). Upon admission, it was noted that Student had a history of aggressive behaviors.
Student was afforded positive re-enforcers, counseling, medications and other

components directed at controlling his behaviors. In July of 2005, application was made to the Probate and Family Court of the Commonwealth of Massachusetts for approval of a proposed Behavior Modification Treatment Plan (Exhibit I), which application (Exhibit I) contains a full history of Student's background and diagnoses, as well as the various treatments- all unsuccessful - utilized by the facility to address Student's increasingly inappropriate behaviors. It is noted in such application that Student has been variously diagnosed as having an Oppositional Deficient Disorder, a Conduct Disorder, an Impulse Disorder Not Otherwise Specified, Attention Deficit Hyperactivity Disorder and a Personality Disorder. The application indicated Student's most appropriate diagnosis as Antisocial Personality Disorder. Formal IQ testing placed Student in the Average Range. An affidavit presented to that Court by Andre Vlok, Psy. D, Student's clinician at The Judge Rotenberg Educational Center, verified December 14, 2005 (Exhibit H), noted that Student exhibited serious aggressive, destructive and disruptive behaviors capable of causing injury to himself and others, injury to property and interference with Student's academic progress. After a review of the intensive positive programming that the School had offered to Student, as well as less intrusive behavior modification techniques that the School attempted, each without clinical success, Dr. Vlok urged the Court to adopt the proposed Behavior Modification Treatment Plan (Exhibit I). Such Behavior Modification Treatment Plan specifically included the use of Level III aversive therapy, including an electrical stimulation device referred to as the Graduated Electronic Decelerator that, by means of a transmitter operated by staff and a receiver worn by Student, would deliver a low-level surface application of electrical current to Student's skin. Also included in the Level III therapy were the utilization of Helmet, Movement Limitation and a Contingent Food Program (Exhibit I). It appears that the Proposed Behavior Modification Treatment Plan was, in some manner, amended before the Court acted upon it. However, such Proposed Amended Behavior Modification Treatment Plan is not part of the record before me. However, it appears that no substantial amendment was made, as the Court, by Decree dated December 16, 2005 (Exhibit 10), approved the use of the Proposed Amended Behavior Modification Treatment Plan, dated December 14, 2005 by the Judge Rotenberg Educational Center, specifically finding that Student "required treatment with such Plan to treat his problematic behaviors, keep him safe, help him progress academically and help him develop independent living skills." (Exhibit 10)  The Court

went on to note that the Center had "attempted less intrusive means of treatment since his arrival at the Center, without clinically sufficient success." The Court also noted that Student's prognosis with treatment with the Court-approved aversive procedures was cautiously optimistic, while Student's prognosis without such Court-approved aversive procedures was poor. The Court thereupon directed the implementation of the Behavior Modification Treatment Plan. The Center began implementation of the Plan, including the utilization of the GED, on December 23, 2005. It appears that the Center returned to the Probate and Family Court, Commonwealth of Massachusetts in April of 2006, again requesting Court approval of the continued utilization of the Proposed Amended Behavior Modification Treatment Plan, as the Court, on April 24, 2006, issued a further Decree (Exhibit F), in which the Court reviewed the Student's progress since the implementation of the aversive therapies. It noted that prior to such implementation, Student had exhibited aggressive behaviors at the rate of 31.9 times per week and health dangerous behaviors at the rate of 7.9 times per week, but that after the implementation of the aversive therapy and use of the GED, Student's aggressive behaviors were reduced to .5 times per week and his health dangerous behaviors to 0 times per week. Similarly, noted the Court, Student's rate of destructive behaviors had decelerated from 10.1 times per week to 0 times per week; his major disruptive behaviors from 227 times per week to .2 times per week; and his non-compliant behaviors from 52.4 times per week to .2 times per week. Significant to the Court was that Student had made notable academic progress. The Court again directed the full implementation of the Behavior Modification Treatment Plan, including the utilization of the GED, to continue.

District's CSE had met on June 7, 2006 to prepare Student's IEP for the 2006-2007 school year (Exhibit B)  The IEP continued Student's classification as having an Emotional Disturbance and continued his placement, on a twelve-month basis, at the Judge Rotenberg Center, a NYS approved Non-Public Residential School, the same residential setting the Student had attended in the 2004-2005 and 2005-2006 school years. Student's June 7, 2006 IEP (Exhibit B) contains a description of Student's Social/Emotional Performance, that notes that Student, over the past year, had continued to respond very well to the structure of his program and had proven that he can control his inappropriate behaviors. Student's Quarterly Report from the Judge Rotenberg Educational Center (Exhibit M) noted that, since going on the Level III interventions, all

his dangerous and disruptive behaviors had decelerated to near zero. Despite such observations, The Committee continued the utilization by the Judge Rotenberg Educational Center of aversive interventions including the continued use of the Graduated Electrical Decelerator. The Committee specifically approved Student's Behavior Intervention Plan that targeted the behaviors that interfered with Student's learning, identified therein as his "aggressive, destructive, health dangerous, noncompliant, major disruptive, educationally and socially interfering and inappropriate verbal behaviors". In describing the supports to be employed to help Student change his behavior, The Behavior Intervention Plan stated that:

> "[Student's] program is supervised by a clinician and is closely monitored by a case manager. He receives supervision 24 hours per day from educational and residential staff. All of JRC's staff are trained in physical crisis management procedures if needed in an emergency situation. JRC employs court ordered Level III interventions to include GED (Graduated Electronic Decelerator) and Movement Limitation to treat [Student's] major inappropriate behaviors including aggression, destruction, major disruptive, health dangerous and noncompliant behaviors."

On June 19, 2006, The New York State Board of Regents amended the provisions of Section 19 of the Rules of the Board of Regents, to be effective January 31, 2007, which, inter alia, prohibited the use of aversive interventions by , inter alia, an approved out-of-State day or residential school. On June 23, 2006, the Commissioner of Education issued an Emergency Regulation adding section 200.22 to Part 200 of the Commissioner's Regulations. Such addition established program standards for behavioral interventions that, in general, prohibited the use of aversive interventions, but made provision for an exception to such prohibition on a child-specific basis (8 NYCRR 200.22(e) and (f)). Germane to this review, child-specific exceptions are permitted only for students who are displaying self-injurious and/or aggressive behaviors that threaten the physical well-being of the student or that of others, but only when the procedures set out in such Regulations have been followed.

Immediately following the issuance of the Emergency Regulations, the staff of the Judge Rotenberg Educational Center ceased the implementation of the GED and Movement Limitations set out in its court-approved Behavior Modification Treatment

Impartial Hearing Officer's Decision
Case No. 109017                                                                                    9

Plan (Exhibit F) as it related to the categories of Disruptive Behavior, Destructive Behavior and Noncompliant Behavior. As a result of such cessation, according to Witness Volk, Student's reported violations in these areas, which had been previously successfully reduced to zero, soared into the hundreds. The Center has continued the use of the GED to address Student's self-injurious and aggressive behaviors without interruption. (Tr. at 207; 233) Through such continued implementation, Student's aggressive and self-injurious behaviors have remained controlled

Thereafter, a proceeding was commenced in the United States District Court for the Northern District of New York, entitled Jeanette Alleyne, et al v. New York State Department of Education, et al, in which parents of students at the Judge Rotenberg Educational Center, as well as the Center itself, sought injunctive and declaratory relief from the actions of the Board of Regents and the Commissioner of Education described above. (Exhibit D)  On October 2, 2006, the Court (Gary L. Sharpe, U.S.D.J.) continued an injunction, originally issued on September 8, 2006, that preliminarily enjoined the Defendants from enforcement of the newly-enacted Regulation concerning the use of aversive behavioral interventions as they pertained to students who 1) had an IEP that expressly permitted Level III interventions on June 23, 2006; 2) had a current behavioral intervention plan that specified the aversive intervention appropriate for each targeted behavior; 3) had a Massachusetts Probate Court order that authorized the use of Level III aversives; and 4) continued parental consent (Exhibit E). Student and Parent were parties to such suit and Student is clearly within the class that the injunction established. (Exhibit E)

Immediately following the issuance of the Federal Court injunction, the staff of the Judge Rotenberg Educational Center resumed the implementation of the GED and Movement Limitations set out in its court-approved Behavior Modification Treatment Plan for all approved categories.

District's CSE conducted a meeting on November 21, 2007 and modified Student's IEP. (Exhibit C)   Student's Academic Performance and Learning Characteristics were rewritten and shortened.  The Committee continued to utilize the Test/Evaluation information from his June 7, 2006 IEP, indicating his instructional level as ascertained by the administration of the KTEA on December 10, 2004, although, I note, there was a more current Educational Evaluation, utilizing the Woodcock-Johnson

III Tests of Achievement completed on July 21, 2006. (Exhibit J)  The description of Student's Social/Emotional Performance was also made more brief, with the notation that "over the past year, Student has continued to respond very well to the structure of his program". The primary thrust of the Committee action at the November 2006 meeting was the revision of Student's Behavior Intervention Plan so as to remove the use of aversive interventions. In describing the supports that would be used to help the student change the behavior, the Plan now reads:

> "[Student's] program (sic) is supervised by a psychologist and is closely monitored by a case manager.  He receives supervision 24 hours a day from educational and residential staff."

All Annual Goals and Short-term Objectives were continued by the Committee without change. It is with this IEP, and more specifically with the removal of aversive interventions from Student's Behavior Intervention Plan, that Parent takes issue.

Parent received notice of the scheduling of a Committee Meeting for November 21, 2006 from the District (Exhibit 4) that advised the Parent that the Committee had completed an evaluation of the child and was scheduling the meeting to discuss the results. Such, however, was not the case. It is clear from the testimony and the exhibits before me that the Committee (Exhibit 5), that when it met on November 21, 2006, it did so for the specific purpose of considering the removal of the provision for aversive interventions from Student's IEP and, more specifically, from his Behavior Intervention Plan that had been approved by the Committee when it met and prepared Student's IEP on June 7, 2006 (Exhibit B), that had specifically approved the continued utilization of such aversives. Witness Alvarez testified that the meeting of the Committee on November 21, 2006 was a result of the Committee having been instructed to meet as a result of the changes in State Regulations dealing with the prohibition of aversive interventions and that, if the Committee agreed that such aversives should remain, it should seek a child-specific exception. I found that Witness Alvarez' response had been clearly rehearsed. According to the testimony of Witness Volk, Student's clinician at the Center and a participant by telephone at that meeting, the Committee never considered anything but the removal of the aversive interventions because it believed that is what New York State Regulations mandated. (Tr. at 233; 237)

I have grave misgivings about the procedural violations apparent in the Committee meeting and their effect on the validity of the determinations emanating from such meeting and their impact on the substantive appropriateness of the IEP State and Federal Regulations require that, in addition to others:

> "one special education teacher of the student, or, as appropriate, a special education provider of the student"

be a member of the Committee. (8 NYCRR 200.3(a)(1)(iii)). The attendance sheet in Student's IEP of November 21, 2006 shows no participation by Student's Special Education teacher. Witness Volk confirmed that Student's Special Education teacher at the Judge Rotenberg Educational Center did not participate in the November 21, 2006 meeting because she was out that day. (Tr. 221) Yet, I find, especially in the case considering the needs of a student of a residential facility and its educational program, the intimate awareness by Student's Special Education teacher at the Center regarding Student's needs and strengths are invaluable and absolutely necessary to any appropriate Committee deliberation. I recognize that, in the Notice to Parent of the CSE meeting (Exhibit 6), John Nagler is listed as a Special Education teacher invited to participate. I presume this was the same John Nagler listed in Student's IEP as the District Representative (No District Representative is listed as an invitee to that meeting). However, Mr. Nagler did not appear as a witness in this proceeding nor is there any evidence before me that indicates Mr. Nagler had any knowledge or awareness of Student sufficient to qualify his participation as a Special Education teacher. He clearly was not *Student's* Special Education teacher. I am also disturbed by the representation of District witnesses that the decision made by the Committee to remove aversive intervention from Student's Behavior Intervention Plan was by consensus. Each District witness confirmed that it was the consensus of "the IEP Team", that is, those District employees – and presumably the Parent Member – who made the determination. However, as confirmed by Dr. Volk, he, Parent, Erin Holland, the Educational Director at the Judge Rotenberg Educational Center, Arthur Apiniant, Student's Case Manager at the Judge Rotenberg Educational Center and Parent's Advocate representative, all disagreed with such determination. Such decision was, therefore, not the consensus of the Committee – or even a majority opinion of the Committee members.

It is my Finding and Determination that the nature and number of procedural violations committed by District's Committee went to the very heart of the Individuals with Disabilities Education Act (IDEA) and resulted in a loss of educational opportunity to Student (Evans, 930 F.Supp. at 93; Briere, 948 F.Supp. 1242).

Substantively, I find that the Committee members who made the decision to modify Student's Behavior Modification Plan were in error in interpreting the information provided to it by the Judge Rotenberg Educational Center through its periodic reports and the information provided by the staff of the Judge Rotenberg Educational Center who participated in the November 21, 2006 Committee meeting. It is my Finding that, as a result of such error, the Committee made an inappropriate recommendation. School Psychologist Lourdes Licea testified that the general consensus at the November 2006 meeting was that Student had improved his behavior between June 2006 and November 2006 (Tr. 574), when, in fact, the very minutes of that meeting (Exhibit 5) stated that:

> "At start of new amendments to NYS Regulations, and suspensions of GED's, [Student's] **behavior deteriorated significantly**, with "500 incidents" tabulated. The re-introduction of GEDs eventually resulted in "0" incidents."
> (Emphasis is mine)

Further, Witness Licea stated that she believed the documentation provided by the Judge Rotenberg Center established that Student was receiving aversive therapy from June to November – for all types of behaviors (Tr. 577), and that she did not know if there was a time when the Center stopped using the GED in the summer. (Tr. 574)  However, as noted in the above quote, there was a report by the Center at the November meeting of a suspension of GED's – with a concomitant – and significant – deterioration of Student's behavior. (Exhibit 5)  Such lack of comprehension or recollection of the information provided to the Committee, together with further inconsistencies found in Witness Licea's testimony, requires that I afford such testimony little, if any, weight.

It is my further finding that the "Committee", i.e., the "IEP Team", failed to fully comprehend that the utilization by the Center of the GED aversive therapies were stopped, after the publication of the Emergency Amendments to the Commissioner's Regulations, only for certain targeted behaviors – but were continued unabated for Student's aggressive and health dangerous behaviors. I base this conclusion regarding the

Committee's unawareness on my reading of the Minutes of the November 2006 meeting (Exhibit 5), which state:

> "The **re-introduction** of GEDs eventually resulted in "0" incidents. The **exception to this** occurred yesterday, when [Student] erupted violently, and struck a school staff in the face."

> (Emphases are mine)

The rationale advanced by both District witnesses as to the Committee decision to remove all aversive interventions from Student's Behavior Intervention Plan was to the effect that, because Student had displayed no violent or aggressive behaviors between June and November of 2006 - with but one exception - there was no need for a recommendation to continue aversive intervention – or to seek a child-specific exception to the Commissioner's Regulations. But why did the Committee think Student's aggressive behaviors were under control? It is insufficient for the Committee to simply say that it found no recent history of aggressive behavior and to so conclude that no therapies were necessary or that no child-specific exception needed to be sought.

The Committee was already aware of the fact that Student's aggressive behaviors had been successfully addressed between March of 2006 and June of 2006 by the use of aversive interventions, including GEDs.  Indeed, the Committee had met in June of 2006 and authorized the continued use of such aversive interventions. Had the Committee been aware that the Center had continued the utilization of GEDs to control Student's aggressive behaviors without abatement during the summer of 2006, and that Student's aggressive and health dangerous behaviors were being controlled, the Committee had no reason whatsoever to withdraw the very therapies that was proving so successful

If the "IEP Team" believed that the aversive interventions had been stopped and thereafter re-started by the Center and that such re-introduction of the GEDs had resulted in regaining total control of Student's aggressive and health dangerous behaviors, it was similarly error by the Committee not to seek authorization for the continuation of such aversive interventions, so as to avoid another significant deterioration of Student's behavior. Thus, in either event, it was error for the Committee not to seek a child-specific exception permitted by the Commissioner's Regulations, so as to keep such aversive interventions in Student's program.

The efficacy of the aversive interventions in Student's program, at the Judge Rotenberg Educational Center, is indeed impressive. A review of Student's Report Card for the 2004-2005 school year (Exhibit K) from the Judge Rotenberg Educational Center indicates that, upon Student's arrival at the Center in September of 2004, Student initially did well academically, earning, in his first quarter, marks of A's and B's. Student's behavior deteriorated thereafter and, by the end of the final quarter, Student received all F's. Student continued to make minimal academic progress during the first two quarters of the 2005-2006 school year. In the Comment referencing Student's Second Quarter, it is noted that:

> "As a result of severe inappropriate behaviors. [Student] has not made much academic progress this period."

However, after the initiation of court-approved aversives, including the use of the GED on December 23, 2005, the change in Student's academic progress was startling. Student's grades immediately went back to all A's and B's, and remained at that level for the remainder of the school year, except for physical education, which Student did not consistently attend. It was noted on Student's 2005-2006 Report Card from 2005-2006 school year:

> "[Student] has made excellent academic progress this period, performing wonderfully in the classroom. His behaviors have significantly decreased and his academic performance has improved dramatically as a result. It is a pleasure to have [Student] in the classroom."

And, at the conclusion of the Fourth Quarter of the 2005-2006 school year, it was reported that:

> "[Student] continued to demonstrate tremendous progress both behaviorally and academically over this period. It is a joy to have [Student] in the classroom and work with him on a daily basis to make improvements He is a very bright and motivated student and is working well in group activities as well as independently in the classroom. [Student] has gone for several months now without demonstrating any major inappropriate behaviors during class time. As a result of his significant behavioral progress, he is excelling in many academic areas including Mathematics, Global Studies and Language Arts..."

Student's remarkable progress at the Judge Rotenberg Educational Center came to an abrupt and unfortunate halt upon the issuance of the Commissioner's Regulations (8 NYCRR 200.22) and the immediate stoppage by the Center of its aversive therapies, in late June of 2006, as they related to Student's Disruptive, Destructive and Non-Compliant behaviors. Student's Report Card confirms a decline in Student's performance during the First Quarter of the 2006-2006 school year and an even more precipitous decline in the Second Quarter of that school year. Comments made a part of the Report (Exhibit K) make the correlation clear. It is noted in Comments accompanying the 2006-2007 Report Card that:

> "[Student] made tremendous academic progress during the first portion of this period. He especially performed exceptionally in all areas of Language Arts. He improved his reading and writing skills and is now performing at grade level in these areas. ...Shortly after the second portion of this period, [Student's] severe inappropriate behaviors hindered his academic progress. He exhibited many disruptive and destructive behaviors and was almost completely noncompliant to complete any academic assignments."

The contrast between Student's availability for academic instruction when Level III aversives are employed and his non-availability when they are not could not be more clear. When the Center is able to utilize aversive interventions, Student makes "tremendous" and "exceptional" academic progress. When aversive interventions are not employed, he does not.

Clearly, if the newly-enacted Regulations are to be given full compliance, aversive interventions cannot be provided to Student to control Student's Destructive, Disruptive and Non-Compliant behaviors – and, as was seen when such aversive interventions were suspended by the Judge Rotenberg Educational Center in June of 2006 – the incidence of such inappropriate behaviors will soar and Student's "tremendous" and "exceptional" academic progress will cease. It is difficult to see how the newly-enacted Emergency Regulations comport with the requirement imposed on New York State by the provisions of the Individuals with Disabilities Education Act (IDEA), (20 U.S.C. §1412 et seq.) that it provide to Student special education and related services sufficient to meet the unique needs of this disabled child. However, I must leave the final

adjudication of the legal validity of the new provisions of the Regulations to the Federal Court that has already assumed jurisdiction of that question. (Exhibit E)

I can and do rule that District has the obligation to provide Student with an appropriate special education – that is, one that is reasonably calculated to allow Student to receive educational benefit, and that it provide to Student appropriate special education services to address Student's educational needs. Witness Volk, the clinician at the Judge Rotenberg Educational Center who has been in charge of Student's therapies, testified that, without doubt, should the aversive interventions, including GEDs, be removed from Student's program, Student's aggressive and self-injurious behaviors are certain to return to the levels that existed before the Court-approved Behavior Modification Program was authorized. There is simply no way to anticipate the degree of loss that Student will suffer, both academically and socially, should the aversive interventions utilized to control Student's aggressive and health dangerous behaviors be prohibited.

It is my determination that the Committee's action in failing to seek a child-specific exception for Student so as to permit the continued utilization of aversive interventions to address Student's aggressive and self-injurious behaviors by the Judge Rotenberg Educational Center denied Student a free, appropriate public education (FAPE), in that, by such action of the Committee, Student's regression and immediate loss of both academic and social progress was virtually guaranteed. Such inappropriate action by the Committee mandates that such determination be annulled.

ORDER

The Committee is hereby directed to reconvene and, in accordance with the Regulations of the Commissioner, seek a child specific exception so as to authorize the Judge Rotenberg Educational Center to continue to provide Student with the Level III aversive interventions previously approved by the Probate Court of the Commonwealth of Massachusetts and previously authorized by District as directed toward Student's aggressive and self-injurious behaviors.

Dated: August 15, 2007

*James P. Walsh (JS)*

JAMES P. WALSH, ESQ.
Impartial Hearing Officer

JPW:ds

Impartial Hearing Officer's Decision
Case No.  109017

17

---

## PLEASE TAKE NOTICE

Within 35 days of the date of this decision, the parent and/or the New York City Department of Education has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act.

"The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed.  The petition for review shall be served upon the school district within 35 days from the date of the decision sought to be reviewed.  If the decision has been served by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25- or 35-day period."  (8NYCRR279.2[b])  Failure to file the notice of intention to seek review is a waiver of the right to appeal this decision.

Directions and sample forms for filing an appeal are included with this decision.  Directions and forms can also be found in the Office of State Review website: www.sro.nysed.gov/appeals.htm.

Impartial Hearing Officer's Decision
Case No.  109017

18

## DOCUMENTATION ENTERED INTO RECORD ON MARCH 13, 2007

| No.: | # of pages | Description: | Offered by: |
|------|-----------|-------------|-------------|
| A | 3 | Impartial Hearing Request, dated 1-16-07 | Parent |
| B | 15 | IEP for Student for 2006-2007 School Year, dated 6-7-06 | Parent |
| C | 16 | IEP for Student for 2006-2007 School Year, dated 11-21-06 | Parent |
| D | 3 | Caption and First Page of Fourth Amended Complaint as filed in United States District Court, Northern District Of New York in Matter of JEANETTE ALLENNE et alia v. NEW YORK STATE EDUCATION DEPARTMENT et al | Parent |
| E | 3 | Preliminary Injunction Order issued by United States District Court, Northern District of New York in Matter of JEANETTE ALLENNE et alia v. NEW YORK STATE EDUCATION DEPARTMENT et al, dated 10-2-06 | Parent |
| F | 6 | Document entitled <u>Findings of Fact and Rulings of Law on Petition for Appointment of Permanent Guardian With Authority to Monitor Administration of Behavior Modification Treatment Plan</u>, as issued by the Probate and Family Court Department of the Commonwealth of Massachusetts, dated 4-24-06 | Parent |
| G | 2 | Decree of Permanent Guardianship of Student, issued to Parent by Probate and Family Court Department, Commonwealth of Massachusetts, dated 4-14-06 | Parent |
| H | 4 | Affidavit of Andre Vlok, Psy.D., made to Probate and Family Court Department, Commonwealth of Massachusetts, sworn to 12-14-05 | Parent |

Impartial Hearing Officer's Decision
Case No.  109017                                                           19

| | | | |
|---|---|---|---|
| I | 29 | Proposed Behavior Modification Treatment Plan, dated 7-05, as submitted To Probate and Family Court Department, Commonwealth of Massachusetts | Parent |
| J | 10 | Educational Evaluation of Student, dated 7-21-06 | Parent |
| K | 3 | Student's Report Cards from Judge Rotenberg Educational Center for School Years 2004-2005, 2005-2006 and 2006-2007 | Parent |
| L | 8 | Quarterly Progress Report for Student for Period 12-05 to 3-06 from JRC | Parent |
| M | 11 | Quarterly Progress Report for Student for Period 3-06 to 6-06 from JRC | Parent |
| N | 10 | Quarterly Progress Report for Student for Period 6-18-06 to 9-16-06 from JRC | Parent |
| O | 11 | Quarterly Progress Report for Student for Period 9-17-06 to 12-16-06 from JRC | Parent |
| 1 | 3 | Parent's Impartial Hearing Request, dated 1-16-07 | DOE |
| 2 | 2 | Resolution Session Outcome, dated 2-16-07 | DOE |
| 3 | 16 | IEP for Student for 2006-2007 School Year, dated 11-21-06 | DOE |
| 4 | 1 | Final Notice of Recommendation of Modification of IEP, dated 11-21-06 | DOE |
| 5 | 2 | Minutes of CSE Review Meeting of 11-21-06 | DOE |
| 6 | 1 | Meeting Notice for EPC/CSE Review, dated 10-07-06 | DOE |
| 7 | 1 | Social History Update, dated 10-30-06 | DOE |
| 8 | 11 | Quarterly Progress Report for Student for Period 6-18-06 to 9-16-06 from JRC | DOE |

Impartial Hearing Officer's Decision
Case No. 109017

20

| 9 | 3 | Psychological Evaluation of Student, dated 2-19-04 | DOE |
| 10 | 4 | First Three pages and One Blank Page of Document entitled <u>Findings of Fact and Rulings of Law on Petition for Appointment of Permanent Guardian With Authority to Monitor Administration of Behavior Modification Treatment Plan</u>, with Caption of the Probate and Family Court Department of the Commonwealth of Massachusetts | DOE |

## <u>DOCUMENTATION ENTERED INTO RECORD ON JUNE 13, 2007</u>

| <u>No.:</u> | <u># of pages</u> | <u>Description:</u> | <u>Offered by:</u> |
|---|---|---|---|
| P | 7 | Memorandum-Decision And Order Granting Preliminary Injunction, dated 9-8-06, issued by United States District Court, Northern District of New York | Parent |
| Q | 2 | Order Granting Preliminary Injunction, dated 2-8-07, issued by United States District Court, Northern District of New York | Parent |

# EXHIBIT 14

# RULE MAKING ACTIVITIES

Each rule making is identified by an I.D. No., which consists of 13 characters. For example, the I.D. No. AAM-01-96-00001-E indicates the following:

AAM —the abbreviation to identify the adopting agency
01 —the *State Register* issue number
96 —the year
00001 —the Department of State number, assigned upon receipt of notice
E —Emergency Rule Making—permanent action not intended (This character could also be: A for Adoption; P for Proposed Rule Making; RP for Revised Rule Making; EP for a combined Emergency and Proposed Rule Making; EA for an Emergency Rule Making that is permanent and does not expire 90 days after filing; or C for first Continuation.)

Italics contained in text denote new material. Brackets indicate material to be deleted.

## Department of Agriculture and Markets

### NOTICE OF ADOPTION

**Tolerances and Regulations for Commercial Weighing and Measuring Devices**
I.D. No. AAM-25-06-00012-A
Filing No. 1289
Filing date: Oct. 25, 2006
Effective date: Nov. 15, 2006

PURSUANT TO THE PROVISIONS OF THE State Administrative Procedure Act, NOTICE is hereby given of the following action:
*Action taken:* Amendment of section 220.2 of Title 1 NYCRR.
*Statutory authority:* Agriculture and Markets Law, sections 16, 18 and 179
*Subject:* Incorporation by reference in 1 NYCRR of the 2006 edition of National Institute of Standards and Technology ("NIST") Handbook 44.
*Purpose:* To incorporate by reference in 1 NYCRR the 2006 edition of NIST Handbook 44.
*Text or summary was published* in the notice of proposed rule making, I.D. No. AAM-25-06-00012-P, Issue of June 21, 2006.
*Final rule as compared with last published rule:* No changes.
*Text of rule and any required statements and analyses may be obtained from:* Ross Andersen, 10B Airline Dr., Albany, NY 12235, (518) 457-3146, e-mail: ross.andersen@agmkt.state.ny.us

*Assessment of Public Comment*
The agency received no public comment.

## Department of Audit and Control

### PROPOSED RULE MAKING
### NO HEARING(S) SCHEDULED

**Filing of Abandoned Property Reports**
I.D. No. AAC-46-06-00008-P

PURSUANT TO THE PROVISIONS OF THE State Administrative Procedure Act, NOTICE is hereby given of the following proposed rule:
*Proposed action:* Amendment of section 123.1; repeal of sections 123.2 and 123.6 of Title 2 NYCRR.
*Statutory authority:* Abandoned Property Law, section 1414
*Subject:* Filing of abandoned property reports.
*Purpose:* To eliminate the use of magnetic tape cartridges as a method of transmitting personal identifying information of owners of abandoned property to the Comptroller.
*Text of proposed rule:* Section 123.1 of Title 2 of the New York Codes, Rules and Regulations is amended as follows:
    Section 123.1 Filing of abandoned property reports
    (a) All holders of abandoned property required to report such property pursuant to the Abandoned Property Law [must] *may* submit their reports of abandoned property using an *approved electronic format* [if reporting more than 25 items] or on form AC 2686, Report of Abandoned Property (Appendices 16 and 16-A of this Title, infra). *"Approved electronic format" shall consist of formats approved by the Comptroller. In no event will magnetic cartridges be permitted or accepted as an approved electronic format by the Comptroller. Information concerning approved electronic formats may be obtained by contacting the Comptroller's Office of Unclaimed Funds.*
    [(b) Holders of abandoned property filing 25 or fewer items can submit their report using either an approved electronic format.]
    *(b) All reports of abandoned property, whether on an approved electronic format, or on form AC 2686, must be accompanied by a completed and notarized form AC 2709, Verification and Checklist for Unclaimed Property (Appendices 17 and 17-A of this Title, infra), signed by an authorized officer certifying that said report is true and complete to the best of said authorized officer's knowledge.*
    Section 123.2 of Title 2 of the New York Codes, Rules and Regulations is repealed.
    Section 123.6 of Title 2 of the New York Codes, Rules and Regulations is repealed.
*Text of proposed rule and any required statements and analyses may be obtained from:* Wendy H. Reeder, Office of the State Comptroller, 110 State St., Albany, NY 12236, (518) 474-5714, e-mail: wreeder@osc.state.ny.us
*Data, views or arguments may be submitted to:* Same as above.

1

COSTS:

I. Costs to private regulated parties (the Business applicants): None. The proposed regulation will not impose any additional costs to the commercial industry.

II. Costs to the regulating agency for the implementation and continued administration of the rule: There could be additional costs to the Department of Economic Development associated with the proposed rule making as the Office will need two additional employees to help with the program's new created administrative process. Such costs are estimated to be $120,000 in annual salary for both employees.

III. Costs to the State government: The program shall not allocate more than $7 million in any calendar year. The program sunsets on December 31, 2011 so the overall cost to the State is $35 million.

IV. Costs to local governments: None. The proposed regulation will not impose any additional costs to local government.

LOCAL GOVERNMENT MANDATES:

None.

PAPERWORK:

The emergency rule creates an application process for eligible applicants, including the creation of an application, certain tax certificates and forms relating to commercial expenditures.

DUPLICATION:

The proposed rule will not duplicate or exceed any other existing Federal or State statute or regulation.

ALTERNATIVES:

No alternatives were considered in regard to creating a new regulation in response to the statutory requirement. The Department of Economic Development, through its Governor's Office for Motion Picture and Television Development, did an extraordinary amount of outreach to various interested parties before submitting this emergency rule. For example, the Department met with seven commercial industry producers to seek industry input. In addition, the Department met with both the CEO and the CFO of the Association of Independent Commercial Producers to solicit their comments. Furthermore, the Department was in close contact with representatives from the State Tax and Finance Department and the Mayor's Office of Film, Theatre and Broadcasting to coordinate the details of the emergency rule.

FEDERAL STANDARDS:

There are no federal standards in regard to the Empire State commercial production tax credit program; it is purely a state program that offers a state tax credit to eligible applicants. Therefore, the proposed rule does not exceed any federal standard.

COMPLIANCE SCHEDULE:

The effected State agencies (Economic Development) and the business applicants will be able to achieve compliance with the emergency regulation as soon as it is implemented. In terms of compliance schedule, the statute (Chapter 62 of the Laws of 2006) was signed into law on June 6, 2006. The statute gave the Department until October 31, 2006 to promulgate regulations to implement the program. The program applies to taxable years beginning on or after January 1, 2007 and expires on December 31, 2011.

*Regulatory Flexibility Analysis*

Participation in the Empire State commercial production credit program is entirely at the discretion of qualified commercial production companies. Neither Chapter 62 of the Laws of 2006 nor the proposed regulations impose any obligation on any local government or business entity to participate in the program. The proposed regulation does not impose any adverse economic impact or compliance requirements on small businesses or local governments. In fact, the proposed regulation may have a positive economic impact on small businesses due to the possibility that these businesses may enjoy a commercial production tax credit if they qualify for the program's tax credit.

Because it is evident from the nature of the proposed rule that it will have either no impact or a positive impact on small businesses and local government, no further affirmative steps were needed to ascertain that fact and none were taken. Accordingly, a regulatory flexibility analysis for small business and local government is not required and one has not been prepared.

*Rural Area Flexibility Analysis*

This program is open to participation from all qualified commercial production companies, defined by statute to include a corporation, partnership or sole proprietorship making and controlling a qualified commercial in New York. The locations of the companies are irrelevant, so long as they meet the necessary qualifications of the definition. This program may impose responsibility on statewide businesses that are qualified commercial production companies, in that they must undertake an application process to receive the Empire State commercial production credit. However, the proposed regulation will not have a substantial adverse economic impact on rural areas. Accordingly, a rural flexibility analysis is not required and one has not been prepared.

*Job Impact Statement*

The proposed regulation creates the application process for the Empire State commercial production credit program. As a tax credit program, it is designed to impact positively the commercial industry doing business in New York State and have a positive impact on job creation. The proposed regulation will not have a substantial adverse impact on jobs and employment opportunities. Because it is evident from the nature of the proposed rule making that it will have either no impact, or a positive impact, on job and employment opportunities, no further affirmative steps were needed to ascertain that fact and none were taken. Accordingly, a job impact statement is not required and one has not been prepared.

---

# Education Department

---

## NOTICE OF EMERGENCY
## ADOPTION
## AND REVISED RULE MAKING
## NO HEARING(S) SCHEDULED

**Licensure as a Clinical Laboratory Technologist**

**I.D. No.** EDU-21-06-00009-ERP

**Filing No.** 1290

**Filing date:** Oct. 27, 2006

**Effective date:** Oct. 30, 2006

PURSUANT TO THE PROVISIONS OF THE State Administrative Procedure Act, NOTICE is hereby given of the following action:

*Emergency action taken:* Addition of Subparts 79-13, 79-14 and 79-15 to Title 8 NYCRR.

*Statutory authority:* Education Law, sections 207 (not subdivided); 210 (not subdivided); 212(3); 6501 (not subdivided); 6504 (not subdivided); 6507(2)(a), (3)(a) and (4)(a); 6508(1); 8605(1)(b) and (c) and (2)(b) and (c); 8602(2) and (3); 8607(1) and (2); and 8608 (not subdivided)

*Finding of necessity for emergency rule:* Preservation of general welfare.

*Specific reasons underlying the finding of necessity:* Article 165 of the Education Law establishes three new licensed professions in New York State: clinical laboratory technologist, cytotechnologist, and clinical laboratory technician. This statute requires individuals who practice these professions to be licensed or under application for a license under the special "grandparenting" requirements in order to practice these professions in New York State on or after September 1, 2006.

Based on recent estimates, approximately 20,000 persons are employed in these three professional areas and, as of September 1, 2006, require licensure or submission of an application under the grandparenting provisions in order to continue to practice these professions. As of October 13, 2006, in excess of 15,000 applications have been received. The State Education Department expects that most current practitioners will be licensed under the grandparenting provisions. These clinical laboratory technology practitioners are employed in the State's clinical laboratories to perform tests and procedures needed for the diagnosis and treatment of illness and disease. They perform important functions that protect the general welfare, health, and safety of residents of New York State.

The proposed regulation implements the requirements of Article 165 of the Education Law by establishing education and examination standards for licensure or certification, special requirements for licensure or certification for applicants already practicing in these field or who have related education and/or experience (grandparenting applicants), and requirements for limited permits in the three professions. It also sets forth interim standards for meeting the educational requirement for licensure or certification in these fields, consistent with statutory requirements. These requirements must be in place in order for the State Education Department to license individuals to practice these new professions. The interim stan-

## NOTICE OF ADOPTION

**State Aid for Public Library Construction**
**I.D. No. EDU-34-06-00016-A**
**Filing No. 1291**
**Filing date:** Oct. 27, 2006
**Effective date:** Nov. 16, 2006

PURSUANT TO THE PROVISIONS OF THE State Administrative Procedure Act, NOTICE is hereby given of the following action:
**Action taken:** Amendment of section 90.12 of Title 8 NYCRR.
**Statutory authority:** Education Law, sections 207 (not subdivided), 215 (not subdivided) and 273-a(5); and L. 2006, ch. 53, section 1
**Subject:** State aid for public library construction.
**Purpose:** To prescribe eligibility requirements and criteria for applications for State aid for library construction; and conform to the commissioner's regulations to recent changes to Education Law, section 273-a.
**Text or summary was published** in the notice of proposed rule making, I.D. No. EDU-34-06-00016-P, Issue of August 23, 2006.
**Final rule as compared with last published rule:** No changes.
**Text of rule and any required statements and analyses may be obtained from:** Anne Marie Koschnick, Legal Assistant, Office of Counsel, Education Department, State Education Bldg., Rm. 148, Albany, NY 12234, (518) 473-8296, e-mail: legal@mail.nysed.gov
**Assessment of Public Comment**
Since publication of a Notice of Proposed Rule Making in the *State Register* on August 23, 2006, the State Education Department received the following comments.
COMMENTS:
Comments were received from several entities in Erie County. These comments did not address the provisions of the proposed amendment, but instead offered broader policy and practical concerns regarding Erie County's fiscal and budgetary situation and the implementation of the library construction grant program as detailed in guidance posted on the Department's website (www.nysl.nysed.gov/libdev/construc/faq14m.htm), including concerns relating to the deadline/timeframe for submission of proposals; submission of an architect's estimate combined with a formal adopted budgetary commitment for the project, or submission of a feasibility study, in lieu of a contractor's bid or quote; providing evidence of the availability of funds to pay for the project minus the amount awarded through the construction grant program; prior approval by the State Historic Preservation Office for projects concerning buildings that are 50 years old or older; and allowing applications for phases of the project rather than the full project.
DEPARTMENT RESPONSE:
The comments are beyond the scope of the proposed amendment, which is intended to conform the Commissioner's Regulations to recent changes to Education Law section 273-a, as made by Chapter 572 of the Laws of 2003 and Chapter 57 of the Laws of 2005, so that funds appropriated pursuant to Chapter 53 of the Laws of 2006 are awarded pursuant to statutory requirements. However, the Department will address the expressed concerns via a conference call followed by individual responses.

## REVISED RULE MAKING
## NO HEARING(S) SCHEDULED

**Behavioral Interventions**
**I.D. No. EDU-28-06-00005-RP**

PURSUANT TO THE PROVISIONS OF THE State Administrative Procedure Act, NOTICE is hereby given of the following revised rule:
**Revised action:** Amendment of sections 19.5, 200.1, 200.4, 200.7 and 201.2 and addition of section 200.22 to Title 8 NYCRR.
**Statutory authority:** Education Law, sections 207 (not subdivided), 210 (not subdivided), 305(1), (2) and (20), 4401(2), 4402(1), 4403(3) and 4410(13)
**Subject:** Behavioral interventions, including aversive interventions.
**Purpose:** To establish standards for behavioral interventions, including a prohibition on the use of aversive interventions; provide for a child-specific exception to the prohibition on the use of aversive interventions; and establish standards for programs using aversive interventions.
**Substance of revised rule:** The Commissioner of Education proposes to amend section 19.5 of the Rules of the Board of Regents and sections 200.1, 200.4, 200.7 and 201.2 of the Regulations of the Commissioner of

Education, and to add a new section 200.22 of the Commissioner's Regulations, effective January 31, 2007, relating to standards for behavioral interventions, including aversive interventions. The following is a summary of the substance of the proposed amendments.

Section 19.5(a)(1) of the Rules of the Board of Regents, as amended, provides that no teacher, administrator, officer, employee or agent of a school district in New York State (NYS), a board of cooperative educational services (BOCES), a charter school, a State-operated and State-supported school, an approved preschool program, an approved private school, an approved out-of-State day or residential school, or a registered nonpublic nursery, kindergarten, elementary or secondary school in this State, shall use corporal punishment against a pupil.

Section 19.5(b) of the Rules of the Board of Regents, as amended, establishes a prohibition on the use of aversive interventions, except as provided by a child-specific exception pursuant to proposed section 200.22(e) of the Commissioner's Regulations, and defines the term 'aversive intervention.'

Section 200.1(r) of the Commissioner's Regulations, as amended, revises the definition of functional behavioral assessment to cross reference the requirements in section 200.22(a).

Sections 200.1(lll) and (mmm) of the Commissioner's Regulations, as added, provide, respectively, definitions of the terms 'aversive intervention' and 'behavioral intervention plan.'

Section 200.4(d)(3)(i) of the Commissioner's Regulations, as amended, provides that the CSE or CPSE shall, in developing a student's IEP, consider supports and strategies to address student behaviors that are consistent with the requirements in section 200.22.

Section 200.7(a)(2)(i)(f) of the Commissioner's Regulations, as added, provides that conditional approval of private schools to serve students with disabilities shall also be based on submission for approval of the school's procedures regarding behavioral interventions, including, if applicable, procedures for the use of aversive interventions.

Section 200.7(a)(3)(iv) of the Commissioner's Regulations, as amended, provides that a school may be removed from the list of approved schools five days after written notice by the commissioner indicating that there is a clear and present danger to the health or safety of students attending the school, and listing the dangerous conditions, including but not limited to, evidence that an approved private school is using aversive interventions to reduce or eliminate maladaptive behaviors of students without a child-specific exception provided pursuant to section 200.22(e) or that an approved private school is using aversive interventions in a manner inconsistent with the standards as established in section 200.22(f).

Section 200.7(b)(8) of the Commissioner's Regulations, as added, provides that except as provided in section 200.22(e), an approved private school, a State-operated school or a State-supported school is prohibited from using corporal punishment and aversive interventions to reduce or eliminate maladaptive behaviors of students; and prohibits an approved preschool program from using aversive interventions with preschool students with disabilities without exception.

Section 200.7(c)(6) of the Commissioner's Regulations, as added, requires a private school that proposes to use or continue to use aversive interventions in its program to submit its written policies and procedures on behavioral interventions to the Department; provides that only those programs with policies and procedures that are approved pursuant to section 200.22(f)(8) on or before June 30, 2007 shall be authorized to use such interventions with NYS students; and provides that failure to comply with the provisions of this paragraph may result in revocation of approval to accept new admissions of NYS students or termination of private school approval pursuant to section 200.7(a)(3).

Section 200.22 of the Commissioner's Regulations, as added, establishes program standards for behavioral interventions. This section further provides that for an education program operated pursuant to section 112 of the Education Law and Part 116 of the Regulations of the Commissioner of Education, if a provision of section 200.22 relating to use of time out rooms, emergency use of physical restraints, or aversive interventions conflicts with the rules of the respective State agency operating such program, the rules of such State agency shall prevail and the conflicting provision of section 200.22 shall not apply.

Section 200.22(a) establishes requirements for the conduct of a functional behavioral assessment to assess student behaviors.

Section 200.22(b) establishes requirements for behavioral interventions for students with disabilities.

Section 200.22(c) establishes requirements regarding the use of time out rooms.

**Rule Making Activities**

Section 200.22(d) establishes requirements for the use of emergency interventions, including requirements to document the emergency intervention and notify the student's parent.

Section 200.22(e) establishes the process for a child-specific exception to the Regents prohibition on the use of aversive interventions. A child-specific exception may be granted for a school-age student, in accordance with the procedures outlined in the subdivision, only during the 2006-2007, 2007-2008 and 2008-2009 school years; provided that a student whose individualized education program (IEP) includes the use of aversive interventions as of June 30, 2009 may be granted a child-specific exception in each subsequent school year, unless the IEP is revised to no longer include such exception. No child-specific exception shall be granted for a preschool student. This subdivision also provides timelines and procedures for an independent panel of experts appointed by the commissioner or commissioner's designee to make a recommendation to the CSE and to the Commissioner as to whether a child-specific exception is warranted.

Section 200.22(f)(1) sets forth applicability provisions for the requirements set forth in the subdivision.

Section 200.22(f)(2) establishes general requirements for programs that employ the use of aversive interventions.

Section 200.22(f)(3) requires each school that uses aversive interventions to establish a Human Rights Committee to monitor the school's behavior intervention practices to ensure the protection of legal and human rights of individuals.

Section 200.22(f)(4) establishes supervision and training requirements for persons who use aversive interventions.

Section 200.22(f)(5) states that aversive interventions shall be provided only with the informed written consent of the parent and no parent shall be required by the program to remove the student from the program if he or she refuses consent for an aversive interventions.

Section 200.22(f)(6) requires the program to conduct quality assurance reviews of its use of aversive interventions, including a review of all incident reports relating to such interventions.

Section 200.22(f)(7) provides for ongoing monitoring of student progress in programs using aversive interventions; and requires a school district that places a student in such a program to: oversee the student's education and behavior program, including review of written progress monitoring and incident reports; conduct observations of, and, as appropriate, interviews with the student at least once every six months; regularly communicate with the student's parent; and convene a CSE meeting at least every six months to review the student's educational program and placement.

Section 200.22(f)(8) requires each school that proposes to use aversive interventions pursuant to the child-specific exception in 200.22(e) to submit its policies and procedures consistent with the standards in this section to the Department for approval prior to the use of aversive interventions; and only schools with policies and procedures approved by the Department on or before June 30, 2007 shall be authorized to use such interventions.

Section 201.2(a) proposes to amend the definition of behavioral intervention plan to add that the strategies must include positive behavioral supports and services to address the behavior.

*Revised rule compared with proposed rule:* Substantial changes were made in sections 19.5(b)(2), 200.1(r), (lll) and (mmm), 200.7(b)(8) and (c)(6), 200.22(b), (c), (d), (e) and (f) and 201.2(a).

*Text of revised proposed rule and any required statements and analyses may be obtained from:* Anne Marie Koschnick, Legal Assistant, Office of Counsel, Education Department, State Education Bldg., Rm. 148, Albany, NY 12234, (518) 473-8296, e-mail: legal@mail.nysed.gov

*Data, views or arguments may be submitted to:* Rebecca H. Cort, Deputy Commissioner, VESID, Education Department, One Commerce Plaza, Rm. 1606, Albany, NY 12234, (518) 473-2714, e-mail: rcort@mail.nysed.gov

*Public comment will be received until:* 30 days after publication of this notice.

*Revised Regulatory Impact Statement*

Since publication of a Notice of Emergency Adoption and Proposed Rule Making in the *State Register* on July 12, 2006, the following substantial revisions were made:

Section 19.5(b) was revised to define aversive intervention to mean an intervention intended to induce pain or discomfort to a student for the purpose of eliminating or reducing maladaptive behaviors, and delete reference to certain aversive interventions.

Section 200.1(r) was revised to clarify that functional behavioral assessments (FBAs) must be developed consistent with the requirements in section 200.22(a), and replace the term "effective" with "affective."

Section 200.1(lll) was revised for clarification and consistency to add a cross citation to the definition of "aversive interventions" in Regents Rules section 19.5(b)(2).

Section 200.1(mmm) was revised to add that behavioral intervention plan (BIP) strategies must include positive behavioral supports and services.

Section 200.7(b)(8) was revised to limit the use of aversive interventions through a child specific exception to school-age programs and prohibit without exception an approved preschool program from using aversive interventions.

Section 200.7(c)(6) was revised to limit the use of aversive interventions to programs having policies and procedures approved by the Department on or before June 30, 2007, and clarify that failure to comply with this paragraph may result in revocation of approval to accept new admissions of New York students or termination of private school approval.

Section 200.22(b) was revised for clarification and consistency to add a cross citation to the definition of BIP in section 200.1(mmm).

Section 200.22(c) was revised to define time out room; add specific minimum requirements for a school's policies and procedures regarding time out rooms; clarify that a time out room is to be used in conjunction with a BIP or for unanticipated situations that pose an immediate concern for the physical safety of a student or others; add requirements regarding information that must be provided to parents; and clarify that staff must continuously monitor the student in a time out room.

Section 200.22(d) was revised to change the term "emergency use of physical restraints" to "emergency interventions;" define "emergency;" clarify that emergency interventions may not be used as a punishment and may be used only in situations when other procedures and methods not involving physical force cannot be reasonably employed; clarify training requirements for staff implementing emergency interventions; and add documentation and reporting requirements when emergency interventions are used.

Section 200.22(e) was revised to authorize child specific exceptions for school-age students only for the 2006-07, 2007-08 and 2008-09 school years, provided that a student with an individualized education program (IEP) that includes aversive interventions as of June 30, 2009 may be granted a child specific exception in each subsequent year, unless the IEP is revised to no longer include such exception; add that no child-specific exception shall be granted for a preschool student; clarify that aversive interventions be considered only for students displaying self-injurious or aggressive behavior that threaten the physical well-being of the student or others, and only to address such behaviors; add that no child-specific exceptions will be granted for certain aversive interventions; clarify that the purpose of the independent panel is to provide a recommendation to a Committee on Special Education (CSE) as to whether a child-specific exception is warranted; specify that panel shall notify the school district of its recommendation for students whose current IEP does not include a child-specific exception within 15 business days of receipt of an application; add that a Subcommittee on Special Education cannot make the determination to provide a child-specific exception; require that the CSE request participation of the school physician member to any meeting where an aversive intervention is being considered; require that the district provide a copy of the IEP to the Commissioner when it includes aversive interventions; clarify that the IEP must identify the self-injurious an/or aggressive behaviors to be targeted and any mechanical restraint devices to be used to provide the aversive intervention; clarify that an application for a child-specific exception must be submitted annually; and add that district must submit a revised copy of the IEP to the Commissioner if it is amended to no longer include a child-specific exception.

Section 200.22(f)(1)(i) was revised to delete approved preschool programs from applicability provisions of this subdivision and to clarify that programs must be authorized by the Department to use aversive interventions.

Section 200.22(f)(2) was revised to clarify that no program may combine the simultaneous use on a student of a physical or mechanical restraint with another aversive intervention and delete proposed qualifications for individuals who develop BIPs.

Section 200.22(f)(3) was revised to add that the Human Rights Committee may include not more than two individuals selected by the program or agency.

Section 200.22(f)(4) was revised to require that aversive interventions be administered by appropriately licensed professionals or certified special

education teachers or under the direct supervision and direct observation of such staff; and that training be provided on a regular, but at least annual basis.

Section 200.22(f)(5) was revised to add that parents must be provided with a copy of the school's policies and procedures on the use of aversive interventions.

Section 200.22(f)(6) was revised to clarify that quality assurance reviews of incident reports regarding aversive interventions must be conducted periodically by the program providing such interventions.

Section 200.22(f)(7) was revised to require that a representative of a school district placing a student in a program that uses aversive interventions with the student, observe the student in the program at least every six months and, as appropriate, interview the student, communicate regularly with the parents and report the results to the CSE.

Section 200.22(f)(8) was revised to limit the schools that use aversive interventions to those that have their policies and procedures approved by the Department as of June 30, 2007.

Section 201.2(a) relating to the definition of behavioral intervention plan, was revised to add that intervention strategies to address the problem behavior must include positive behavioral supports and services.

The above revisions require that the term "aversive behavioral intervention" be replaced with "aversive intervention" throughout the previously published Regulatory Impact Statement and that the Costs, Local Government Mandates and Paperwork sections be revised to read as follows:

COSTS:

a. Costs to State government: See costs to the State Education Department.

b. Costs to local governments: None.

c. Costs to regulated parties: School districts may incur minimal costs to duplicate materials to submit an application for a child-specific exception and for required observations (estimated at $200 per student) and CSE meetings at least every six months for students receiving aversive interventions (estimated at $1,000 per student). Currently, it is estimated that less than 30 school districts in New York State have students placed in schools using aversive interventions and most of these have only one student where such a recommendation currently appears on the student's IEP. Schools using aversive interventions may also incur additional administrative costs estimated at less than $8,000 annually for implementing the proposed standards, including staff training and convening Human Rights Committee meetings at least quarterly (e.g., administrative oversight, duplication and meeting costs estimated at $6,000 per year).

d. Costs to the State Education Department of implementation and continuing compliance: The cost of funding a three-member independent panel of experts to provide a recommendation regarding the need for a child-specific exception is estimated at approximately $230,000 for the first year. This calculation was based on approximately 100 requests for child-specific exceptions, at an estimated cost of $2,300 for each student. Additional costs for State administration and oversight of the child-specific exception, including duplication of materials for the panel are estimated at $10,000 annually. The annual costs of the review panel are expected to be less in subsequent years and after July 1, 2009 should diminish significantly. These costs may be offset if the CSE determines that a student no longer requires aversive interventions since the cost for one student currently placed in an out-of-state residential school for aversive interventions ranges from $281,180 to $329,970 per year.

LOCAL GOVERNMENT MANDATES:

Section 19.5(a) prohibits use of corporal punishment in school districts, BOCES, charter schools, State-operated or State supported schools, approved preschool programs, approved private schools, approved out-of-State day or residential schools, or in registered nonpublic nursery, kindergarten, elementary or secondary schools in the State.

Section 19.5(b) prohibits use of aversive interventions except pursuant to a child-specific exception pursuant to section 200.22(e) and (f).

Section 200.1(r) of the Commissioner's Regulations, as amended, revises the definition of FBA to cross reference the requirements in section 200.22(a).

Section 200.4(d)(3)(i) requires a CSE, in developing a student's IEP, to consider supports and strategies, including positive behavioral interventions, to address student behaviors that are consistent with program standards in section 200.22.

A CSE/CPSE shall conduct a FBA in accordance with section 200.22(a) and develop and implement a BIP in accordance with 200.22(b).

Each school, which uses a time out room as part of its behavior management approach, is subject to section 200.22(c) requirements.

Section 200.22(d) establishes requirements regarding emergency interventions. Section 200.22(e) provides that a child-specific exception to the prohibition of the use of aversive interventions may be granted for school-age students only during the 2006-2007, 2007-2008 and 2009-2010 school years; provided that a student whose IEP includes use of aversive interventions as of June 30, 2009 may be granted such exception in each subsequent school year, unless the IEP is revised to no longer include such exception. No child-specific exception shall be granted for a preschool student. Whenever a CSE is considering whether a child-specific exception is warranted, the school district shall submit an application to the Commissioner for referral to an independent panel of experts. The CSE shall, based on its consideration of the recommendation of the panel, determine whether the student's IEP shall include a child-specific exception. The school district shall notify the Commissioner when such exemption has been included in the student's IEP. An IEP providing such exemption shall identify the specific targeted behaviors, aversive interventions to be used, and aversive conditioning devices where the aversive interventions include use of such devices.

Public schools, BOCES, charter schools, approved private schools, State-operated or State-supported schools in NYS and approved out-of-State day or residential schools are subject to section 200.22(f) program standards for use of aversive interventions. Each school using aversive interventions shall establish a Human Rights Committee pursuant to section 200.22(f)(3) to monitor the program. Persons using aversive interventions shall be supervised and trained pursuant to section 200.22(f)(4). Pursuant to section 200.22(f)(5), aversive interventions shall be provided only with the parent's informed written consent and no parent shall be required by the program to remove the student from the program if the parent refuses consent. Use of aversive interventions is subject to quality assurance reviews pursuant to section 200.22(f)(6) and the program shall provide for ongoing monitoring of student progress pursuant to section 200.22(f)(7), including quarterly written progress reports. A school district placing a student in such program shall ensure the student's IEP and BIP are being implemented. The CSE shall convene at least every six months to review the student's educational program and placement, including review of written progress monitoring and incident reports, at least annual observations of, and, as appropriate, interviews with the student and regular communication with the parent. Each school proposing to use aversive interventions pursuant to a child-specific exception shall submit its policies and procedures consistent with section 200.22(f) to the Department for approval prior to use.

Section 201.2(a) proposes to amend the definition of BIP to add that the strategies must include positive behavioral supports and services to address the behavior.

PAPERWORK:

CSEs must compile and submit student record information and school districts must submit an application for the child-specific exception. Currently there are approximately 23 school districts that have students recommended for aversive interventions.

*Revised Regulatory Flexibility Analysis*

Since publication of a Notice of Emergency Adoption and Proposed Rule Making in the *State Register* on July 12, 2006, the proposed rule has been substantially revised as set forth in the Revised Regulatory Impact Statement submitted herewith.

The revisions require that the term "aversive behavioral intervention" be replaced with "aversive intervention" throughout the previously published Regulatory Flexibility Analysis and that the Compliance Requirements and Compliance Costs sections be revised to read as follows:

COMPLIANCE REQUIREMENTS:

Section 19.5(a) prohibits use of corporal punishment in school districts, BOCES, charter schools, State-operated or State supported schools, approved preschool programs, approved private schools, approved out-of-State day or residential schools, or in registered nonpublic nursery, kindergarten, elementary or secondary schools in the State.

Section 19.5(b) prohibits use of aversive interventions except pursuant to a child-specific exception pursuant to section 200.22(e) and (f).

Section 200.1(r) of the Commissioner's Regulations, as amended, revises the definition of FBA to cross reference the requirements in section 200.22(a).

Section 200.4(d)(3)(i) requires a CSE, in developing a student's IEP, to consider supports and strategies, including positive behavioral interventions, to address student behaviors that are consistent with program standards in section 200.22.

A CSE/CPSE shall conduct a FBA in accordance with section 200.22(a) and develop and implement a BIP in accordance with 200.22(b).

Each school, which uses a time out room as part of its behavior management approach, is subject to section 200.22(c) requirements.

Section 200.22(d) establishes requirements regarding emergency interventions.

Section 200.22(e) provides that a child-specific exception to the prohibition of the use of aversive interventions may be granted for school-age students only during the 2006-2007, 2007-2008 and 2009-2010 school years; provided that a student whose IEP includes use of aversive interventions as of June 30, 2009 may be granted such exception in each subsequent school year, unless the IEP is revised to no longer include such exception. No child-specific exception shall be granted for a preschool student. Whenever a CSE is considering whether a child-specific exception is warranted, the school district shall submit an application to the Commissioner for referral to an independent panel of experts. The CSE shall, based on its consideration of the recommendation of the panel, determine whether the student's IEP shall include a child-specific exception. The school district shall notify the Commissioner when such exemption has been included in the student's IEP. An IEP providing such exemption shall identify the specific targeted behaviors, aversive interventions to be used, and aversive conditioning devices where the aversive interventions include use of such devices.

Public schools, BOCES, charter schools, approved private schools, State-operated or State-supported schools in NYS and approved out-of-State day or residential schools are subject to section 200.22(f) program standards for use of aversive interventions. Each school using aversive interventions shall establish a Human Rights Committee pursuant to section 200.22(f)(3) to monitor the program. Persons using aversive interventions shall be supervised and trained pursuant to section 200.22(f)(4). Pursuant to section 200.22(f)(5), aversive interventions shall be provided only with the parent's informed written consent and no parent shall be required by the program to remove the student from the program if the parent refuses consent. Use of aversive interventions is subject to quality assurance reviews pursuant to section 200.22(f)(6) and the program shall provide for ongoing monitoring of student progress pursuant to section 200.22(f)(7), including quarterly written progress reports. A school district placing a student in such program shall ensure the student's IEP and BIP are being implemented. The CSE shall convene at least every six months to review the student's educational program and placement, including review of written progress monitoring and incident reports, at least annual observations of, and, as appropriate, interviews with the student and regular communication with the parent. Each school proposing to use aversive interventions pursuant to a child-specific exception shall submit its policies and procedures consistent with section 200.22(f) to the Department for approval prior to use.

Section 201.2(a) proposes to amend the definition of BIP to add that the strategies must include positive behavioral supports and services to address the behavior.

COMPLIANCE COSTS:

School districts may incur minimal costs to duplicate materials to submit an application for a child-specific exception and for required observations (estimated at a $200 per student) and Committee on Special Education (CSE) meetings at least every six months for students receiving aversive behavioral interventions (estimated at $1,000 per student). Currently, it is estimated that less than 30 school districts in New York State have students placed in schools using aversive interventions and most of these have only one student where such a recommendation currently appears on the student's individualized education program (IEP). Schools using aversive interventions may also incur additional administrative costs estimated at less than $8,000 annually for implementing standards, including staff training (estimated at $2,000 annually) and costs associated with convening Human Rights Committee meetings at least quarterly (e.g., administrative oversight, duplication and meeting costs estimated at $6,000 per year).

*Revised Rural Area Flexibility Analysis*

Since publication of a Notice of Emergency Adoption and Proposed Rule Making in the *State Register* on July 12, 2006, the proposed rule has been substantially revised as set forth in the Revised Regulatory Impact Statement submitted herewith.

The revisions require that the term "aversive behavioral intervention" be replaced with "aversive intervention" throughout the previously published Rural Area Flexibility Analysis and that the Reporting, Record-Keeping and Other Compliance Requirements and Professional Services section and Cost section be revised to read as follows:

REPORTING, RECORDKEEPING AND OTHER COMPLIANCE REQUIREMENTS AND PROFESSIONAL SERVICES:

Section 19.5(a) prohibits use of corporal punishment in school districts, BOCES, charter schools, State-operated or State supported schools, approved preschool programs, approved private schools, approved out-of-State day or residential schools, or in registered nonpublic nursery, kindergarten, elementary or secondary schools in the State.

Section 19.5(b) prohibits use of aversive interventions except pursuant to a child-specific exception pursuant to section 200.22(e) and (f).

Section 200.1(r) of the Commissioner's Regulations, as amended, revises the definition of FBA to cross reference the requirements in section 200.22(a).

Section 200.4(d)(3)(i) requires a CSE, in developing a student's IEP, to consider supports and strategies, including positive behavioral interventions, to address student behaviors that are consistent with program standards in section 200.22.

A CSE/CPSE shall conduct a FBA in accordance with section 200.22(a) and develop and implement a BIP in accordance with 200.22(b).

Each school, which uses a time out room as part of its behavior management approach, is subject to section 200.22(c) requirements.

Section 200.22(d) establishes requirements regarding emergency interventions.

Section 200.22(e) provides that a child-specific exception to the prohibition of the use of aversive interventions may be granted for school-age students only during the 2006-2007, 2007-2008 and 2009-2010 school years; provided that a student whose IEP includes use of aversive interventions as of June 30, 2009 may be granted such exception in each subsequent school year, unless the IEP is revised to no longer include such exception. No child-specific exception shall be granted for a preschool student. Whenever a CSE is considering whether a child-specific exception is warranted, the school district shall submit an application to the Commissioner for referral to an independent panel of experts. The CSE shall, based on its consideration of the recommendation of the panel, determine whether the student's IEP shall include a child-specific exception. The school district shall notify the Commissioner when such exemption has been included in the student's IEP. An IEP providing such exemption shall identify the specific targeted behaviors, aversive interventions to be used, and aversive conditioning devices where the aversive interventions include use of such devices.

Public schools, BOCES, charter schools, approved private schools, State-operated or State-supported schools in NYS and approved out-of-State day or residential schools are subject to section 200.22(f) program standards for use of aversive interventions. Each school using aversive interventions shall establish a Human Rights Committee pursuant to section 200.22(f)(3) to monitor the program. Persons using aversive interventions shall be supervised and trained pursuant to section 200.22(f)(4). Pursuant to section 200.22(f)(5), aversive interventions shall be provided only with the parent's informed written consent and no parent shall be required by the program to remove the student from the program if the parent refuses consent. Use of aversive interventions is subject to quality assurance reviews pursuant to section 200.22(f)(6) and the program shall provide for ongoing monitoring of student progress pursuant to section 200.22(f)(7), including quarterly written progress reports. A school district placing a student in such program shall ensure the student's IEP and BIP are being implemented. The CSE shall convene at least every six months to review the student's educational program and placement, including review of written progress monitoring and incident reports, at least annual observations of, and, as appropriate, interviews with the student and regular communication with the parent. Each school proposing to use aversive interventions pursuant to a child-specific exception shall submit its policies and procedures consistent with section 200.22(f) to the Department for approval prior to use.

Section 201.2(a) proposes to amend the definition of BIP to add that the strategies must include positive behavioral supports and services to address the behavior.

COSTS:

School districts may incur minimal costs to duplicate materials to submit an application for a child-specific exception and for required observations (estimated at a $200 per student) and Committee on Special Education (CSE) meetings at least every six months for students receiving aversive behavioral interventions (estimated at $1,000 per student). Currently, it is estimated that less than 30 school districts in New York State have students placed in schools using aversive interventions and most of these have only one student where such a recommendation currently appears on the student's individualized education program (IEP). Schools using aversive interventions may also incur additional administrative costs estimated at less than $8,000 annually for implementing standards, includ-

**Rule Making Activities**

ing staff training (estimated at $2,000 annually) and costs associated with convening Human Rights Committee meetings at least quarterly (*e.g.*, administrative oversight, duplication and meeting costs estimated at $6,000 per year).

*Revised Job Impact Statement*

Since publication of a Notice of Emergency Adoption and Proposed Rule Making in the *State Register* on July 12, 2006, the proposed rule has been substantially revised as set forth in the Revised Regulatory Impact Statement submitted herewith.

The proposed rule, as so revised, is necessary in order to establish standards for behavioral interventions for students with disabilities, including a prohibition on the use of aversive behavioral interventions; to provide for a child specific exception to the prohibition on the use of aversive behavioral interventions; and to establish standards for programs using aversive behavioral interventions. These amendments will ensure that aversive behavioral interventions are used only when necessary; in accordance with research-based practices; under conditions of minimal intensity and duration to accomplish their purpose; and in accordance with the highest standards of oversight and monitoring. The revised proposed rule will not have a substantial impact on jobs and employment opportunities. Because it is evident from the nature of the revised proposed rule that it will not affect job and employment opportunities, no affirmative steps were needed to ascertain that fact and none were taken. Accordingly, a job impact statement is not required, and one has not been prepared.

*Summary of Assessment of Public Comment*

Since publication of a Notice of Emergency Adoption and Proposed Rule Making on July 12, 2006, the State Education Department (SED) received the following comments.

1. General
COMMENT:

Most opposed use of aversives; some supported procedures to limit aversives and assure children receive other appropriate interventions; a few opposed any restrictions on aversives.

DEPARTMENT RESPONSE:

Use of aversives has been considered in relation to its treatment value for students with severe self-injurious behaviors, its basis in scientific research, its potential effect on a student's health and safety, and moral and ethical issues. SED does not support the use of aversives. However, some parents expressed that without this intervention their child's health and safety is at risk because of the child's severe self-injurious behaviors. Revised rule allows for new child-specific exceptions to use aversive interventions until June 30, 2009, provided that students with aversive interventions recommended on their individualized education programs (IEPs) as of June 30, 2009 may continue to be considered for a child-specific exception annually thereafter. SED will take steps during the next two years to ensure that effective research-based alternative behavioral interventions are available for all New York students.

2. Section 19.5(a) - Prohibition of corporal punishment
COMMENT:

Prohibit corporal punishment without exception; distinguish between "physical force" and "corporal punishment."

DEPARTMENT RESPONSE:

Corporal punishment is prohibited without exception. Other recommended changes are beyond scope of proposed rule making.

3. Section 19.5(b)(2) and Section 200.1(lll) – Definition of aversive intervention
COMMENT:

Categorize restrictive interventions at different levels; identify aversives not allowed; add definitions of other interventions; allow aversives such as helmets and restraints necessary to avoid injury; prohibit harmful aversives such as electric shock and noxious sprays.

DEPARTMENT RESPONSE:

Revised rule revised definition of 'aversive intervention' and specifies aversives not allowed. It is not practicable to define the various forms of other behavioral interventions.

4. Section 19.5(b) - Exception to the prohibition on aversives
COMMENT:

Prohibit aversives without exception. Mild aversives may be more appropriate than time out or restraints. Allowing aversives violates students' civil rights. It is discriminatory to prohibit aversives for nondisabled students but allow them for students with disabilities.

DEPARTMENT RESPONSE:

Limited exceptions to use aversives are intended to address parent concerns for their children with severe self-injurious behaviors who may not have had the opportunity to benefit from current research and practice

on the effective use of nonaversive interventions. Revised rule sunsets child-specific exception by June 30, 2009 except for students with IEPs including aversive interventions as of June 30, 2009.

5. Section 200.7 - Approval of private schools
COMMENT:

Require onsite program review by SED staff prior to approval of a new program.

DEPARTMENT RESPONSE:

SED may consider this recommendation in future rule making.

6. Section 200.22(a) – Functional Behavioral Assessment (FBA)
COMMENT:

Prohibit use of aversives and require training on FBAs and positive behavior intervention plans (BIPs). Require in-depth analyses of behaviors when shock is used.

DEPARTMENT RESPONSE:

The Individuals with Disabilities Education Act (IDEA) requires IEPs to include positive behavioral supports and services and FBAs and BIPs to be developed and implemented for students with behaviors that impede learning. The definition of BIP is revised to require intervention strategies to include positive behavioral supports and interventions.

7. Section 200.22(b) – BIPs
COMMENT:

Specify qualified professionals that can design and supervise BIPs; require all interventions, including antecedent and other consequences, be supported by peer-reviewed research.

DEPARTMENT RESPONSE:

Requirement that BIPs be designed and supervised by qualified professionals in accordance with their respective areas of professional competence has been deleted since BIPs are often developed by teams of qualified individuals. Section 200.4 requires the IEP to include, to extent practicable, programs and services that are based on peer-reviewed research.

8. Section 200.22(c) – Time Out Rooms
COMMENT:

Define time out room; prohibit its use; provide clear procedures on its use with the student's safety as the priority; prohibit seclusion.

DEPARTMENT RESPONSE:

Revised rule establishes standards for use of time out rooms including physical and monitoring requirements, parent rights and IEP requirements. Section is revised to define "time out room;" add other monitoring, policy and parent communication requirements; and clarify that time out rooms are to be used in conjunction with a BIP except for unanticipated situations that pose an immediate concern for the physical safety of the student or others.

9. Section 200.22(d) - Emergency use of physical restraints
COMMENT:

Prohibit non-emergency restraint use in facilities receiving federal funding. Adopt federal law (42 USC § 15009); allow use of mechanical restraints for emergency interventions; define physical, chemical and mechanical restraints; specify appropriate durations of restraint; add reporting requirements; and require parent consent prior to use of physical restraint.

DEPARTMENT RESPONSE:

Proposed regulation is consistent with federal law. Revised rule defines emergency; clarifies emergency interventions may not be used as a punishment and may be used only in situations in which alternative procedures and methods not involving the use of physical force cannot reasonably be employed; requires the school to maintain documentation on the use of emergency interventions; and prohibits use of aversives as an emergency intervention. It is not possible to specify the appropriate duration of an emergency intervention or require parent consent prior to intervening in an emergency situation.

10. Section 200.22(e) - Child-specific exception to use aversives
COMMENT:

While most opposed a child-specific exception, comments requested clarification and additional protections if exception allowed, including: clarify criteria for when an exception is appropriate; require Panel to include other individuals, including those experienced with aversives; do not limit Panel's review to written documentation; require districts to notify SED if a previously approved aversive plan is discontinued; include an enforcement mechanism so that school districts would be held accountable for noncompliance; allow Committees on Special Education (CSEs) to reapply if alternative procedures fail to suppress or reduce behaviors; give parents the right to choose aversives; allow court-ordered use of aversives; do not allow CSEs to make the final decision to allow aversives;

require more medical information and CSE consultation with a certified behavior analyst or psychologist with extensive experience in behavior analysis; do not limit aversives based on a student's unsuccessful history with positive behavioral supports; and clarify that an exception application must be submitted annually.

DEPARTMENT RESPONSE:

Panel's determination is based on the professional judgment of the Panel members in review of the individual student's behaviors, evaluations, including medical information, and history of the use of positive and other behavioral interventions used with the student. Positive behavioral supports are only one factor in the determination. Panel members must have appropriate clinical and behavioral expertise to make a determination. It is not necessary for such individuals to have experience using aversives. Only a CSE can develop a student's IEP consistent with federal and State laws and regulations.

Revised rule requires CSE to notify and provide a copy of the student's IEP to SED when a child-specific exception is in the IEP and when IEPs are amended to no longer include a child-specific exception; to require the school physician to be invited to the CSE meeting whenever a recommendation for the use of aversives is being considered; and clarify that an exception application must be submitted each year.

11. Section 200.22(f) Program standards for the use of aversives

COMMENT:

Provide greater limitations on programs using aversives; require greater oversight and supervision when aversives used, including medical and psychological reviews, outcome measures identified and use of video cameras. Clarify what is meant by use of aversives in a humane and dignified manner. Define "aggressive behavior." Ban electric skin shock and do not allow devices that administer electric shock. Limit behaviors for which aversives can be used to only most serious ones. Give programs discretion as to type of aversives that can be used, including use of contingent physical restraints and allow aversives to be used for noncompliant and antecedent behaviors because one program reported students who were receiving aversives for noncompliance and other inappropriate behaviors are now demonstrating academic and behavioral regression. Require related services for a student receiving aversives to include "research-validated cognitive-behavior therapy" and "sensory integrative experiences." Limit use of aversive devices only with populations for which devices have been approved; and require regular maintenance of aversive devices. Allow physical restraint to be used as a contingent procedure. Adopt policies and procedures specific to the use of helmets, restraints and other mechanical devices to ensure the health and safety of a child, not to punish or inflict discomfort. Disseminate information on risks associated with using restraints, seclusion and physical force to school personnel. Prohibit use of aversive consequences in combination with negative practice (overcorrection) procedure.

DEPARTMENT RESPONSE:

Revised rule limits programs using aversives to those whose policies and procedures are approved by June 30, 2007; prohibits use of aversives by preschool programs; requires aversives be considered only for students displaying self-injurious and/or aggressive behaviors that threaten the physical well being of the student or that of others and only to address such behaviors; requires CSE to request participation of school physician to any meeting where use of aversives is being considered; requires aversives be administered by appropriately licensed professionals or certified special education teachers or under the direct supervision and direct observation of such staff; defines emergency interventions; and requires training in safe and effective restraint for staff who may be called upon to implement emergency interventions.

Use of automated aversive conditioning devices present health and safety risks. Mechanical restraint for the purpose of applying another aversive such as skin shock is corporal punishment. The CSE determines appropriate related services for a student. Proposed regulations require evidence of the safety and effectiveness of aversive devices for the population to be served. Interventions medically necessary for the treatment or protection of the student are not considered aversives.

12. Human Rights Committee (HRC)

COMMENT:

Clarify purpose of the HRC; require special educators, school psychologists and positive behavior experts as members. Allow staff employed by the agency and others not employed by the program to serve on the HRC; do not allow a physician's assistant or nurse practitioner to be used in place of a doctor and a law student or paralegal in place of a lawyer.

DEPARTMENT RESPONSE:

The HRC serves as an objective review body to protect student rights. To be practicable, flexibility to appoint a licensed physician, physician's assistant or nurse practitioner and an attorney, law student or paralegal is necessary to ensure availability of medical and legal perspectives at HRC meetings. The revised rule allows additional HRC members who are not affiliated with the program.

13. Supervision and training requirements

COMMENT:

Require higher qualifications on individuals who provide, supervise and monitor aversive interventions.

DEPARTMENT RESPONSE:

Revised rule requires appropriately licensed professionals or certified special education teachers or under the direct supervision and direct observation of such staff to administer aversives.

14. Parental Consent

COMMENT:

Ensure parents understand their rights and are provided with effective alternatives to aversives. Allow adult students to provide consent for aversives. Allow the program to discharge the student if the parent does not consent for aversives.

DEPARTMENT RESPONSE:

A school must provide the parent with written prior notice that describes any other options considered when it requests parent consent. A program must not intentionally or unintentionally coerce a parent to provide consent. NYS does not transfer IDEA rights to the student at the age of majority.

15. School district responsibility for progress monitoring

COMMENT:

Increase school district oversight of a student in a program that uses aversives.

DEPARTMENT RESPONSE:

Revised rule requires a six-month student observation and interview.

16. Other:

COMMENT:

Restrict use of medications with negative side effects and that are not approved for children by the Food and Drug Administration.

DEPARTMENT RESPONSE:

The use of medication is beyond the scope of this rule making.

# Insurance Department

## EMERGENCY
## RULE MAKING

**Rules Relating to Processing of Claims**

**I.D. No.** INS-46-06-00012-E
**Filing No.** 1295
**Filing date:** Oct. 31, 2006
**Effective date:** Oct. 31, 2006

PURSUANT TO THE PROVISIONS OF THE State Administrative Procedure Act, NOTICE is hereby given of the following action:

*Action taken:* Addition of Part 56 (Regulation 183) to Title 11 NYCRR.

*Statutory authority:* Insurance Law, sections 201, 301, 1109, 3201, 3216, 3217, 3221, 4235, 4303, 4304, 4305 and 4802 and art. 49

*Finding of necessity for emergency rule:* Preservation of general welfare.

*Specific reasons underlying the finding of necessity:*

Insurance Law and regulations require certain health insurance policies to provide coverage for surgical services. 11 NYCRR 52.16(c)(5) permits insurers to exclude coverage for surgery that is considered to be cosmetic. Articles 49 of the Insurance Law and Public Health Law, enacted after Section 52.16, provide for internal and external appeal when services are denied as not medically necessary.

It is the Insurance Department's position that whenever surgery is a covered benefit under a policy, a determination that the surgery is cosmetic is a medical necessity determination subject to the utilization review and external review requirements of Title I and Title II of Article 49 of the Insurance Law or Public Health Law. It has come to the Department's

# EXHIBIT 15



**THE STATE EDUCATION DEPARTMENT** / THE UNIVERSITY OF THE STATE OF NEW YORK / ALBANY, NY 12234

**TO:**               EMSC-VESID Committee

**FROM:**           Rebecca H. Cort

**SUBJECT:**      Emergency adoption of proposed regulations relating to behavioral interventions, including the use of aversive behavioral interventions.

**DATE:**           June 6, 2006

**STRATEGIC GOAL:**   Goals 1 and 2

**AUTHORIZATION(S):**

## SUMMARY

### Issue for Decision

Should the Regents approve as an emergency action the proposed amendment to section 19.5 of the Rules of the Board of Regents and the proposed amendments to sections 200.1, 200.4 and 200.7 and a new proposed section 200.22 of the Regulations of the Commissioner of Education, relating to behavioral interventions?

### Reason for Consideration

Review of Policy.

### Proposed Handling

The proposed amendment is before the Committee for emergency action.

### Procedural History

This issue was first discussed at the March 2006 EMSC/VESID Committee Meeting. Draft proposed regulations were discussed at the May 2006 EMSC/VESID Committee Meeting.

Background Information

Currently, neither New York State (NYS) Education Law nor Regulations of the Commissioner prohibit the use of aversive behavioral interventions in school programs, although the Rules of the Board of Regents prohibit corporal punishment. There is currently a lack of a clear policy and no standards or guidance on this issue at a time when we are assessing the extent of the use of aversive interventions at public and private school programs. We believe that greater guidance and oversight is necessary to ensure the availability of professional advice to school districts and parents when making the difficult decision as to whether all possible alternatives to aversive interventions have been considered and, where aversive interventions are determined to be absolutely necessary, on how to minimize their intensity and duration.

At the March 2006 EMSC/VESID Committee meeting, the Regents reviewed issues to consider in discussing and developing a policy on the use of aversive behavioral interventions. At the May 2006 Committee meeting, the Regents discussed proposed draft regulations and reviewed additional findings relating to the need for a policy on the use of aversive behavioral interventions, including information that:

- At least two approved private preschool programs use some forms of aversive interventions, such as the application of lemon juice or hot sauce to a student's lips for inappropriate behaviors. There are no State standards that would limit or provide required oversight of the administration of such interventions (e.g., there is no current requirement for Human Rights or Peer Review Committee reviews for such recommendations). We have learned that in some instances the school districts that placed the preschool children in these programs were unaware that such aversive behavioral interventions were being used with the children.

- The policy of the residential school that uses aversive interventions most extensively includes *manual and mechanical movement limitation; contingent food programs* and *electrical stimulation* (i.e., electric shock). The Department conducted a site review of this program and identified several findings that raise significant concerns about the use of aversive behavioral interventions as they are being used with NYS students. In addition, we were unable to identify any peer-reviewed research which supports the interventions as used at this school, including the use of electric shock on the population of students at the intensities, frequency, circumstances, and for the types of behaviors and duration (in some cases for more than three years) for which they are used. A report of findings from two recent visits to this school has been shared with the members of the Board of Regents under separate cover.

The purpose of the proposed amendment is to establish policy and general rules for behavioral interventions, including a prohibition on the use of aversive behavioral interventions. The proposed regulations would establish a process whereby a panel of independent experts would provide a recommendation to a committee on special education (CSE) or committee on preschool special education (CPSE) for a child-specific exception to the prohibition on the use of aversive behavioral interventions

when necessary for behaviors that pose significant health and safety concerns. The proposed amendment would also establish standards for assessing student behaviors, developing and implementing behavioral intervention plans, emergency interventions, use of time out rooms and standards for programs using aversive behavioral interventions, as authorized through the child-specific exception process.

The proposed amendment was modified from the draft version discussed at the May 2006 Regents meeting as follows:

- The definition of aversive behavioral interventions was modified to include noxious tastes; to clarify that contingent food programs means withholding meals or limiting essential nutrition or hydration; and to clarify that the term does not include interventions medically necessary for the treatment or protection of the student.

- The program standards for functional behavioral assessments (FBA) and behavioral intervention plans were modified to require multiple sources of data to establish a baseline of behaviors with regard to the frequency, duration, intensity and/or latency of the behaviors.

- The process for child-specific exceptions to use aversive behavioral interventions to reduce or modify student behaviors was modified to limit the independent panel to three members; to delete the requirement that the panel reach unanimous agreement; to add that the panel review the student's diagnosis(es); and to modify the criteria upon which the panel makes its determination as to whether a child-specific exception to the prohibition on the use of aversive behavioral interventions is warranted. The time period of 15 business days for the panel determination was modified to apply when a CSE or CPSE is first considering a child-specific exception to the prohibition on the use of aversive behavioral interventions.

- The program standards for the use of aversive behavioral interventions was modified to prohibit the use of restraint combined with other aversive behavioral interventions on a student; and to prohibit the use of automated aversive conditioning devices.

- The requirements for the ongoing monitoring of student progress when aversive behavioral interventions are used were modified to include reports on the assessment of and strategies used to address any indirect or collateral effects the use of aversive behavioral interventions may be having on the student.

Timetable for Implementation

The effective date of the emergency adoption is June 23, 2006. A Notice of Emergency Adoption and Proposed Rule Making will be published in the State Register on July 12, 2006. Public comment will be accepted until August 28, 2006. The proposed amendment will be presented to the Board of Regents at the September 2006 meeting for permanent adoption.

<u>Recommendation</u>

It is recommended that the Board of Regents take the following action:

VOTED:

That section 19.5 of the Rules of the Board of Regents be amended; that new paragraphs (lll) and (mmm) of section 200.1 of the Regulations of the Commissioner be added; that subparagraph (i) of paragraph (3) of subdivision (d) of section 200.4 of the Regulations of the Commissioner be amended; that subparagraph (i) of paragraph (2) and subparagraph (iv) of paragraph (3) of subdivision (a) of section 200.7 of the Regulations of the Commissioner be amended; that a new paragraph (8) of subdivision (b) and a new paragraph (6) of subdivision (c) be added to section 200.7 of the Regulations of the Commissioner; and that a new section 200.22 be added to the Regulations of the Commissioner, as submitted, effective June 23, 2006, as an emergency action upon a finding by the Board of Regents that such action is necessary for the preservation of the public health and safety  in order to minimize the risk of physical injury and/or emotional harm to students who are subject to aversive behavioral interventions that inflict pain or discomfort, by immediately establishing standards for such interventions that will ensure they are used only when absolutely necessary and under conditions of minimal intensity and duration to accomplish their purpose.

Attachments

PROPOSED AMENDMENT OF SECTION 19.5 OF THE RULES OF THE BOARD OF REGENTS AND SECTIONS 200.1, 200.4 AND 200.7 OF THE REGULATIONS OF THE COMMISSIONER OF EDUCATION AND PROMULGATION OF A NEW SECTION 200.22 OF THE REGULATIONS OF THE COMMISSIONER OF EDUCATION PURSUANT TO SECTIONS 207, 210, 305, 4401, 4402, 4403 AND 4410 OF THE EDUCATION LAW, RELATING TO BEHAVIORAL INTERVENTIONS, INCLUDING THE USE OF AVERSIVE BEHAVIORAL INTERVENTIONS

STATEMENT OF FACTS AND CIRCUMSTANCES WHICH NECESSITATE EMERGENCY ACTION

The purpose of the proposed rule is to establish standards for behavioral interventions, including a prohibition on the use of aversive behavioral interventions; to provide for a child-specific exception to the prohibition on the use of aversive behavioral interventions; and to establish standards for programs using aversive behavioral interventions.

Currently, neither New York State Education Law nor the Regulations of the Commissioner prohibit the use of aversive behavioral interventions in school programs serving New York State students.  Aversive behavioral interventions have the potential to affect the health and safety of children, yet there is currently a lack of a clear policy and no standards on their use in school programs.  Through site visits, reports and complaints filed by parents, school districts and others, the Department identified concerns with preschool programs serving children with disabilities that use aversive behavioral interventions such as sprays to the face and noxious tastes placed on the child's lips, and an out-of-state residential school serving more than 145 New York State

students with disabilities that is using contingent food programs, mechanical restraints and electric shock interventions to modify students' behaviors.  A recent site review of the out-of-state residential school identified significant concerns for the potential impact on the health and safety of New York's students placed at this school.  Regulations are needed to limit the aversive behavioral interventions that inflict pain and discomfort to children and have the potential to result in physical injury and/or emotional harm.  In those exceptional instances when a child displays such extreme self-injurious or aggressive behaviors as to warrant a form of punishment to intervene with the behavior, regulations are necessary to ensure that such interventions are used in accordance with the highest standards of oversight and monitoring and in accordance with research-based practices.

Emergency action to adopt the proposed rule is necessary for the preservation of the public health and safety in order to minimize the risk of physical injury and/or emotional harm to students who are subject to aversive behavioral interventions that inflict pain or discomfort, by immediately establishing standards for the use of such interventions that will ensure they are used only when absolutely necessary and under conditions of minimal intensity and duration to accomplish their purpose.

It is anticipated that the proposed rule will be presented to the Board of Regents for adoption as a permanent rule at the September 2006 meeting of the Board of Regents, which is the first scheduled meeting after expiration of the 45-day public comment period mandated by the State Administrative Procedure Act.

AMENDMENT TO THE REGULATIONS OF THE COMMISSIONER OF EDUCATION

Pursuant to Education Law sections 207, 210, 305, 4401, 4402, 4403, and 4410

1.      Section 19.5 of the Rules of the Board of Regents is amended, effective June 23, 2006, as follows:

§ 19.5  Prohibition of corporal punishment and certain behavioral interventions.

(a)  Prohibition of corporal punishment.

(1) No teacher, administrator, officer, employee or agent of a school district in this State, [or of] a board of cooperative educational services (BOCES), a charter school, State-operated or State-supported school, an approved preschool program, an approved private school, an approved out-of-State day or residential school, or a registered nonpublic nursery, kindergarten, elementary or secondary school in this State, shall use corporal punishment against a pupil.

[(b)] (2) As used in this section, corporal punishment means any act of physical force upon a pupil for the purpose of punishing that pupil, except as otherwise provided in [subdivision (c)] paragraph 3 of this [section] subdivision.

[(c)] (3) In situations in which alternative procedures and methods not involving the use of physical force cannot reasonably be employed, nothing contained in this section shall be construed to prohibit the use of reasonable physical force for the following purposes:

[(1)] (i) to protect oneself from physical injury;

[(2)] (ii) to protect another pupil or teacher or any person from physical injury;

[(3)] (iii) to protect the property of the school, school district or others; or

1

[(4)] (iv) to restrain or remove a pupil whose behavior is interfering with the orderly exercise and performance of school or school district functions, powers and duties, if that pupil has refused to comply with a request to refrain from further disruptive acts.

(b)      Prohibition of the use of aversive behavioral interventions.

(1)      No public school, BOCES, charter school, approved preschool program, approved private school, State-operated or State-supported school in this State, approved out-of-State day or residential school, or registered nonpublic nursery, kindergarten, elementary or secondary school in this State shall employ the use of aversive behavioral interventions to reduce or eliminate maladaptive behaviors, except as provided pursuant to section 200.22(e) and (f) of this Title.

(2)      As used in this section, aversive behavioral intervention means:

(i)      application of noxious, painful, intrusive stimuli or activities intended to induce pain such as electric skin shock, ice applications, hitting, slapping, pinching, kicking, hurling, strangling, shoving, deep muscle squeezes or other similar stimuli;

(ii)      any form of noxious, painful or intrusive spray, inhalant or tastes;

(iii)      withholding sleep, shelter, bedding, bathroom facilities or clothing;

(iv)      contingent food programs that include withholding meals or limiting essential nutrition or hydration or intentionally altering staple food or drink in order to make it distasteful;

(v)      movement limitation used as a punishment, including but not limited to helmets and mechanical restraint devices;

2

(vi)     the placement of a child unsupervised or unobserved in a room from which the student cannot exit without assistance; or

(vii)     other stimuli or actions similar to the interventions described in subparagraphs (i) through (vi) of this paragraph.

The term does not include such interventions as voice control, limited to loud, firm commands; time-limited ignoring of a specific behavior; token fines as part of a token economy system; brief physical prompts to interrupt or prevent a specific behavior; interventions medically necessary for the treatment or protection of the student; or other similar interventions.

2.     Paragraphs (lll) and (mmm) are added to section 200.1 of the Regulations of the Commissioner of Education, effective June 23, 2006, as follows:

(lll)     Aversive behavioral intervention means application of noxious, painful, intrusive stimuli or activities intended to induce pain such as electric skin shock, ice applications, hitting, slapping, pinching, kicking, hurling, strangling, shoving, deep muscle squeezes or other similar stimuli; any form of noxious, painful or intrusive spray, inhalant or tastes; withholding sleep, shelter, bedding, bathroom facilities or clothing; contingent food programs that include withholding meals or limiting essential nutrition or hydration or intentionally altering staple food or drink in order to make it distasteful; movement limitation used as a punishment, including but not limited to helmets and mechanical restraint devices; the placement of a child unsupervised or unobserved in a room from which the student cannot exit without assistance; or  other similar stimuli or actions.  The term does not include such interventions as voice control, limited to loud, firm commands; time-limited ignoring of a specific behavior; token fines as part of a

3

token economy system; brief physical prompts to interrupt or prevent a specific behavior; interventions medically necessary for the treatment or protection of the student; or other similar interventions.

(mmm)  Behavioral intervention plan means a plan that is based on the results of a functional behavioral assessment and, at a minimum, includes a description of the problem behavior, global and specific hypotheses as to why the problem behavior occurs and intervention strategies to address the behavior.

3.     Subparagraph (i) of paragraph (3) of subdivision (d) of section 200.4 of the Regulations of the Commissioner of Education is amended, effective June 23, 2006, as follows:

(i)      in the case of a student whose behavior impedes his or her learning or that of others, consider strategies, including positive behavioral interventions, and supports and other strategies to address that behavior that are consistent with the requirements in section 200.22 of this Part;

4.     Subparagraph (i) of paragraph (2) of subdivision (a) of section 200.7 of the Regulations of the Commissioner is amended, effective June 23, 2006, as follows:

(i)      Conditional approval for private schools shall be limited to a period of one school year, or the period of time required to complete approval, and will be based on:

(a)     .   .   .

(b)     .   .   .

(c)     .   .   .

(d)     for schools operating as corporate entities, evidence of the following:

(1)     .   .   .

4

(2) . . .

(3)    for out-of-state schools, a license or charter from the state education agency of the state in which the school is located; [and]

(e)    at least one onsite program review visit by program or fiscal staff of the Education Department; and

(f)    submission for approval of the school's procedures regarding behavioral interventions, including, if applicable, procedures for the use of aversive behavioral interventions.

5.    Subparagraph (iv) of paragraph (3) of subdivision (a) of section 200.7 of the Regulations of the Commissioner of Education is amended, effective June 23, 2006, as follows:

(iv)    Schools may be removed from the approved list five business days after written notice by the commissioner indicating that there is a clear and present danger to the health or safety of students attending the school, and listing the dangerous conditions at the school, including, but not limited to, evidence that an approved private school is using aversive behavioral interventions to reduce or eliminate maladaptive behaviors of students without a child-specific exception provided pursuant to section 200.22(e) of this Part or that an approved private school is using aversive behavioral interventions in a manner inconsistent with the standards as established in section 200.22 (f) of this Part.

6.    Paragraph (8) is added to subdivision (b) of section 200.7 of the Regulations of the Commissioner of Education, effective June 23, 2006, as follows:

5

(8)    Except as provided in subdivision (e) of section 200.22 of this Part, an approved private school, a State-operated school, or a State-supported school is prohibited from using corporal punishment and aversive behavioral interventions to reduce or eliminate maladaptive behaviors of students.

7.    Paragraph (6) is added to subdivision (c) of section 200.7 of the Regulations of the Commissioner of Education, effective June 23, 2006, as follows:

(6)    Policies and procedures relating to the use of aversive behavioral interventions.  Not later than August 15, 2006, a private school that proposes to use or to continue to use aversive behavioral interventions in its program shall submit its written policies and procedures on behavioral interventions to the Department with certification that the school's policies, procedures and practices are demonstrably in compliance with the standards established in section 200.22(f) of this Part.  Any school that fails to meet this requirement shall be immediately closed to new admissions of New York students and shall be prohibited from using aversive behavioral interventions with any New York State student placed in such program.  Failure to comply with this requirement may result in termination of private school approval pursuant to paragraph (3) of subdivision (a) of this section.

8.    A new section 200.22 is added to Part 200 of the Regulations of the Commissioner of Education, effective June 23, 2006, as follows:

§ 200.22    Program standards for behavioral interventions.

Behavioral intervention plans shall be provided in accordance with this section and those other applicable provisions of this Part and/or Part 201 that are not inconsistent with this section.

6

(a)     Assessment of student behaviors.  For purposes of this section, an assessment of student behaviors shall mean a functional behavioral assessment (FBA), as such term is defined in section 200.1(r) of this Part.

(1)     A FBA shall be conducted as required in section 200.4 of this Part and section 201.3 of this Title.

(2)     The FBA shall, as appropriate, be based on multiple sources of data including, but not limited to, information obtained from direct observation of the student, information from the student, the student's teacher(s) and/or related service provider(s), a review of available data and information from the student's record and other sources including any relevant information provided by the student's parent.  The FBA shall not be based solely on the student's history of presenting problem behaviors.

(3)     The FBA shall provide a baseline of the student's problem behaviors with regard to frequency, duration, intensity and/or latency across activities, settings, people and times of the day and include the information required in section 200.1(r) of this Part in sufficient detail to form the basis for a behavioral intervention plan for the student that addresses antecedent behaviors, reinforcing consequences of the behavior, recommendations for teaching alternative skills or behaviors and an assessment of student preferences for reinforcement.

(b)     Behavioral intervention plan.  The CSE or CPSE shall consider the development of a behavioral intervention plan for a student with a disability whenever the student exhibits persistent behaviors that impede his or her learning or that of others, despite consistently implemented general school-wide or classroom-wide interventions; when the student's behavior places the student or others at risk of harm

7

or injury; when the CSE or CPSE is considering more restrictive programs or placements as a result of the student's behavior; and as required pursuant to section 201.3 of this Title.

(1)     In accordance with the requirements in section 200.4 of this Part, in the case of a student whose behavior impedes his or her learning or that of others, the CSE or CPSE shall consider strategies, including positive behavioral interventions and supports and other strategies to address that behavior.  If a particular device or service, including an intervention, accommodation or other program modification is needed to address the student's behavior that impedes his or her learning or that of others, the IEP shall so indicate.  A student's need for a behavioral intervention plan shall be documented on the IEP and such plan shall be reviewed at least annually by the CSE or CPSE.

(2)     Except as provided in subdivision (f) of this section, a behavioral intervention plan shall not include the use of aversive behavioral interventions.

(3)     The behavioral intervention plan shall identify:

(i)     the baseline measure of the problem behavior, including the frequency, duration, intensity and/or latency of the targeted behaviors.  Such baseline shall, to the extent practicable, include data taken across activities, settings, people and times of the day.  The baseline data shall be used as a standard to establish performance criteria and against which to evaluate intervention effectiveness;

(ii)     the intervention strategies to be used to alter antecedent events to prevent the occurrence of the behavior, teach individual alternative and adaptive behaviors to

8

the student, and provide consequences for the targeted inappropriate behavior(s) and alternative acceptable behavior(s); and

(iii)    a schedule to measure the effectiveness of the interventions, including the frequency, duration and intensity of the targeted behaviors at scheduled intervals.

(4)    Progress Monitoring.  The implementation of a student's behavioral intervention plan shall include regular progress monitoring of the frequency, duration and intensity of the behavioral interventions at scheduled intervals, as specified in the behavioral intervention plan and on the student's IEP.  The results of the progress monitoring shall be documented and reported to the student's parents and to the CSE or CPSE and shall be considered in any determination to revise a student's behavioral intervention plan or IEP.

(c)    Use of time out rooms.  (1) Each school which uses a time out room as part of its behavior management approach shall ensure that the school's policy and procedures on the use of the time out room are developed and implemented consistent with this subdivision, including the physical and monitoring requirements, parental rights and IEP requirements for students with disabilities.

(2)    A student's IEP shall specify when a behavioral intervention plan includes the use of a time out room for a student with a disability, including the maximum amount of time a student will need to be in a time out room as a behavioral consequence as determined on an individual basis in consideration of the student's age and individual needs.

9

(3)     Except for emergency interventions, the use of a time out room shall only be used in conjunction with a behavioral intervention plan that is designed to teach and reinforce alternative appropriate behaviors.

(4)     Parents shall be informed prior to the initiation of a behavioral intervention plan which will incorporate the use of a time out room.  Upon request, parents must be shown the physical space that will be used as a time out room.

(5)     The physical space used as a time out room shall provide a means for continuous visual and auditory monitoring of the student.  The room shall be of adequate width, length and height to allow the student to move about and recline comfortably.  Wall and floor coverings should be designed to prevent injury to the student and there shall be adequate lighting and ventilation.  The temperature of the room shall be within the normal comfort range and consistent with the rest of the building.  The room shall be clean and free of objects and fixtures that could be potentially dangerous to a student and shall meet all local fire and safety codes.

(6)     The time out room shall be unlocked and the door must be able to be opened from the inside.  The use of locked rooms or spaces for purposes of time out or emergency interventions is prohibited.

(7)     Staff shall be assigned to continuously monitor the student in a time out room.  The staff must be able to see and hear the student at all times.

(8)     The school shall establish and implement procedures to document the use of the time out room, including information to monitor the effectiveness of the use of the time out room to decrease specified behaviors.

(9)     For an education program operated pursuant to section 112 of the Education Law and Part 116 of this Title, if a provision of this section relating to use of time out rooms conflicts with the rules of the respective State agency operating such program, the rules of such State agency shall prevail and the conflicting provisions of this section shall not apply.

(d)     Emergency use of physical restraints.

(1)     The use of physical force to restrain a student from engaging in behaviors shall not be used as a substitute for systematic behavioral interventions that are designed to change, replace, modify or eliminate a targeted behavior.

(2)     Staff who may be called upon to implement emergency interventions shall be provided with appropriate training in safe and effective restraint interventions.

(3)     Emergency use of physical restraints shall be used only when no other methods of controlling the student's behaviors would be effective.

(4)  For an education program operated pursuant to section 112 of the Education Law and Part 116 of this Title, if a provision of this section relating to the emergency use of physical restraints conflicts with the rules of the respective State agency operating such program, the rules of such State agency shall prevail and the conflicting provision of this section shall not apply.

(e)     Child-specific exception to use aversive behavioral interventions to reduce or modify student behaviors.

(1)     (i)  Effective on or after October 1, 2006, whenever a CSE or CPSE is considering whether a child-specific exception to the prohibition of the use of aversive

behavioral interventions set forth in section 19.5(b) of this Title is warranted, the school district shall submit an application to the commissioner.

(ii)      For any student with an IEP in effect prior to October 1, 2006 that includes the use of aversive behavioral interventions, such application shall be submitted prior to the next scheduled review of the student's IEP, but not later than October 1, 2006.

(2)      The application shall be in a form prescribed by the commissioner.  The commissioner shall refer the application to an independent panel of experts appointed by the commissioner or commissioner's designee.  The panel shall be comprised of three professionals with appropriate clinical and behavioral expertise to make such determinations.

(3)      The panel shall review the written application; the student's IEP; the student's diagnosis(es); the student's functional behavioral assessment; any proposed, current and/or prior behavioral intervention plans for the student, including documentation of the implementation and progress monitoring of the effectiveness of such plans; and other relevant individual evaluations and medical information that allow for an assessment of the student's cognitive and adaptive abilities and general health status, including any information provided by the student's parent.

(4)      The panel's recommendation to the CSE or CPSE as to whether a child-specific exception is warranted shall be based on the professional judgment of the panel that:

(i)      the student is displaying self-injurious or aggressive behaviors that threaten the physical well being of the student or that of others and a full range of evidence-based positive behavioral interventions have been consistently employed over

12

an appropriate period of time and have failed to result in sufficient improvement of a student's behavior; or

(ii)     the student's self-injurious or aggressive behaviors are of such severity as to pose significant health and safety concerns that warrant the use of aversive behavioral interventions to effect rapid suppression of the behavior and a range of nonaversive prevention strategies have been employed and have failed to provide a sufficient level of safety.

(5)     The panel shall notify the school district and the commissioner of its recommendation as to whether a child-specific exception is warranted and the reasons therefor.  For applications received pursuant to subparagraph (i) of paragraph (1) of this subdivision, the panel shall provide such notice within 15 business days of receipt of an application.

(6)     The CSE or CPSE shall, based on its consideration of the recommendation of the panel, determine whether the student's IEP shall include a child-specific exception allowing the use of aversive behavioral interventions.  The school district shall notify the commissioner when a child-specific exception has been included in the student's IEP.

(7)     Any IEP providing for a child-specific exception allowing the use of aversive behavioral interventions shall identify the specific:

(i)      targeted behavior(s);

(ii)     aversive behavioral intervention(s) to be used to address the behavior(s); and

(iii)    aversive conditioning device(s) where the aversive behavioral intervention(s) includes the use of such device(s).

(8)    Nothing in this section shall authorize the use of aversive behavioral interventions without the informed written consent of the student's parent.

(9)    Any such child-specific exception shall be in effect only during the school year for which such IEP applies.  If the student's IEP is amended, or a subsequent IEP is adopted, that no longer permits the use of aversive behavioral interventions, the school district need not notify the panel or the commissioner.

(10)    For an education program operated pursuant to section 112 of the Education Law and Part 116 of this Title, if a provision of this section relating to the use of aversive behavioral interventions conflicts with the rules of the respective State agency operating such program, the rules of such State agency shall prevail and the conflicting provision of this section shall not apply.

(11)    Coordination with licensing agencies.  Nothing in this section shall authorize a school or agency to provide aversive behavioral interventions that are otherwise prohibited by the State agency licensing such program.

(f)    Program standards for the use of aversive behavioral interventions.

(1)    Applicability.  (i)  The requirements in this subdivision shall apply to a public school, BOCES, charter school, approved preschool program, approved private school, State-operated or State-supported school in this State and an approved out-of-State day or residential school.

(ii)    For an education program operated pursuant to section 112 of the Education Law and Part 116 of this Title, if a provision of this section relating to the use

14

of aversive behavioral interventions conflicts with the rules of the respective State agency operating such program, the rules of such State agency shall prevail and the conflicting provision of this section shall not apply.

(2)    General requirements.  Any program that employs the use of aversive behavioral interventions to modify an individual student's behavior as authorized pursuant to subdivision (e) of this section shall comply with the following standards:

(i)    The program shall provide for the humane and dignified treatment of the student and for the development of such student's full potential at all times.  The program shall promote respect for the student's personal dignity and right to privacy and shall not employ the use of threats of harm, ridicule or humiliation, nor implement behavioral interventions in a manner that shows a lack of respect for basic human needs and rights.

(ii)    Aversive behavioral intervention procedures may  be used only if such interventions are recommended by the CSE or CPSE consistent with the student's IEP and behavioral intervention plan as determined by the CSE or CPSE.

(iii)    Aversive behavioral intervention procedures shall not be the sole or primary intervention used with a student and shall be used in conjunction with other related services, as determined by the CSE or CPSE, such as verbal or other counseling services, speech and language therapy and/or functional communication training.

(iv)    Aversive behavioral interventions shall be combined with reinforcement procedures, as individually determined based on an assessment of the student's reinforcement preferences.

(v)     Aversive behavioral interventions shall be implemented consistent with peer-reviewed research based practices and shall include individualized procedures for generalization and maintenance of behaviors and for the fading of the use of such aversive behavioral interventions.

(vi)     The use of aversive behavioral interventions shall be limited to those self-injurious or aggressive behaviors identified for such interventions on the student's IEP.

(vii)     Whenever possible, the use of aversive behavioral interventions shall apply the lowest intensity for the shortest duration and period of time that is effective to treat the problem behavior and employ strategies that increase the effectiveness of mild levels of aversive behavioral interventions.  In the event the aversive behavioral intervention fails to result in a suppression or reduction of the behavior over time, alternative procedures shall be considered that do not include increasing the magnitude of the aversive behavioral intervention.

(viii)     The use of any aversive conditioning device used to administer an electrical shock or other noxious stimuli to a student to modify undesirable behavioral characteristics shall be limited to devices tested for safety and efficacy and approved for such use by the United States Food and Drug Administration where such approval is required by federal regulation.  The magnitude, frequency and duration of any administration of aversive stimulus from such a device must have been shown to be safe and effective in clinical peer-reviewed studies.  The use of automated aversive conditioning devices is prohibited.

(ix)     No program may use an aversive behavioral intervention on a student while the student is in a physical or mechanical restraint.

(x)    Behavioral intervention plans shall be designed and supervised by qualified professionals in accordance with their respective areas of professional competence.  All personnel involved in the development, application, monitoring, data collection or review of a behavioral intervention plan that includes the use of aversive behavioral interventions shall be appropriately certified in accordance with the provisions of Part 80 of this Title and sections 200.6 and 200.7 of this Part

(3)    Human Rights Committee.   (i) Each school that uses aversive behavioral interventions with students shall establish a Human Rights Committee to monitor the school's behavior intervention program for any student being considered for or receiving aversive behavioral interventions to ensure the protection of legal and human rights of individuals.

(ii)    The Human Rights Committee shall be comprised of individuals not employed by the school or agency, which shall include at least one licensed psychologist with appropriate credentials in applied behavior analysis; one licensed physician, physician's assistant or nurse practitioner; one registered dietician or nutritionist; one attorney, law student or paralegal; and one parent or parent advocate. In addition, when the purpose of the Human Rights Committee meeting includes a review of an individual New York State student's program, a representative of the school district or agency placing the student in the program and a representative of the Department shall be invited to participate.

(iii)    The Human Rights Committee shall meet at least quarterly to review, monitor and investigate the implementation of students' behavioral intervention plans that include aversive behavioral interventions.  A written report on the findings and

recommendations of the Human Rights Committee regarding an individual student shall be provided to the CSE or CPSE of the student and to the agency that placed the student in the program.

(4)    Supervision and training requirements.   Any person who uses aversive behavioral interventions on students shall receive appropriate supervision, including direct observation.  Appropriate training shall be provided on a regular, but at least annual basis, which shall include, but not be limited to, training on:

(i)    safe and therapeutic emergency physical restraint interventions;

(ii)    data collection of the frequency, duration and latency of behaviors;

(iii)    identification of antecedent behaviors and reinforcing consequences of the behavior;

(iv)    approaches to teach alternative skills or behaviors including functional communication training;

(v)    assessment of student preferences for reinforcement,

(vi)    assessing and responding to the collateral effects of the use of aversive behavioral interventions including, but not limited to, effects on a student's health, increases in aggression, increases in escape behaviors and/or emotional reactions;

(vii)    privacy rights of students; and

(viii)    documentation and reporting of incidents, including emergency restraints and injuries.

(5)    Parent consent.  Aversive behavioral interventions shall be provided only with the informed written consent of the parent and no parent shall be required by the

18

program to remove the student from the program if he or she refuses consent for an aversive behavioral intervention.

(6)     Quality assurance reviews.  The program's use of aversive behavioral interventions, including a review of all incident reports relating to such interventions, shall be subject to quality assurance reviews to ensure that practices are clinically sound, supported by proper documentation and consistent with these program standards and the school's policies and procedures as approved by the Department.

(7)     Progress monitoring.  (i) The program shall provide for ongoing monitoring of student progress, including the collection and review of data and information.  Such information shall include reports on the assessment of and strategies used to address any indirect or collateral effects the use of aversive behavioral interventions may be having on the student, including, but not limited to, increases in aggressive or escape behaviors, health-related effects and/or emotional reactions.  The program shall submit quarterly written progress reports on the implementation of the student's behavioral intervention program to the CSE or CPSE and to the agency that placed the student in the program.

(ii)     A school district that places a student in a program that uses aversive behavioral interventions with such student shall be responsible to ensure that the student's IEP and behavioral intervention plan are being implemented.  The CSE or CPSE shall convene at least every six months, or more frequently as needed, to review the student's educational program and placement for any student for whom the CSE or CPSE has recommended the use of aversive behavioral interventions.  Such review shall include the review of written progress monitoring and incident reports, at least

annual observations of and, as appropriate, interviews with the student in the program and regular communication with the student's parent.

(8)     Policies and procedures.  Each school that proposes to use aversive behavioral interventions pursuant to a child-specific exception shall submit its policies and procedures consistent with this subdivision to the Department for approval prior to the use of such interventions.

# EXHIBIT 16

# NEWS



**NEW YORK STATE BOARD OF REGENTS**
**THE STATE EDUCATION DEPARTMENT** / THE UNIVERSITY OF THE STATE OF NEW YORK / ALBANY, NY 12234
Office of Communications / (518) 474-1201

FOR IMMEDIATE RELEASE, Wednesday, June 14, 2006

For more information, contact:
Jonathan Burman, Tom Dunn, Alan Ray at 518/474-1201
www.nysed.gov

## NEW YORK STATE EDUCATION DEPARTMENT FINDS SERIOUS PROBLEMS AT JUDGE ROTENBERG CENTER IN MASSACHUSETTS

The New York State Education Department has concluded site visits to the Judge Rotenberg Educational Center, located in Canton, Massachusetts, that showed reason for serious concern regarding the school's use of aversive behavioral interventions. The Department has taken a series of actions to correct these practices:

- The Department notified JRC that it must immediately take corrective actions to cease certain interventions that threaten the health and safety of students at the school.  Failure to do so would impact its approval to serve NY State students.

- The Massachusetts Department of Education has been notified and requested to review the findings to determine whether action is required relative to their oversight responsibilities for the program.

- The report is being provided to the Massachusetts Probate Court that oversees the implementation of a settlement agreement that governs the procedures to be followed before and during the use of aversive therapies at JRC.

- The U.S. Food and Drug Administration has been notified regarding concerns relating to JRC's use of electric skin shock devices.

JRC provides residential and educational services to approximately 148 students from New York State.  The site visits were conducted because of concerns raised regarding JRC's use of aversive behavioral interventions, including the use of skin shock, manual and mechanical restraints.

The Board of Regents will meet on Monday, June 19 to consider the adoption of regulations that would apply to JRC and all other public and private schools to generally prohibit the use of aversive behavioral interventions and to establish specific standards for behavioral interventions used with students.

594

The site visits revealed serious concerns for the health, safety, privacy and dignity of students attending this school, including findings that:

- The background and preparation of staff is not sufficient to oversee the treatment of children with challenging emotional and behavioral problems.
- The skin shock device is used for relatively minor behaviors, such as nagging, swearing and failing to keep a neat appearance.
- Skin shock is used in a manner inconsistent with U. S. Food and Drug Administration required safety precautions, such as application of shock while students bathe or shower. Various injuries to students have been reported.
- The potential harmful psychological effects (such as depression, anxiety and fear) of the use of aversive interventions such as skin shock on students is not adequately assessed or addressed.
- The combined use of mechanical restraints and simultaneous application of skin shock has been used with some students.
- Many students were observed as they arrived to and from school wearing leg and wrist restraints.

# EXHIBIT 17

JAMES DeLORENZO                                      275

1           then, sir.

2    BY MR. LEE:

3           Q.   When the regulations were adopted in June

4    of 2006, can you identify for me any actual instance

5    when a student suffered an actual injury to their

6    health, safety, or well-being from their receipt of

7    aversive interventions?

8                   MR. McGOWAN:   Form.

9                   THE WITNESS:   No.

10   BY MR. LEE:

11          Q.   Now I want to switch gears a bit and talk

12   about another aspect of the regulations, and that's

13   the regulations prohibit the use of aversive

14   interventions for anything other than aggressive and

15   self-injurious behavior.   Is that correct?

16          A.   That's correct.

17          Q.   How do you define aggressive behavior?

18                   MR. McGOWAN:   Form.

19                   THE WITNESS:   Aggressive behavior is --

20              in this term is potentially harmful to self

21              or another individual.

22   BY MR. LEE:

23          Q.   Do the regulations define the term

24   "aggressive"?

JAMES DeLORENZO                          271

1           THE WITNESS:  Yes.  For example, the

2       issue about collateral effects of aversives

3       on individual students.

4   BY MR. LEE:

5       Q.   When the regulations were promulgated, were

6   you aware of any actual collateral effects to

7   students from their receipt of aversive

8   interventions?

9           MR. McGOWAN:  Form.

10          THE WITNESS:  We witnessed youngsters

11      that were clearly distraught and upset at

12      their situation at JRC.  So yes.

13  BY MR. LEE:

14      Q.   But were you aware of any student who

15  suffered any actual, long-term, physical harm from

16  their receipt of aversive interventions?

17          MR. McGOWAN:  Form.

18          THE WITNESS:  No.

19  BY MR. LEE:

20      Q.   Were you aware of any student who actually

21  suffered from any long-term emotional harm from

22  their receipt of aversive interventions when these

23  regulations were adopted?

24          MR. McGOWAN:  Form.

JAMES DeLORENZO                           272

1          THE WITNESS:  Long-term?

2          MR. LEE:  Yes.

3          THE WITNESS:  No.

4     BY MR. LEE:

5          Q.   Is it fair to say that when these

6     regulations were promulgated there was anecdotal

7     information regarding potential adverse effects to

8     students from their receipt of aversive

9     interventions?

10          MR. McGOWAN:  Form.

11          THE WITNESS:   The issue I was referring

12          to was the assessment of collateral

13          effects, that the assessment of collateral

14          effects was inadequate.

15    BY MR. LEE:

16          Q.   Okay.  Okay, but let me back up.  So it was

17    determined in approximately June of 2006 there was

18    an emergency or, rather, facts or circumstances that

19    justified adopting these regulations on an emergency

20    basis; correct?

21          A.   Yes.

22          Q.   Did that emergency exist on May 2006 after

23    the review team completed its visit?

24          MR. McGOWAN:  Form.

# EXHIBIT 18



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

ANDREW M. CUOMO
ATTORNEY GENERAL

Writer Direct:  (518) 474-7642

DIVISION OF STATE COUNSEL
LITIGATION BUREAU

February 13, 2008

Michael P. Flammia, Esq.
Eckert, Seamans Law Firm-Boston Office
One International Plaza, 18th Floor
Boston, MA  02110

Jeffrey J. Sherrin, Esq.
O'Connell, Aronowitz Law Firm-Albany Office
54 State Street, 9th Floor
Albany, NY  12207-2501

Meredith H. Savitt, Esq.
Office of Meredith H. Savitt
126 State Street, 6th Floor
Albany, NY  12207

Re:    *Alleyne, et al. v. New York State Education Department, et al.*
        United States District Court-Northern District of New York
        06-CV-0994      (GLS)

Dear Counselors:

        Enclosed for service upon you is a copy of the Expert Disclosure in the above-referenced case.

                                        Very truly yours,

                                        James B. McGowan
                                        Assistant Attorney General

Enclosure

RECEIVED
FEB 1 4 2008
O'Connell and Aronowitz, P.C.
For: _____

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JEANNETTE ALLEYNE, et al.,

                                    *Plaintiffs*,          06-CV-0994
                                                   (GLS)

                  -against-

NEW YORK STATE EDUCATION DEPARTMENT, et al.,

                                        *Defendants*.

Defendants, by their attorney, ANDREW M. CUOMO, Attorney General for the State of New York, hereby disclose, as directed by the Court at a conference held July 17, 2007, and an order dated January 28, 2008, that the following individual may be used as an expert for purposes of a dispositive motion:

                  Louis Hagopian, Ph.D.
                  Kennedy Krieger Institute
                  Room 200B, 2nd Floor Tower
                  707 N. Broadway
                  Baltimore, MD 21205

Dr. Hagopian is anticipated to testify about the justification for and propriety of New York State's regulations addressing certain behavioral interventions and education of children with disabilities, including the topics set forth in the attached report which is incorporated in its entirety by reference herein. In addition, the expert is expected to rebut plaintiffs' experts and address related topics. Defendants reserve the right to amend and/or supplement this disclosure up to and including the time of trial.

      Please find attached the curriculum vitae of Dr. Hagopian, which includes a list of publications by the expert witness and certain cases in which Dr. Hagopian has been engaged as an expert. In addition to those matters mentioned, Dr. Hagopian has given

trial testimony or been deposed as an expert in the following:

Testimony as an Expert Witness in the W.G. and B.G. o/b/o A.G. v. Brick Township Board of Education, New Jersey Office of Administrative Law, OAL Docket No. EDS-4374-03. January, 2006. Served as an Expert Witness on behalf of the plaintiff seeking educational and behavioral services.

Testimony as an Expert Witness in Louis Hagopian, Ph.D. v. CareFirst of Maryland, Inc., OAH Case Number: MIA-CC-33-06-46250. June, 2007. Served as an Expert Witness in appealing denial of insurance authorization and seeking payment for services.

Deposition as an Expert Witness in the Matter of the Fair Hearing of P.W. Case No. 08-0189. December, 2007. Served as an Expert Witness in support of P.W.'s appeal of denial for authorization for inpatient services at the Kennedy Krieger Institute.

Testimony as an Expert Witness in the Matter of the Fair Hearing of P.W. Case No. 08-0189. February, 2008. Served as an Expert Witness in support of P.W.'s appeal of denial for authorization for inpatient services at the Kennedy Krieger Institute.

The compensation to be paid to this expert for study and testimony is $250.00 per hour.

Dated:          February 13, 2008
                Albany, New York

                                ANDREW M. CUOMO
                                Attorney General of the State of New York
                                Attorney for Defendants
                                The Capitol
                                Albany, New York 12224
                                  S/ James B. McGowan
                                James B. McGowan
                                Assistant Attorney General, of Counsel
                                Bar Roll No. 507606
                                Telephone: (518) 474-7642
                                FAX: (518) 473-1572

To:    Michael P. Flammia, Esq.                Jeffrey J. Sherrin, Esq.
       Eckert, Seamans Law Firm - Boston Office    O'Connell, Aronowitz Law Firm -
       One International Plaza, 18th Floor      Albany Office
       Boston, MA 02110                        54 State Street - 9th Floor
                                               Albany, NY 12207-2501

       Meredith H. Savitt, Esq.
       Office of Meredith H. Savitt
       126 State Street, 6th Floor
       Albany, NY 12207

Expert Opinion

Regarding NYSED Regulations on the Use of Aversive Interventions

Louis Hagopian, Ph.D.

February 6, 2008

<u>s/ Louis Hagopian</u>

Louis Hagopian, Ph.D

**1) Are New York State regulations addressing the use of aversive interventions consistent with current research-based practices used for behavioral interventions?**

Yes. The NYSED regulations reflect current thought and research on the use of behavioral interventions involving aversive interventions, generally defined as those interventions "*intended to induce pain or discomfort to a student for the purpose of eliminating or reducing maladaptive behaviors.*" Essentially, the regulations are based on the following tenets:

   a) behavioral interventions should be based on a functional behavioral assessment;
   b) that the use of more intrusive interventions should be applied only when lesser intrusive interventions have been attempted and failed or they are warranted by the severity of the behavior; and
   c) aversive interventions, generally defined as interventions "*intended to induce pain or discomfort*" should be applied only when their use can be justified as absolutely necessary and following appropriate review and ongoing monitoring

What follows is commentary on each of these fundamental tenets guiding the NYDSE regulations on the use of aversives:

a) The need to develop behavioral interventions based on functional behavioral assessment findings is universally accepted in the professional and scientific community in the field of behavioral psychology and behavior analysis (e.g., Mace, 1994). Moreover, other scientific and professional communities have recognized the need to develop interventions based on an understanding of the function of problem behavior. For example, the National Institute of Health Consensus Conference on the "Treatment of Destructive Behaviors in Persons with Developmental Disabilities" (NIH, 1989) issued recommendations supporting functional behavioral assessment as the basis for treatment. The practice was also mandated in federal law in the Individuals with Disabilities Education Improvement Act (IDEA, 2004), which stipulated that behavioral intervention plans must be based on functional behavioral assessment findings.

b) There is also general consensus that more intrusive interventions should be applied only when lesser intrusive intervention have failed, or are determined to be insufficient. The Association for Behavior Analysis Task Force on the Right to Effective Treatment (Van Houten et el., 1988) indicated that "Consistent with the philosophy of least restrictive yet effective treatment, exposure of an individual to restrictive procedures is unacceptable unless it can be shown that such procedures are necessary to produce safe and clinically significant behavior change." Division 33 of the American Psychological Association articulated "Guidelines on Effective Behavioral Treatment for Persons with Mental Retardation and Developmental Disabilities" (APA, 1994), recommending that "Highly restrictive procedures shall not be employed until there has been sufficient determination that the use of less restrictive procedures was or would be ineffective or harm would come to the client because of gradual change in the client's particular problematic behavior." As noted by the NIH Consensus Conference (NIH, 1989), "Behavior reduction procedures should be selected for their rapid effectiveness *only* if the exigencies of the clinical situation require such restrictive interventions and *only* after appropriate review. These interventions should *only* be used in the context of a comprehensive and individualized behavior enhancement treatment package." This approach is also supported by the American Association on Intellectual and Developmental Disabilities (AAIDD; formerly the American Association on Mental Retardation – the largest and oldest professional organization concerned with mental retardation) in their "Guidelines on Psychosocial Treatments" (Rush & Frances, 2000). According to these best practice guidelines, the use of more intrusive interventions can be recommended only as when lesser intrusive interventions are insufficient. Moreover, use of contingent noxious stimulation such as electric shock was endorsed by experts surveyed as the least appropriate among all other intrusive interventions. Interventions involving the delivery of noxious stimuli intended to induce pain or discomfort (e.g., electrical shock, noxious tastes and smells) are clearly on the far end of the continuum of restrictiveness.

c) Finally, the need for review and regulation regarding the use of aversive interventions involving the delivery of noxious stimulation has long been recognized in the field of clinical psychology (Matson & Kazdin, 1981). Regulation of aversive interventions is consistent with recommendations articulated by the NIH Consensus Conference (NIH, 1989), and "Guidelines on Effective Behavioral Treatment for Persons with Mental Retardation and Developmental Disabilities" developed by Division 33 of the American Psychological Association (APA, 1994). Published research articles describing the use of aversive interventions involving electric shock also advocate for review and regulation of these procedures (e.g., Linscheid & Reichenbach, 2002; Matson et al., 1996). The regulations developed by the NYSED regarding the use of aversives place an appropriate and reasonable burden of justification upon those seeking an exemption to use aversive interventions; and describe an appropriate peer-review process.

**2)  In your opinion, does an appropriate alternative exist to the use of aversive interventions upon children with disabilities?  Can you provide examples of alternatives?**

Yes.  There is a broad and diverse range of treatment options available for addressing problem behavior in this population that rely on reinforcement alone or reinforcement with other non-aversive treatment components (for reviews see, Didden et al., 1997; Kahng, Iwata, & Lewin, 2002).  Effective behavioral treatments for problem behavior typically rely on training individuals in alternative adaptive behavior repertoires, engineering the environment to minimize the probability of problem behavior, minimizing reinforcement for problem behavior, and when necessary employing non-aversive behavior reduction techniques.  There is an extensive body of research spanning the past three decades, documenting effective behavioral assessment and treatment technologies for reducing problem behavior and increasing appropriate skills for children and adults with a range of disabilities, including intellectual disabilities, and autism and related disorders.  The variety of function-based reinforcement procedures, and muti-component interventions involving reinforcement combined with non-aversive behavior reduction interventions are almost too numerous to list:  they include a variety *antecedent interventions*, which involve altering the environment, schedules, instructional tactics, and the availability of noncontingent reinforcement; *differential reinforcement interventions* which involve shifting reinforcement contingencies to strengthen alternative responses; *skill-building interventions*, which involve establishing appropriate skills, such as social skills training, leisure training, and functional communication training; and when necessary; and when necessary, *behavior reduction interventions* involving interventions such as extinction, response cost, response interruption, time-out, brief physical holds, protective equipment such as helmets, and mechanical restraints (for reviews, see Didden et al., 1997; Horner et al., 2002; Kahng, Iwata, & Lewin, 2002).

Results of a survey of 48 experts by the AAIDD described in the consensus "Guidelines" (Rush & Frances, 2000) indicated that when reinforcement based interventions fail, then the first line of choice is response interruption.  "Second line" choices endorsed were response-cost, non-exclusionary timeout, positive practice overcorrection, restitution overcorrection, and exclusionary time-out.  Contingent noxious stimulation (such as shock) was endorsed as a "third line" intervention by the majority of respondents; even in cases when the problem behavior was severe and had not responded other interventions.  Review of the literature on the use of aversive interventions involving the contingent delivery of noxious stimulation such as shock reveals that this intervention is used only when justified, and increasingly rare in the last two recent decades.  For example, of the 8 studies describing the use of electric shock as a treatment for problem behavior in individual with disabilities published in the Journal of Applied Behavior Analysis, 7 were published in the 1960's and 1970's; the most recent study was published over 17 years ago (Linscheid et al., 1990).  In sum, there is widespread consensus in the professional community that there are a number of effective behavioral intervention alternatives (including reinforcement alone, or reinforcement with other behavior reduction components) that do not

Page 3 of 6

involve the use of painful or noxious stimulation; and that aversive interventions should be considered only when absolutely necessary.

**3) Is there adequate support in the literature, science, or through peer review, to require the State to permit the use of aversives as a behavioral therapy for children with disabilities?**

Yes. There is a body of research demonstrating the utility of aversive interventions involving shock in quickly and safely reducing severe self-injurious behavior (and chronic rumination) that poses significant health risks and/or has persisted despite the application of other interventions (e.g., Duker & Seys, 1996; Linscheid & Reichenbach, 2002; Linscheid et al., 1990). This body of research indicates that aversive interventions may be appropriate and necessary in some cases, effective in quickly reducing self-injury, and that frequently noted concerns about side effects are minimal. While the Association for Behavior Analysis "Task Force on the Right to Effective Treatment" (Van Houten et el., 1988) cautioned against using more restrictive interventions unless absolutely necessary, they also noted that "It is equally unacceptable to expose an individual to a nonrestrictive intervention (or a series of such interventions) if assessment results or available research indicate that other procedures would be more effective. Indeed, a slow-acting but nonrestrictive procedure could be considered highly restrictive if prolonged treatment increases risk, significantly inhibits or prevents participated in needed training programs, delays entry into a more optical social or living environment, or leads to adaptation and the eventual use of a more restrictive procedure. Thus, in some cases, a client's right to effective treatment may dictate the immediate use of quicker acting, but temporarily more restrictive procedures."

The publication of studies describing the use of more intrusive interventions appears to have decreased in recent decades (Matson & LoVullo, 2008; Kahng et al., 2002) – perhaps as a function of advances in behavioral technologies as well as professional and community standards of acceptability. Despite these trends and the preference of lesser intrusive/restrictive interventions, there is sufficient scientific evidence to permit use of aversive interventions as a final option and following appropriate review.

**4) Should States regulate the use of aversives upon children with disabilities?**

In general, regulation of the use of aversive interventions is appropriate, so long as the regulations are developed based on knowledge of research, professional standards, and stipulate the conditions under which such interventions may be used rather than prescribing how the behavior programs are to be designed. The institution or organization responsible for the safety and well-being of the persons served (and the staff working in those settings) has the right and responsibility to provide some regulations and guidelines on the use of these interventions. In light of the nature of these interventions, some level of peer review and regulation of the use of aversives is necessary to ensure that practitioners operate within the professional and community standards; to safeguard against indiscriminant use of aversives; and to protect students, practitioners, and institutions. It is appropriate for NYSED to promulgate regulations regarding the use of aversives for students in enrolled New York state-funded placements or in private state-licensed educational settings. There is general support in the professional community for regulation and peer review of aversive interventions as generally defined in the NYSED regulations (e.g., APA, 1994; van Houten, 1998). Indeed, many of the published studies describing the use of aversive interventions such as shock include clear and compelling justification for its use, and discuss having gone through some sort of peer review, human rights, or ethics committee review process (e.g., Duker & Seys, 1996; Linschied & Reichenbach, 2002; Linschied et al., 1990).

**5) What, if any, is the appropriate role of aversive interventions in addressing behavior in publicly supported schools?**

In light of the behavioral technologies currently available, the need to apply aversive interventions

Page 4 of 6

involving noxious stimuli should be rare.  However, aversive interventions may be appropriate when other less-restrictive interventions have failed or determined to be insufficient and/or there is an immediate need to reduce of self-injurious behavior.

**6) Are New York State's regulations an appropriate approach to address the use of aversives?**

Yes.  The regulations are consistent with current professional standards in that they recognize the need to develop interventions based on a functional behavioral assessment, that lesser restrictive interventions be applied first, and that aversive interventions should generally not be used, except under certain circumstances and following independent review.  The circumstances under which they may be permitted as described under the current regulations are appropriate and consistent with professional standards (AAIDD, 2000; APA, 1994; NIH, 1989; van Houten, 1988).  They place an appropriate burden on the provider seeking authorization to justify the need for aversive interventions, and include an independent and reasonable peer review process.

**7) Is it appropriate to rule out the use of electrical shock while subjecting children with disabilities to mechanical restraints?**

As described in the behavioral research literature on the treatment of children with disabilities, mechanical restraint, usually involves the use of arm splints designed to prevent or limit flexion at the elbow, or the use of hand mitts that restrict finger access and movement.  These sorts of mechanical restraints are used primarily to reduce occurrences of self-injurious behavior (such as head hitting, eye poking, etc.) and not intended to produce pain or discomfort.  Mechanical restraints are generally considered less intrusive than shock because they do not involve the delivery of painful stimulation.  The survey results and practice guidelines developed by AAIDD (2000) referenced previously suggests that mechanical restraints should be considered as a second line intervention (before aversive interventions involving noxious stimulation).  Nevertheless, mechanical restraints are highly restrictive and regulations governing their use are needed to guard against misuse and to protect students and staff.

# References

APA. (1994). *Division 33 Guidelines on Effective Behavioral Treatment for Persons with Mental Retardation and Developmental Disabilities.* , http://www.apa.org/divisions/div33/effectivetreatment.html

Didden, R., Korzilius, H., van Oorsouw, W., Sturmey, P. (1997). Behavioral treatment of challenging behaviors in individuals with mild mental retardation: Meta-analysis of single-subject research. *American Journal on Mental Retardation, 111*, 290-8.

Duker, P.C., Seys, D.M. (1996). Long-term use of electrical aversion treatment with self-injurious behavior. *Research in Developmental Disabilities, 23*, 53-78.

Horner, R.H., Carr, E.G., Strain, P.S., Todd, A.W., & Reed H.K. (2002). Problem Behavior Interventions for Young Children with Autism: A Research Synthesis, *Journal of Autism and Developmental Disorders, 32*, 423-446.

IDEA. (2004). *Individuals With Disabilities Education Improvement Act of 2004*, Pub. L. No. 108-446.

Kahng, S., Iwata, B.A., & Lewin, A. (2002). Behavioral Treatment of Self-Injury, 1964 to 2000. *American Journal on Mental Retardation, 107*, 212–221.

Linscheid, T. R., Iwata, B. A., Ricketts, R. W., Williams, D. E., & Griffin, J. C. (1990). Clinical evaluation of the self-injurious behavior inhibiting system (SIBIS). *Journal of Applied Behavior Analysis, 23*, 53-78.

Linscheid, T. R., & Reichenbach, H. (2002). Multiple factors in the long-term effectiveness of contingent electric shock treatment for self-injurious behavior: A case example. *Research in Developmental Disabilities, 23*, 161–177.

Mace, F. C. (1994). The significance and future of functional analysis methodologies. *Journal of Applied Behavior Analysis, 27*, 385-392.

Matson, J. L., LoVullo, S. V. (2008). A Review of Behavioral Treatments for Self-Injurious Behaviors of Persons with Autism Spectrum Disorders. *Behavior Modification, 32*, 61-76.

Matson, J. L., Benavidez, D. A., Stabinsky-Compton, L., Paclawskyj, T., & Baglio, C. (1996). Behavioral treatment of autistic persons: A review of research from 1980 to the present. *Research in Developmental Disabilities, 17*, 433-465.

NIH (1989). *Treatment of Destructive Behaviors in Persons with Developmental Disabilities*. NIH Consensus Statement, 1989 Sep 11-13; 7(9):1-15.

Rush, A. J. & Frances, A. (Eds.) (2000). Expert consensus guideline series: Treatment of psychiatric and behavioral problems in mental retardation [Special Issue]. *American Journal on Mental Retardation*: Vol. 105 (3).

Van Houten, R., Axelrod, S., Bailey, J. S., Favell, J. E., Foxx, R. M., Iwata, B. A., & Lovaas, O. I. (1988). The right to effective behavioral treatment. *Journal of Applied Behavior Analysis, 21*, 381-384.

Louis Hagopian, Ph.D.

CURRICULUM VITAE

## DEMOGRAPHIC INFORMATION

### Current Academic Appointments

<u>Associate Professor</u>.  Department of Psychiatry and Behavioral Sciences, Johns Hopkins University School of Medicine, and the Department of Behavioral Psychology, Kennedy Krieger Institute.  2003 – present.

<u>Adjunct Assistant Professor</u>.  Department of Psychology, The University of Maryland, Baltimore County. 2000 – present.

### Personal Data

Business Address:   Kennedy Krieger Institute
Room 200B, 2nd Floor Tower
707 N. Broadway
Baltimore, MD 21205

Phone: (443) 923-2841
FAX: (443) 923-2845
e-mail: hagopian@kennedykrieger.org

## EDUCATION AND TRAINING

<u>B.S.</u>, 1985.  Virginia Commonwealth University, Richmond, Virginia.  Bachelor of Science in Psychology, Cum Laude.

<u>M.S.</u>, 1988.  Virginia Polytechnic Institute and State University, Blacksburg, Virginia.  Master of Science in Psychology.  Specialization in Clinical Psychology (APA-Approved).

<u>Pre-Doctoral Internship</u>, 1991. The Kennedy Institute and the Johns Hopkins University School of Medicine, Department of Pediatrics, Baltimore, Maryland.  Internship in Applied Behavior Analysis, Developmental Disabilities, and Behavioral Pediatrics, (APA-Approved).

<u>Ph.D.</u>, 1991.  Virginia Polytechnic Institute and State University, Blacksburg, Virginia.  Doctor of Philosophy degree in Psychology.  Specialization in Clinical Child Psychology (APA-Approved).  National Institute of Mental Health, Clinical Child Psychology Fellow.

## PROFESSIONAL EXPERIENCE

### Previous Academic Appointments

1992 – 1994.  <u>Instructor</u>.  Department of Psychiatry and Behavioral Sciences, Johns Hopkins University School of Medicine, and the Department of Behavioral Psychology, Kennedy Krieger Institute.

1995 – 2003.  Assistant Professor.  Department of Psychiatry and Behavioral Sciences, Johns Hopkins University School of Medicine, and the Department of Behavioral Psychology, Kennedy Krieger Institute.

## Professional Positions

1991 – present.  Clinical Supervisor.  APA-Approved Pre-doctoral Internship and Postdoctoral Fellowship, Department of Behavioral Psychology, Kennedy Krieger Institute and Department of Psychiatry and Behavioral Sciences, Johns Hopkins University School of Medicine.  Responsibilities include mentoring, training, and providing licensed supervision to pre-doctoral interns and postdoctoral fellows.

1991- 1996.  Psychologist/Case Manager.  Neurobehavioral Unit, Department of Behavioral Psychology, The Kennedy Krieger Institute.  Responsibilities include supervision of clinical and administrative staff, conducting behavioral assessment and treatment sessions for inpatients with developmental disabilities and severe behavior problems, parent training, school consultation, and co-leading an interdisciplinary team.

1996 - present.  Program Director.  Neurobehavioral Unit, Department of Behavioral Psychology, Kennedy Krieger Institute.  Responsible for overseeing a continuum of care for the treatment of individuals with developmental disabilities and severe behavior disorders.   Programs include an internationally renowned 16-bed inpatient unit, an intensive day-treatment program, an outpatient and follow-up clinic, and a consultation service.  Responsibilities include providing clinical, administrative, and academic supervision to faculty psychologists, psychology associates, postdoctoral fellows, pre-doctoral interns, and clinical staff; and provision of behavioral assessment and therapy services to children and adolescents with developmental disabilities, severe behavior disorders, medical problems, and psychiatric disorders. Co-leader of an interdisciplinary treatment team.

## *RESEARCH ACTIVITIES*

### Peer Reviewed Scientific Articles

**Hagopian, L. P.**, Weist, M. D., & Ollendick, T. H.  Cognitive-behavior therapy with an 11-yeard old girl fearful of AIDS and illness: A case study.  Journal of Anxiety Disorders.  1990; 4: 257-265.

Ollendick, T. H., **Hagopian, L. P.**, & Huntzinger, R. M.  Cognitive-behavior therapy with nighttime fearful children.  Journal of Behavior Therapy and Experimental Psychiatry.  1991; 22: 113-121.

Fisher, W. W., Piazza, C. C., Bowman, L. G., **Hagopian, L. P.**, Owens, J. C., & Slevin, I.  A comparison of two approaches for identifying reinforcers for persons with severe and profound disabilities.  Journal of Applied Behavior Analysis.  1992; 25: 491-498.

**Hagopian, L. P.**, & Slifer, K. S.  Treatment of separation anxiety disorder with graduated exposure and reinforcement targeting school attendance: A controlled case study.  Journal of Anxiety Disorders.  1993; 7: 271-280.

Richman, G. S., **Hagopian, L. P.**, Harrison, K., Mann, L., & Brierley-Bowers, P. Assessing parental response patterns in the treatment of noncompliance in children. Journal of Child and Family Behavior Therapy.  1994; 16: 29-42.

Fisher, W. W., Piazza, C. C., Bowman, L. G., **Hagopian, L. P.**, & Langdon, N. A. Empirically derived consequences: A data based method for prescribing treatments for destructive behavior.  Research in Developmental Disabilities.  1994; 15: 133-149.

**Hagopian, L. P.**, & Ollendick, T. H.  Behavioral inhibition and test anxiety: An empirical investigation of Gray's theory.  Personality and Individual Differences.  1994; 16: 597-604.

**Hagopian, L. P.**, Fisher, W. W., Piazza, C. C., & Wierzbicki, J. J.  A water prompting procedure for the treatment of urinary incontinence.  Journal of Applied Behavior Analysis.  1994; 26: 473-474.

**Hagopian, L. P.**, Fisher, W. W., & Legacy, S. M.  Schedule effects of noncontingent reinforcement on attention-maintained destructive behavior in identical quadruplets.  Journal of Applied Behavior Analysis.  1994; 27: 317-326.

Piazza, C. C., Fisher, W. W., **Hagopian, L. P.**, Bowman, L. G., & Toole, L. A. Using a choice assessment to predict reinforcer effectiveness.  Journal of Applied Behavior Analysis.  1996; 29: 1-9.

**Hagopian, L. P.**, Farrell, D. A., & Amari, A.  Treating total liquid refusal with backward chaining and fading.  Journal of Applied Behavior Analysis.  1996; 29: 573-575.

**Hagopian, L. P.**, & Ollendick, T. H.  Behavioral inhibition and anxiety sensitivity: A reanalysis.  Journal of Personality and Individual Differences.  1996; 21: 247-252.

Bowman, L. G., Piazza, C. C., Fisher, W. W., **Hagopian, L. P.**, & Kogan, J. S. Assessing individuals' preference for varied versus constant reinforcer presentation. Journal of Applied Behavior Analysis.  1997; 30: 451-458.

**Hagopian, L. P.**, Fisher, W. W., Thompson, R. H., Owen-DeSchryver, J., Iwata, B. A., & Wacker, D. P.  Toward the development of structured criteria for interpretation of functional analysis data.  Journal of Applied Behavior Analysis.  1997; 30: 313-326.

Piazza, C. C., **Hagopian, L. P.**, Hughes, C. R., & Fisher, W. W.  Using chronotherapy to treat the severe sleep problems in a child with mental retardation. American Journal on Mental Retardation.  1998; 102: 358-366.

**Hagopian, L. P.**, Fisher, W. W., Thibault-Sullivan, M., Acquisto, J., & LeBlanc, L. A.  Effectiveness of functional communication training with and without extinction and

3

punishment: A summary of 21 inpatient cases.  Journal of Applied Behavior Analysis.
1998; 31: 211-235.

Richman, D. M., & **Hagopian, L. P.**  On the effects of "quality" of attention in the
functional analysis of destructive behavior.  Research in Developmental Disabilities.
1999; 20: 51-62.

Myer, E. A., **Hagopian, L. P.**, & Paclawskyj, T. R.  Shaping child and parent
behavior in the treatment of school refusal behavior.  Research in Developmental
Disabilities.  1999; 20: 401-410.

Adelinis, J. D., & **Hagopian, L. P.**  The use of symmetrical "do" and "don't"
requests to interrupt ongoing activities.  Journal of Applied Behavior Analysis.  1999; 32:
519-523.

**Hagopian, L. P.**, & Thompson, R. H.  Reinforcement of compliance with
respiratory treatments in a child with cystic fibrosis.  Journal of Applied Behavior
Analysis.  1999; 32: 233-236.

Fisher, W. W., Thompson, R. H., Bowman, L. G., **Hagopian, L. P.**, & Krug, M. A.
Facilitating tolerance of delayed reinforcement during functional communication training.
Behavior Modification.  2000; 24: 3-29.

Derby, K. M., **Hagopian, L. P.**, Fisher, W. W., Richman, D. M., Thompson, R. H.,
Fahs, A., & Augustine, M. A.  Functional analysis of aberrant behavior through
measurement of separate response topographies.  Journal of Applied Behavior
Analysis.  2000; 33: 113-117.

**Hagopian, L. P.**, Crockett, J. L., VanStone, M., DeLeon, I. G., & Bowman, L. G.
Effects of noncontingent reinforcement on problem behavior and stimulus engagement:
The role of satiation, extinction, and alternative reinforcement.  Journal of Applied
Behavior Analysis.  2000; 33: 433-450.

**Hagopian, L. P.**, LeBlanc, L. A. & Maglieri, K. A.  Noncontingent attention for the
treatment of excessive medical complaints in a medically-fragile man with mental
retardation.  Research in Developmental Disabilities.  2000; 21: 215-221.

LeBlanc, L. A., **Hagopian, L. P.**, & Maglieri, K. A.  Using a token economy to
eliminate excessive inappropriate social behavior in an adult with developmental
disabilities.  Behavioral Interventions.  2000; 15: 135-143.

LeBlanc, L. A., **Hagopian, L. P.**, & Marhefka, J. M.  Effects of therapist gender
and type of attention on assessment and treatment of attention-maintained destructive
behavior.  Behavioral Interventions.  2001; 16: 39-57.

**Hagopian, L. P.**, Crockett, J. L., & Keeney, K. M.  A multi-component treatment
for blood-injury injection phobia in a young man with mental retardation.  Research in
Developmental Disabilities.  2001; 21: 141-149.

Rush, K. S., Crockett, J. L., & **Hagopian, L. P.**  An analysis of the selective effects of NCR with punishment targeting screaming and SIB associated with positive affect, <u>Behavioral Interventions</u>.  2001; 16: 127-135.

**Hagopian, L. P.**, Wilson, D. M., & Wilder D. A.  Assessment and treatment of problem behavior maintained by negative reinforcement in the form of escape from interactive play. <u>Journal of Applied Behavior Analysis</u>.  2001; 34: 229-232.

Farrell, D. A., **Hagopian, L. P.**, & Kurtz, P. F.  A hospital-and-home-based behavioral intervention for a child with chronic food refusal and gastrostomy tube dependence.  <u>Journal of Developmental and Physical Disabilities</u>.  2001; 13: 407-418.

**Hagopian, L. P.**, Rush, K. S., Lewin, A. B., & Long, E. S.  Evaluating the predictive validity of a single stimulus engagement preference assessment. <u>Journal of Applied Behavior Analysis</u>.  2001; 34: 475-486.

**Hagopian, L. P.**, Adelinis, J. D.  Response blocking with and without redirection for the treatment of pica.  <u>Journal of Applied Behavior Analysis</u>.  2001; 34: 527-530.

LeBlanc, L. A., **Hagopian, L. P.**, Maglieri, K. A., & Poling, A.  Decreasing the intensity of reinforcement-based interventions for reducing behavior: Conceptual issues and a proposed model for clinical practice.  <u>The Behavior Analyst Today</u>.  2002; 3: 289-300.

**Hagopian, L. P.**, Rush, K. S., Richman, D. M., Kurtz, P. F., Contrucci, S. A., & Crosland, K.  The development and application of individualized levels systems for the treatment of severe problem behavior.  <u>Behavior Therapy</u>.  2002; 33: 65-86.

Toole, L. M., Bowman, L. G., Thomason, J. L., **Hagopian, L. P.**, & Rush, K. S.  Observed increases in positive affect during behavioral treatment.  <u>Behavioral Interventions</u>. 2003; 18: 35 - 42.

**Hagopian, L. P.**, Long, E. S., & Rush, K. S. Preference assessment procedures for individuals with developmental disabilities.  <u>Behavior Modification</u>.  2004; 28: 668-677.

Lieving, G. A., **Hagopian, L. P.**, Long, E. S., & O'Connor J. T. Response-Class Hierarchies and Resurgence of Severe Problem Behavior. <u>Psychological Record</u>.  2004; 54:  621-634.

**Hagopian, L. P.**, Toole, L. M., Long, E. S., Bowman, L. G., & Lieving, G. A.  A Comparison of dense-to-lean and fixed-lean schedules of alternative reinforcement and extinction.  <u>Journal of Applied Behavior Analysis</u>.  2004; 37: 323-338.

Long. E. S., **Hagopian, L. P.**, DeLeon, I. G., Marhefka, J. M., Resau, D. Competing stimuli for the treatment of multiply controlled problem behavior during hygiene routines.  <u>Research in Developmental Disabilities</u>.  2005; 26: 57-69.

5

**Hagopian, L. P.**, Paclawskyj, T. R., Contrucci, S.A.C.  The use of conditional probability analysis to identify a response chain leading to the occurrence of eye poking.  Research in Developmental Disabilities.  2005; 26: 393-397.

**Hagopian, L. P.**, Contrucci, S. A. C., Long, E. C., & Rush, K. S. Schedule thinning following communication training: Using competing stimuli to enhance tolerance to decrements in reinforcer density.  Journal of Applied Behavior Analysis.  2005; 38: 177-193.

DeLeon, I. G., Williams, D. C., Gregory, M. K., & **Hagopian, L. P.** Unexamined potential effects of the non-contingent delivery of reinforcers.  European Journal of Behavioral Analysis.  2005; 5: 57-70.

Crockett, J. L., & **Hagopian, L. P.**  Prompting procedures as establishing operations for escape-maintained behavior.  Behavioral Interventions.  2006; 21: 65-71.

Wachtel, L. E., & **Hagopian, L. P.**  Psychopharmacology and applied behavioral analysis: Tandem treatment of severe problem behaviors in intellectual disability and a case series.  Israel Journal of Psychiatry.  2006; 43 (4): 265-274.

**Hagopian, L. P.**, Bruzak, J. L., Bowman, L. G., & Jennett, H. K.  Assessment and treatment of problem behavior occasioned by interruption of free operant behavior.  Journal of Applied Behavior Analysis.  2007; 40: 89-103.

**Hagopian, L. P.**, Kuhn, D. E., & Strother, G. E.  Treatment of inappropriate social behavior with an adolescent diagnosed with pervasive developmental disorder.  Journal of Applied Behavior Analysis.  (in press).

DeLeon, I. G., **Hagopian, L. P.**, Rodriguez-Catter, V., Bowman, L. G., Long, E. S., & Boelter, E. W.  Increasing wearing of prescription glasses in individuals with mental retardation.  Journal of Applied Behavior Analysis. (in press).

Kuhn, D. E., **Hagopian, L. P.**, & Terlonge, C.  Treatment of life-threatening self injurious behavior secondary to hereditary sensory and autonomic neuropathy, type II: A controlled case study.  Journal of Child Neurology.  (in press).

Jennett, H. K., & **Hagopian, L. P.**  Identifying empirically supported treatments for phobic avoidance in individuals with intellectual disabilities.  Behavior Therapy.  (in press).

## Book Chapters and Newsletter Articles

**Hagopian, L. P.**, & Ollendick, T. H.  (1993).  Simple phobias in children.  In R. T. Ammerman & M. Hersen (Eds.), Handbook of Behavior Therapy with Children and Adults: A Developmental and Longitudinal Perspective, pp. 123-136.  Allyn and Bacon: Boston.

**Hagopian, L. P.**, & Ollendick, T. H.  (1997).  Anxiety Disorders.  In R. T. Ammerman and M. Hersen (Eds.), Handbook of Prevention and Treatment with Children and Adolescents, pp. 431-454.  New York: Wiley.

Ollendick, T. H., **Hagopian, L. P.**, & King, N. J.  (1997).  Specific phobias in children.  In G. Davey (Eds.), Phobias: A Handbook of Description, Treatment, and Theory, pp. 201-226.  New York: Wiley.

**Hagopian, L. P.** (2007). Managing Problem Behavior in Autism.  Pediatric News, 41 (5), 43.

### Extramural Funding

7/1/03 - 6/30/04 (Previous).  MCH Training Program in Neurodevelopmental Disabilities. 5T73MC00019-11, Sponsor: MCH; $1,240,878
Principal Investigator: Goldstein
Role: Clinical Supervisor, Pre-doctoral Internship in Clinical Psychology, Department of Behavioral Psychology, Kennedy Krieger Institute; 5% effort

8/1/03 - 7/31/04 (Previous). DHHS HRSA Graduate Psychology Education Programs. 6 D40HP00042-01-01, Sponsor: HRSA; $114,000
Principal Investigator:  Kahng
Role: Clinical Supervisor, Pre-doctoral Internship in Clinical Psychology, Department of Behavioral Psychology, Kennedy Krieger Institute; 5% effort

9/1/04 – 6/30/08 (Previous). Examining Contingency Control Deficits in Autism and MR. 1R01HD044072-01, Sponsor: DHHS-NICHD, $525,000
Role: Principal Investigator; 15% effort

7/1/04 - 6/30/09 (Current). MCH Training Program in Neurodevelopmental Disabilities. 5T73MC00019-13, Sponsor: MCH
Principal Investigator: Goldstein
Role: Clinical Supervisor, Pre-doctoral Internship in Clinical Psychology, Department of Behavioral Psychology, Kennedy Krieger Institute; 5% effort

## *EDUCATIONAL ACTIVITIES*

### Teaching

#### Classroom Instruction

1998-1999, "Behavioral Interventions for Students with Autism" (Graduate), Johns Hopkins University, School of Professional Studies in Business and Education, Faculty Associate.
2000-2004, "Advanced Topics in Applied Behavior Analysis" (Graduate), University of Maryland, Baltimore County, Adjunct Assistant Professor.

#### Mentoring

Joaquin Flores, M.A.,1992, Pre-doctoral Intern
Kelly Maxwell, M.A., 1992, Pre-doctoral Intern
Antolin Llorente, M.S., 1993, Pre-doctoral Intern

Cathy Niager, M.A., 1993, Pre-doctoral Intern
Naomi Swiezy, M.S., 1993, Pre-doctoral Intern
Joan Baran, M.S., 1994, Pre-doctoral Intern
William Frea, M.A., 1995, Pre-doctoral Intern
Carl Myers, M.S., 1995, Pre-doctoral Intern
Christine Zaldo, M.S., 1995, Pre-doctoral Intern
Katrina Hallmark, M.A., 1996, Pre-doctoral Intern
Jodi Doling-Liftin, M.S., 1996, Pre-doctoral Intern
Linda LeBlanc, Ph.D., 1997, Postdoctoral Fellow
George Linke, M.A., 1997, Pre-doctoral Intern
Bart Sevin, M.S., 1997, Pre-doctoral Intern
Marnie Smith, M.S., 1997, Pre-doctoral Intern
David Richman, Ph.D., 1998, Postdoctoral Fellow
Jane Barbin, M.S., 1998, Pre-doctoral Intern
Dosia Paclawskyj, M.S., 1998, Pre-doctoral Intern
Jennifer Crockett, Ph.D., 1999, Postdoctoral Fellow
David Wilder, Ph.D., 1999, Postdoctoral Fellow
Karena Rush, M.S., 1999, Pre-doctoral Intern
Laura Seligman, M.S., 1999, Pre-doctoral Intern
Karena Rush, Ph.D., 2000, Postdoctoral Fellow
Jennifer Dawson, M.S., 2000, Pre-doctoral Intern
Jennifer Henry, M.A., 2000, Pre-doctoral Intern
Marc Wildmon, M.S., 2000, Pre-doctoral Intern
Tamara Marder, M.S., 2000, Pre-doctoral Intern
Ethan Long, M.S., 2001, Pre-doctoral Intern
Christine Accardo, M.A., 2001, Pre-doctoral Intern
David McAdam, Ph.D., 2001, Postdoctoral Fellow
Gregory Lieving, Ph.D., 2001, Postdoctoral Fellow
Yemonja Smalls, M.S., 2001, Pre-doctoral Intern
Ethan Long, Ph.D., 2002, Postdoctoral Fellow
Melissa Hale, M.S., 2002, Pre-doctoral Intern
Stephanie Contrucci, M.S., 2002, Pre-doctoral Intern
Laura Lee McIntryre, M.A., 2002, Pre-doctoral Intern
Brian Konik, M.S., 2003, Pre-doctoral Intern
David Kuhn, M.S., 2003, Pre-doctoral Intern
Heather Jennette, M.S., 2004, Pre-doctoral Intern
Melanie DuBard, M.S., 2004, Pre-doctoral Intern
Robert Peyton, M.S., 2004, Pre-doctoral Intern
Mary Caruso-Anderson, M.S., 2005, Pre-doctoral Intern
Eric Boelter, Ph.D., 2005, Postdoctoral Fellow
Heather Jennett, Ph.D., 2005, Postdoctoral Fellow
Koren Boggs, M.S., 2006, Pre-doctoral Intern
Mary Caruso-Anderson, Ph.D., 2005, Postdoctoral Fellow

Research Supervisor for David Kuhn, Ph.D., 2006 - 2008, Recipient of Pediatric Research Loan Repayment Program, National Institutes of Health. Total funding up to $70,000.

Research Supervisor for Stephanie Contruccci Kuhn, 2006 - 2008, Recipient of Pediatric Research Loan Repayment Program, National Institutes of Health.  Total funding up to $88,000.

## CLINICAL ACTIVITIES

### Certification

Licensed Psychologist, 1992- present, Maryland #2817

### Service Responsibilities

1991 - present.  Clinical Supervisor, APA-Approved Pre-doctoral Internship.
Role:  Supervision and Mentoring of Pre-doctoral Interns

1991 - present.  Supervising Psychologist, Neurobehavioral Unit.
Role: Management of behavioral treatment of inpatients, supervision of 4 Faculty-level Psychology Associates

1996 - present.  Program Director, Neurobehavioral Unit.
Role: Oversight of Inpatient and Outpatient Neurobehavioral Programs

Certified by the Board of Examiners of Psychologists, Department of Health and Mental Hygiene as the Supervisor of KKI faculty as Psychology Associates practicing under my Maryland license.
1998 – present.  Lynn Bowman, M.A.
1999 – present.  Iser DeLeon, Ph.D.
1999 – present.  Sung Woo Kahng, Ph.D.
2001 – 2002.  Karena Rush, Ph.D.
2003 – 2006.  David Kuhn, Ph.D.
2003 – 2006.  Stephanie Contrucci-Kuhn, Ph.D.

## ORGANIZATIONAL ACTIVITIES

### Institutional Administrative Appointments

1996 – 2001 & 2007 – present.  Executive Committee Member. APA-Approved Pre-doctoral Internship and Post-Doctoral Fellowship, Department of Behavioral Psychology, Kennedy Krieger Institute and Department of Pediatrics, Johns Hopkins University School of Medicine.

2000 - present.  Reviewer. Neurobehavioral Research Unit Protocol Review Sub-Committee, Johns Hopkins University School of Medicine, General Clinical Research Center.

2001 - 2007.  Director of Training. APA-Approved Pre-doctoral Internship and Post-Doctoral Fellowship, Department of Behavioral Psychology, Kennedy Krieger Institute and Department of Pediatrics, Johns Hopkins University School of Medicine.

9

## Editorial Activities

### Editorial Board Appointments

Associate Editor, <u>Journal of Applied Behavior Analysis</u>, 2003 - 2006
Guest Associate Editor, <u>Journal of Applied Behavior Analysis</u>, 2002, 2003, 2007

Editorial Board, <u>Journal of Behavioral Analysis in Health, Sports, Fitness and Medicine</u>, 2006-present
Editorial Board, <u>Behavior Analysis in Practice</u>, 2007 – present
Editorial Board, <u>Journal of Applied Behavior Analysis</u>, 1998-2000, 2002-2003, 2008-present
Editorial Board, <u>Research in Developmental Disabilities</u>, 2003 - present
Editorial Board, <u>Journal of Clinical Child Psychology</u>, 1997 - 2001

### Journal Peer Review Activities

Ad Hoc Reviewer, <u>Behavior Therapy</u>, 2006, 2007, 2008
Guest Reviewer, <u>Journal of Applied Research in Intellectual Disabilities</u>, 2008
Guest Reviewer, <u>Personality and Individual Differences</u>, 2000
Guest Reviewer, <u>Research in Developmental Disabilities</u>, 2000, 2001
Guest Reviewer, <u>Education and Treatment of Children</u>, 2002
Guest Reviewer, <u>Journal of Applied Behavior Analysis</u>, 1992-1995, 1997, 2001, 2007
Guest Reviewer, <u>Journal of Autism and Developmental Disorders</u>, 2000-2002

### Professional Societies

<u>Member</u>, Association for Behavior Analysis. 1991-present
<u>Member</u>, Maryland Association for Behavior Analysis. 1998-present
<u>Member</u>, Association for Advancement of Behavior Therapy. 1987-1992, 1997

### Advisory Committees

Maryland Autism Project, Rockville, MD. 1998-present.
Role: <u>Professional Advisory Board</u>

### NIH Review Groups

<u>Scientific Reviewer</u>, National Institutes of Health, Special Emphasis Panel, ZRG1 BBBP-B, Developmental Disabilities, Communication and Science Education. October, 2007.

### Consulting Experience

1998-1999. Maryland Autism Project, Rockville, MD. Provided consultation for program development, and licensed supervision to the Program Director. <u>Consultant</u>.

2000. Liberty Healthcare Corporation. Conducted functional behavioral assessments and developed treatment plans for residents of a State Development Facility in New Jersey. <u>Behavioral Consultant</u>.

2001.  Office of the Attorney General of the State of New Jersey.  Provided expert consultation to J.P. Horan, Deputy Attorney General, regarding a case involving a resident of a Developmental Facility in the State of New Jersey.   Expert Consultant.

2003.  Dilworth Paxson, L.L.P.  on behalf of the Office of the Attorney General of the State of Florida.  Served as an expert witness at the request of Thomas York, Esq. regarding a case involving placement and disposition of residents in Developmental Centers in the State of Florida. Expert Witness.

2003-present.  Faison School for Autism, Richmond, VA.  Consultation and training on applied behavior analysis to staff working with students with autism, case consultation, school policy and procedure development, and program planning.  Clinical Consultant.

2005 - present.  Delaware Autism Project.  Provided workshops, training, and consultation to professional staff and affiliates.  Trainer.

2006.  W.G. and B.G. o/b/o A.G. v. Brick Township Board of Education, New Jersey Office of Administrative Law, OAL Docket No. EDS-4374-03.  Served as an expert witness on behalf of the plaintiff with S. Paul Prior, Esq. Hinkle & Fingles, Attorneys at Law.  Expert Witness.

2006.  Bonamo v. Children's Center of Monmouth County.  Docket No. MON-L-1772-05. Provided expert consultation on behalf of the defendant with Timothy E. Haggerty, Esq. Expert Consultant.

2007 - present.  State Panel on Child-Specific Behavioral Interventions, New York State Department of Special Education.  Provided independent expert review of child-specific behavioral assessment and intervention plans to ensure compliance with state regulations.   Panel Member.

2007 – present.  Alpine Learning Group.  Provided consultation to staff working with students with autism and severe behavior.   Consultant.

## OTHER PROFESSIONAL ACTIVITIES

### Professional Presentations

Ollendick, T. H., **Hagopian, L. P.**, Huntzinger, R. M., & Weist, M. D. (1988). Cognitive-behavior therapy with children:  An initial analysis of the cognitive and behavioral components.  Poster presented at the Annual Convention of The Association for Advancement of Behavior Therapy, New York, NY.

**Hagopian, L. P.** (1988).  Effects of concurrent verbal shadowing on linguistic phonetic encoding.  Poster presented at the Annual Convention of the American Psychological Association, Atlanta, GA.

**Hagopian, L. P.**, Harrison, D. W., & Alden, J. D. (1989).  Dichotic listening in reading disabled children:  Hemi-inattention and linguistic dysfunction.  Poster presented at the Annual Convention of the American Psychological Association, New Orleans, LA.

**Hagopian, L. P.**, Ollendick, T. H., & Weist, M. D. (1989). <u>Cognitive-behavior therapy with and 11-year old girl fearful of AIDS and illness: A case study</u>. Poster presented at the Annual Convention of the Association for Advancement of Behavior Therapy, Washington, D.C.

Richman, G., Birk, D., Ormerod, A., Mann, L., Brierley, P., Harrison, K., & **Hagopian, L. P.** (1991). <u>Discrimination training: Teaching parents to identify compliance</u>. Poster presented at the Annual Convention of the Association for Behavior Analysis, Atlanta, GA.

Rifkin, R. H., Fisher, W. F., Bowman, L. G., Piazza, C. C., **Hagopian, L. P.**, & Langdon, N. (1992). <u>Empirically derived consequences: A data-based method for selecting treatments for destructive behavior</u>. Poster presented at the Annual Convention of the Association for Behavior Analysis, San Francisco, CA.

Fisher, W., Piazza, C. C., Bowman, L. G., Cataldo, M. F., & **Hagopian, L. P.** (1992). <u>The treatment of severe behavior disorders with empirically derived consequences</u>. Poster presented at the Annual Convention of the Association for Behavior Analysis, San Francisco, CA.

Fisher, W., Piazza, C. C., Bowman, L. G., **Hagopian, L. P.**, Owens, J. C., & Slevin, I. (1992). <u>A comparison of two approaches for identifying reinforcers for persons with severe and profound disabilities</u>. Poster presented at the Annual Convention of the Association for Behavior Analysis, San Francisco, CA.

Bowman, L. G., Fisher, W., Kahng, S., Langdon, N. A., **Hagopian, L. P.**, Kurtz, P. F., Piazza, C. C., & Rifkin, R. (1992). <u>Treating destructive behavior displayed by children with mental retardation</u>. Poster presented at the Annual Convention of the American Academy of Child and Adolescent Psychiatry, Washington, D.C.

**Hagopian, L. P.**, Fisher, W., Wierzbicki, J., & Young, D. L. (1992). <u>The use of water prompting in the treatment of primary incontinence in a profoundly retarded male</u>. Poster presented at the Annual Convention of the Association for Behavior Analysis, San Francisco, CA.

Sherer, M., Flieshell, J, Grace, N, Fisher, W., Jones, J, Carpenter, R. O., Gerson, A., **Hagopian, L. P.** (1993). <u>Evaluation of the effectiveness of opiate antagonists in a case of cyclical self-injury</u>. Poster presented at the Annual Convention of the Association for Behavior Analysis, Chicago, Ill.

Lou, K. K., O'Neill, L. P., **Hagopian, L. P.**, & Fisher, W. (1993). <u>A comparison of three approaches for the treatment of a case of severe pica</u>. Poster presented at the Annual Convention of the Association for Behavior Analysis, Chicago, Ill.

Jung, J., Fisher, W., Anderson, C. M., Grace, N. C., Bowman, L. G., **Hagopian, L. P.**, & Carpenter, R. O. (1993). <u>Pharmacological treatment of food stealing and excessive food consumption in three persons with Prader-Willi Syndrome</u>. Poster presented at the Annual Convention of the Association for Behavior Analysis, Chicago, Ill.

12

**Hagopian, L. P.**, Fisher, W., Lou, K. K., Wierzbicki, J. J., Owen, J. (1993).  The use of other operant procedures to enhance functional communication training.  Poster presented at the Annual Convention of the Association for Behavior Analysis, Chicago, Ill.

Toole, L., Piazza, C. C., Fisher, W. W., **Hagopian, L. P.**, Bowman, L. G., & Amari, A. (1994).  Evaluation of the predictive validity of stimulus choice assessment procedures.  Poster presented at the Annual Convention of the Association for Behavior Analysis, Atlanta, GA.

Thompson, R., **Hagopian, L. P.**, Fisher, W. W., Bowman, L. G., O'Connor, J., Papa, M., Williams, M., & Campbell, L. (1994).  Functional analysis of destructive behavior:  Aggregated results from multiple cases.  Poster presented at the Annual Convention of the Association for Behavior Analysis, Atlanta, GA.

Owen, J., Fisher, W. W., **Hagopian, L. P.**, Thompson, R., & Pacchiano, D. (1994).  Levels of agreement between brief and extended functional analyses.  Poster presented at the Annual Convention of the Association for Behavior Analysis, Atlanta, GA.

Fisher, W. W., **Hagopian, L. P.**, Sevin, J., Piazza, C. C., Thompson, R., & Owen, J. (1994).  Visual inspection and statistical interpretation of brief and extended functional analysis.  Paper presented at the Annual Convention of the Association for Behavior Analysis, Atlanta, GA.

Fisher, W. W., **Hagopian, L. P.**, Owen, J., Meyer, K., & Thompson, R. (1994).  Reliability of visual inspection interpretation of functional analysis data using structured criteria.  Poster presented at the Annual Convention of the Association for Behavior Analysis, Atlanta, GA.

**Hagopian, L. P.**, Fisher, W. W., Sevin, J., Bowman, L. G., Baran, J., Thompson, R., & Owen, J. (1994).  The use of statistical procedures to aid in the interpretation of functional analysis data.  Poster presented at the Annual Convention of the Association for Behavior Analysis, Atlanta, GA.

**Hagopian, L. P.**, Kahng, S. W., Hunt, L. A., Heller, M., Toole, L. (1994).  Correspondence training for the treatment of incontinence.  Poster presented at the Annual Convention of the Association for Behavior Analysis, Atlanta, GA.

Toole, L. M., **Hagopian, L. P.**, Kurtz, P. F., Levin, P. A., Rainville, E. A., Fisher, W. W. (1995).  The use of noncontingent reinforcement and time-out for the treatment of aggressive behavior maintained by physical attention.  Poster presented at the Annual Convention of the Association for Behavior Analysis, Washington, D.C.

Thibault, M., **Hagopian, L. P.**, Fisher, W. W., Piazza, C. C., Harrell, R. Gerencser, J., Patterson, H. (1995).  Further investigation of the effects of functional communication training with and without extinction and punishment :A summary of thirty cases.  Poster presented at the Annual Convention of the Association for Behavior Analysis, Washington, D.C.

13

Owen, J. S., Thompson, R., **Hagopian, L. P.**, Fisher, W. W., Hanley, G. P., Jung, J. (1995).  Analysis of the efficacy of functional assessment based treatments.  Poster presented at the Annual Convention of the Association for Behavior Analysis, Washington, D.C.

Frea, W. D., **Hagopian, L. P.**, Fisher, W. W., Thibault, M. (1995).  Treating food selection and consumption in a patient with Prader-Willi syndrome.  Poster presented at the Annual Convention of the Association for Behavior Analysis, Washington, D.C.

Bowman, L. G., Fisher, W. W., Owen, J. S., Piazza, C. C., Grace, N., **Hagopian, L. P.**, Hilker, K. (1995).  The effects of constant versus stimulus variation on correct responding by children with mental retardation.  Poster presented at the Annual Convention of the Association for Behavior Analysis, Washington, D.C.

Thompson, R. H., Farrell, D. A., **Hagopian, L. P.**, Piazza, C. P., & Kurtz, P. F. (1996).  Noncompliance with inhalation treatment and food refusal in a child with CF, autism, and mental retardation.  Poster presented at the Annual Convention of the Association for Behavior Analysis, San Francisco, CA.

Rogan, C. L., Piazza, C. C., **Hagopian, L. P.**, Wilke, A. E., & Mann, L. H. (1996).  Using chronotherapy to treat sleep problems of clients with mental retardation.  Poster presented at the Annual Convention of the Association for Behavior Analysis, San Francisco, CA.

Hanley, G. P., Magleri, K., Adelinus, J., Bowman, L. G., **Hagopian, L. P.**, Piazza, C. C., & Fisher, W. W. (1996).  Functional analysis-based treatments and alternative reinforcers in the treatment of destructive behavior in persons with mental retardation.  Poster presented at the Annual Convention of the Association for Behavior Analysis, San Francisco, CA.

Farrell, D. A., **Hagopian, L. P.**, & Amari, A. (1996).  Treating total liquid refusal with backward chaining and fading. Poster presented at the Annual Convention of the Association for Behavior Analysis, San Francisco, CA.

**Hagopian, L. P.**, Fisher, W. W., Thompson, R. H., Owen-DeSchryver, J., & Marhefka, Jean-Marie. (1996).  Toward the development of structured criteria for interpretation of functional analysis data.  In B. A. Iwata (Chair), Current research on the functional analysis of severe behavior disorders.  Symposium conducted at the Annual Convention of the Association for Behavior Analysis, San Francisco, CA.

Sevin, B. M., **Hagopian, L. P.**, Breen, L. E., & Woodruff, V. C. (1997).  Sleep deprivation and insensitivity to social contingencies.  Poster presented at the Annual Convention of the Association for Behavior Analysis, Chicago, IL.

Hughes, C., Farrell, D., **Hagopian, L. P.**, & Kurtz, P. F. (1997).  Hospital and home-based treatment of a child with chronic food refusal and gastrostomy-tube dependence.  In R. L. Babbitt (Chair), Advances in the behavioral treatment of pediatric feeding disorders.  Symposium conducted at the Annual Convention of the Association for Behavior Analysis, Chicago, IL.

14

Bowman, L. G., Fisher, W. W., Piazza, C. C., **Hagopian, L. P.**, Kuhn, D. E., & Kurtz, P. F. (1997).  Choice paradigms for identifying potential reinforcers and assessing their relative reinforcement value.  In T. R. Vollmer (Chair), Recent research on stimulus preference assessments. Symposium conducted at the Annual Convention of the Association for Behavior Analysis, Chicago, IL.

Augustin, M., Fahs, A. J., Derby, K. M., & **Hagopian, L. P.** (1997).  Functional analysis of destructive behavior of combined destructive behaviors compared to separate topographies. Poster presented at the Annual Convention of the Association for Behavior Analysis, Chicago, IL.

**Hagopian, L. P.**, Fisher, W. W., Thibault, M. L., Acquisto, J., Marhefka, J. M., Lindauer, S. E., Breen, L. E., & LeBlanc, L. (1997).  Functional communication training with and without extinction and punishment:  A summary of 24 cases.  In J. M. Asmus (Chair), Outcome Data:  Inpatient, in-home, and residential placement examples. Symposium conducted at the Annual Convention of the Association for Behavior Analysis, Chicago, IL.

**Hagopian, L. P.** (1997).  Discussant.  In W. D. Frea (Chair), Approaches to treating behavioral, academic, and social problems with developmental disorders. Symposium conducted at the Annual Convention of the Association for Advancement of Behavior Therapy, Miami, FL.

Paclawskyj, T. R., **Hagopian, L. P.**, Cercone, J. J. (1998).  Improving treatment outcome in a client eye-poking through reduction of antecedent stereotypy.  Poster presented at the 24th Annual Convention of the Association for Behavior Analysis, Orlando, FL.

Maglieri, K. A., **Hagopian, L. P.**, LeBlanc, L. A., & Worthy, W. (1998).  Assessment and treatment of excessive medical complaints in a young man with medical problems and mental retardation.  Poster presented at the 24th Annual Convention of the Association for Behavior Analysis, Orlando, FL.

Frank, T., Ibberson, S., Herman, K., & **Hagopian, L. P.** (1998).  The comparison of two prompting procedures when teaching functional skills to child with autism.  Poster presented at the 24th Annual Convention of the Association for Behavior Analysis, Orlando, FL.

Derby, K. .M., **Hagopian, L. P.**, Fisher, W. W., Augustine, M., Fahs, A., Thompson, R. H., & Owen-DeSchryver, J. (May, 1998).  Analyzing multiple topographies of aberrant behavior using functional analysis procedures: A summary of 50 clients.  In K. M. Derby (Chair), Refinements in functional analysis methods.  Symposium conducted at the 24th Annual Convention of the Association for Behavior Analysis, Orlando, FL.

Barbin, J., **Hagopian, L. P.**, Richman, D. M., & Cercone, J. (1998).  An evaluation of the relationship between therapist gender and aberrant behavior during analogue functional analysis.  Poster presented at the 24th Annual Convention of the Association for Behavior Analysis, Orlando, FL.

15

Adelinis, J. D., **Hagopian, L. P.,** Delia, M., Worthy, W., Resau, D., & Ross, V. (1998).  Distinct stimulus class effects associated with the use of "do" and "don't" requests in the interruption of preferred activities.  Poster presented at the 24th Annual Convention of the Association for Behavior Analysis, Orlando, FL.

Adelinis, J. D., **Hagopian, L. P.,** Worthy, W., Delia, M., Wilke, A., Ross, V., & Resau, D. (1998).  The use of redirection and noncontingent reinforcement in the treatment of pica.  Poster presented at the 24th Annual Convention of the Association for Behavior Analysis, Orlando, FL.

**Hagopian, L. P.,** Rush, K. S., & Hendrickson, D. J. (1998).  A functional analysis-based "levels" treatment for treating two individuals with severe problem behavior.  Poster presented at the 1st Annual Meeting of MABA, Baltimore, MD.

**Hagopian, L. P.,** Ruyter, J. M., Patterson, H., Marhefka, J. M., & Blakeley-Smith, A. (1998).  A step-wise approach for training parents to implement intensive behavioral treatment programs for individuals with severe behavioral problems.  Poster presented at the 24th Annual Convention of the Association for Behavior Analysis, Orlando, FL.

Rush, K. S., **Hagopian, L. P.,** Perry, A. S., Stone, M. V. (1999).  The eliciting effects of reinforcer removal in a functional analysis tangible condition.  Poster presented at the 25th Annual Convention of the Association for Behavior Analysis, Chicago, IL.

Rush, K. S., **Hagopian, L. P.,** Neidert, P. L., & Breen, L. E. (1999).  A comparison of paired-choice and verbal choice preference assessments.  Poster presented at the 25th Annual Convention of the Association for Behavior Analysis, Chicago, IL.

Maglieri, K. A., Richman, D. M., Adelinis, J. D., & **Hagopian, L. P.** (1999).  Interrater agreement and levels of correspondence across brief and extended functional analysis.  Poster presented at the 25th Annual Convention of the Association for Behavior Analysis, Chicago, IL.

**Hagopian, L. P.,** Rush, K. S., Richman, D. M., Contrucci, S. A., Hendrickson, D. J., & Crosland, K. (1999).  Levels treatment packages based on functional analysis outcomes.  In J. M. Asmus (Chair), Use of applied behavior analysis procedures across school and inpatient settings.  Symposium conducted at the 25th Annual Convention of the Association for Behavior Analysis, Chicago, IL.

Wilson, D., Wilder, D. A., Dawson, J., & **Hagopian, L. P.** (2000).  Modifying the conditions of a functional analysis to provide a specific indication of function.  Poster presented at the 26th Annual Convention for the Association of Behavior Analysis, Washington, D.C.

Wilson, D. M., Wilder, D. A., & **Hagopian, L. P.** (2000).  Modifying conditions of a functional analysis.  Poster presented at the 108th Convention of the American Psychological Association, Washington, D.C.

16

Van Stone, M., Keevican, A., **Hagopian, L. P.**, & Crockett, J. (2000). Treating dropping to the floor maintained by automatic reinforcement for an adolescent with mental retardation. Poster presented at the 26th Annual Convention for the Association of Behavior Analysis, Washington, D.C.

VanStone, M., Keevican, A. L., Hagopian, L. P., & Crockett, J. L. (2000). Treating dropping to the floor maintained by automatic reinforcement. Poster presented at the 108th Convention of the American Psychological Association, Washington, D.C.

Scruggs, J. J., Wilke, A. E., Marder, T. J., Crockett, J. L., & Hagopian, L. P. (2000). An analysis of the selective effects of punishment targeting screaming associated with positive affect. Poster presented at the 26th Annual Convention for the Association of Behavior Analysis, Washington, D.C.

Ruffin, G., Lewis, M., **Hagopian, L. P.**, & Crockett, J. (2000). Increasing compliance with wearing prescription glasses using a NCR with response cost, DRA, and response blocking. Poster presented at the 26th Annual Convention for the Association of Behavior Analysis, Washington, D.C.

McKerchar, T. L., Crockett, J. L., Breen, L. E., DeLeon, I. G., & Hagopian, L. P. (2000). Alternative prompting procedures for destructive behavior maintained by escape. Poster presented at the 26th Annual Convention for the Association of Behavior Analysis, Washington, D.C.

Crockett, J. L., DeLeon, I. G., **Hagopian, L. P.**, Bowman, L. G., Boney, B., Keeney, K. M., Rodriguez-Catter, V., & Sgro, G. (2000). Intensive behavioral intervention for avoidance of medical necessities by children with developmental disabilities. In K. J. Slifer (Chair), Dispelling the myth of "noncompliance" with medical procedures and regimens in children with chronic disorders. Symposium conducted at the 26th Annual Convention for the Association of Behavior Analysis, Washington, D.C.

Crocetti, D., Boney, B., Rsuh, K., & **Hagopian, L. P.** (2000). Treatment of elopement maintained by automatic reinforcement usig competing items. Poster presented at the 3rd Annual Meeting of MABA, Baltimore, MD.

Boney, B., Long, E., Crocetti, D., Rush, K. S., & **Hagopian, L. P.** (2000). An analysis of a response class hierarchy. Poster presented at the 3rd Annual Meeting of MABA, Baltimore, MD.

Boney, B. R., Ruffin, G., **Hagopian, L. P.**, Toole, L. M., Bowman, L. G., & Crockett, J. L. (2000). Identifying the primary function of multiply maintained problem behavior using a competing functions analysis. Poster presented at the 26th Annual Convention for the Association of Behavior Analysis, Washington, D.C.

**Hagopian, L. P.**, Crockett, J. L., VanStone, M., DeLeon, I. G., & Bowman, L. G. (2000). Response allocation between stimulus engagement and problem behavior: A matching account of noncontingent reinforcement effects. In L. P. Hagopian (Chair), Basic and applied research examining the operant mechanisms of noncontingent reinforcement. Symposium conducted at the 26th Annual Convention for the Association of Behavior Analysis, Washington, D.C.

17

**Hagopian, L. P.,** Rush, K. S., Richman, D. M., Kurtz, P. F., Contrucci, S. A., & Crosland, K. A. (2000). Treating severe behavior using functional analysis-based levels systems. In L. P. Hagopian (Co-Chair), <u>Assessment and treatment of severe behavior problems.</u> Symposium conducted at the 108th Convention of the American Psychological Association, Washington, D.C.

Rush, K., **Hagopian, L. P.,** & Lewin, A. (2001). Current research on assessment procedures for individuals with developmental disabilities and severe behavior disorders. In L. P. Hagopian (Chair), <u>Evaluating the concurrent and predictive validity of a duration-based preference assessment.</u> Symposium conducted at the 27th Annual Convention of the Association for Behavior Analysis, New Orleans, LA.

Ruffin, G., Rush, K., & **Hagopian, L. P.** (2001). <u>Combined behavioral and pharmacological intervention for the treatment of cyclical self-injury.</u> Poster presented at the 27th Annual Convention of the Association for Behavior Analysis, New Orleans, LA.

Ruffin, G., Arnold, K., **Hagopian, L. P.,** & Rush, K. (2001). <u>Targeting inappropriate social behavior using differential reinforcement.</u> Poster presented at the 27th Annual Convention of the Association for Behavior Analysis, New Orleans, LA.

Rodriguez-Catter, V., DeLeon, I., **Hagopian, L. P.,** Bowman, L., Fisher, W., Marhefka, J.-M., Delia, M., & Henry, J. (2001). <u>Treatment of severe behavior disorders through differential reinforcement and competing stimulus availability.</u> In B. Shore (Chair), <u>The use of competing stimulus assessments across multiple functions of aberrant behavior.</u> Symposium conducted at the 27th Annual Convention of the Association for Behavior Analysis, New Orleans, LA.

LeBlanc, L. A., Hagopian, L. P., Poling, A., & Maglieri, K. A. (2001). Decreasing the intensity of behavioral interventions: Conceptual issues and clinical guidelines. In W. L. Williams (Chair), Developing and implementing effective function based interventions. Symposium conducted at the California Association for Behavior Analysis, Redondo Beach, CA.

Kahng, S. S., **Hagopian, L. P.,** & Oakes, M. (2001). <u>Predoctoral training at the Kennedy Krieger and Marcus Institutes.</u> Poster presented at the 4th Annual Meeting of MABA, Baltimore, MD.

Crocetti, D., Boney, B., Rush, K., & **Hagopian, L. P.** (2001). <u>Treatment of elopement maintained by automatic reinforcement using competing items.</u> Poster presented at the 27th Annual Convention of the Association for Behavior Analysis, New Orleans, LA.

Boney, B., Long, E., Rush, K., & **Hagopian, L. P.** (2001). <u>An analysis of a response class hierarchy.</u> Poster presented at the 27th Annual Convention of the Association for Behavior Analysis, New Orleans, LA.

Schlund, M. W., Fridberg, D., Hoehn-Saric, R., **Hagopian, L. P.,** & Cataldo, M. F. (2002). <u>Integrating operant methods and neuroimaging technology: Effects of

18

uncertain consequences on 'Anticipatory Anxiety' and neural activation. Poster presented at the 5th Annual Meeting of MABA, Baltimore, MD.

Smalls, Y., Long, E. S., & **Hagopian, L. P.** (2002). Differentiated responding with a modified functional analysis procedure. Poster presented at the 28th Annual Convention of the Association for Behavior Analysis, Toronto, Canada.

Oakes, M., Kahng, S. W., **Hagopian, L. P.**, & Cataldo, M. F. (2002). Predoctoral internship and postdoctoral fellowship. Poster presented at the 28th Annual Convention of the Association for Behavior Analysis, Toronto, Canada.

Long, E. S., **Hagopian, L. P.**, DeLeon, I. G., Resau, D., & Smalls, Y. (2002). Proximity to therapy as a potential variable during functional analysis. Poster presented at the 28th Annual Convention of the Association for Behavior Analysis, Toronto, Canada.

Long, E. S., **Hagopian, L. P.**, & Lieving, G. (2002). An applied demonstration of response resurgence. Poster presented at the 28th Annual Convention of the Association for Behavior Analysis, Toronto, Canada.

Long, E. S., **Hagopian, L. P.**, & Lazerchick, W. N. (2002). Separating the effects of preference and competition. Poster presented at the 28th Annual Convention of the Association for Behavior Analysis, Toronto, Canada.

**Hagopian, L. P.**, Long, E. S., & Fyffe, C. (2002). The effects of response blocking and contingent redirection on engagement with alternative stimuli and self-injurious behavior. Poster presented at the 28th Annual Convention of the Association for Behavior Analysis, Toronto, Canada.

**Hagopian, L. P.**, Rush, K. S., Long, E. S., Lieving, G. A., & Abt, K. (2002). Alternative reinforcement schedule effects. In R. G. Smith (Chair), Basic behavioral processes in the treatment of behavioral disorders. Symposium conducted at the 28th Annual Convention of the Association for Behavior Analysis, Toronto, Canada.

**Hagopian, L. P.**, Long, E. S., & DeLeon, I. G. (2002). Noncontingent competing stimuli for the treatment of problem behaviors occurring during activities of daily living. Poster presented at the 28th Annual Convention of the Association for Behavior Analysis, Toronto, Canada.

Wilke, A., Rush, K., **Hagopian, L. P.**, Zamora, M., & Boney, B. (2003). Use of competing items to treat clothing destruction for a developmentally disabled individual with OCD. Presented at the 29th Annual Convention of the Association for Behavior Analysis, San Francisco, CA.

**Hagopian, L. P.** (2003). Identification and application of preferred and competing stimuli in the treatment of problem behavior (Chair). Symposium conducted at the 29th Annual Convention of the Association for Behavior Analysis, San Francisco, CA.

19

Toole, L. M., Bowman, L. G., Hagopian, L. P., & DeLeon, I. G. (2003). On the relation between competition and preference in competing stimulus assessments. In L. P. Hagopian (Chair), Identification and application of preferred and competing stimuli in the treatment of problem behavior. Symposium conducted at the 29th Annual Convention of the Association for Behavior Analysis, San Francisco, CA.

Oakes, M., Kahng, S. W., Cataldo, M. F., & Hagopian, L. P. (2003). Predoctoral internship at Kennedy Krieger Institute and Johns Hopkins University School of Medicine. Poster presented at the 29th Annual Convention of the Association for Behavior Analysis, San Francisco, CA

McIntyre, L. L., Philips, J., Bowman, L. G., Toole, L. M., & Hagopian, L. P. (2003). Examining the effects of psychostimulants with children with autism. Poster presented at the 29th Annual Convention of the Association for Behavior Analysis, San Francisco, CA.

Huete, J., Kurtz, P. F., O'Connor, J. T., Paclawskyj, T., R., Chin, M. D., & Hagopian, L. P. (2003). A model of continuum of care in behavioral services: Kennedy Krieger Institute's Neurobehavioral Programs. In J. Ringdahl (Chair), Clinical service models within applied behavior analysis. Symposium conducted at the 29th Annual Convention of the Association for Behavior Analysis, San Francisco, CA

DeLeon, I. G., Braud, S. A., Bowman, L. G., Christensen, A., Hagopian, L. P., & Kahng, S. (2003). An examination of atypical operant functions for problem behavior identified through analog functional analyses. In L. G. Bowman (Chair), Extensions of functional behavioral assessment of problem behavior: Variations in population, therapist and functional classes. Symposium conducted at the 29th Annual Convention of the Association for Behavior Analysis, San Francisco, CA.

Hagopian, L., P. (2004). Discussant. In W. K. Berg (Chair), Identifying effective treatment components for reducing problem behaviors maintained by automatic reinforcement. Presented at the 30th Annual Convention of the Association for Behavior Analysis, Boston, MA.

Bruzek, J. L., Hagopian, L. P., Bowman, L. G., Schonbachler, H., & Phillips, J. G. (2004). Assessment and treatment of problem behavior maintained by interruption of preferred activities. In D. P. Wacker (Chair), Further applications and extensions of functional communication training. Symposium conducted at the 30th Annual Convention of the Association for Behavior Analysis, Boston, MA.

Arnold, K. L., Kuhn, D. E., Wilke, A. E., & Hagopian, L. P. (2004). Increasing independent social interactions in a child with pervasive developmental disorder. Poster presented at the 30th Annual Convention of the Association for Behavior Analysis, Boston, MA.

Wilke, A., Kuhn, D. E., Hagopian, L. P., & Crawford, B. (2004). Increasing appropriate toy play skills in an individual diagnosed with Autism. Poster presented at the 30th Annual Convention of the Association for Behavior Analysis, Boston, MA.

Shao, B. J., Kahng, S., Cataldo, M. F., & **Hagopian, L. P.** (2004). Advanced training at the Kennedy Krieger Institute and the Johns Hopkins University School of Medicine. Poster presented at the 30th Annual Convention of the Association for Behavior Analysis, Boston, MA.

Shao, B. J., Kahng, S., Cataldo, M. F., & **Hagopian, L. P.** (2004). Predoctoral internship at the Kennedy Krieger Institute and the Johns Hopkins University School of Medicine. Poster presented at the 30th Annual Convention of the Association for Behavior Analysis, Boston, MA.

**Hagopian, L. P.** (2004). Functional assessment of problem behavior: Refining analyses through the manipulation of response and reinforcement variables (Chair) Symposium conducted at the 30th Annual Convention of the Association for Behavior Analysis, Boston, MA.

Kuhn, D. E., **Hagopian, L. P.**, Kuhn, S. A. C., & Jennett, H. (2004). The identification of response-class hierarchies during functional analysis. In L. P. Hagopian (Chair), Functional assessment of problem behavior: Refining analyses through the manipulation of response and reinforcement variables. Symposium conducted at the 30th Annual Convention of the Association for Behavior Analysis, Boston, MA.

Bowman, L. G., Brown, T. M., **Hagopian, L. P.**, Bruzek, J. L., & Moore, M. E. (2004). Comparing moderate-to-lean and dense-to-lean schedules of reinforcement. Poster presented at the 30th Annual Convention of the Association for Behavior Analysis, Boston, MA.

Schonbachler, H., Kahng, S., Kurtz, P. F., Fritz, J. N., Goysovich, R., & **Hagopian, L. P.** (2004). The effects of a warning stimulus on punishment fading. In C. M. Anderson (Chair), The use of stimulus control to enhance intervention efficacy. Symposium presented at the 30th Annual Convention of the Association for Behavior Analysis, Boston, MA.

**Hagopian, L. P.** (2005). Assessment and treatment methodologies. Presentation at the 4th Annual Autism Conference of the Commonwealth Autism Service, Richmond, VA.

**Hagopian, L. P.** (2005). Assessment and treatment of challenging behavior. Keynote Address presented at the 4th Annual Autism Conference of the Commonwealth Autism Service, Richmond, VA.

**Hagopian, L. P.** & Chung, K. (2005). Toward the Development of Evidence-Based Treatment for Individuals with MR/DD (Co-chair). Symposium conducted at the Meeting of the Annual Psychological Association, Washington, DC.

**Hagopian, L. P.** (2005). Hypothesis testing in applied behavior analysis. In M. F. Cataldo (Chair), Functional analysis of problem behavior in persons with developmental disabilities. Symposium conducted at the Meeting of the Annual Psychological Association, Washington, DC.

Hagopian, L. P. (2006).  Teaching skills to children and adults with severe behavior disorders using applied behavior analysis.  Presentation at the Behavior Analysis and Developmental Disabilities Conference, Queens College, Flushing, NY.

Hagopian, L. P. (2006) Chair.  Current research on preference assessment. Symposium conducted at the 32nd Annual Convention of the Association for Behavior Analysis, Atlanta, GA.

Kuhn, D. E., Hagopian, L. P., Chirighin, A. E. (2006).  Skills acquisition training for young and developmentally disabled children.  In Lynn G. Bowman (Chair). Increasing appropriate play skills in individuals diagnosed with Autism.  Symposium conducted at the 32nd Annual Convention of the Association for Behavior Analysis, Atlanta, GA.

Shulleeta, M. M., DeLeon, I. G., Fisher, W., Neidert, P.L. (2006).  Differential reinforcement in the treatment of behavior disorders:  Variables related to treatment efficacy and maintenance.  In Louis Hagopian (Chair).  Treatment of problem behavior during transitions:  The influence of task preference on DRA Efficacy.  Symposium conducted at the 32nd Annual Convention of the Association for Behavior Analysis, Atlanta, GA.

Lieving, G. A., Hagopian, L.P., Toole, L. M., Jennett, H. K., Boelter, E. W. (2006).  Mathematical principles of reinforcement and human schedule performance: preliminary analyses with children with developmental delays.  Poster presented at the 32nd Annual Convention of the Association for Behavior Analysis, Atlanta, GA.

Dolezal D. N., Falwell, K. D., Kahng, S., Cataldo, M. F., Hagopian, L.P. (2006). Advanced training in developmental disabilities and applied behavior analysis at the Kennedy Krieger Institute and the Johns Hopkins University School of Medicine. Special Event presented at the 32nd Annual Convention of the Association for Behavior Analysis, Atlanta, GA.

Toole, L. M., MacWhorter, K. J., Lieving, G. A., Jennett, H. K., Boelter, E. W., Hagopian, L.P. (2006).  Behavioral persistence of children with and without Autism responding on progressive-ratio schedules.  Poster presented at the 32nd Annual Convention of the Association for Behavior Analysis, Atlanta, GA.

Chirighin, A. E., Kuhn, D. E., Hagopian, L. P., Zelenka, K. M., Triggs, M. M. (2006).  Treating problem behavior with functional communication training: Variables that impact response selection and stimulus control.  Teaching individuals with Autism to attend to naturally occurring discriminative stumuli during FCT.  Symposium conducted at the 32nd Annual Convention of the Association for Behavior Analysis, Atlanta, GA.

Lieving, G. A., Hagopian, L.P., Toole, L., Jennett, H. K., Boelter, E. (2006). Conceptual and empirical investigations on the nature of Autism spectrum disorders.  In J. Tarbox (Chair).  Beyond words:  Reductionism and executive function in the study of the behavioral features of Autism.  Symposium conducted at the 32nd Annual Convention of the Association for Behavior Analysis, Atlanta, GA.

Jennett, H. K., Lieving, G. A., **Hagopian, L. P.**, Boelter, E. W., Toole, L. M. (2006).  Resistance to extinction and behavioral variability in individuals with and without Autism.  Poster presented at the 32nd Annual Convention of the Association for Behavior Analysis, Atlanta, GA.

Boelter, E., Lieving, G. A., Toole, L., Jennett, H. K., **Hagopian, L. P.** (2006).  An examination of behavioral sensitivity and persistence in children diagnosed with Autism.  Poster presented at the 32nd Annual Convention of the Association for Behavior Analysis, Atlanta, GA.

Kuhn, D. E., **Hagopian, L. P.**, Chirighin, A. E., Zelenka, K., Triggs, M., & Shuleetta, M. (2006).  Teaching individuals with developmental disabilities to attend to naturally occurring discriminative stimuli during FCT.  Paper presented at the 114th Annual Convention of the American Psychological Association, New Orleans, LA.

**Hagopian, L. P.**, Toole, L. M., Boelter, E., Jennett, H. K., Lieving, G. A., MacWhorter, K. J., & Tobin, E. L.  (2007).  Examining contingency control deficits in children with and without autism.  Poster presented at the 40th Annual Gatlinburg Conference on Research and Theory in Intellectual and Developmental Disabilities, Annapolis, MD.

Boelter, E., **Hagopian, L.P.** (2007). A Demonstration of Discriminated Responding between Simultaneously Presented Communication Cards. Poster presented at the 33rd Annual Convention of the Association for Behavior Analysis, San Diego, CA.

Graves, S.D., Jennet, H.K., **Hagopian, L.P.** (2007). The Use of Non-Contingent Reinforcement without Extinction to Treat Aggressive Behavior Occaisioned by Blocking Sleep. Poster presented at the 33rd Annual Convention of the Association for Behavior Analysis, San Diego, CA.

Boggs, K.M., **Hagopian, L.P.** (2007). Using Competing Stimuli to Treat Self-Injurous and Other Problem Behavior in a Young Adult with Cornelia de Lange Syndrome. Poster presented at the 33rd Annual Convention of the Association for Behavior Analysis, San Diego, CA.

Jennett, H.K., Boelter, E., **Hagopian, L.P.** (2007). Two Methods for Restricting Access to Items when Using Functional Communication Cards. Poster presented at the 33rd Annual Covention of the Association for Behavior Analysis, San Diego, CA.

Minshawi, N., Small, C., Kahng, S.W., Cataldo, M. F., **Hagopian, L.P.** (2007). Advanced Training at the Kennedy Krieger Institute and the Johns Hopkins University School of Medicine. ABA Expo presented at the 33rd Annual Convention of the Association for Behavior Analysis, San Diego, CA.

Jennett, H.K., **Hagopian, L.P.**, Boelter, E. (2007). The Effects of Blocking during Experimental Analyses of Aggressive Behavior. Symposium conducted at the 33rd Annual Convention of the Association for Behavior Analysis, San Diego, CA.

23