# EXHIBIT 19

Page 37

1                    LOUIS HAGOPIAN, PhD

2         proponents of positive behavior supports consider

3         positive behavioral supports to be an alternative

4         to applied behavior analysis.  Do you recall that

5         testimony?

6    A.   Yes.

7    Q.   And you do not consider it to be an alternative.

8         Is that an accurate statement of your position on

9         that?

10   A.   I think they present it as an alternative to

11        outside people.  It is different in that some of

12        its proponents don't -- would not use any type of

13        punishment procedures, but it's similar in many

14        other regards.

15   Q.   Is there a scientific support for the position

16        taken by some proponents of positive behavioral

17        supports that punishment is not needed to treat

18        severe behavioral disorders?

19   A.   I think the position that punishment should not be

20        used is more of a philosophical based type of

21        position.

22   Q.   Would you agree that that position does not have

23        scientific support?

24                    MS. MUNKWITZ:  Form.

25   A.   Yes.

1          LOUIS HAGOPIAN, PhD

2     Q.    You would agree with that?

3     A.    Yes.

4     Q.    Now, before the break you testified to some of the

5           punishment procedures that you have used.  I

6           believe you testified you've not used skin shock at

7           all; is that correct?

8     A.    That's correct.

9     Q.    Why have you not used skin shock in any of your

10          work in behavioral psychology?

11    A.    We have been able to produce highly successful

12          outcomes without it.  I have not received any kind

13          of formal training to use electric shock myself,

14          and I don't -- I have never sought permission from

15          my institution, but I don't know how they would

16          view it.

17    Q.    Are you -- to your knowledge, has your -- you said

18          you have not sought permission, and I forgot.  From

19          whom did you say you have not sought permission?

20    A.    From my institution.

21    Q.    That's Kennedy Krieger?

22    A.    Yes.

23    Q.    Do you know if the Kennedy Krieger has a position

24          on the use of skin shock?

25    A.    They do not.

1          LOUIS HAGOPIAN, PhD

2     A.   If the individual needs time to calm down, and

3          releasing him after 30 seconds he's not calm yet,

4          behaviors are going to persist, whereas if you do

5          it longer, he calms down and you can let go.  And

6          my statement about building tolerance to shock,

7          that research has been done with shock, not with

8          nonaversive interventions and time-out.  So I don't

9          know if that's...

10    Q.   Based on your view of the -- have you reviewed

11         literature on the use of skin shock?

12    A.   A little.

13    Q.   How many articles have you read?

14    A.   A handful.

15    Q.   Do you know how many peer-reviewed professional

16         articles are available on use of skin shock?

17    A.   Several dozen.

18    Q.   And would it be necessary for you to read all of

19         those several dozen articles to have a complete

20         understanding of what the professional standards

21         are for the use of skin shock?

22    A.   I think it's important to make a distinction

23         between the application and use of skin shock as an

24         intervention.  Many people are not qualified based

25         on experience and training to apply skin shock, yet

Page 94

1                        LOUIS HAGOPIAN, PhD

2    A.    Based on the definition and the regulations, no.

3    Q.    Now, the hierarchy of positions, what is the lowest

4          level?  Would that be direct care staff?

5                   MS. MUNKWITZ:  Form.

6    A.    Yes.

7    Q.    I believe you testified that direct care staff do

8          apply the aversive procedures to the patients;

9          correct?

10   A.    Yes.

11   Q.    That would include the time-out procedures that you

12         testified to the, basket hold, facial screens,

13         hands down; correct?

14   A.    Yes.

15   Q.    What are the minimum qualifications to get a direct

16         care staff at your unit?

17   A.    High school degree or GED, I think, is the minimum.

18         About half our staff have bachelor's degrees,

19         direct care staff.

20   Q.    Would it be accurate to say that approximately half

21         of your direct care staff, their highest is a high

22         school degree?

23   A.    Yes.

24   Q.    What is the next level up on the hierarchy after

25         direct care staff?

Page 95

1                  LOUIS HAGOPIAN, PhD

2     A.    We have different levels within the direct care

3           staff where some have more training and supervisor

4           responsibilities.

5     Q.    What are those levels?

6     A.    I think we have positions called clinical

7           assistants, CA1, 2 and 3.  We have some CA3s that

8           are specifically -- have specific responsibilities

9           for staff training and orientation.  And we have

10          some that have some supervisory responsibilities in

11          terms of making sure people are where they need to

12          be at a given time.  And then we have some direct

13          care staff that assist with some of the behavioral

14          assessment and treatment sessions.

15    Q.    The direct care staff that apply the aversives,

16          such as basket holds, facial screens, hands down,

17          are they required to have some license or

18          certification before they are allowed to apply the

19          aversive procedures?

20    A.    No.

21    Q.    Where are the aversive procedures such as basket

22          holds, facial screens, hands down, where are they

23          conducted physically in your unit?

24    A.    Wherever the response that we're targeting occurs.

25          We have a locked unit, and patients are staffed

Page 120

1                          LOUIS HAGOPIAN, PhD

2          person, but on occasion the supervisor might be in

3          a different part of the unit.

4     Q.   When I say "aversive intervention," you know that

5          I'm referring to the basket holds, facial screens,

6          hands down.  You understand that; correct?

7                    MS. MUNKWITZ:  Form.  The doctor has

8               testified those are not aversive

9               interventions.

10    Q.   What's the term you used for these interventions?

11    A.   There's a number of terms.  You can call them --

12    Q.   What do you call them?

13    A.   -- behavior reduction procedures.

14    Q.   So these behavior reduction procedures that I would

15         refer to as facial screens, basket holds, hands

16         down, chair time-out, these procedures can be

17         applied by the clinical assistants in your unit to

18         a patient if called for by the protocol even if

19         there's no supervisor directly observing and

20         implementing?

21    A.   Yes.

22                    (There was a discussion off the record.)

23    BY MR. FLAMMIA:

24    Q.   Dr. Hagopian, to your knowledge, are there any

25         regulations by any agencies in the State of

Page 130

LOUIS HAGOPIAN, PhD

1

2          JRC?

3     A.   No.

4     Q.   I'm now going to show you what we've marked as

5          Exhibit 5.  I ask you to take a look at it.

6     A.   (Witness complies with request.)

7     Q.   My first question is going to be, do you recognize

8          Exhibit 5 as a description of Kennedy Krieger's

9          continuum, neurobehavioral continuum that is on the

10         website of Kennedy Krieger Institute?

11    A.   Yes.

12    Q.   Did you write this website page that we've marked

13         as Exhibit 5?

14    A.   I believe I did quite a while ago.

15    Q.   Do you have any reason to believe it's not

16         accurate?

17    A.   No.

18    Q.   Now, you testified that one of the types of

19         behaviors that are treated at Kennedy Krieger in

20         your unit with response reduction procedures are

21         destructive behaviors.  Do you recall that

22         testimony?

23    A.   Yes.

24    Q.   Why is it in your opinion important to treat

25         destructive behaviors?

Page 131

LOUIS HAGOPIAN, PhD

1

2        MS. MUNKWITZ:   Form.

3    A.    Those behaviors can interfere with the individual's

4          participation in school and community activities.

5          They can place the individual at risk for injury

6          and others at risk for injury.

7    Q.    Do you consider it important to treat behaviors

8          such as screaming?

9    A.    If they're disruptive and could result in the

10         individual, for example, being placed in a more

11         restrictive setting, then yes.

12   Q.    Do you consider it important to treat behaviors

13         such as noncompliance?

14   A.    Yes.

15   Q.    Is that for the same reasons or for different

16         reasons?

17   A.    Noncompliance, mainly because that often occurs in

18         the context of academic instruction, and if the

19         individual doesn't comply with instruction, then

20         that's going to limit his or her ability to acquire

21         new skills.  It could also be a problem because

22         noncompliance is often -- noncompliance often

23         co-occurs with problem behavior.  So if the

24         individual is asked to complete instructions,

25         sometimes noncompliance occurs with disruptive

Page 132

1           LOUIS HAGOPIAN, PhD

2      aggressive behavior.

3   Q.   Now, you mentioned a success story on Exhibit 5,

4        BB, a seven-year-old male.  Do you have any memory

5        of that case beyond reading Exhibit 5?

6   A.   Let me read this thing in its entirety.

7               (A pause was taken in the proceedings.)

8   A.   It's vaguely familiar.  I don't recall any details

9        of this case.  This page on the website is probably

10       several years ago.

11  Q.   Do you recall why you chose to mention BB's

12       treatment history as a success story on this page?

13  A.   No, I don't.

14  Q.   Would it be accurate to say that you treated

15       screaming, BB's screaming behavior with the

16       response reduction procedure, based on your review

17       of Exhibit 5?

18  A.   It's hard to tell based on reading this whether

19       screaming was targeted with the time-out.  It's

20       possible.

21  Q.   Do you see where it says, "Treatment consisted of

22       teaching him to appropriately ask for attention,

23       free access to toys and a brief time-out for any of

24       his inappropriate behaviors": do you see that?

25  A.   Oh, yes, I do.  That would imply that SIB,

1          LOUIS HAGOPIAN, PhD

2    Q.    In your program, do you refer to a hands down

3          procedure as a prompt?

4    A.    No.

5    Q.    In your program, do you refer to the chair time-out

6          as a prompt?

7    A.    No.

8    Q.    Would it be accurate to define a block as a brief

9          physical prompt to interrupt or prevent a specific

10         behavior?

11              MS. MUNKWITZ:   Form.

12   A.    Yes.

13   Q.    In your program, do you use blocks as response

14         reduction procedures?

15   A.    In a way, yes.

16   Q.    How?

17   A.    For some individuals, simply blocking a response

18         not only prevents it from occurring and minimizes

19         injury, it also has an effect on reducing the

20         probability of that behavior, much the same way a

21         basket hold might, in some cases.

22   Q.    Would it be accurate to say that in your program

23         you use response reduction procedures to address

24         behaviors other than self-injurious and aggressive

25         behaviors?

1                    LOUIS HAGOPIAN, PhD

2    A.    Yes.

3    Q.    Would you consider it to be inconsistent with

4          professional standards if you were prohibited from

5          using response reduction procedures for anything

6          other than self-injurious and aggressive behaviors?

7                    MS. MUNKWITZ:   Form.

8    A.    Yes.

9    Q.    Why?

10   A.    Because these interventions -- couple of reasons.

11         These interventions have been demonstrated to be

12         effective, and they are accepted as appropriate

13         interventions to use.

14   Q.    When you say these interventions, in your answer,

15         you're referring to things like basket hold, facial

16         screen, hands down, chair time-out; is that

17         correct?

18   A.    Nonaversive behavior reduction.

19   Q.    Those procedures in particular; correct?

20                   MS. MUNKWITZ:   Form.

21   A.    Those are the more commonly used ones, yes.

22   Q.    Do you know what an automated aversive conditioning

23         device is?

24   A.    Yes.

25   Q.    What is it?

Page 173

1                    LOUIS HAGOPIAN, PhD

2    A.   The one I know of is the SIBIS unit, self-injurious

3         behavior intervention system.   That's the only one

4         I know of.

5    Q.   Do you know how the SIBIS unit works?

6    A.   Not precisely, just again in general terms the way

7         I described.

8    Q.   Do you know what type of aversive stimulus the

9         SIBIS emits?

10   A.   My understanding is that it is electric shock.

11   Q.   Do you know whether Johns Hopkins University had

12        any role in the development of the SIBIS?

13   A.   Yes, it was developed in part by the Johns Hopkins

14        -- some program at Hopkins; I don't recall exactly.

15        It was a quite a long time ago.

16   Q.   Would you consider it inconsistent with current

17        professional standards to prohibit the use of

18        automated aversive conditioning devices?

19   A.   With professional standards, no.

20   Q.   Why not?

21   A.   Because there are many alternatives, including

22        nonautomated electric shock devices that can be

23        used to address similar problems.

24   Q.   Well, would you consider a prohibition on the use

25        of automated aversive conditioning devices to be

1              LOUIS HAGOPIAN, PhD

2       inconsistent with the peer-reviewed literature that

3       has been published in support of the use of those

4       devices?

5               MS. MUNKWITZ:   Form.

6  A.    I think it depends on the setting.  I think in a

7       hospital setting or in a clinic, where again under

8       the right clinical conditions, where you have an

9       individual who is not responding to other forms of

10      treatment and is engaging in a very high rate of

11      behavior, that sort of treatment might be

12      appropriate.  I would view that treatment as highly

13      intensive, requiring an extreme level of oversight

14      and supervision, and one that probably requires a

15      level of -- that level of oversight and supervision

16      beyond what a school would be able to provide.

17  Q.   And, I know you've testified that you've never used

18      an automated aversive conditioning device.  Do you

19      know whether an automated aversive conditioning

20      device has ever been used in your unit at Kennedy

21      Krieger?

22  A.    I don't know if it has.

23  Q.   Do you consider your unit to have the sufficient

24      resources to safely use an automated aversive

25      conditioning device?

Page 176

1          LOUIS HAGOPIAN, PhD

2     Q.    Would it be accurate to say that one of those

3           devices is commonly referred to as arm splints?

4     A.    Yes.

5     Q.    Can you describe any other restraint device that

6           you've used other than arm splints?

7     A.    We have two devices that are currently on our list

8           and two devices we've used for many years.  That's

9           the arm splints and the mitts, which is a padded

10          mitt that fits over their hand and tied around the

11          wrist, and keeps the fingers separate and away from

12          the child's mouth, or wherever they're trying to

13          get.

14    Q.    Now, do you ever use your response reduction

15          procedures on your patients -- including the basket

16          hold, facial screen, hands down, chair time-out --

17          when they are also at the same time in a restraint

18          device?

19    A.    I don't recall any cases.  If we have it's been

20          rare.

21    Q.    Would you consider it to be against professional

22          standards to use a response reduction procedure

23          with a patient who's also in some form of restraint

24          device?

25    A.    Not generally.  It would depend on the patient and

1           LOUIS HAGOPIAN, PhD

2       what the nature of the problems are.

3   Q.  So you can envision some circumstances where it

4       would be appropriate to use a response reduction

5       procedure with a patient who's also in some form of

6       restraint device?

7           MS. MUNKWITZ:   Form.

8   A.  Yes.

9   Q.  Have you heard of a restraint device referred to as

10      a hooper device?

11  A.  Yes.

12  Q.  What is that?

13  A.  That is a device that can be used to keep a patient

14      in bed.  And I believe it restricts movement of the

15      torso, and the arms can be moved.  But we have not

16      used a hooper in a long time and that is no longer

17      on our list of approved devices.

18  Q.  When was the last time that you can recall your

19      unit using a hooper device?

20  A.  Many years ago.  I don't recall how many.

21  Q.  And does your unit use any other device that is

22      similar to a hooper device?

23  A.  No.

24  Q.  Does your unit use any other restraint devises

25      other than the splints and the mitts?

1              LOUIS HAGOPIAN, PhD

2      aversive interventions upon children with

3      disabilities?"  Do you see that question?

4   A.  Yes.

5   Q.  There's a follow-up question:  "Can you provide

6      examples?"

7          You answered the question yes; is that

8      correct?

9   A.  Yes.

10  Q.  Is it your opinion that there are effective

11     alternatives to the use of aversives for all cases?

12  A.  No.  Some individuals need -- some individuals may

13     need nonaversive behavior reduction interventions,

14     and there potentially are some individuals that may

15     require aversive interventions.

16  Q.  In your opinion, would it be appropriate for a

17     regulation to ban completely the use of aversives

18     under any circumstances for any client?

19  A.  No.

20  Q.  Why not?

21  A.  Because there may be a small percentage of

22     individuals who may need that level of

23     intervention.

24  Q.  Now, on the second part of the question 2 that

25     asked you to provide examples of alternatives, do

# EXHIBIT 20

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

JEANETTE ALLEYNE, *et al.*,

<div style="margin-left:2em">Plaintiffs,</div>

-against-

NEW YORK STATE EDUCATION DEPARTMENT, *et al.*,

<div style="margin-left:2em">Defendants.</div>

**AFFIDAVIT OF JAMES
ANTON MULICK, PH.D.**

Civ. A. No.

1:06-CV-994-GLS

---

## <u>AFFIDAVIT OF JAMES ANTON MULICK, PH.D.</u>

I, James Anton Mulick, Ph.D., upon my own personal knowledge, hereby depose and declare the following:

1.   I am a Professor of Psychology and Pediatrics at the Ohio State University in the Departments of Psychology and Pediatrics.

2.   I have been retained as an expert witness by the Plaintiffs in the above-captioned action.

3.   I have co-authored a written report with Ronald Van Houten, Ph.D. entitled "Experts' Report Concerning The Judge Rotenberg Center" ("Report"), based upon our review of detailed written records and other information and our activities as set forth in the Report. A true and accurate copy of the Report, which was provided to Defendants' counsel on April 14, 2008, is attached hereto as Exhibit 1, and is incorporated herein by reference.

4.   All of the statements and opinions in the Report are true. I offer all of these opinions and conclusions to a reasonable degree of psychological certainty.

{K0392165.2}

SWORN TO AND SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY
ON THIS ___<sup>th</sup> DAY OF MARCH 2009.

/s/ James Anton Mulick, Ph.D.
James Anton Mulick, Ph.D.

Sworn to before me this

March 30, 2009

/s/_____
Notary Public

# EXHIBIT 1

The material attached as Exhibit 1 is confidential and the Court has given leave for it to be filed traditionally and under seal.

### Experts' Report Concerning The Judge Rotenberg Center

Submitted by

Ron Van Houten, Ph.D.

1021 Hol Hi Drive

Kalamazoo, MI 49008

And

James A. Mulick, Ph.D.

7861 Flint Rd.

Columbus OH 43235

April 13, 2008

We were asked to visit the Judge Rotenberg Center (JRC) on February 28th and 29th to determine whether we would be willing to testify about our impressions of JRC. We toured the school, interviewed staff and students, and examined a report from experts sent by authorities in New York (*NYSED Report regarding JRC, dated June 9, 2006 (cover letter is dated June 12,2006)*; as listed in Appendix 1). During that visit, we decided that we would do so if we were asked specific questions we could seek to answer through our investigation. Prior to conducting the second site visit we requested documents from JRC and these were provided (See Appendix 2 for a list of these documents). We conducted a second site visit from March 28 through March 30. During the second site visit we interviewed clinicians and observed specific students at JRC and in their residences whose programs we were asked to examine because they are part of the New York litigation. During the first week of April, on the 1st through the 4th, we worked via teleconference with JRC staff to interview each of the designated students' teachers about the students' educational progress at JRC. We received raw video recordings of the students in their classrooms from April 2, 3 and 4, 2008. This report represents our answers to those questions based on these sources of information, and on documents indicated in Appendix 1 & 2 attached. The opinions presented in this report are to a reasonable degree of psychological certainty.

We have both been familiar with JRC from contact in the past when it was known as the Behavior Research Institute (BRI). We are well aware of the fact that it has been the center of controversy many times. Our last professional contact with JRC/BRI was as members of a larger panel of experts about 18 years ago, after which we have had no professional dealings with JRC. In the interim, our knowledge of the program and the many changes it has undergone was limited and completely incidental.

We considered how we would formulate our response to the issues we were asked to consider regarding the nine clients at JRC involved in the litigation. We decided that first, an examination of the clinical decision making process and the competencies of those making treatment decisions should be undertaken. We then examined how the process was applied to each of the nine cases. Next, we observed each of the students to

determine if the processes as we understood them were discernibly in place. Fourth, we looked into behavioral outcome data to determine whether decision-making as documented in the records is evidence based. We obtained an understanding of the extent of monitoring and oversight at JRC. Finally, we looked for evidence of how treatment decisions influenced clients right to an appropriate education.

**Judge Rotenberg Center**

Judge Rotenberg Center (JRC) is a private treatment facility and school in Massachusetts we understand to specialize in serving people with developmental disorders and behavior disorders of an extreme nature, such that concerns about the safety of the clients and others prevents them from successful management in less restrictive settings. The facility currently serves about 200 individuals, most of whom also receive educational services through JRC and live in JRC residences. Clients' meals are taken through JRC. Based on the principles of behavioral psychology, the program has the overarching goal of providing educational and habilitative services in a safe and healthy environment where behavior is carefully managed. Behavior management of dangerous, antisocial, self-injurious, and other undesirable acts is accomplished using a full range of individualized environmental manipulations, including motivational and behavioral-consequence-based tools. Motivational tools are designed to increase the desirability of reinforcement provided to clients through programs intended to increase prosocial and other desired behavior, and include restriction of access to desired objects and activities. Undesired behavior is managed through (a) increasing either desired behavior or the omission of undesired behavior via reinforcement, (b) through restraint, and (c) through the use of direct decelerative procedures based on operant punishment (including the contingent reduction of access to reinforcement, such as loss of earned token reinforcement, and the contingent application of aversive stimulation, notably including a 2-second electrical stimulus delivered through a device known as the GED and GED 4). The education of clients is provided according to an Individualized Education Plan developed in collaboration with home school districts and JRC teachers. JRC staff designated clinicians, all of whom are supervised by a licensed psychologist or are themselves licensed as psychologists, develop the behavior management and general treatment procedures. The Massachusetts Probate Court under substituted judgment procedures approves the use of highly restrictive procedures, including the GED and/or GED 4; About 41% of the school age clients at JRC were approved for the GED and/or GED 4 at the time of this investigation. Direct care staff at JRC accompany clients at all times, and all clients are additionally monitored via extensive digital video installations at the school and in the residences. The JRC residences are distributed throughout the local community in suburban settings, and seem well appointed and comfortable. Transportation of clients is always through JRC, except when family visits are involved. Systems of staff training and supervision at JRC are astonishingly, and uniquely, extensive and detailed.

Its unique client population and approach complicate evaluating the program and procedures at JRC. The clients are restricted to those for whom referring agencies are willing to pay the very large expense of placement at JRC, which is not something likely to be available to any but the most treatment resistant individuals. The clients frequently

arrive with dangerous aggressive or self-injurious behavior. They often arrive on high doses of psychotropic drugs that self-evidently have failed to help the client adequately, and which in some cases reached arguably toxic levels. With respect to approach, and except for cases where medical or psychiatric staff determine the exception, treatment is entirely directed toward behavior change, and uses behavior modification methods based on general principles of conditioning and learning. As such, treatment decisions are represented as data based. This is in contrast to many agencies working with disabled populations where treatment decisions are based not only on data concerning client response to treatment, but to a much greater degree on non-scientific ideological and cultural belief systems. We understand that JRC aims at normalizing clients' behavior so that they can better access habilitative and educational experiences, and better participate in normative experiences in the larger community.

We support JRC's general approach; that is, its emphasis on understanding the needs of clients in terms of their need for behavior change. We recognize that new behavior is most efficiently built up by learning how to perform socially and culturally valued behavior through contact with social and non-social rewards as reinforcement. This approach is sometimes referred to as positive behavior modification or positive behavior support. But we understand that positive, appetitively motivated behavior change has limitations most evident with some of the kinds of clients served at JRC. Antisocial behavior can be acquired by achieving personally valued or positive outcomes, such as material gain and interpersonal domination. Antisocial behavior, once acquired, can be resistant to change precisely because the reinforcement it accesses is not normally under therapist control. Under this circumstance, restriction of access to the rewards of antisocial behavior is a necessary therapeutic measure, as is sharpening the client's desire for rewards that are under the therapist's control to enable their use as reinforcement for new prosocial behavior. The system at JRC can be understood as aiming toward this sort of environmental design.

The system at JRC includes extraordinary levels of restriction and the use of aversives. Aversives can be understood as useful, not for the creation of prosocial behavior, but for the suppression of antisocial or counter-therapeutic behavior that limits the client's ability to acquire prosocial behavior, an education, or free access to participation in the community. The decision to use extraordinary levels of restriction and aversives to suppress undesired behavior is both a difficult technical decision and a moral decision. The technical decision has to be based on the relative effectiveness of feasible alternative treatments, and how the direct effects and side effects of these alternatives are likely to play out in the setting in which treatment will occur and with respect to the client's behavior. This is a risk-benefit analysis of feasible treatment alternatives. The moral decision has to be based on factual elements as well, including the health effects of treating the behavior in alternate ways, the likely duration of treatment, the direct effects of treatments, the risks of doing nothing or more of the same, and the costs and risks to the individual and to others in the individual's everyday environment. The moral decision is going to be based on the values of decision makers, given the facts and relevant regulatory constraints. The most overriding moral consideration is that of benefit to the client from the expected outcome of feasible treatment alternatives, the individual risks,

costs and benefits, to the client as opposed to those of the agency or professionals involved. The generally accepted approach to arriving at beneficial and appropriate decisions involving significant risk to clients is to assure adequate knowledge and information, resources, oversight, and consultation to agencies implementing these decisions. Training and experience of staff and access to information is essential for good decision-making. Oversight through staff supervision and through external agencies is the other important element for sound decision-making. At JRC, the court and a human rights oversight mechanism are in place. JRC follows the Massachusetts regulation governing the composition of Human Rights Committees for students who are not from NY. JRC has a separate Human Rights Committee for students who are from NY. The Committee for NY students consists of a licensed psychologist with appropriate credentials in applied behavior analysis; a licensed physician, a physician's assistant or nurse practitioner; a registered dietician or nutritionist; an attorney, law student or paralegal; and at least three of the members shall be individuals receiving services or supports provided, or purchased, or parents or guardians of, or advocates for such individuals. None of the members of this committee can be employed by JRC. JRC makes the final decision with respect to membership of the Committee, in consultation with the existing membership of the Committee. Whenever the Committee is reviewing a New York school-aged student, the Committee will invite a representative from NYSED, a representative from the student's school district and the placing agency. A peer review procedure for clinician decision-making is also available, although this process is accomplished entirely using JRC personnel.

## General Description of the Clinical Decision Making Process at JRC

The clinical decision making process is a key element of good care. Therefore, we decided to examine this process as it pertained to nine NY students. We were informed that the clinical decision-making process used by the clinical team at JRC begins at admission. The admission team meets when a new student is to be admitted to JRC. This team consists of representatives from administration, the clinical team, the programming department, the student services department, and nursing. Dr. Robert von Heyn, head of the clinical department chairs this team. Dr. von Heyn assigns a clinician based on the recommendation of the team. The education department appoints a teacher, and programming appoints a case manager. The incoming student is also assigned a staff advocate who is not a member of their team. This person is typically an administrator.

The clinician, case manager and teacher then develop an initial program based on the student's history. During the first week the student has the opportunity to sample reinforcers available at JRC, to observe the level system, and visit facilities including the residences. No major requirements are placed on the students during this period. An ABC analysis, examination of charts, direct observation, and manipulation of variables in the natural setting are used to test hypothesis about the functions of challenging behaviors. Clinicians also look at digital video recorded (DVR) footage obtained at school, and in the residence to identify important antecedents and consequences of challenging behaviors. A program is then tailored to meet the individual student's needs. Clinicians meet with their clients at a minimum of once per week, but most meets with

each of their students on a daily basis. The clinicians are on call and also go to the residence in the evenings to assess problems and to teach staff how to implement new programs for behaviors that need to be addressed in the residence setting. Clinicians also meet with teachers and work out solutions to behavioral issues that negatively impact the student's education.  In order to insure a non-insular perspective, clinicians meet on a weekly basis with other clinicians to discuss difficult cases and each member of the clinical team present their entire caseload to the clinical team every 6 months.   One of the most important observations we made was that clinicians frequently adapted programs based on data and interactions with their clients. The clinical staff also appeared to take collaborative approach with other professionals, which helps ensure treatment consistency.

Case managers are directly involved with each of their clients on a daily basis. Case managers get to see the students in all environments.  Teachers have an education department with staff they can consult.  The director of curriculum development reviews each student's progress and meets with teachers to review students program when students are not making adequate progress as indicated by reports and graphs of student progress.

### Answers to Specific Questions

Professional Assessment of the Effects of the NYSED Regulations:

a) *Limiting aversive treatment to aggressive and health-dangerous behavior.* Although the rationale for employing aversive procedures such as skin shock is understood to do so as a last resort to address dangerous and life threatening behaviors that have not responded to less intrusive treatment, it is critical to understand that failure to address precursor behaviors and shaped down versions of the behavior can slow treatment and result in the need to apply more aversive consequences than otherwise would be necessary. Shaped down substitute behavior can sometimes lead to rapid recovery of the original treatment target when fading of aversive treatment is attempted. JRC has reasonable procedures in place to identify precursors and shaped down forms of self-injury or aggression, which are discussed later in this report.  Other behaviors that need to be *considered* for treatment with aversive consequences are highly disruptive behaviors that prevent the student from receiving a free and appropriate education and that do not respond to less intrusive means. Examples of such behaviors are public disrobing, public masturbation in school, and attempts to destroy educational materials such as computers.  The final decision should be based on a formal decision analysis considering the risks, costs and benefits of feasible alternative treatments some of which may have emerged as possibilities subsequent to the suppression of destructive behaviors.

b) *Limiting aversive treatment to the specific topographies identified in the IEP and prohibiting any change in those topographies without going through the lengthy IEP process again.* Once treatment is initiated the determination of behaviors that are precursors to serious behavior, and new forms of shaped down or displaced forms of self-abusive and aggressive behavior require prompt treatment. Treatment decisions need to be made in a timely manner when dealing with serious behaviors that could have profound consequences for treatment outcome. A lengthy decision making process deprives someone in crisis of their right to effective treatment. Because the IEP process is too slow to meet this function, more timely forms of oversight need to be employed.

c) *No use of restraint and aversives at the same time.* There are circumstances where it is appropriate to apply aversive procedures during restraint. For example, it would be appropriate to follow a clients continued attempts to injure themselves or others with aversive procedures during restraint in order to stop these behaviors. It would also be appropriate to apply an aversive procedure when a client is in partial restraint to prevent elopement when in transport or walking from one building to another, engages in self-injury, aggression or property destruction. In these cases it is critical that the aversive procedure is applied to maintain treatment consistency. The decision of whether it is appropriate to administer aversives to a restrained individual needs to be decided on a case-by-case basis which addresses individual circumstances.

d) *No automated conditioning devices.* Automated devices can apply consequences in a very timely manner. However, these devices need to be highly reliable, and closely monitored to ensure treatment integrity. It would be inappropriate to use aversives with an unmonitored automated or unreliable automated device. It is our understanding that the automated use of aversives is always under invigilation, and that no device that has not proven reliable has or would be used. Major modifications to skin shock administration or the apparatus used should be independently reviewed and benefit from independent informed consent of legal guardians.

e) *Whenever possible, the use of aversive intervention shall apply the lowest intensity for the shortest duration and period of time.* This regulation has two parts. First it states that the treatment must be of the lowest *effective* intensity. In order to follow this regulation, the clinician needs to know what level of treatment is the minimum effective dose. At present the only criteria for making this decision is clinical experience with similar cases in the past. It is always possible that the clinician may choose an intensity that is somewhat greater or less than necessary. If the level is somewhat greater than necessary it will be effective and the number of applications required to bring the behaviors under control should be small. However, if

the treatment level selected is not sufficient is good clinical practice to program a sufficiently large increase in intensity to avoid producing adaptation to the consequence. It has long been known based on laboratory and applied studies that gradually increasing the intensity of an aversive will lead to adaptation and the need for even higher intensities to obtain treatment effects. Therefore it is prudent to increase the intensity to the highest safe level if the behavior does not respond to the initial intensity.

f) *In the event the aversive intervention fails to result in the suppression or reduction of a behavior over time, alternative procedures shall be considered that do not include increasing the magnitude of the aversive intervention.* All reasonable alternative less intrusive procedures should have been considered prior to introducing aversive procedures including the use of positive reinforcement procedures for pro-social behavior, which should remain in place. It is also critical that motivational operations are not in effect to render skin shock less effective (for example provocative interactions). If the intensity selected is not adequate a higher intensity should be tried provided it is known to be safe. The only other alternative that might be considered would be a brief vacation from skin shock. Both of these options are far more intrusive then skin shock, provided a higher intensity of skin shock can eliminate or maintain the behavior at very low rates (at which few if any shocks are actually delivered).

g) *The magnitude, frequency and duration of any administration of aversive stimulus from any aversive conditioning device must have been shown to be safe and effective in clinical, peer-reviewed studies.* There is a large amount of literature on the use of skin shock with infrahuman subjects and more modest clinical literature on the use of skin shock with human clients. Variables that affect the efficacy of skin shock were well established and understood since the seminal work of Azrin and Holtz (1966). Van Houten (1983) discussed how this work related to the treatment of behavior disorders. Although the basic principles for delivering skin shock and the parameters affecting its efficacy are well understood the more critical element in a treatment plan is to understand how to successfully fade aversives in such a manner as to produce generalization and transfer. Subsequent published studies have shown that a lengthy structured treatment plan is needed to produce a long term positive outcome that shows generalization and transfer and is maintained over time (Duker & Seys, 2000; Foxx, 2003). The procedures employed at JRC are highly consistent with this literature.

h) *The requirement that aversive interventions shall be administered by appropriately licensed professionals or certified special education teachers or under the direct supervision and direct observation of such*

*staff.* It would be impossible to have a 24-hour treatment program that required the constant presence of a certified licensed professional. However, it is critical that a high standard of training and monitoring be followed when employing skin shock. The training procedures employed at JRC are more detailed and comprehensive than any we have previously seen. These procedures also include frequent recurrent training and 24 hour DVR monitoring and invigilation by clinical staff.

*Are the NYSED Regulations consistent with sound professional judgment, supported by the peer-reviewed literature, and consistent with generally accepted practices in the field of behavioral psychology?*

No. This issue is addressed by our answers to other more specific questions.

*Are the Regulations necessary for the preservation of the public health and safety and to minimize the risk of physical injury and/or emotional harm?*

No. The regulations will be harmful to the public health and safety and will on average raise the risk of physical injury and/or emotional harm to NY students. Not only are these regulations not in accord with what is known about variables affecting the efficacy of skin shock as a means of decelerating harmful behaviors, but they have also been demonstrated to cause harm to some of the nine students they were imposed on. The implementation of the NYS regulations was associated with regression in 8 of the 9 students, and an increase in GED applications in 5 of the 9 students. Details are provided below in the section on each of the nine students.

*What harm would be caused by the NYSED Regulations complete ban on the use of aversives after June 30, 2009? The only exception to this complete ban is a grandfather clause for any student who has aversives in their IEP as of June 30, 2009.*

Banning an effective treatment option that is only used when the application of best practice less intrusive treatments have failed would be to deny the client their right to effective treatment, and in the case of students their right to a free and appropriate education. At present there are only four options available to clinicians in the case of severe behavior disorders. The first option is the use of positive programs based on a comprehensive functional analysis of the controlling antecedents and consequences of the behavior. If this approach fails the next procedure includes the use of aversive procedures. The only other alternatives left are the use of mechanical or chemical restraint or incarceration. These options are much more intrusive than aversive procedures. It is possible that NY State assumes that new positive based treatments will be available in a little over a year's time. However, we are unaware of any new promising techniques that could achieve the intended results.

*What effective alternatives are available to take the place of aversives after the complete ban set for June 30, 2009?*

We are not aware of any such treatment that shows such promise. No responsible professional working in this field would make the claim with anything approaching certainty that such a treatment would be available by that time.  One option would be to increase the availability of early intervention for children with developmental disabilities and children with severe behaviors issues.  Even if such treatment were immediately available to all children in need and effective in almost all cases, there are already many older children who have failed to receive this treatment.

*Describe how aversives eliminate the impediments to students receiving an education, and describe what will happen to the health and educational progress of a student who needs aversives and cannot receive them due to the NYSED regulations.*

Students that engage in high levels of severe aggression, self-injury, and property destruction are typically either physically or chemically restrained on an ongoing basis. Restraint is to a very large degree present an insurmountable impediment to an appropriate education.  Without an education students' freedom to live a valued independent life is compromised because they cannot learn the communication, self-care, and vocational skills required to maintain a greater degree of independence, and control over their environment.  Data clearly show that the use of skin shock in almost all cases eliminates the need for restraint for individuals with severe challenging behaviors that do not respond to a scientifically based positive approach (Duker & Seys, 2000; Duker & Seys, 2006; Foxx, 2003).

*What is your opinion on whether and why a student's education and learning would be affected by a prohibition against using aversives to treat destructive behavior, major disruptive behavior and non-compliant behaviors?*

It would be difficult or impossible to provide a free and appropriate education to students who engage in a high frequency of destructive behavior.  One JRC student engaged in disrobing in front of peers and masturbation in front of peers multiple times each day. Other behaviors that would deny students an education were destruction of computers. Individual consideration would be important in deciding which destructive, major disruptive, and non-compliant behaviors should be targeted for treatment. Once severe challenging behaviors like aggression are under control, compliance training and other structured approaches should be attempted for non-compliant behavior and other techniques that could not be considered in the face of a repertoire of severe aggression should be considered before introducing skin shock.  This appears to be the procedure followed at JRC in most cases.

*What is your opinion about whether and why the teaching of replacement behaviors would be adversely affected by a prohibition against the treatment of major disruptive, destructive and non-compliant behaviors?*

Teaching of replacement behaviors is impossible if clients successfully use antisocial behaviors to escape contact with treatment.

*Evaluation of the nine students selected as the "Representative Plaintiffs" in the lawsuit.*
*Note comments on the effect of the NYSED Regulations are based on client graphs (see*
*Appendix 6*

**Student 1 JH**
**Interview with JH's Clinician, Dr. Nicole Matthews.**
Dr. Mathews is pursuing the BCBA credential.  Nicole Matthews is the clinician assigned to this case.  JH came to JRC from Junior High.  She received special education services at the age of 9.  She will be 19 in ▆▆▆▆ '08.  She was 375 pounds when she arrived.  She is now 280.  Prior to admission to JRC she had 1 on 1 support for aggression.  She was placed on medication and hospitalized.  Dec 03 to Sept 04 she was at Devereux.  She spent 108 days in residence 49 days in the hospital.  Therapeutic holds were listed as a treatment.  She arrived at JRC Dec 04.  Trish Rivera was her initial clinician.  She is a licensed clinical psychologist.  Aggression was the major behavioral issue.  Since July 07 she has been faded from the GED.  There has been no aggressive behavior since the GED has been faded.  She was initially diagnosed Bi Polar and her IQ was listed in the mid 80s.  There has been no evidence of cycling in this environment since her recent clinician has had her case (the last 2 years).

Dr. Matthews indicated that clinicians make decisions and move precursors out of GED behaviors if it has not occurred in the past 6 months.  She said that clinicians are in the classroom everyday and Dr. Matthews explains every new behavior to staff in detail.  Clinicians can identify the category of a behavior if a GED is applied.  Stealing was on GED because its function was to aggress against others (JH would do it in a vindictive manner and throw the object away).  They can renegotiate their contract with the clinician.  With major disruptive 2, Dr. Matthews has discretion to wait and look for a trend before reintroducing GED if major disruptive behavior occurs at a low level and does not show an increasing trend.  Dr. Matthews indicated that she frequently discusses cases with other clinicians.

**Examination of Behavioral Data**
The NYS regulations and the successful court injunction constitute an unplanned BAB design.  The data on JH's aggressive behavior indicate that the removal of the treatment resulted in an increase in aggression, and the reinstatement of the treatment led to a marked reduction in aggression to zero levels that were maintained.  Similar results were observed for inappropriate verbal behavior, education/social interfering behavior, non-compliance and major destructive behavior, but no significant change was noted for health dangerous behavior.  These data clearly document a negative effect of the NYS regulations on JH's treatment that resulted in worsening of serious behavior and an increased number of GED applications.

**Observation of JH at JRC**
JH was observation during the weekend in school after she had just returned from a break with mother. Social interaction was fine.  JH had lots of opportunities for social interaction.  Tried to get staff to talk about her mother.  These were attempts were placed

on extinction and she interacted with the group after that. She had a clear connection with one of the other students. He is one of the members of the basketball team.

**Interview with Jeff King, JH's teacher for the past year**
Mr. King indicated that JH has been at JRC for a little over 3 years. The GED had been faded for the past 8 months. JH does not like to do math. She has a math tutor and has refused to work with her until recently. She has been working with her math tutor during the last quarter. Reading decoding is estimated at the high school level and comprehension is at the 7th or 8th grade level. Her interest in education varies and she is somewhat defiant about doing academics. JH is at a fourth grade math level and spelling is at a 5th grade level. JH is a good writer and writes business letters. JH has a Biology, Spanish and History tutor. She often misplaces her work after it is assigned to her. Largest area of improvement is in language arts. JH is on the Morningside expressive writing program and reportedly likes to write. When she does not want to do other work JH is willing to write. She is 275 pounds now. She has no problems socializing with other students and staff, she has lots of friends and is popular. She has attended a couple of cosmetology classes in the local vocational school. She is interested in becoming a cosmetologist. More course work in this area is planned.

**Student 2 HS.**
**Interview with Dr. Nicole Matthews, HS's Clinician**
HS attended Jamaica Ave School. He has a diagnosis of autism, severe MR, and has a clef lib and pallet. He was referred to Melmark in Penn. Had 2 to 1 staffing. Melmark performed an analog functional analysis but they could not treat him. HS had fallen out of 3rd story windows in his previous placement, and is reported to have no sense of danger. He receives GED for a few behaviors. HS is at risk for wandering away and getting lost and climbing on furniture. These are GED Behaviors. He has Aortic regurgitation. HS has received 5 GED applications in the last 90 days. This burst occurred after the NY State regulations went into effect. He apparently discriminated that he could not get GED in residence because there was no monitor. HS taps objects on his chin frequently (health dangerous 2) but no GED is authorized for this behavior. Clinical staff would reconsider this if the severity of this behavior increased to the point where it caused tissue damage. Rituals include a high frequency of tapping, and sensory reinforcement is suspected as the function of this behavior, and the team has decided to try other strategies.

**Examination of Behavioral Data**
The NYS regulations and the successful court injunction constitute an unplanned BAB design. The data indicate that the NYS regulations were associated with an increase in HS's major property destruction, major disruptive behavior and non-compliant behavior, but had little effect on his aggressive, health dangerous or education and social interfering behaviors. The reinstatement of these procedures was associated with improvements in all behaviors that worsened when the NYS regulations were in effect. It should be noted that although serious behavior has been maintained at low levels, less serious behaviors that are not followed by the GED have shown some increase in the second half of 2007.

**Direct Observation of HS at JRC**

HS was observed to tap objects when staff members were not interacting with him. When they took the toy away rocking increased. He did not appear to have much to do. He did some coloring. Staff rotated the electrodes. Could benefit from discrete trials. Ritualized praise was used. He was relaxed, showed no anxiety and follows directions well.

**Interview with Kerri White, HS's teacher**

Kerri has been his teacher for 8 months. HS was already on the GED when Kerri started working as his teacher. She noted that he has a high frequency of rituals and tapping objects. HS is currently in the toilet training program that is presently his primary treatment focus. There is also a focus on dressing and undressing in this program. He has been partially undressing recently. Practice good sitting when not touching buttons. There has been less of a focus on academics as a result of the toilet training program. He now goes 2 or 3 days without an accident. HS was in a diaper before. Computers available for school work in toilet training room and he works on matching lower and upper case letters. He works well on alphabet skills. He is not good with receptive letter discriminations. HS also works on manipulative tasks such as identifying body parts; and he is good at motor imitation. Tapping behavior is a problem in that it interferes with other behaviors. HS gets group lessons on identifying body parts, raising his hand and sharing. He is now able to work on the computer for extended periods and is able to focus on tasks for a few minutes at a time. This increase in academic attention span is described as one his greatest achievements.

**Student 3 ES**

**Interview with Dr. Nicole Matthews, ES's Clinician**

Dr. Matthews just took over this case from Dr. Michelle Koue. ES was diagnosed with mild MR (IQ 66), ODD, Psychosis, and ADHD. She was physically aggressive and did well with GED. GED was added for 5 or more verbal tantrums in an hour. Aggression and pre-cursors also received GED. Precursors included: Property destruction, health dangerous behavior, and major disruptive behavior.

**Examination of Behavioral Data**

ES was removed from the GED the day after the NYS regulations because it was believed that it was not in the IEP. It was subsequently found to be in the IEP and treatment was resumed on July 14th. On the 15th of September was disrobing in front of classmates, masturbating in front of classmates, and damaged computers. Consequences could not be applied to these behaviors because of the NYS regulations. E████ faded from GED on Oct 3rd and on Oct 6th was back on GED for specific behaviors and pre-cursors. E████'s behaviors deteriorated when GED treatment was removed, and when precursors did not receive the GED consequence, and showed a marked improvement when GED treatment was reinstated in for all precursors in October.

**Direct Observation of ES at JRC**

Observed in classroom on weekend. ES was observed smiling and talking with other girls. She asked to see a nurse and the nurse came to the classroom to speak with her.

She seemed to enjoy appropriate social interactions with other girls in the class. She did appear somewhat tense and nervous when she was eating. After she ate she joined the group to watch a movie. In the reinforcement room she played with many things and interacted socially. She played with the Wii with other students and watched others play.

**Observation of ES in Talbot Residence after school**
ES sat a separate table at dinner with another girl who appeared to be functioning at her intellectual level. She seemed relaxed at home but may have felt out of place because many of the other residents were functioning at a lower intellectual level.

**Interview with Felicia Alexander, ES's Teacher**
Felicia Alexander has been working with ES for about 2 months. Until recently ES had five electrode sites and now she has four. She has received 1 GED in her classroom about a month ago for rude comments. In the last couple of months she has made exceptional progress. She has made progress in her handwriting. English is progressing well. ES is also working on filling out job applications and is making good progress. She likes to read the newspaper and writes an article on a newspaper story each day. She is interested in entertainment articles, or current events. She has recently been writing essay on the Democratic presidential candidates. ES also has a math, history and science tutor. The tutors work with ES during sessions two or three times per week. Sessions last between a half hour to 45 minutes. Tutors are all teachers. The history tutor completed his undergraduate degree in history. ES is working toward her diploma. She is placed at the 10th grade level. She is moving from the 9th to 10th grade level in language arts. Math is reportedly more at a 7th or 8th grade level. She is quiet and keeps to herself. She will give her opinion on things in class when asked to participate. She is learning keyboarding and she likes to draw.

**Student 4 DB**
**Interview with Dr. Stephanie Koue, DB's Clinician, BCBA**
DB displayed aggressive and disruptive behaviors in school. Functional analysis revealed that these behaviors had multiple functions. These functions include attention and escape and avoidance of demands. Dr. Koue picked up this case in April of 06. Dr. Koue indicated she identified precursors by observing DVR records using an ABC analysis, direct observation and discussing the results with case managers. DB is no longer on GED. GED was very effective and has eliminated major aggressive and major health injurious behavior. DB's improvements were maintained when NY regulations were introduced and he was successfully faded from GED and is now on level 8 on the JRC level system. Dr. Koue said that she has discretion to make decisions. His plan allows what could be done but individual consideration and evaluation are important in making final decisions.

**Examination of Behavioral Data**
The NYS regulations and the successful court injunction constitute an unplanned BAB design. The data indicate that the NYS regulations were associated with an initial increase in all of DB's treated behaviors and an increase in total GED applications during

the first month. This increase was followed by a decreasing trend in all behaviors and GED applications returned to pre NY Regulation levels.

**Interview with Danielle Buckingham, DB's Teacher**
Danielle has worked with DB on and off since he was admitted. Has been working with as his teacher more intensively for the last 7 months. DB arrived at JRC when he was about 10. He is now 14. When he first arrived he was very disruptive. Now he does not speak unless you try to facilitate communication. He needs to be encouraged to attend. He was very aggressive toward staff when academic demands were placed on him. He would roll up his sleeves would begin to swear and then aggress. As a result of these behaviors little or no academic time was possible. GED was very effective in reducing these behaviors and he has now graduated from GED device with no setbacks. When DB is frustrated he now only makes facial expressions. If he has a complaint he has learned to write a letter to his case manager or clinician. Socially he is fairly quiet but he has a few friends. There is reportedly one female student who he interacts with frequently. On field trips DB asks that she comes along and she typically does. His other friend is a male. DB will talk and joke with his friend. He likes to talk about music and he will also talk about movies and video games. His reading has improved. Decoding and comprehension were at the beginning 6th grade level last year. Danielle said he is working well in reading. She estimates DB is at the end of the 7th grade level in decoding but is lagging in comprehension. He is taking greater interest in his academics and his writing skills are showing improvement. He was 1st grade level in writing and he is now at a 4th grade level. He is currently working on the Morningside writing program and sentence combining exercises. DB asks for directions and clarification now, but those behaviors were never observed before. He has requested time with the subject area teachers. His new IEP will involve working with subject area teachers. He is mastering social studies and science goals on his IEP. He takes a lot of pride in his appearance. He has been off the GED and has not had it all year in Danielle's class. He recently moved to level 8 in the level system (Feb).

**Student 5 GR**
**Interview with Dr. Stephanie Koue, GR's Clinician**
GR was diagnosed with autism and was at the Shield institute in NY. Behaviors included aggression and self-injurious behavior. She also has problems with non-compliance.

**Examination of Behavioral Data**
The NYS regulations and the successful court injunction constitute an unplanned BAB design. The data indicate that the NYS regulations were not associated with any changes in GR's behaviors.

**Observation of GR in Talbot Residence after School**
GR received the GED for self-abuse. She did not mind when staff moved electrodes and seemed relaxed at home. She enjoyed supper. There were social interactions. No restrictions on social interactions were apparent.

**Interview with Kerri White, GR's Teacher**

Kerri has worked with her before and after the GED was introduced. GR engaged in much crying and many temper tantrums before being placed on the GED and did little academic work. Since being placed on the GED she is capable of working productively for 5 minutes at a time to earn her breaks. She is also now capable of following directions. GR has made progress on receptive vocabulary, learning to count, alphabet skills, matching objects and matching characters. She can now discriminate many letters. GR also understands how to start the academic programs on her computer. After earning a break she will go back to work without exhibiting behavioral issues. She has also graduated from the toilet training room and is no longer wearing a diaper. GR has also learned how to dress herself. Eating skills have improved. She has learned to use utensils, and napkins, and can clean up after herself. Since being placed on the GED, GR has become more social and now plays with other children. Daily living skills are part of her IEP. She has learned to discriminate colors and is now working on shapes. Her motor imitation is reported to be showing improvement. GR also has a program in her IEP that includes communication book.

### Student 6 CL
**Interview with Dr. Stephanie Koue, CL's Clinician**
CL was previously at the Herbert G Birch School. He received ABA from age 3 to 5. He is diagnosed with PDD. CL was 9 when admitted to JRC. He may have been sexually abused at Herbert G. Birch School. Questionable whether facial contortions should receive GED. We also felt refusal to follow directions, might respond to structured compliance training. He also receives GED for engaged in flapping and making animal noises. Tokens are effective as reinforcers. The token system has eliminated slouching and lying down on his desk.

### Examination of Behavioral Data
The NYS regulations and the successful court injunction constitute an unplanned BAB design. The data indicate that the NYS regulations were only associated with an increase in major disruptive and non-compliant behaviors. Other behaviors were maintained at levels similar to those prior to the regulations going into effect. The NY regulations were also associated with a decrease in total GED applications for two of the three months.

### Interview with Eunice Drigo, CL's Teacher
Eunice Drigo began working with CL in late August of last year. He was on GED when he entered her class. He started working 30-seconds on each task, and this has increased to about a minute now. CL has just completed grade 4 spelling and is now on grade 5 unit. He is also writing with support and CL has acquired typing skills. His reading decoding is at a grade 5 level but comprehension is at the grade 3 level. CL has good recall. Decoding has not improved this year but his comprehension has improved to a beginning inference level. In math CL needs to be closely supervised or he only produces the minimum amount of work. He does well when supervised. CL has mastered addition and subtraction and he is now working on multiplication and division. Eating at the table has improved somewhat. With prompting he does well. He gets along with everyone in class. He interacts with peers. In the reward store he was singing for everyone. A speech therapist works with him inside and outside of the classroom.

**Student 7 TJ**

**Interview with Dr. Nathan Blenkush, TJ's Clinician BCBA**

TJ was diagnosed with Moderate MR. He had a diagnosis of psychosis in the past. The introduction of the GED was associated with the discontinuation of psychotic behavior. Most of his inappropriate behavior now occurs at a low frequency. Before JRC he was in a special education program, a psychiatric hospital, and then Devereux. TJ was 14 when admitted to JRC and he is now 17. Out of seat without raising his hand was a reliable prerequisite for aggression. He would get up to hit someone. He usually raised his hand to request permission to leave his seat if he was not going to attack. Nathan has begun to plot these together to see the relationship. The graph shows a strong relationship between these two behaviors, verifying that it is a precursor. Nathan mentioned that staff can verify the occurrence of a GED behavior in under 5 s. It can take up to 10 s under some conditions. He gets GED for non-compliance (three step instruction). Last field trip was to a bowling alley on Feb 2nd. Boston Symphony Hall to Boston Pops. Each class has outdoor time at the playground, playing basketball, walk on trails, etc.

**Examination of Behavioral Data**

The NYS regulations and the successful court injunction constitute an unplanned BAB design. The data indicate that the NYS regulations were associated with a marked increase in TJ's aggression, property destruction, major disruptive, non-compliance, that was associated with more than a 10 fold increase in GED applications. These behaviors returned to their original low levels following the injunction.

**Direct Observation of TJ at JRC**

TJ initiated conversation with us when we observed him. He seemed relaxed and indicated that he felt the GED had helped him. He was free to move around the room and he talked with other students. Unable to go to the rewards store but understood the contingencies and took it well.

**Interview with Ron Kureb, TJ's Teacher**

TJ currently reads and decodes at a 4th grade level. Comprehension is at the 2nd grade level. Before the GED was introduced to his treatment plan he was very aggressive and would refuse to do academics. Mr. Kureb has been working with TJ for about half a year. TJ had attacked another teacher between 9 months and a year ago. The entire time in Ron's class he has not received a single application of the GED. TJ likes to joke and has made friends in his class. He works well on his academic programs but he is easily distracted. The largest improvement over the past 6 months has been his ability to stay on task and work through problems he has on the computer. Much of his work is presented as real life problems such as budgeting or using a cash register. Reading comprehension was a 1st grade level before, and TJ is now at a 2nd grade level. TJ can follow threads in a story now. Some of work on the computer involves working from books such as answering history questions. TJ's expressive writing program involves sentence combining exercises, and the Morning Side Expressive writing program. He is getting letter grades based on acceleration through the program. His business letters are

showing improvement and growth in using complete sentences. TJ is on a fourth grade level in spelling. Has also learned to type since the GED was added to his plan. He made very good progress and moved from the 3rd grade to a 4th grade level. Before the quarter is out he should move to the 5th grade level. Math is at the 2nd grade level. TJ has shown improvement in his ability to complete abstract math problems. He can now complete word problems on his own. In the area of fundamentals, TJ has mastered addition and subtraction and he is currently making progress in the area of multiplication. Ron stated that the use of level 3 aversive has maintained TJ's safety and the safety of the class. It has allowed him to learn. The teacher does not feel bad about him being on aversives given the alternatives. In thinks that TJ would be in a correctional facility without the use of the GED. He used to have had rages but now he can bring theses under control. TJ enjoys the hands on science program that involves working in the garden. TJ likes working with his hands. He very much enjoys field trips to aquarium, the zoo, etc. He can manage his money, and can order and pay for his meal himself in a restaurant on field trips.

**Student 8  SS**
**Interview with Dr. Nathan  Blenkush, SS's Clinician**
SS presents with severe MR. She has been in early intervention programs, including the Anderson School in NY. Challenging behaviors included face slapping and head hitting. At the Anderson school she would self-injure 700 to 1000 times in an 8 hr shift. This level of abuse resulted in a detached Retinas. An analog functional analysis was performed at the Anderson School. Christine Sands was the prime therapist before Nathan. SS received lots of shocks for many behaviors and major behaviors were reduced, however she is one of the few students that showed adaptation to skin shock. The decision was made to give her a vacation from the GED device and then reintroduce it only to teach her to keep her hands at her sides. The holster device was used to immediately alert the therapist when her hands left the holsters. This approach was intended to break down control by the first step in the chain of self-abusive behavior.

**Examination of Behavioral Data**
The NYS regulations and the successful court injunction constitute an unplanned BAB design. The data indicate that the NYS regulations appeared to be associated with an increase in self-injury and an increase in GED applications. SS was taken off the GED 4 when she had a case of shingles. The GED was then reinstated in October of 2004. She is now on a one-on-one program and is making progress out of restraint for longer and longer periods without self-injury.

**Direct Observation of SS at JRC**
We observed SS during the weekend on her program. She is doing well and program is appropriate and being carried out properly. They should introduce other staff into the program in the future in order to promote generalization. She is not experiencing distress when she is wearing the holster device and was not receiving any shocks. No marks were observed under the electrodes. Reinforcers employed seemed effective and appropriate and SS appeared to have a close relationship with Sue Parker, the therapist who was working closely with her. Sue informed us, and the data confirmed that only one shock

was applied in March.  SS remained calm during breaks.  There were some shaped down versions of the behaviors during breaks. Without holsters on, the behavior is reported to be much worse.  SS made good eye contact with Sue and it appeared that Sue has developed a excellent personal relationship with SS.  SS whined before the treatment session started but smiled throughout the session.

**Observation of SS in Talbot Residence after School**
Observed her at meals and doing chores after school.  Electrode care was not associated with distress. Moving electrode had little discernable effect.

**Interview with Denise Shavers, SS's Teacher**
Denise Shavers has been SS's teacher for a year and a half.  Academics have been a challenge because of her behavior.  She is in arm splints when not on one-on-one programs.  Interventions worked and then she regressed.  Her teacher said that SS's behaviors are always evolving.  She has been at JRC for 3 years.  She was on receptive vocabulary with an audible voice.  She made minimal progress on this task.  This is a touch screen computer program.  She has not had much educational progress in three years because she did not make progress with behavior problems until recently.  There are a few words in her repertoire.  The mastery list from speech therapist is very relevant. Melissa Walsh is the speech therapist.

**Student 9  JB**
**Interview with Dr. Robert von Heyn, JB's Clinician**
Dr. von Heyn is pursuing a BCBA.  JB was diagnosed with severe MR and Autism.  JB has some limited verbal ability.  Before arriving here he was in the New England Center for Children.  They reportedly decided they could not handle him because of his severe aggression.  Destructive behavior was also high as was self-injury in the form of picking his skin and biting himself.  He frequently jumped out of his seat and attacked others. GED was very effective.  He was then taken out of emergency restraint.  Many behaviors improved, as that did not receive GED after GED was introduced.  Not following a learned direction could have been handled with compliance training after aggression was eliminated.

**Examination of Behavioral Data**
The NYS regulations and the successful court injunction constitute an unplanned BAB design.  The data indicate that the NYS regulations were associated with an increase in JB's aggression, property destruction, major disruptive behavior, non-compliance, education/social interfering behaviors, inappropriate verbal behaviors, and total GED applications.  These behaviors returned to previous levels following the injunction.

**Observation of JB in the classroom at JRC**
JB had completed some leisure tasks and then worked on letter matching.  JB's nose was running.  Staff picked up on this and the nurse was called.  The classroom staff member let him watch TV, a reinforcer, because the cold may have been interfering with him meeting his behavioral contract.  This is an example of the adaptation to changing conditions that we observed.  JB was observed using limited language.  Prompts could

have been used to produce more steady academic behavior.  Staff spoke very quickly with verbal pinpoints.  Maybe these could be simplified in some cases.  Bathroom access is good: once an hour or more if someone requests a break.

**Interview with Kelly Grimes, J████████'s Teacher**

Kelly Grimes has been JB's teacher since the end of August.  She said he is calm in her classroom.  He has received GED very rarely.  In the classroom the estimated the GED has been used 10 times for behaviors when he was opening cuts or hurting himself. Knowledge of alphabet has improved as well as telling time on the hour with digital and analog clocks.  Counting objects and labeling numbers are also improving.  JB is also on a verbal object and verb-labeling program.  He has difficulty using multiple words in a sentence.  The teacher works with him three days a week (half hour each time on language skills).  The speech therapist consults with Kelly for 45 minutes one day a week on all of the children on communication training. There are nine students in the classroom with one teacher and one TA.  The TA also works with JB.  Kelly said that JB has made good progress on making requests.  He can request the use of the bathroom using a full sentence.  He can use "Yes" and "No" appropriately in many situations. Kelly said that JB gets along with the other students in his class.  There is another student in the class that he often watches movies with.  He will mention his name.  They work together in group lessons and Gym.  Daily living skills are taught in residence.  They also work to support those lessons in school.  Examples of current living skills that are being taught are tooth brushing, wiping down his desk, eating at a normal pace, using utensils and using a napkin appropriately.  JB requires prompting not to rush through tasks.  Does not play basketball, because he shows no interest.  But he does have the skills.  Has learned hazard signs and symbols.  The teacher work with him showing these symbols around the school such as at exit signs to promote generalization.

*State your opinion on whether the NYSED Regulations significantly harm a student's right to a free and appropriate education which is supposed to based on these students' unique needs.*  The clinical notes and supporting data cited above, clearly demonstrate significant harm in most of the nine cases.  Individual consideration is essential to addressing each student's unique needs.  The NYSED Regulations deny students the right to the individual consideration required to meet NY students' right to effective treatment.

*Give your opinion on the process set-forth in the NYSED Regulations for selecting members for the panel reviews and the process for those panels making recommendations on the use of aversives.  Include in your opinion, your assessment of the value of the recommendations, which are only record reviews, and the potential harm to the students.*

Experts at the local level are more familiar with all of the information required to make the decision of whether the client would benefit that could include aversive treatment procedures.  We do not understand how the process set-forth in the NYSED Regulations improves upon the process already in place for clinical decision making at JRC under the supervision of the probate court.  Appointing members to a human rights or professional peer review committee willing to travel to and participate on site might contribute to the

decision making process. Professionals selected because they have apriori opposition to procedures and practices used at JRC would make no useful contributions, and would violate professional ethical standards if they were psychologists by failing to make recommendations based on individual needs and characteristics of clients.

*Describe your familiarity with the qualifications of the clinicians at JRC and state your opinion on whether they are qualified to design and supervise the implementation of behavior modification treatment plans with aversive interventions.* We have examined their CVs, their ongoing in-service training, and have interviewed them to assess their general clinical skills in managing the nine cases. It is clear that they are qualified professionals who are able to design and supervise the implementation of behavior modification treatment plans with aversive interventions. The clinical decision making process through peer collaboration adds the checks and balances that should be in place when treating serious problems with a comprehensive treatment plan that includes skin shock.

*Describe your familiarity with JRC's training of direct-care staff and state your opinion on whether JRC staff and the training they receive are adequate to allow the staff to apply aversives and otherwise implement the behavior modification treatment plans designed by the JRC clinicians.*

We have studied that training manual and consider the training and recurrent standards adequate to train direct care staff to employ aversives. These procedures are more detailed and more closely supervised than most.

*Describe your familiarity with all of the aversive interventions in use at JRC and is it your opinion that the aversive treatments in use at JRC are consistent with peer-reviewed and generally accepted forms of behavioral treatment, including: how JRC identifies targeted behaviors; how JRC applies the aversives; how JRC categorizes behaviors; and how JRC uses behavioral rehearsal lessons?*

The application of aversive treatments at JRC is consistent with peer-reviewed and generally accepted forms of treatment. The identification of target behaviors are appropriate. Precursors are determined in a variety of ways including: direct observation of behavior and DVR records; examination of charts for close co-variation, and the examination of physical precursors. When the correlation is ambiguous they may chart the suspected precursor along with the challenging behavior to determine whether the behaviors often occur together. Applying consequences early in the behavioral chain has been documented to reduce behaviors more effectively than waiting to apply an aversive consequence to the final element in the chain. Shaped down versions of aggressive or self-injurious behavior are identified through their similarity to the target behavior and the timing of the behaviors emergence. If the topography physically resembles the form of self-injury and emerges after the behavior is decelerated it is assumed to be a shaped down version. For example, a person who hits their head may begin to tap their head or attempt to hit their head with their shoulder. This may begin by the client twitching their

shoulder toward their head.  If these shaped down versions are ignored they can easily emerge as new forms of self-injury.

*Describe your familiarity with the systems of JRC for supervision of the use of aversives by direct-care staff including, DVR monitoring, numerical limits, notifications to clinicians, and supervision by the clinicians, and state your opinion on whether the systems at JRC are adequate to maintain the health, safety and effective treatment of the JRC students.*

We looked at DVR monitoring at the school and at the residence.  We talked with clinicians who informed us that they routinely review instances when aversive have been used.  We believe JRC supervision is adequate as designed.

*Give your opinion on the competence, bias and conclusions of the Review Team that was sent to JRC by NYSED in April and May of 2006.*

We read the report and disagree with many of their observations and conclusions.  This report lacks credibility and any regulations based on this report would be seriously flawed.

*What is your prognosis for students with severe behavior disorders who cannot receive aversive treatment for their destructive, major disruptive and non-compliant behaviors?*

Clients with severe behavior disorders who do not respond to state of the art positive based programs, who are denied the right to aversive treatments will most likely receive long term mechanical and/or chemical restraint and will be warehoused in a forensic or highly restrictive closed living facility.  This outcome will negatively impact their physical and mental health would deny them access to an education that would be essential to their opportunity to enjoy a positive and enriched living experience.

*Are positive behavioral supports effective in all cases of severe behavior disorders?*

No. The use positive behavioral supports are typically most effective with young children, or with older children who have less severe problem behaviors.  It is least effective with adolescents or adults with severe aggression, self-injury or destructive behavior.

*Give your opinion on whether the positive behavioral support movement and its practitioners are anti-aversive.*

In general most proponents of positive behavioral support (PBS) are anti-aversive. The PBS movement emerged from professionals writing about the unacceptability of aversive interventions in general in the 1980s, and from research programs funded under the rubric of "non-aversive behavior modification."

*Evaluate and give an opinion on JRC's success in removing New York students from ineffective drug treatments and providing them with effective aversive interventions that have improved the health and educational progress of the student.*

JRC has been successful in removing the nine New York students from ineffective drug treatments and providing them with effective aversive interventions that have reduced the use of restraint, and improved their access to educational programs.

*Give your answers to the questions answered by NYSED's expert Dr. Hagopian in his report dated February 6, 2008*

It is our professional opinion that the NYSED regulations are not in the best interest of the NY Students based on best practice or the effects of these regulations on the nine NY students studied. It is our professional opinion that for some students with disabilities there are not effective alternatives currently available to treat severe behavior disorders. It is also our professional opinion that there is an adequate literature to inform the professional use of aversives in behavior therapy with children with disabilities. It is our professional opinion that it is sometimes appropriate to use skin shock with children with disabilities when they are in partial mechanical restraints.

*Describe and evaluate the quality of JRC's education program.*

We examined it only to determine if the nine students are receiving educational services and that they are making progress. From our observations and the discussions with the teachers it appears students are making educational progress once severe behaviors were brought under control. This question is addressed in greater detail in the section on the nine NY students.

*State your opinion on whether JRC parents and guardians who have passed JRC's parent training program should be allowed to use the GED and GED-4 devices on home visits.*

Parents who have passed a rigorous training program should be allowed to use the skin shock device at home provided its use is carefully monitored. We did not interview parents, observe training nor look at data from home visits.

**Recommendations**

Although clinicians at JRC provide a rational for aversive and restrictive procedures each time they are introduced for a new behavior that examines risks, costs and benefits of the procedure as well as alternatives, we recommend that a flow sheet be developed to formally document these procedures. Although we feel the level of oversight for the use of skin shock is acceptable we also recommend that oversight could be greatly enhanced by adding an event recording system and alert to the DVR system following GED activation in school and in home. This system would automatically alert DVR staff when a device is activated and would also make it more convenient for clinicians to monitor GED use. We also recommend that a tamper proof counter be added to the GED device

to monitor how often it is used during home visits.  Staff should also consider greater use of discrete trial training and fading along with gradually fading restraints for lower functioning clients.  Time out of restraints could be filled with one-on-one training on recreational skills.

Respectfully Submitted

Your Name _____ Ron Van Houten, Ph.D.  Dated: 6/6/08

Your Name _____ James A. Mulick, Ph.D.  Dated: 6/9/08

We are each being compensated at a rate of $125.00 per hour for our time as expert witnesses.

Our Curriculum Vitae are presented in Appendix 3 and 4.  Our qualifications are contained in our Curriculum Vitae.

Dr. Van Houten has not testified at trials or nor has he been deposed in the past four years.

Dr. Mulick has not testified at trials or nor has he been deposed in the past four years.

24

List of Appendices

Appendix 1.   JRC Documents received First Binder from Devorah A. Levine sent
              March 14, 2008.

Appendix 2.   A list of Documents sent to us by JRC at our request.

Appendix 3.   Dr. Mulick's CV

Appendix 4.   Dr. Van Houten's CV

Appendix 5    Excerpt from the 2003 APA code

Appendix 6    Behavior Graphs for the six NY Students

## Appendix 1

JRC Documents received First Binder from Devorah A. Levine sent March 14, 2008

1. an index of the documents contained in the binder with comments;

2. the New York State Education Department's ("NY SED") November 17, 2005 Report;

3. a report by Rebecca H. Cort to the New York Board of Regents, dated March 20,2006;

4. a report by Rebecca H. Cort's to the New York Board of Regents, dated May 16, 2006;

5. a report by Rebecca H. Cort's to the New York Board of Regents, dated June 6, 2006;

6. an NYSED Report regarding JRC, dated June 9, 2006 (cover letter is dated June 12,2006);

7. a letter from Mike Flammia, Esq., counsel for The Judge Rotenberg Educational Center, Inc.    ("JRC"), to Richard Mills, the Commissioner of NYSED, dated June 15,2006;

8. JRC's Response to the NYSED's June 9,2006 Report;

9. the final version of NYSED's regulations on aversive interventions, dated January 16, 2007;

10. an excerpt from the New York State Register listing the articles NYSED relied on to support its    regulations on the use of aversive interventions as well as the articles themselves;

11. a document titled "Discrepancies Between the NYSED Regulations on Aversives and the Professional Papers on which they are Asserted to be Based";

12. 115 CMR 5.00 from the Code of Massachusetts Regulations titled Standards to Promote Dignity, which have been in effect since 1987 (Section 5.14 focuses on treatment with behavior modification techniques including aversive interventions);

13. the Fifth Amended Complaint in *Jeanette Alleyne, et ai. v. New York State Education Department, et al.,* N.D.N.Y. No. 06-CV -994 (GLS);

14. a report by Louis Hagopian, Ph.D., NYSED's expert in *Jeanette Alleyne, et al. v. New York Stat Education Department, et al.,* N.D.N.Y. No. 06-CV -994 (GLS), his resume, and the articles that support his report;

15. a paper by Louis Hagopian et al, "Effectiveness of Functional Communication Training with and without Extinction and Punishment: A Summary of 21 Inpatient Cases," JABA, 1998,31,211235;

16. an analysis by Matthew Israel of the paper by Hagopian et al, "Effectiveness of Functional Communication Training with and without Extinction and Punishment: A Summary of 21 Inpatient Cases," JABA, 1998,31,211-235;

17. van Oorsouw, W.M.W.J., et al., Side effects of contingent shock treatment, Research in Developmental Disabilities (2007), doi:10.1016/j.ridd.2007.08.005;

18. the transcript from the Deposition of Daniel Crimmins in *Jeanette Alleyne, et al.* v. *New York State Education Department, et al.*, N.D.N.Y. No. 06-CV-994 (GLS);

19. the transcript from the Deposition of Caroline Magyar in *Jeanette Alleyne, et al.* v. *New York StateEducation Department, et al.*, N.D.N.Y. No. 06-CV-994 (GLS);

20. the transcript from the Deposition of David Roll in *Jeanette Alleyne, et al.* v. *New York State Education Department, et al.*, N.D.N.Y. No. 06-CV-994 (GLS);

21. the transcript from the Deposition of Rebecca Cort in *Jeanette Alleyne, et al.* v. *New York State Education Department, et al.*, N.D.N.Y. No. 06-CV -994 (GLS);

22. a list of issues to be addressed by the Psychology Expert Reports

23. articles that support JRC's use of aversive interventions.

Appendix 2

1.   JRC Training Manual

2.   Protocol for moving a topography from a behavior category which does not
     provide for treatment with Level III interventions to a category which does

3.   JRC Policy and Procedures for the Development and Implementation of Plans
     Employing Level III Interventions

4.   JRC Policy and Procedure on Court-Authorized Supplemental Aversives (Level
     II & III Interventions

5.   Procedures and Rules for GED Applications and Approvals

6.   JRC Procedure for Body Checks and Reporting Student Illness/Injury

7.   JRC Notice to the Court Procedures

8.   JRC Policy on GED Rotation

9.   JRC DVR Manual

10.  JRC Notification Procedures

11.  JRC Policy on Evaluating Staff

12.  Staff/Student Interview Policy

13.  Excerpts from "Regression" Document

14.  Curriculum Vitae for JRC Clinicians

15.  Policy on Continuing Education Credits for Doctoral Level Clinicians Who
     Oversee Students with Substituted Judgment

16.  Mandatory Pre-Service & In-Service

17.  JRC Policy on Delayed Consequences

Revised:  6/4/2008

# CURRICULUM VITAE

**James Anton Mulick, Ph.D.**
The Ohio State University
Department of Pediatrics
Division of Psychology

**HOME:**      7861 Flint Road
Slate Hill House
Columbus, Ohio  43235–6406
U.S.A.

**EMAIL:**      mulick.1@osu.edu

**CITIZENSHIP:**      United States of America

**BORN:**      1948, Passaic, New Jersey

**MARRIED:**   Nancy Elizabeth Witt  (Mulick)

**CHILDREN:**   Garek Hampton Mulick,  DOB: 04–27–87

**CURRENT POSITION:**      Professor, The Ohio State University

**EDUCATION:**

1970  A.B.            Psychology, Rutgers College, Rutgers–The State University,
New Brunswick, New Jersey.
Undergraduate Honors:  Alpha Psi Omega, elected 1969.

1973  M.A.            Experimental Psychology, University of Vermont, Burlington, Vermont.

1975  Ph.D.          General Psychology, Learning and Behavioral Development, University
of Vermont, Burlington, Vermont.

# POSTGRADUATE TRAINING:

1975 – 1976            Postdoctoral Fellow in Clinical Child Psychology, Child Development
Institute, Division for Disorders of Development and Learning,
University of North Carolina School of Medicine, Chapel Hill, North
Carolina.

## LICENSE, REGISTRATION, SPECIAL RECOGNITION AND LISTING:

| | |
|---|---|
| 1977-1992 | Massachusetts, Licensed Psychologist Provider (#1948) |
| 1978-1996 | North Carolina, Health Service Provider—Psychologist (#0540) |
| 1978-1990 | Rhode Island, Certified Psychologist (#185) |
| 1979-1998 | National Register for Health Service Providers in Psychology (#22335) |
| 1982 | Behavior Therapy and Research Society, Clinical Fellow |
| 1984 | American Psychological Association, Elected Fellow |
| 1984 | Ohio, Licensed Psychologist (#3431, Ren: 9/30/2004) |
| 1986 | Elected Fellow, Division 33, Mental Retardation and Developmental Disabilities, American Psychological association |
| 1988 | American Board of Medical Psychotherapists, Fellow and Diplomate (#1596) |
| 1989 | Charter Fellow, American Psychological Society |
| 1989- | 17th – 25th Editions of American Men & Women of Science |
| 1991 | Special Recognition Award, [". . . for contributions as founding and series editor of **Transitions in Mental Retardation**, as a scientist in the field of mental retardation and developmental disabilities and a leader in Northeast Region X of the American Association on Mental Retardation"]  Presented at the Annual Awards Banquet at the 54th Annual Conference of Northeast Region X of the American Association on Mental Deficiency, Portland, ME, October 7, 1991. |
| 1992 | Charter Fellow, American Association of Applied and Preventive Psychology |
| 1993 | Elected Fellow, Division of the Experimental Analysis of Behavior, American Psychological Association. |
| 1994 | Elected President, Division of Mental Retardation and Developmental Disabilities, American Psychological Association |
| 1998 | 1998 Karl F. Heiser Award for Advocacy, American Psychological Association. |
| 2002 | Elected Fellow, Division of General Psychology, American Psychological Association |
| 2002 | Connecticut. Licensed Psychologist (#002441, Annual Ren. 6/17) |
| 2007 | Lifetime Contributions to Psychology Award, Ohio Psychological Association |

## ACADEMIC APPOINTMENTS:

### Current Appointments

| | |
|---|---|
| 1985-current | **Professor**, Department of Psychology, Division of Mental Retardation & Developmental Disabilities, The Ohio State University, Columbus, Ohio |
| 1983 –current | **Professor**, Department of Pediatrics, Division of Psychology, The Ohio State University, Columbus, Ohio (Tenure in Pediatrics effective 10/86). |

### Past Academic Appointments

30

| | |
|---|---|
| 1979 – 1983 | Adjunct Associate Professor of Psychology, University of Rhode Island, Kingston, RI. Courses: Graduate Seminar in Operant Conditioning; Graduate Developmental Disabilities Course. |
| 1978 – 1983 | Clinical Assistant Professor of Pediatrics, Brown University, Providence, R.I. Courses: Graduate Developmental Disabilities Course; Behavioral Pediatrics Curriculum. |
| 1977 – 1980 | Visiting Assistant Professor of Psychology, Graduate Program in Applied Behavior Analysis in Mental Retardation, Northeastern University, Boston, MA. Courses: Clinical Seminar; Administration of Mental Retardation Services. |
| 1974 – 1975 | Cooperative Study Program Supervisor, Experimental College, University of Vermont, Burlington, VT. |
| 1972 – 1974 | Instructor, Psychology Department, Evening Division and Summer Faculty, University of Vermont, Burlington, VT. Courses: Psychology of Aggression, Behavior Disorders of Childhood, Child Development. |
| 1971 – 1972 | Graduate Teaching Fellow, Experimental Psychology, Psychology Department, University of Vermont, Burlington, VT. |

## HOSPITAL APPOINTMENTS:

| | |
|---|---|
| 1983 – current | Psychologist, The Children's Hospital, Columbus, Ohio. Clinical Specialties: Early childhood, developmental disabilities, behavioral assessment of drug action, habit disorders. |
| 1978 – 1983 | Psychologist, Department of Pediatrics, Rhode Island Hospital, Providence, RI. |
| 1977 – 1978 | Consulting Psychologist, Eunice Kennedy Shriver Center Mental Retardation Hospital Unit, Waltham, MA. |

## PROFESSIONAL APPOINTMENTS:

| | |
|---|---|
| 2002-current | Supervising Psychologist, Institute for Educational Planning, Inc., Milford CT. |
| 1987 – 1989 | National Behavior Modification Technical Consultant, Department of Mental Health, Retardation and Hospitals, State of Rhode Island and Providence Plantations. |
| 1986 – 1989 | Program Co–Director, NIMH Training and Demonstration Grant: "Training in Community Management of EDMR Children." The |

31

|  | Nisonger Center and Department of Pediatrics, The Ohio State University. |
|---|---|
| 1986 – 1988 | Program Evaluation and Research Consultant, Behavior Research Institute, Providence, R.I. |
| 1985 | Program Evaluation Consultant, Walter E. Fernald State School, Waltham, MA. |
| 1984 –1997 | Core Faculty, Psychology Discipline, MCH funded Special Project: Fellowship Training in Behavioral Developmental Pediatrics. The Ohio State University, Department of Pediatrics and Columbus Children's Hospital (10-30% FTE, release time varied annually). |
| 1984 –current | Supervising Consulting Psychologist, (10% time), Heinzerling Developmental Center and Memorial Foundation, Columbus, OH. |
| 1984 – 1986 | Software Design Consultant, Rising Star Industries, Torrance, CA. |
| 1983 | Consultant, Belchertown State School, Belchertown, MA. |
| 1982 | Consultant and Trainer, AFSCME Career Development of Rhode Island, Inc. (Project to retrain institutional workers for community service programs), Northeast Research Services, Woonsocket, RI. |
| 1980 – 1982 | Consultant, Flower Hospital Project, NY OMR/DD. |
| 1979 – 1983 | UAP Training Director (general administration and proposal writing), Child Development Center, Rhode Island Hospital, Providence, RI. |
| 1978 – 1983 | Behavioral Training Consultant, Department of Education and Recreation, Dr. Joseph H. Ladd Center, North Kingstown, RI. |
| 1978 – 1983 | Director of Psychology, Child Development Center/UAP, Rhode Island Hospital, Department of Pediatrics, Section on Reproductive and Developmental Medicine, Brown University, Providence, RI. |
| 1977 – 1978 | Chief Psychologist, Eunice Kennedy Shriver Center for Mental Retardation, Inc., Waltham, MA. |
| 1976 – 1977 | Psychology Service Director I, Self–Injurious Behavior Project, Murdock Center, Butner, NC. |
| 1976 | Consultant, Self–Injurious Behavior Project, Murdock Center, Butner, NC. |
| 1975 – 1976 | Instructor and Behavioral Consultant, Project Outreach, Carrboro–Chapel Hill Public Schools, NC. |
| 1974 – 1975 | Public Health Service Research Fellow, University of Vermont, Burlington, VT. |

| | |
|---|---|
| 1973 – 1974 | Graduate Research Fellow, Vermont Child Development Project, Psychology Department, University of Vermont, Burlington, VT. |
| 1972 – 1973 | Graduate Research Fellow, Developmental Psychobiology Laboratory, Psychology Department, University of Vermont, Burlington, VT. |
| 1970 – 1971 | Graduate Research Fellow, Project Themis, Psychology Department, University of Vermont, Burlington, VT. |
| 1968 – 1970 | Research Assistant, Operant Conditioning Laboratory (No. 3), Psychology Department, Rutgers University, New Brunswick, NJ. |

**SERVICE POSITIONS AND APPOINTMENTS:**

| | |
|---|---|
| 2007-current | Alternate Member Representing College of Medicine, University Senate, The Ohio State University. Member, Faculty Council, The Ohio State University. |
| 2006-current | Member at Large, Executive Board, Ohio State University Chapter, American Association of University Professors. |
| 2005-2007 | Member, Connecticut Center for Child Development Human Rights Committee |
| 2000-2006 | Member, Council of Representatives for Division 33 (MRDD), American Psychological Association. |
| 2003-2007 | Member, NIMH Workgroups on Interventions Research in Autism Spectrum Disorders. |
| 2002-current | Scientific Council (research grant proposal reviewer), member, Organization for Autism Research, Arlington, VA |
| 2002-current | Advisory Board Member, Association for Science and Autism Treatment |
| 1997-2002 | Member, Board of Directors, Association for Science in Autism Treatment. |
| 1999-2004 | Member, Autism Spectrum Disorder 6-21 Task Force, Ohio Developmental Disabilities Council. |
| 1999-2003 | Editorial Board Member, Behavior and Social Issues, Cambridge Center for Behavior Analysis, Cambridge, MA. |
| 1998-2004 | Member (Representing APA, Division 33), Science Seminar Committee, Federation of Behavioral, Psychological and Cognitive Sciences. |
| 1996-97 | Editorial Board Member, Focus on Autism, Pro-Ed, Inc. |

| | |
|---|---|
| 1996—current | Editorial Board Member, Behavioral Interventions, John Wiley & Sons. |
| 1994-current | Federal Advocacy Coordinator, Division 33, American Psychological Association. |
| 1996—1998 | Editorial Board Member, Behavior Analyst, Society for the Advancement of Behavior Analysis. |
| 1995 | Reviewer, Graduate Student Research Awards, American Psychological Association, Washington DC. |
| 1995-2003 | Member, Personnel Preparation Subcommittee for Part H, Ohio Interagency Early Intervention Council, Ohio Department of Health. |
| 1994 | 102nd Annual Convention Program Chair, Division on Mental Retardation and Developmental Disabilities (Division 33), American Psychological Association. |
| 1994 | Peer reviewer, 1993 Poster Subcommittee for submissions for the 6th Annual Meeting of the American Psychological Society. |
| 1994-1996 | Associate Editor, Behavior and Social Issues, Cambridge Center for Behavioral Studies. |
| 1993-1996 | President-elect, President, Past-President sequence, Division on Mental Retardation and Developmental Disabilities (Division 33), American Psychological Association. |
| 1993 | Peer reviewer, 1993 Poster Subcommittee for submissions for the Fifth Annual Meeting of the American Psychological Society, Chicago, IL, June 25-28, 1993. |
| 1993-1996 | Editor, Division 25 Recorder, Experimental Analysis of Behavior, American Psychological Association. |
| 1992 | Peer reviewer, 1992 Poster Subcommittee for submissions for the Fourth Annual Meeting of the American Psychological Society, San Diego, CA, June 20-22, 1992. |
| 1991-1993, 2006-2008 | Member-at-Large, Executive Committee, Division 33: Mental Retardation and Developmental Disabilities, American Psychological Association. |
| 1990 -1998 | Chairman, Psychology Subcommittee, Medical Advisory Committee, Bureau for Children with Medical Handicaps, Ohio Department of Health. |
| 1989-1991 | Chairman, Ethics Committee, Division 33: Mental Retardation and Developmental Disabilities, American Psychological Association. |

| | |
|---|---|
| 1989 – 1998 | Member, Medical Advisory Committee, Bureau for Children with Medical Handicaps, Ohio Department of Health. |
| 1989-1996 | Expert Witness, U.S. Department of Justice, Special Litigation, Civil Rights Division [two separate investigations]. |
| 1988-2002 | Consulting Editor, American Journal of Mental Retardation, American Association on Mental Retardation. |
| 1987 –2003 | Associate Editor and Software Editor, Research in Developmental Disabilities, Pergamon Press. |
| 1986 –1994 | Member, Editorial Board, Journal of Clinical Child Psychology. |
| 1986 – 1987 | Member, Board of Editors, Analysis and Intervention in Developmental Disabilities, Pergamon Press. |
| 1985 – 1989 | Member, Task Force on Psychiatric Treatments, Panel on Mental Retardation, American Psychiatric Association. |
| 1984 – 1987 | Chairperson, Psychology Division, Ohio Chapter, American Association on Mental Deficiency. |
| 1984 –1994 | Editorial Board and Reviewing Editor, Computers in Human Behavior, Pergamon Press. |
| 1984 – 1987 | Editor, Psychology in Mental Retardation, Division on Mental Retardation, American Psychological Association. |
| 1984 – 1988 | Member, Early Childhood Resource Network, Columbus, Ohio. |
| 1983 –1991 | Series Editor and Founder, Transitions in Mental Retardation, Monograph of Northeast Region X, American Association on Mental Retardation. |
| 1983 – 1987 | Software Editor, Applied Research in Mental Retardation, Pergamon Press. |
| 1983 – 1992 | Editorial consultant and article reviewer, Mental Retardation, American Association on Mental Retardation. |
| 1983 – 1984 | AAUAP Interdisciplinary Council, Psychology Discipline Representative. |
| 1983 –1987 | Occasional Reviewer, American Journal of Mental Retardation. |
| 1983 | Chairman, Northeast Region X, American Association on Mental Deficiency. |

| | |
|---|---|
| 1982 | Member, Subcommittee on Developmental Disabilities, 1982 State Plan for Child/Youth Services, Rhode Island Department for Children and Their Families. |
| 1982 | Chairman–Elect, Northeast Region X, American Association on Mental Deficiency. |
| 1981 | Vice–Chairman, Northeast Region X, American Association on Mental Deficiency. |
| 1980 – 1986 | Editorial Board and Reviewing Editor, Applied Research in Mental Retardation. |
| 1979 – 1980 | Member, AAUAP Psychology Division Research Committee. |
| 1979 – 1980 | Community Member, Research Committee, Dr. Joseph H. Ladd Center, North Kingstown, RI. |
| 1978 – 1981 | Member, Human Rights Committee, Behavioral Development Center, Providence, RI. |
| 1978 – 1980, Renewed 1993-2003 | Editorial Consultant, Journal of Autism and Developmental Disorders. |
| 1978 – 1981 | Occasional Editorial Consultant, Journal of Pediatric Psychology. |
| 1978 – 1981 | Member, Governor's Committee on Mental Retardation, State of Rhode Island and Providence Plantations. |
| 1979 – 1981 | Chairperson, Psychology Division, Region X of the American Association on Mental Deficiency. |
| 1977 – 1978 | Member, Eunice Kennedy Shriver Center, Service Reorganization Committee, Waltham, MA. |
| 1973 – 1975 | Member, Psychology Department Committee on Ethics in Human Experimentation, University of Vermont, Burlington, VT. |
| 1971 – 1973 | Chairman, Graduate Student Association, University of Vermont, Burlington, VT. |

## PROFESSIONAL MEMBERSHIPS:

American Association for the Advancement of Science
American Association of University Professors
American Psychological Association (Divisions 1, 12, 25, 28, 33, 37, 54)
   Elected APA Fellow, 1984, with initial sponsorship by Division 37 (Child, Youth and Family Services); Elected Fellow, 1985, Division 33 (Mental Retardation and Developmental Disabilities); Elected Representative-at-large, 1991, Division 33;

Elected Fellow, 1993, Division 25 (Experimental Analysis of Behavior); elected President, 1993, Division 33; Elected Fellow, Division 1 (General Psychology), 2002.
Association for Behavior Analysis
Cambridge Center for Behavioral Studies (Autism Advisory Board Member)
Federation of American Scientists
International Society for Developmental Psychobiology
International Society for Infant Studies
International Society for Research on Aggression
New York Academy of Sciences
Society for Pediatric Psychology
Union of Concerned Scientists

**THESIS and DISSERTATION:**

Mulick, J. A. (1973)   The Effects of Varying Reinforcement Density Provided for Competing Behavior in Extinction. Masters Thesis, University of Vermont.

Mulick, J. A. (1975)   Use of Positive Reinforcement Contingencies to Suppress Behavior During Extinction.   Doctoral Dissertation, University of Vermont.   (Dissertation Abstracts International, 1975, 36, (6–B) 3095).

**PUBLICATIONS:**
**Peer Reviewed:**

Joffe, J. M., Mulick, J. A., & Rawson, R. A. (1972).  Effects of adrenalectomy on open–field behavior in rats. Hormones and Behavior, 3, 87–96.

Joffe, J. M., Rawson, R. A., & Mulick, J. A. (1973).  Control of their environment reduces emotionality in rats. Science, 180, 1383–1389.

Leitenberg, H., Rawson, R. A., & Mulick, J. A. (1975).  Extinction and reinforcement of alternative behavior. Journal of Comparative and Physiological Psychology, 88, 640–652.

Mulick, J. A., Joffe, J. M., & Peterson, J. M. (1975).  Sex differences in the effects of dexamethasone phosphate on behavior in rats. Physiology and Behavior, 14, 37–42.

Mulick, J. A., Leitenberg, H., & Rawson, R. A. (1976).   Alternative response training, differential reinforcement of other behavior and extinction in squirrel monkeys (Saimiri Sciureus). Journal of the Experimental Analysis of Behavior, 25, 311–320.

Joffe, J. M., Mulick, J. A., Peterson, J. M., & Paunovic, J. (1976). Sex differences in the effect of dexamethasone on open–field behavior: gonadal hormones. Physiology and Behavior, 16, 543–548.

Rawson, R. A., Leitenberg, H., Mulick, J. A., & Lefebvre, M. (1977).  Recovery of extinction responding in rats following discontinuation of reinforcement of alternative behavior: A test of two explanations. Animal Learning and Behavior, 5, 451–457.

Joffe, J. M., Mulick, J. A., Ley, K. F., & Rawson, R. A. (1978). Effects of prenatal stress procedures on maternal corticosterone levels and behavior during gestation. Bulletin of the Psychonomic Society, 11, 93–96.

Rojahn, J., Mulick, J. A., McCoy, D., & Schroeder, S. R. (1978). Setting effects, adaptive clothing, and the modification of head–banging and self–restraint in two profoundly retarded adults. Behavioral Analysis and Modification, 2, 185–196.

Schroeder, S. R., Rojahn J., Mulick, J. A. (1978). On the ethical and unethical use of time–out: Appearances can be deceiving. Behavioral Analysis and Modification, 2, 200–202.

Schroeder, S. R., Rojahn, J., & Mulick, J. A. (1978). Ecobehavioral organization of developmental day care for the chronically self–injurious. Journal of Pediatric Psychology, 3, 81–88.

Mulick, J. A., Hoyt, P., Rojahn, J., & Schroeder, S. R. (1978). Reduction of a "Nervous Habit" in a profoundly retarded youth by increasing independent toy play. Journal of Behavior Therapy and Experimental Psychiatry, 9, 25–30.

Schroeder, S. R., Rojahn, J., & Mulick, J. A. (1978). A behavioral analysis of consent committee performance. North Carolina Journal of Mental Health, 8, 25–30.

Mulick, J. A., Schroeder, S. R., & Rojahn, J. (1980). Chronic ruminative vomiting: A comparison of four treatment procedures. Journal of Autism and Developmental Disorders, 10, 203–312.

Rojahn, J., Schroeder, S. R., & Mulick, J. A. (1980). Ecological assessment of self–protective devices in three profoundly retarded adults. Journal of Autism and Developmental Disorders, 10, 59–66.

Mulick, J. A., & Schroeder, S. R. (1980). Research relating to management of antisocial behavior in mentally retarded persons. The Psychological Record, 30, 397–417.

Schroeder, S. R., Mulick, J. A., & Rojahn, J. (1980). The definition, taxonomy, epidemiology, and ecology of self–injurious behavior. Journal of Autism and Developmental Disorders, 10, 417–432.

Mulick, J. A., Barbour, R., Schroeder, S. R., & Rojahn, J. (1980). Over–correction of pica in two profoundly retarded adults: Analysis of setting effects, stimulus and response generalization. Applied Research in Mental Retardation, 1, 241–252.

Huguenin, N. H., & Mulick, J. A. (1981). Nonexclusionary timeout: Maintenance of appropriate behavior across settings. Applied Research in Mental Retardation, 2, 55–67.

Sassaman, E. A., Zartler, A. S., & Mulick, J. A. (1981). Cognitive functioning in two sisters with carbamyl phosphate synthetase I deficiency. Journal of Pediatric Psychology, 6, 171–175.

Schroeder, S. R., Kanoy, J. R., Mulick, J. A., Rojahn, J., Thios, S. J., Stephens, M., & Hawk, B. (1982). Environmental antecedents which affect management and maintenance of

programs for self–injurious behavior.   In J.C. Hollis & C.E. Myers (Eds.) Life–threatening behavior. Washington, DC:  AAMD (Monograph No.5).

Clement, D. B., Zartler, A. S., & Mulick, J. A. (1983).   Ethical considerations for school psychologists in planning for special needs children.  School Psychology Review, 12, 452–456.

Rojahn, J. Schroeder, S. R., & Mulick, J. A. (1983). Selbstverletzungsverhalten geistig Behinderter– okebehaviorale Analyse und Modifikation.  Zeitschrift fur Klinische Psychologie, 12(3), 174–199.

Vyse, S., Mulick, J. A., & Thayer, B. (1984).   An ecobehavioral assessment of a special education classroom.  Applied Research in Mental Retardation, 5, 395–408.

Dura, J. R., Mulick, J. A., & Rasnake, L. K. (1987).   Prevalence of stereotypy in institutionalized nonambulatory profoundly retarded people.   American Journal of Mental Deficiency, 91, 548–549.

Dura, J. R., & Mulick, J. A. (1987).  Behavior disorder teams:  An efficient institutional strategy.  Behavioral Residential Treatment, 2, 223–228.

Wisniewski, J. J., Mulick, J. A., Genshaft, J. L., & Coury, D. L.  (1987).  Test–retest reliability of the revised children's manifest anxiety scale (RCMAS).   Perceptual and Motor Skills, 65, 67–70.

Coury, D. L., Mulick, J. A., Eaton, A. P., Bruce, N. M., & Heron, T. E. (1988). Development of a fellowship curriculum in behavioral–developmental pediatrics.  Journal of Developmental and Behavioral Pediatrics, 9, 39–41.

Dura, J. R., Mulick, J. A., & Hammer, D. (1988).   Rapid clinical evaluation of sensory integrative therapy for SIB.  Mental Retardation, 26, 83–87.

Dura, J. R., Mulick, J. A., & Myers, E. G. (1988).   Prevalence of multiple problem behaviors in institutionalized profoundly mentally retarded children.   Behavioral Residential Treatment, 3, 239–246.

Dura, J. R., Torsell, A. E., Heinzerling, R., & Mulick, J. A. (1988, November–December). Special oral concerns in people with severe and profound mental retardation.  Special Care in Dentistry, 265–267.

Mulick, J. A., Schroeder, S. R., & Rojahn, J. (1988).   Comment on Starin and Fuqua's (1987) review of research on rumination and vomiting. Research in Developmental Disabilities, 9, 433–436.

Wisniewski, J. J., Naglieri, J. A., & Mulick, J. A. (1988).  Psychometric properties of a children's psychosomatic symptom checklist. Journal of Behavioral Medicine, 11, 5, 497–507.

Wisniewski, J. J., Genshaft, J. L., Mulick, J. A., Coury, D., & Hammer, D. (1988). Relaxation therapy and compliance in the treatment of childhood headache. Headache, 28, 612–617.

Dura, J. R., Aman, M. G., & Mulick, J. A. (1988).  Medication use in an ICF/MR for nonambulatory severely and profoundly mentally retarded children.  Journal of the Multihandicapped Person, 1, 155–159.

Mulick, J. A., & Kedesdy, J. H. (1988).  Self–injurious behavior, its treatment, and normalization. Mental Retardation, 26, 223–229.

Vyse, S. A., & Mulick, J. A. (1988).  Ecobehavioral assessment of a special education classroom: Teacher–student behavioral covariation. Journal of the Multihandicapped Person, 1, 201–216.

Tarnowski, K. J., Rasnake, L. K., Linscheid, T. R., & Mulick, J. A. (1989):  Behavioral adjustment of pediatric burn victims. Journal of Pediatric Psychology, 14, 607–615.

Mulick, J. A., & Dura, J. R. (1989).  Environmental factors and antisocial behavior.  In C. T. Gualtieri and S.R. Schroeder (Eds.).  Psychiatric treatments in mental retardation. Washington, DC:  American Psychiatric Association.  (A Task Force Report of the American Psychiatric Association, APPI, 1989).

Antonak, R. F., Fiedler, C. R., & Mulick, J. A. (1989). Misconceptions relating to mental retardation. Mental Retardation, 27, 91–97.

Gunsett, R. P., Mulick, J. A., Fernald, W. B., & Martin, J. L. (1989).  Brief report: Indications for medical screening prior to behavioral programming for severely and profoundly mentally retarded clients.  Journal of Autism and Developmental Disorders, 19, 167–172.

Tarnowski, K. J., Rasnake, L. K., Linscheid, T. R., & Mulick, J. A. (1989).  Ecobehavioral characteristics of a pediatric burn injury unit.  Journal of Applied Behavior Analysis, 22, 101–109.

Tarnowski, K. J., Rasnake, L. K., Mulick, J. A., & Kelly, P. A. (1989).  Acceptability of behavioral interventions for self–injurious behavior.  American Journal on Mental Retardation, 93, 575–580.

Kedesdy, J. H., & Mulick, J. A. (1989).  Counter–therapeutic facilitation of a complex movement disorder with haloperidol in a young adult with a developmental disability.  Journal of the Multihandicapped Person, 2(3), 191-200.

Rojahn, J., Polster, M.L., Mulick, J.A., & Wisniewski, J.J. (1989).  Reliability of the behavior problem inventory. Journal of the Multihandicapped Person, 2(4), 283-293.

Bosma, A., & Mulick, J. A. (1990).  Brief report:  Ecobehavioral assessment using transparent scatter plots. Behavioral Residential Treatment, 5, 137–140.

Mulick, J. A. (1990).  The ideology and science of punishment in mental retardation. American Journal of Mental Retardation, 95, 142-156.

Tarnowski, K. J., Mulick, J. A., & Rasnake, L. K. (1990).  Acceptability of behavioral interventions for self–injurious behavior:  Replication and interinstitutional comparison. American Journal on Mental Retardation, 95, 182-191.

Meinhold, P. M., & Mulick, J. A. (1990).   Risks, choices, and behavioral treatment: Behavioral Residential Treatment, 5(1), 29–44.

Meinhold, P. M., & Mulick, J. A. (1990).  Counter–habilitative contingencies in institutions for mentally retarded people:  Ecological and regulatory influences.  Mental Retardation, 28(2), 67–75.

Dura, J.R., Mulick, J.A., Hammer, D., Myers, E. (1990).   Establishing independent microcomputer use in people with multiple handicaps, profound mental retardation and a history of learning failure.  Computers in Human Behavior, 6, 177–183.

Mulick, J.A., (1990).  Ideology and punishment reconsidered.  American Journal on Mental Retardation, 95, 173-181.

Mulick, J.A. & Meinhold, P.M. (1991).   Evaluating  models for the emergence and maintenance of stereotypy and self-injurious behavior.  American Journal on Mental Retardation, 96, 327-333.

Mulick, J. A., & Meinhold, P. M. (1992).   Analyzing the impact of regulations on residential ecology.  Mental Retardation,  30, 151-161.

Meinhold, P. M., & Mulick, J. A. (1992).  Social policy and science in the treatment of severe behavior disorders:  Defining and securing a healthy relationship.  Clinical Psychology Review, 12, 585-603.

Rasnake, L. K., Martin, J., Tarnowski, K. J., & Mulick, J. A. (1993).  Acceptability of behavioral treatments:  Influence of knowledge of behavioral principles.  Mental Retardation, 31, 247-251.

Antonak, R. F., Fiedler, C. R., & Mulick, J. A. (1993).  A scale to measure the application of eugenics to persons with mental retardation.  Mental Deficiency Research, 37, 75-83.

Jacobson, J. W., & Mulick, J. A. (1994).  Facilitated communication: Better education through applied ideology.  Journal of Behavioral Education, 4, 93-105.

Kobe, F. H., Mulick, J. A., Rash, T A., & Martin, J (1994). Nonambulatory persons with profound mental retardation: Physical, developmental, and behavioral characteristics. Research in Developmental Disabilities, 15, 413-423.

Meinhold, P. M., Mulick, J. A., & Teodoro, J. M. (1994). Risks and costs of SIBIS-treatment litigation: Focus on the family. Journal of Child and Family Studies , 3, 403-415.

Antonak, R. F., Mulick, J. A., Kobe, F. H., & Fiedler, C. R. (1995). The influence of mental retardation severity and respondent characteristics on self-reported attitudes toward mental retardation and eugenics. Journal of Intellectual Disability Research, 39, 316-325.

Kobe, F. H., & Mulick, J. A. (1995). Attitudes toward mental retardation and eugenics: The role of formal education and experience. Journal of Developmental and Physical Disabilities, 7, 1-9.

Wisniewski, J. J., Andrews, T. J., & Mulick, J. A. (1995). Objective and subjective factors in the disproportionate referral of children for academic problems. Journal of Consulting and Clinical Psychology,63, 1032-1036.

Jacobson, J. W., Mulick, J. A., & Schwartz, A. A. (1995). A history of facilitated communication: Science, pseudoscience, and antiscience. American Psychologist, 50, 750-765.

Schroeder, S. R., Hammock, R.G., Mulick, J. A., Rojahn, J., Walson, P., Fernald, W., Meinhold, P., Sarphare, G. (1995). Clinical trials of D1 and D2 dopamine modulating drugs and self-injury in MR/DD.  Mental Retardation and Developmental Disability Reviews, 1, 120-129.

Jacobson, J. W., Mulick, J. A., & Schwartz, A. A. (1996). If a tree falls in the woods . . . American Psychologist, 51(9), 988-989.

Andrews, T. J., Wisniewski, J. J., & Mulick, J. A. (1997). Variables influencing teachers' decisions to refer children for school psychological assessment services.  Psychology in the Schools, 34(3), 239-244.

DeWitt, M. B., Schreck, K. A. & Mulick, J. A. (1998). Use of the Bayley scales in individuals with profound mental retardation: Comparison of the first and second editions. Journal of Developmental and Physical Disabilities, 10, 307-313.

Jacobson, J. W., Mulick, J. A., & Green, G. (1998). Cost benefit estimates for early intensive behavioral intervention for young children with autism – general model and single state case. Behavioral Interventions, 13, 201-226.

Mulick, J. A. (1999). Making a difference: "Differential rates of skill acquisition and outcome of early intervention in autism". Behavioral Interventions, 14 (1), 29-34.

Jacobson, J. W., Mulick, J. A., & Green, G. (1999) EIBI Saves Up to $2,500,000. Peer reviewed web-publication: http://www.behavior.org/autism/autism_cost benefit.html.

Schreck, K. A., & Mulick, J. A. (2000). Parental report of sleep problems in children with autism. Journal of Autism and Developmental Disorders, 30, 127-135 .

Jacobson, J. W., & Mulick, J. A. (2000). System and cost research issues in treatments for people with autistic disorders. Journal of Autism and Developmental Disorders, 30(6) 585-594.

Mulick, J. A. & Butter, E. M. (2002). Educational advocacy for children with autism. Behavioral Interventions, 17, 57-74.

Schreck, K. A., Mulick, J. A., & Rojahn, J. (2003). Development of the behavioral evaluation of disorders of sleep. Journal of Child and Family Studies, 12, 349-359.

Schreck, K. A., Mulick, J. A., & Smith, A. F. (2004). Sleep problems as predictors of intensified symptoms of autism. Applied Research in Developmental Disabilities, 25, 57-66.

Salvy, S. J., Mulick, J. A., Butter, E., Kahng, R., & Linscheid, T. R. (2004). Contingent Electric Shock (SIBIS) and a Conditioned Punisher Eliminate Severe Head Banging in a Preschool Child. Behavioural Interventions, 19, 1-14.

Schreck, K. A., Mulick J. A., Rojahn, J. (2005). Parent Perception of Elementary School Aged Children's Sleep Problems. Journal of Child and Family Studies, 14, 101 – 109.

Johnston, J.M., Foxx, R.M., Jacobson, J.W., Green, G., & Mulick, J.A. (2006). Positive behavior support and applied behavior analysis. The Behavior Analyst, 29, 51-74.

Bass, J. D., & Mulick, J.A. (In Press). Social play skill enhancement of children with autism using peers and siblings as therapists. Psychology in the Schools.

Butter, E. M., Mulick, J. A., & Metz, B. (2006). Eight case reports of learning recovery in children with pervasive developmental disorders after early intervention. Behavioral Interventions, 21, 227-245.

RUPP Autism Network. [Butter, E.M, Aman, MG, Arnold, L.E, Hall, K, Mulick, JA, Hollway, J, Lecavalier, L, Scahill, L, Sukhodolsky, D, Williams, S, Koenig, K, Bearss, K, Roumen N, McDougle, C, Stigler, K, Swiezy, N, Kohn, A, Fairbanks, J, Grothe, M, Handen, B, Johnson, CR, Wagner, A, Vitiello, A, & Ritz, L.] (in press). Parent Training for Children with Pervasive Developmental Disorders: A Multi-site Feasibility Trial. Behavioral Interventions.

Johnson, C.R., Handen, B.L. Butter, E.M., Wagner, A., Mulick, J., Sukhodolsky, D.G., Williams, S., Swiezy, N.A., Arnold, L.E., Aman, M.G., Scahill, L., Stigler, K.A., McDougle, C.J., Vitiello, B., & Smith, T. (in press). Development of a Parent Training Program for Children with Pervasive Developmental Disorders. Behavioral Interventions.

**General Circulation Periodicals:**

Mulick, J. A., Jacobson, J. W., & Kobe, F. H. (1993). Anguished silence and helping hands: Autism and facilitated communication. The Skeptical Inquirer, 17(3), 270-280. [Reprinted in K. Frazier (Ed.) (1998). Encounters with the Paranormal: Science, Knowledge, and Belief, Amherst, NY: Prometheus Books.]

**Instructional Multimedia:**

Coury, D., Mulick, J. A., & Yeargin-Allsopp, M. (Speakers). (2003). Autism (Cassette Recording Volume 23, AAP-Pediatric Update 7), Port Washington, NY: Medical Information Systems.

Butter, E., & Mulick, J. A. (2003). Parent management training for pervasive developmental disorders: Accompanying video vignettes. (DVD ROM & VHS Videotape), Ohio State University & Columbus Children's Hospital: Produced for the NIMH Autism Network— Research Units on Pediatric Psychopharmacology and Psychosocial Intervention.

**Non–Peer Reviewed, Professional and Trade Periodicals:**

Sassaman, E., & Mulick, J. A. (1980). Sterilization of the Mentally Retarded (Letter to the editor). Pediatrics, 66, 651.

Mulick, J. A. (1980). Behavior management. In Busdrivers and Busdrivers' Aides Manual, pp. 29–34, Providence, RI: State Department of Education.

Mulick, J. A. (1982).   Recommended reference:   Parent training materials. Region X Reporter, 5(1), 3.

Mulick, J. A. (1982).   Recommended reference:   Vocational education.   Region X Reporter, 5(2), 3.

Mulick, J. A. (1983).   Recommended reference: Interdisciplinary work in medical settings. Region X Reporter, 5(3), 4.

Mulick, J. A. (1983).   Recommended reference:   Advances in clinical psychology.   Region X Reporter, 6(1), 4.

Mulick, J. A. (1983).   Recommended reference:   Public policy and the process of change. Region X Reporter, 6(2), 4.

Mulick, J. A. (1984, August 24).   Computers in mental retardation. Echo 6, 3–4.

Mulick, J. A. (1984).   More on user friendliness (letter to the Editor). Byte, 9(10), 30, 32.

Mulick, J. A. (1984).   Editorial. Psychology in Mental Retardation, 10(2), 4.

Mulick, J. A. (1985).   Editorial:   Public funding and values. Psychology in Mental Retardation, 11(1),  5.

Mulick, J. A. (1985).   Editorial:  New communication opportunities. Psychology in Mental Retardation, 11(2), 5.

Mulick, J. A. (1986).   Editorial:  Regulation, intervention, science; Too much, too late or too little? Psychology in Mental Retardation, 11(3), 5–6.

Mulick, J. A. (1986).   Editorial:  Alliances. Psychology in Mental Retardation, 12(1), 5–6.

Mulick, J. A. (1987).   Editorial:  Scientific misconduct and trust of science. Psychology in Mental Retardation, 13(1), 5–6, 9.

Mulick, J. A. (1988).   Fellowship training in developmental disabilities in a department of pediatrics. Psychology in Mental Retardation, 13(3), 14–15.

Jacobson, J. W., & Mulick, J. A. (1988).   A policy on effective behavioral treatment. Psychology in Mental Retardation, 14(1), 3–6.

Jacobson, J. W., & Mulick, J. A. (1989).   Some contingencies affecting restrictive behavioral intervention. Psychology in Mental Retardation, 14(3), 9–13.

Jacobson, J. W., & Mulick, J. A. (1989).   Developing consensus. Psychology in Mental Retardation, 15(2), 13–16.

Linscheid, T.R., Meinhold, P.M., & Mulick, J.A. (1990).   Letter to the Editor:  Gentle teaching? The Behavior Therapist, 13(2), 32.

Mulick, J.A. (1990). Computers: Exploring the possibilities. Psychology in Mental Retardation and Developmental Disabilities, 15(3), 8–11.

Jacobson, J.W., & Mulick, J.A. (1990). Behavioral analysis of advocacy. Psychology in Mental Retardation and Developmental Disabilities, 15(3), 4–7.

Mulick, J.A. (1990). Computer software for psychologists in mental retardation. Psychology in Mental Retardation and Developmental Disabilities, 16 (2), 3-4, 17.

Jacobson, J.W., & Mulick, J.A. (1990). Assisted living: Behavioral and technological contingencies. Psychology in Mental Retardation and Developmental Disabilities, 16 (2), 5-7.

Jacobson, J.W., & Mulick, J.A. (1991). Assisted living: Behavioral and electronic supports. Psychology in Mental Retardation and Developmental Disabilities, 16 (3), 5-8.

Jacobson, J.W., & Mulick, J.A. (1991). Uncommon liability in the practice of behavior analysis. Psychology in Mental Retardation and Developmental Disabilities, 17 (1), 9-14.

Jacobson, J. W., & Mulick, J. A. (1991). Common sense and the crisis in confidence. Psychology in Mental Retardation and Developmental Disabilities, 17 (2), 6-9.

Jacobson, J. W. & Mulick, J. A. (1992). Speak for yourself, or . . . I can't quite put my finger on it! Psychology in Mental Retardation and Developmental Disabilities, 17(3), 3-7.

Mulick, J. A. (1992). Paradigm's labors lost—A dialog on mental retardation with Dr. Maestro. Psychology in Mental Retardation and Developmental Disabilities ,18(1), 15-16.

Mulick, J. A., & Antonak, R. F. (1992). The legacy of eugenics. Psychology in Mental Retardation and Developmental Disabilities, 18(1), 5-9.

Jacobson, J. W., & Mulick, J. A. (1992). A new definition of MR or a new definition of practice? Psychology in Mental Retardation and Developmental Disabilities, 18(1), 9-14.

Jacobson, J. W., & Mulick, J. A. (1993). An allegory: The problem of counting and its communication. Psychology in Mental Retardation and Developmental Disabilities, 18(2), 6-9.

Jacobson, J. W., & Mulick, J. A. (1993). VOX POPULI — Community integration and other mythodologies. Psychology in Mental Retardation and Developmental Disabilities, 18(3), 14-17.

Mulick, J. A. (1994). The temptation of Dr. Maestro: A morality play in one short scene. Psychology in Mental Retardation and Developmental Disabilities, 19(2), 21-22.

Jacobson, J. W., & Mulick, J. A. (1994). Pieces of the professional puzzle: Contents of a guide. Psychology in Mental Retardation and Developmental Disabilities, 19(2), 6-9.

Mulick, J.A., (November/December, 1994). The non-science of facilitated communication. Psychological Science Agenda, 8-9.

Jacobson, J. W., & Mulick, J. A. (1994). Speaking the unspeakable, naming the unnamable, and reading the unreadable. Psychology in Mental Retardation and Developmental Disabilities, 20(1), 4, 9-13.

Jacobson, J. W. & Mulick, J. A. (1995). Ethical dilemmas for practitioners posed by facilitated communication. Psychology in Mental Retardation and Developmental Disabilities, 20(2), 14-18.

Mulick, J. A. (1995). Message from the president. Psychology in Mental Retardation and Developmental Disabilities, 20(2), 9-10.

Mulick, J. A. (1995, Spring). Message from the president: The importance of checking. Psychology in Mental Retardation and Developmental Disabilities, 20(3), 4-6.

Jacobson, J.W., & Mulick, J. A. (1995, Spring). The misapprehension of merit and ability: The Bell Curve, egalitarianism and early intervention. Psychology in Mental Retardation and Developmental Disabilities, 20(3), 11-17.

Mulick, J. A. (1995, Summer). Message from the president: All things are not equal. Psychology in Mental Retardation and Developmental Disabilities, 21(1), 1-2.

Jacobson, J.W., & Mulick, J. A. (1995, Summer). Against all odds: Merchandising a fad. Psychology in Mental Retardation and Developmental Disabilities, 21(1), 4-10.

Jacobson, J.W., & Mulick, J. A. (1995, Fall). Don't ask, don't tell, don't even bother to study human behavior. Psychology in Mental Retardation and Developmental Disabilities, 21(2), 18-22.

Jacobson, J.W., & Mulick, J. A. (1996, Spring). Message from the President: An open letter to OSERS and ADD. Psychology in Mental Retardation and Developmental Disabilities, 21(3), 2-6.

Jacobson, J. J., & Mulick, J. A. (1996). How to conduct and report postmodern research: So much verbal behavior, so many venues, and so little time. Psychology in Mental Retardation and Developmental Disabilities, 22(1), 12-19.

Jacobson, J. J., & Mulick, J. A. (1996). Pedagogue's process: Getting your due out of early intervention. Psychology in Mental Retardation and Developmental Disabilities, 22(2), 18-25.

Jacobson, J. J., & Mulick, J. A. (1997). McBehavior, Consequence King and Walden MCCXIV: Going where no marketeers of behavioral and human services have gone before. Psychology in Mental Retardation and Developmental Disabilities, 22(3), 11-17.

Jacobson, J. J., & Mulick, J. A. (1996). What if someone gave a party and only behavior analysts could attend?. Psychology in Mental Retardation and Developmental Disabilities, 23(2), 6-12.

Jacobson, J. J., & Mulick, J. A., Apollo, S. J. (1998). That depends on what the meaning of eclectic is. Psychology in Mental Retardation and Developmental Disabilities, 24(1), 15-23.

Jacobson, J. J., & Mulick, J. A. (1998). In for calf, in for a cow: The social and professional costs of ignoring opportunities. Psychology in Mental Retardation and Developmental Disabilities, 24(Summer), 8-13.

Mulick, J. A. (1998). APA Practice Directorate and Division 33 federal action initiatives. Psychology in Mental Retardation and Developmental Disabilities, 24(Summer), 3-4.

Jacobson, J. J., & Mulick, J. A. (1999) Ding, dong, the Wicca's dead...and it's getting better all the time. Psychology in Mental Retardation and Developmental Disabilities, 24 (3), 8-15.

Jacobson, J. J., & Mulick, J. A. (1999) Once in a blue moon: Faint praise and shoddy implementation n'er won hearts for behavior analysis. Psychology in Mental Retardation and Developmental Disabilities, 25 (2), 3-8.

Jacobson, J. W., & Mulick, J. A. (2000 Spring-Summer). Affective disposition toward ☐ ☐ (The condition formerly known as mental retardation). Psychology in Mental Retardation and Developmental Disabilities, 25 (3), 7-12.

Schreck, K. A., Metz, B., Mulick, J. A., & Smith, A. (2000). Making it fit: A provocative look at models of early intensive behavioral intervention for children with autism. The Behavior Analyst Today, 1 (3), 27-32.

Jacobson, J. W., & Mulick, J. A. (2000) MRDD consulting for DUMMIES. Psychology in Mental Retardation and Developmental Disabilities, 26 (2), 3-11.

Jacobson, J. W., & Mulick, J. A. (2001). Free trade will set you free: An alternate universe. Psychology in Mental Retardation and Developmental Disabilities, 27 (1), 3-11.

Jacobson, J. W., & Mulick, J. A. (2002). Wassup? Ya want MR? I got Yur MR right here. Psychology in Mental Retardation and Developmental Disabilities, 28 (1), 2-4.

Mulick, J. A. (2002). Don Baer, passing, will be remembered. Psychology in Mental Retardation and Developmental Disabilities, 28 (1), 5-6.

Jacobson, J. W., & Mulick, J. A. (2003). No child left dawdling, temporarily indisposed, unavailable, catching the next bus, being socially promoted, forgotten, dismissed late, untutored, abandoned, disenfranchised, deprived of full citizenship, or waiting impatiently in the hallway. Psychology in Mental Retardation and Developmental Disabilities, 28 (3), 8-13.

Butter, E. M., Wynn, J., & Mulick, J. A. (2003). Early intervention: Critical to autism treatment. Pediatric Annals, 32(10), 677-684.

Mulick, J. A. (2005). Just exactly what do they mean by "left behind"? Psychology in Mental Retardation and Developmental Disabilities, 30(2), 2-6.

**Book and Software Reviews:**

Mulick, J. A., & Sassaman, E. (1980). Encyclopedia of Pediatric Psychology. Journal of Autism and Developmental Disorders, 10, 108–111.

Mulick, J. A. (1980).   Special Technology for Special Children.   Journal of Autism and Developmental Disorders, 10, 473–476.

Mulick, J. A. (1984).   Models for Analysis of Social Policy.   Applied Research in Mental Retardation, 5, 297–298.

Mulick, J. A. (1984).   Special Ware Directory 1983.   Applied Research in Mental Retardation, 5, 412–413.

Rasnake, L. K., & Mulick, J. A. (1986).  Software Review:  Manuscript Preparation Made Easy (Manuscript Manager:  APA Style).  Applied Research in Mental Retardation, 7, I–IV.

Mulick, J. A., & Linscheid, T. R. (1988).   A review of LaVigna and Donnellan's Alternatives to Punishment:  Solving Behavior Problems with Non–aversive Strategies.  Research in Developmental Disabilities, 9, 317–327.

Mulick, J.A. (1989).  Software Review:  An individual reference data base tool; Publish or Perish.  Research in Developmental Disabilities, 10, 445–449.

Mulick, J.A. (1992).   Review of Behavior on a Disk from CMS academic software:  Instructional programs for teaching teachers: .  Research in Developmental Disabilities, 13, 301-307.

Mulick, J. A. (1992). Review of Innovations in Behavior Therapy by Michel Hersen. Journal of Behavior Therapy and Experimental Psychiatry, 23, 142.

Kobe, F. H., & Mulick, J. A. (1993).  Review of Family issues in pediatric psychology by M. C. Roberts and J. L. Wallander (Eds.).  Clinical Psychology Review, 13, 204-205.

Mulick, J. A. (2001). Review of Stop Teaching Our Kids to Kill. Behavioral Interventions, 16. 137-143.

Mulick, J. A. (2001). ABA and the computer: A review of Discrete Trial Trainer. Behavioral Interventions, 16. 287-291.

**Chapters:**

Schroeder, S. R., Mulick, J. A., & Schroeder, C. (1979).  Management of severe behavior problems in the retarded.  In N. Ellis (Ed.), Handbook of Mental Deficiency, (2nd Edition). Lawrence Erlbaum Associates, Hillsdale, New Jersey.

Schroeder, S. R., Schroeder C. S., Rojahn, J., & Mulick, J. A. (1982).  Analysis of self–injurious behavior:  Its development and management. In: J. L. Matson & J. R. McCartney (Eds.) Handbook of behavior modification with the mentally retarded(pp. 61-115).  New York:  Plenum Press.

Mulick, J. A., Scott, F. D., Gaines, R. F., & Campbell, B. M. (1983).  Devices and instrumentation in skill development and behavior change.  In J. L. Matson and F. Andrasik (Eds.)  Treatment issues and innovations in mental retardation.  New York:  Plenum Press.

Mulick, J. A. (1983)  The Parent–professional partnership.  In J. A. Mulick & S. M. Pueschel (Eds.)  Parent–professional partnerships in developmental disability services. Cambridge, MA:  Academic Guild Publishers.

Huguenin, N. H., Weidenman, L. E., & Mulick, J. A. (1983).  Programmed instruction.  In J. L. Matson & J. A. Mulick (Eds) Handbook of mental retardation, New York: Pergamon Press.

Mulick, J. A., & Rollins, E. I. (1988).  Helping children learn.  In S. M. Pueschel, J. C. Bernier, & J .E. Weidenman (Eds.) The Special Child. Baltimore: Paul H. Brookes.

Rollins, E. I., Weidenman, L. E., & Mulick, J. A. (1988).  Assessing developmental disabilities:  Psychological tests and procedures.  In S. M. Pueschel, J. C. Bernier, & J. E. Weidenman (Eds.) The Special Child. Baltimore: Paul H. Brookes.

Weidenman, L. E., & Mulick, J. A. (1988).  Parents and professionals:  A partnership.  In S. M. Pueschel, J.C. Bernier, & J. E. Weidenman (Eds.) The Special Child.  Baltimore:  Paul H. Brookes.

Jacobson, J. W., Dura, J. R., & Mulick, J. A. (1987).  Microcomputer applications in group homes.  In M. P. Janicki, M. W. Krauss, & M. M. Seltzer (Eds.),  Community residences for developmentally disabled persons.  Baltimore:  Paul H. Brookes.

Linscheid, T. R., Rasnake, L. K., Tarnowski, K. J., & Mulick, J. A. (1989).  Behavioral assessment.  In J. K. Luiselli (Ed.), Behavioral medicine and developmental disabilities.  New York:  Springer–Verlag.

Mulick, J. A. (1990).  In the cause of prevention.  In S. M. Pueschel & J. A. Mulick (Eds.) Prevention of developmental disabilities.  Baltimore:  Paul H. Brookes.

Vyse, S.A., & Mulick, J.A. (1990).  Ecobehavioral assessment: Future directions in the planning and evaluation of behavioral intervention.  In S. R. Schroeder (Ed.) Ecobehavioral analysis and developmental disabilities: The twenty–first century (pp. 228-244). New York: Springer–Verlag.

Vyse, S.A., & Mulick, J.A. (1990).  A correlational approach to ecobehavioral assessment. In S. R. Schroeder (Ed.), Ecobehavioral analysis and developmental disabilities; the twenty–first century(pp. 64-81). New York: Springer–Verlag.

Meinhold, P.M., & Mulick, J.A. (1990).  Counter–habilitative contingencies in residential institutions.  In S. R. Schroeder (Ed.), Ecobehavioral analysis and developmental disabilities; the twenty–first century(pp. 105-121). New York: Springer–Verlag.

Schroeder, S. R., Rojahn, J., Mulick, J. A., & Schroeder, C. S. (1990).  Self–injurious behavior:  An analysis of behavior management techniques.  In J. L. Matson & J. R. McCartney (Eds.), Behavior modification with the mentally retarded (2nd edition). New York: Plenum.

Mulick, J.A., & Matson, J.L. (1991).  Introduction: A continuum of service and research. In J. L. Matson & J. A. Mulick (Eds.) Handbook of Mental Retardation (2nd edition, pp. ix-xv). New York: Pergamon Press.

Huguenin, N. H., Weidenman, L. E., & Mulick, J. A. (1991). Programmed instruction. In J. L. Matson & J. A. Mulick (Eds.) Handbook of Mental Retardation (2nd edition, pp. 451-467). New York: Pergamon Press.

Mulick, J. A., Hammer, D., & Dura, J. R. (1991). Assessment and management of antisocial and hyperactive behavior. In J. L. Matson & J. A. Mulick (Eds.) Handbook of Mental Retardation (2nd edition, pp. 397-412). New York: Pergamon Press.

Mulick, J.A., & Meinhold, P.M. (1994). Developmental disorders and broad effects of the environment on learning and treatment effectiveness. In E. Schopler & G.R. Mesibov (Eds.) Behavioral issues in autism (pp. 97-126). New York: Plenum.

Mulick, J. A. 1994). Aversive motivation in therapeutic intervention. In M. A. Mason & E. Gambrill (Eds.), Debating children's lives (pp. 223-224, 228-236), Hollywood, CA: Sage Publications.

Mulick, J. A. (1994). Response to Sailor and Carr. In M. A. Mason & E. Gambrill (Eds.), Debating children's lives (pp. 246-249), Hollywood, CA: Sage Publications.

Jacobson, J. W., Eberlin, M., Mulick, J. A., Schwartz, A. A., Szempruch, J., & Wheeler, D. L. (1994). Autism, facilitated communication, and future directions. In J. L. Matson (Ed.), Autism in children and adults: Etiology, assessment, and intervention (59-83). Pacific Grove, CA: Brokes/Cole.

Kobe, F. . H. & Mulick, J.A. (1995). Mental Retardation. R.T. Ammerman & M. Hersen (Eds.), Handbook of Child Behavior Therapy in the Psychiatric Setting (pp. 153-180). New York: Wiley.

Mulick, J. A., & Hale, J. B. (1996). Communicating assessment results in mental retardation. In J. W. Jacobson & J. A. Mulick (Eds.) Manual of diagnosis and professional practice in mental retardation(pp. 257-263). Washington, DC: American Psychological Association.

Jacobson, J. W., & Mulick, J. A. (1996). Psychometrics. In J. W. Jacobson & J. A. Mulick (Eds.) Manual of diagnosis and professional practice in mental retardation (pp.75-84). Washington, DC: American Psychological Association.

Singh, N. N., Ellis, C. R., Mulick, J., & Poling, A. (1998). Vitamin, mineral, and dietary treatments. In S. Reiss & M. G. Aman (Eds.) Psychotropic medications and developmental disabilities: The international consensus handbook, Columbus, OH: The Ohio State University Nisonger Center.

Jacobson, J. W., & Mulick, J. A. (2003). Defining mental retardation, or the incurability of ideological imbecility. In Switzky, H.N., & Greenspan, S. (Eds). What is Mental Retardation?: Ideas for an evolving disability. stop underline. [On-line] Washington, D.C.: American Association on Mental Retardation.Retrieved: July 2003 from <http://www.disabilitybooksonline.com>.

Mulick, J. A., & Butter, E. (2005). Positive behavior support: A paternalistic utopian delusion. In J. W. Jacobson, R. M. Foxx, & J. A. Mulick (Eds.) Controversial therapies for

developmental disabilities: Fad, fashion, and science in professional practice (pp 385-403). Hillsdale, NJ: Lawrence Erlbaum Associates.

Jacobson, J. W., Foxx, R. M., & Mulick, J. A., (2005). Facilitated communication. In J. W. Jacobson, R. M. Foxx, & J. A. Mulick (Eds) Controversial therapies for developmental disabilities: Fad, fashion, and science in professional practice (pp 363-383). Hillsdale, NJ: Lawrence Erlbaum Associates.

Jacobson, J. W., & Mulick, J. A (2005). Developmental disabilities and the paranormal. In J. W. Jacobson, J. A. Mulick , & R. M. Foxx (Eds.) Controversial therapies for developmental disabilities: Fad, fashion, and science in professional practice (pp 139-156). Hillsdale, NJ: Lawrence Erlbaum Associates.

Jacobson, J. W., Mulick, J. A,& Foxx, R. M. (2005). Historical approaches to developmental disabilities. In J. W. Jacobson, R. M. Foxx, & J. A. Mulick (Eds.) Controversial therapies for developmental disabilities: Fad, fashion, and science in professional practice (pp 61-83). Hillsdale, NJ: Lawrence Erlbaum Associates.

Metz, B., Mulick, J. A., & Butter, E. (2005). Autism: A late 20th century fad magnet. In J. W. Jacobson, R. M. Foxx, & J. A. Mulick  (Eds.) Controversial therapies for developmental disabilities: Fad, fashion, and science in professional practice (pp 237-263). Hillsdale, NJ: Lawrence Erlbaum Associates.

Jacobson, J. W., & Mulick, J. A. (2006). Ten Years Later: Two AAMR Tales of a Condition  In Switzky, H.N., & Greenspan, S. (Eds). What is Mental Retardation?: Ideas for an evolving disability. Washington, DC: American Association on Mental Retardation.

**Books:**

Matson, J. L., & Mulick, J. A. (Eds.) (1983).  Handbook of mental retardation.  New York: Pergamon Press.  [Winner of the 1983 Award for Excellence in the Social and Behavioral Sciences from the Association of American Publishers.]

Mulick, J. A. & Pueschel, S. M. (Eds.) (1983).  Parent–professional partnerships in developmental disability services. Cambridge, MA: Academic Guild Publishers.

Mulick, J. A., & Mallory, B. L. (Eds.) (1984).  Transitions in mental retardation: Advocacy, technology, and science (Vol. 1). Norwood, NJ: Ablex Publishing Corporation.

Mulick, J. A., & Antonak, R. F. (Eds.) (1987).  Transitions in mental retardation:  Issues in therapeutic intervention (Vol. 2). Norwood, NJ: Ablex Publishing Corporation.

Antonak, R. F., & Mulick, J. A. (Eds.) (1987).  Transitions in mental retardation:  The community imperative (Vol. 3). Norwood, NJ: Ablex Publishing Corporation.

Coury, D. L., Eaton, A. P., Mulick, J. A., Heron, T. E., & Bruce, N. (1987).  Fellowship curriculum in behavioral–developmental pediatrics. Columbus, OH: The Children's Hospital.

Hammer, D. & Mulick, J.A. (1988).  Community management of children and youth with emotional disturbance and mental retardation:  A curriculum for advanced training.  Columbus, OH: The Nisonger Center.

Mulick, J. A., & Antonak, R. F. (1989).  Transitions in mental retardation:  Applications and implications of technology (Vol. 4). Norwood, NJ: Ablex Publishing Corporation.

Pueschel, S. M., & Mulick, J. A. (Eds.) (1990).  Prevention of developmental disabilities. Baltimore:  Paul H. Brookes.

Matson, J. L., & Mulick, J. A. (Eds.) (1991).  Handbook of mental retardation (2nd edition). New York:  Pergamon Press.

Jacobson, J. W., & Mulick, J. A. (Eds.) (1996 [July]): Manual of diagnosis and professional practice in mental retardation. Washington, DC: American Psychological Association.

Jacobson, J. W., Mulick, J. A., & Holburn, S. C. (Eds.) (2002). Contemporary dual diagnosis MH/MR – Service Models: Volume I: Residential and day services. Kingston, NY: National Association for Dual Diagnosis.

Jacobson, J. W., Holburn, S. C., & Mulick, J. A. (Eds.) (2002). Contemporary dual diagnosis MH/MR – Service Models: Volume II: Partial and supportive services. Kingston, NY: National
Association for Dual Diagnosis.

Jacobson, J. W., Foxx , R. M., & Mulick, J. A. (2005) (Eds.). Controversial therapies for developmental disabilities: Fad, fashion, and science in professional practice. Hillsdale, NJ: Lawrence Erlbaum Associates.

Jacobson, J. W., Mulick, J. A., & Rojahn, J. (2007). Handbook of Intellectual and Developmental Disabilities. New York: Springer.

## SELECTED PAPERS AND ABSTRACTS:

Mulick, J. A. and Joffe, J. M.   Effects of adrenalectomy on open–field behavior in rats. Paper presented at the 43rd Annual Meeting of the Eastern Psychological Association, Boston, April, 1972.

Mulick, J. A.   Reinforcement frequency for alternative behavior in extinction.    Paper presented at the 44th Annual Meeting of the Eastern Psychological Association, Washington, DC, April, 1973.

Joffe, J. M., Mulick, J. A., Ley, K. F., and Rawson, R. A.  Is prenatal stress stressful?  Paper presented at the Annual Meeting of the International Society for Developmental Psychobiology, San Diego, November, 1973.

Mulick, J. A., Joffe, J. M., and Peterson, J. M.   Sex differences in the effects of dexamethasone phosphate on behavior in rats.  Paper presented at the 3rd Annual Meeting of the Society for Neuroscience, San Diego, November, 1973.

Rawson, R. A., Mulick, J. A., and Joffe, J. M.  Control of their environment affects emotionality in rats:  An early experience phenomenon?  Paper presented at the Annual Meeting of the International Society for Developmental Psychobiology, San Diego, November, 1973.

Mulick, J. A., Rawson, R. A., Lefebvre, M., and Leitenberg, H.  Reinforcement of alternative behavior and response prevention in extinction. Paper presented at the 45th Annual Meeting of the Eastern Psychological Association, Philadelphia, April, 1974.

Joffe, J. M., Mulick, J. A., Peterson, J. M., and Paunovic, J. Sex differences in the effect of dexamethasone on open–field behavior: Gonadal Hormones. Paper presented at the 15th Annual Meeting of the Psychonomic Society, Boston, November, 1974.

Mulick, J. A., and O'Sullivan, P. J.  Use of positive reinforcement to  suppress behavior in extinction:  DRO versus reinforcement of a discrete alternative response. Paper presented at the 46th Annual  Meeting of the Eastern Psychological Association, New York, April 1975.

Mulick, J. A., O'Sullivan, P. J., Veins, M. J., and Leitenberg, H.  Reinforcement frequency in the use of positive reinforcement to  suppress behavior during extinction:  DRO  versus alternative response training.  Paper presented at the 47th Annual Meeting of the Midwestern Psychological Association, Chicago, May, 1975.

Schroeder, S. R., and Mulick, J. A.  A comparison of four procedures for treating chronic ruminative vomiting.  Paper presented at the Annual Meeting of the North Carolina Division of Mental Health Research, October, 1976.

Mulick, J. A.  Alternatives to punishment in the treatment of self–injurious behavior. Psychology Department  Colloquium, Dalhousie University, Halifax, Nova Scotia, February, 1977.

Mulick, J. A., Schroeder, S., and Rojahn, J.  A comparison of six procedures in the treatment of chronic ruminative vomiting.  Proceedings of the 10th Annual Gatlinburg Conference on Research in Mental Retardation, Gatlinburg, TN, March, 1977. (summary)

Mulick, J. A., and Leitenberg, H.  Extinction, omission, and alternative response training: The effects of cues associated with the reinforcing event.  Paper presented at the 49th Annual Meeting of the Eastern Psychological Association, Washington, DC, May, 1978.

Mulick, J. A., Rojahn, J., and Schroeder, S. R.  Reduction of a "Nervous Habit" in a profoundly retarded youth by promoting independent toy play.  Proceedings of the 11th Annual Gatlinburg Conference on Research in Mental Retardation, Gatlinburg, TN, March, 1978. (summary)

Rojahn, J., Schroeder, S. R., and Mulick, J. A.  Ecological assessment of developmental day care for the chronically self–injurious—some methodological and procedural problems in applied research. Proceedings of the 11th Annual Gatlinburg Conference on Research in Mental Retardation, Gatlinburg, TN, March, 1978. (summary)

Mulick, J. A.  Response–contingent techniques for controlling self–injurious behavior. Paper presented at the International Congress of Behavior Therapy (8th European Congress of Behavior Therapy), Vienna, Austria, September, 1978.

Mulick, J. A. Ecobehavioral psychology and behavior modification of the self–injurious. Paper presented at the Annual Meeting of the Southeastern Psychological Association, New Orleans, April, 1979.

Rojahn, J., Mulick, J. A., and Schroeder, S. R. Analysis of generalization and setting effects during over–correction to control pica in two retarded adults. Proceedings of the 12th Annual Gatlinburg Conference on Research in Mental Retardation, Gulf Shores, AL, April, 1979. (summary)

Mulick, J. A. (Organizer and Discussant) Symposium on applications of programmed instruction research in education and training of the mentally retarded. Proceedings of the 12th Annual Gatlinburg Conference on Research in Mental Retardation, Gulf Shores, AL April, 1979. (summary)

Mulick, J. A. Behavioral consultation in school programs. Paper presented at the 103rd Annual Meeting of the American Association on Mental Deficiency, Miami Beach, June, 1979.

Huguenin, N. H., and Mulick, J. A. Behavioral management programs for severely retarded students. Paper presented at the 103rd Annual Meeting of the American Association on Mental Deficiency, Miami Beach, June, 1979.

Lash, P. S., and Mulick, J. A. The use of over–correction in the treatment of a retarded boy's mouthing behavior in the home setting. Paper presented at the 26th Annual Conference of the Northeast Region X American Association on Mental Deficiency, Waterville Valley, NH October, 1979.

Mulick, J. A. Manipulating operant consequences to control self–injurious behavior: Practical considerations. Paper presented at the 26th Annual Conference of the Northeast Region X American Association on Mental Deficiency, Waterville Valley, NH, October, 1979.

Mulick, J. A. Coercive therapies: Scientific, ethical, and legal considerations. Moderator and Discussant of Opening Plenary Session, 26th Annual Conference of the Northeast Region X American Association on Mental Deficiency, Waterville Valley, NH, October, 1979.

Schroeder, S. R., Mulick, J. A., and Rojahn, J. The definition taxonomy, epidemiology, and ecology of self–injurious behavior. Proceedings of the 13th Annual Gatlinburg Conference on Research in Mental Retardation and Developmental Disabilities, March 12–19, 1980. (summary)

Mulick, J. A. AAUAP psychology research committee survey report. Proceedings of the University Affiliated Program Psychology Training Directors Conference, March 30, – April 1, 1980. (summary)

Huguenin, N. H., and Mulick, J. A. Control of disruptive behavior in a retarded youth with DRO and "nonexclusionary time–out." Poster presentation at the 14th Annual Meeting of the Association for Advancement of Behavior Therapy, New York City, November 20–23, 1980.

Mulick, J. A. Impact of computerized record keeping in developmental disability programs on the delivery of psychological services. In R. Lubin (Chair), Symposium on computerized record keeping in developmental disability services, 104th Annual Meeting of the American Association on Mental Deficiency, San Francisco, May, 1980.

Mulick, J. A.   Nonexclusionary time–out to control severely disruptive behavior in mental retardation programs:   Verification and parameters.   Paper presented at the 27th Annual Conference of the Northeast Region X American Association on Mental Deficiency, Hartford, CT, November 9–11, 1980.

Schroeder, S. R., Kanoy, J. R., Mulick, J. A., Rojahn, J., Thios, S. J., Stephens, M. and Hawk, B.  Environmental antecedents which affect management and maintenance of program for self–injurious behavior.  Proceedings of the 14th Annual Gatlinburg Conference on Research in Mental Retardation and Developmental Disabilities, March, 1981. (summary)

Mulick, J. A. (Discussant). Evaluating mentally retarded individuals for guardianship. Symposium presented at the 28th Annual Conference of the Northeast Region X American Association on Mental Deficiency, Montreal, October 18–20, 1981.

Scott, F., and Mulick, J. A.  A service model for behavioral consultation in school programs for the severely handicapped. Workshop presented at the Annual Meeting of The Association for The Severely Handicapped, New York City, October, 15–17, 1981.

Mulick, J. A., Clement, D. B., Vyse, S., and Polk, X. J. Behavioral science consultation to a public institution as a vehicle for training and outreach.  Poster presented at the Annual Meeting of the American Association of University Affiliated Programs in Mental Retardation and Developmental Disabilities, Boston, May, 1982.

Touchette, P., Marholin, B., Remillard, R., and Mulick, J. A.   Curriculum change eliminates severe chronic self–injurious behavior.   Poster presented at the 29th Annual Conference of the Northeast Region X American   Association on Mental Deficiency, Providence, RI, October 17–19, 1982.

Vyse, S., and Mulick, J. A.   A simple correlational procedure for use in ecobehavioral assessment. Proceedings of the 16th Annual Gatlinburg Conference on Research in Mental Retardation and Developmental Disabilities, March, 1983. (summary)

Touchette, P., Mulick, J. A., and Marholin, B.  Preferred activities displace chronic self–mutilative behavior.  Proceedings of the 16th Annual Gatlinburg  Conference on  Research  in Mental  Retardation  and Developmental Disabilities, March, 1983. (summary)

Kedesdy, J. H., and Mulick, J. A.   Self–injurious behavior, behavior interventions, and normalization principles. Proceedings of the 4th Annual Young Adult Institute Conference:  A Reappraisal of Normalization in the Light of Reality, United  Nations  Plaza, New York City, April, 1983. (full text)

Mulick, J. A.  Presidential Address: "Change in human services."  Paper presented at the 30th Annual Conference of the Northeast Region X American Association on Mental Deficiency, Portland, ME. October, 1983.

Mulick, J. A.   Invited Address:   "Treatment of self–injurious behavior."   Annual Conference of the Ohio Chapter of the American Association on Mental Deficiency, Columbus, Ohio, April, 1984.

Mulick, J. A.  Ecobehavioral treatment approaches.  A National Interdisciplinary Seminar on Self–Injurious Behavior. Akron, OH, April 25 and 26, 1985.

Vyse, S., and Mulick, J. A.  Ecobehavioral assessment of a special education classroom: Adult–child behavioral covariation.  Paper presented at the 11th Annual Convention of the Association for Behavior Analysis, Columbus, Ohio, May, 1985.

Kedesdy, J. H., and Mulick, J. A.  Counter–therapeutic facilitation of a complex movement disorder with haloperidol.  Poster presented at the 11th Annual Convention of the Association for Behavior Analysis, Columbus, Ohio, May, 1985.

Mulick, J. A.  Victimization of parents with mental retardation.  Presentation at the Ohio Chapter Fall Conference   of the American Association on Mental Deficiency, Columbus, September 26–27, 1985.

Mulick, J. A.  Invited Address:  Applications and implications of technology in mental retardation – a summation.  Paper presented at the 32nd Annual Conference of the Northeast Region X American Association on Mental Deficiency, Stowe, VT, October 27–29, 1985.

Coury, D. L., Mulick, J. A., Eaton, A. P., Heron, T., Showers, J., and Bruce, N.  A fellowship curriculum in developmental–behavioral pediatrics. Symposium presented at the Annual Meeting of the Association for Behavioral Sciences and Medical Education, Washington, D.C., October 13–16, 1985.

Cavin, D. C., Hammer, D., Dura, J., Mulick, J. A., and Shibley, R.  Microtechnologies for persons with severe handicaps.  Symposium presented at the Annual Meeting of the Association for Persons with Severe Handicaps, Ohio Chapter, Columbus, OH, February 13–14, 1986.

Mulick, J. A.  Orienting staff to microtechnologies for the severely handicapped.  Paper presented at the 110th Annual Meeting of the American Association on Mental Deficiency, Denver, May, 1986.

Coury, D. L., Mulick, J. A., Eaton, A. P., Heron, T., Showers, J., and Bruce, N.  Structure and implementation of a fellowship curriculum in developmental–behavioral pediatrics.  A Workshop Presented at the Annual   Meeting of  the Ambulatory Pediatric Association, Washington, D.C., May 7, 1986.

Mulick, J. A., Dura, J. R., Rasnake, L. K., & Callahan, C.  Prevalence of SIB in institutionalized nonambulatory profoundly retarded people.  Poster presented at the 94th Annual Convention of the American Psychological Association, Washington, D.C., August 22–26, 1986.

Mulick, J. A.  Self–injurious behavior and the ideology of normalization.  Paper presented at the Ohio Chapter Fall Conference of the American Association  on Mental Deficiency, Dublin, Ohio, September 25–26, 1986.

Mulick, J. A., Dura, J. R., Rasnake, L. K., & Wisniewski, J.  Self–injurious behavior and stereotypy in nonambulatory children with profound mental retardation.  Poster presented at the 2nd Annual North Coast Regional Conference of the Society of Pediatric Psychology, Worthington, OH, May 12–14, 1988.

Mulick, J. A.  Aversives in behavior therapy:  When science and public policy clash.  Paper presented at the 112th Annual Meeting of the American Association on Mental Retardation, Washington, D.C., May 29 – June 2, 1988.

Hammer, D., & Mulick, J. A.  Training in community management of EDMR children. Paper presented at the 96th Annual Convention of the American Psychological Association, Atlanta, GA, August 12–16, 1988.

Mulick, J. A., Dura, J., Rasnake, L. K., & Wisniewski, J. J.  Behavioral disturbance in nonambulatory profoundly retarded children and adults.  Paper presented at the 96th Annual Convention of the American Psychological Association, Atlanta, GA, August 12–16, 1988.

Tarnowski, K. J., Rasnake, L. K., Linscheid, T. R., & Mulick, J. A.  Behavioral sequelae of pediatric burn injuries.  Paper presented at the 96th Annual Convention of the American Psychological Association, Atlanta, GA, August 12–16, 1988.

Meinhold, P. M., & Mulick, J.A.  Risks, choices and behavioral treatment.  Paper presented at the 10th Annual International Conference of the Young Adult Institute, New York City, April 12–14, 1989.

Mulick, J.A., & Meinhold, P.M.  Counter–habilitative contingencies in institutions for mentally retarded people:  Ecological and regulatory influences.  Paper presented at Annual Meeting of the Association for Behavior Analysis, Milwaukee, May 24–28, 1989.

Mulick, J. A., & Meinhold, P. M.  A task analysis approach to supervision.  Paper presented at the 97th Annual Convention of the American Psychological Association, New Orleans, August 11–15, 1989.

Mulick, J.A., & Meinhold, P.M.  Invited Address:  A broad perspective on environmental influences on behavior.  Invited address presented at the 11th Annual TEACCH Conference: Assessment and management of behavior problems in children with autism, Chapel Hill, NC, May 17–18, 1990.

Mulick, J.A., & Meinhold, P.M.  Assessment of behavior disorders in very young children: Some methodologic issues, conceptual considerations, and case examples.  Paper presented at Annual Meeting of the Association for Behavior Analysis, Nashville, TN, May 26–30, 1990.

Meinhold, P.M., & Mulick, J.A.  Assessing the ecology of abnormal stereotyped behaviors in infants and toddlers:  Methods and clinical applications.  Paper presented at the 98th Annual Convention of the American Psychological Association, Boston, August 10–14, 1990.

Mulick, J.A.  Invited Address:  Research opportunities in ecobehavioral analysis.  Paper presented at the 2nd Annual Meeting of the North Carolina Association for Behavior Analysis, Greensboro, NC, February 27-March 1, 1991.

Mulick, J.A.  Analyzing the impact of regulations on residential ecology.  Paper presented in the Multidisciplinary Session entitled "Compliance and Quality in the ICF-MR:  How Can We Have Both?" at the 115th Annual Meeting of the American Association on Mental Retardation, Crystal City, VA, May 19-23, 1991.

Mulick, J.A.  Invited Address:  Implications of ecobehavioral analysis for public policy decision making.  Presented at the 99th Annual Convention of the American Psychological Association, San Francisco, August 16-20, 1991.

Meinhold, P.M., Landau, R.J., & Mulick, J.A.  Diverse policy responses in public special education system SIBIS litigations.  Symposium paper presented at the 99th Annual Convention of the American Psychological Association, San Francisco, August 16-20, 1991.

Mulick, J. A.  Invited Address: Transitions in Mental Retardation:  A Look at What's Over the Horizon.  Paper presented at the 54th Annual Conference of the Northeast Region X American Association on Mental Retardation, Portland, ME, October 6-8, 1991.

Meinhold, P. M., Mulick, J. A., & Teodoro, J. M.  Assessing the outcomes of a SIBIS-treatment litigation:  Focus on the family.  Paper presented at the 116th Annual Meeting of the American Association on Mental Retardation, New Orleans, LA, May 26-30, 1992.

Kobe, F. H., & Mulick, J. A.  Attitudes toward mental retardation and eugenics:  The role of education and experience.  Poster presented at the 100th Annual Convention of the American Psychological Association, Washington, DC, August 14-18, 1992.

Jacobson, J. W., & Mulick, J. A.  Cultural materialism:  Establishing the larger context of ecobehavioral analysis.  Paper presented at the 100th Annual Convention of the American Psychological Association, Washington, DC, August 14-18, 1992.

Antonak, R. F., Mulick, J. A., Fiedler, C. R., & Kobe, F.  The influence of referent on attitudes toward mental retardation and eugenics.  Poster presented at the 117th Annual Meeting of the American Association on Mental Retardation, Washington, DC, June 1-5, 1993.

Mulick, J. A.  On asking questions about facilitated communication. Paper presented at the 101st Annual Convention of the American Psychological Association, Toronto, August 19-24, 1993

Mulick, J. A.  A critical analysis of facilitated communication. Invited Address presented at the 13th Annual Meeting of the Florida Association for Behavior Analysis, Ft. Lauderdale, FL, September 23, 1993

Mulick, J. A.  Developing a pilot program for pediatric psychology for chronically ill children (Ohio BCMH). Paper presented at the 1994 North Coast Regional Conference of the Society of Pediatric Psychology, Cincinnati, OH, April 15, 1994.

Pejeau, C. M., Linscheid, T.R., & Mulick, J.A. Does treatment with contingent electric shock produce or reduce distress and are observers biased against behavioral procedures? Paper presented at the 20 Annual Meeting of the Association for Behavior Analysis, Atlanta, May 27-30, 1994.

Mulick, J.A.  Invited Address: Early Identification and Psychological Assessment. Paper presented at the regional conference of the Autism Society of Ohio and the Autism Society of Indiana entitled " Charting the Course for Change", Cincinnati, OH, October 21-22, 1994.

Mulick, J. A., Invited Address: The culture of science and antiscience in developmental disabilities: facilitated communication and inclusion.  Paper presented at the Ninth Annual Behavior Analysis Association of Michigan, Ypsilanti, MI, March 23-24, 1995.

Schreck, K. A., & Mulick, J. A.  The relationships among parenting stress, children's adaptive behavior, cognitive level, and behavior problems. Poster presented at the 1995 Annual

58

Meeting of the American Association of Applied and Preventive Psychology, New York, June 30-July 1, 1995

Mulick, J. A. We live in interesting times. Invited Panel: "The Future of the Treatment of Behavior Disorders", Chair Dr. Judith E. Favell, 21st Annual Convention of the Association for Behavior Analysis, Washington, DC, May 26-30, 1995.

Mulick, J. A. Why are there so few good people now just when we need them? Invited Panel: "Training in Behavior Analysis," Chair, John W. Jacobson, 104th Annual Convention of the American Psychological Association, Toronto, August 8-13, 1996.

Mulick, J. A. Diagnosis, Parents, and Practice. Invited Panel: "The Division 33 Manual of Diagnosis and Professional Practice in Mental Retardation," Chair, John W. Jacobson, 104th Annual Convention of the American Psychological Association, Toronto, August 8-13, 1996.

Mulick, J. A. Diagnosis and Parent Collaboration. Paper presented at the Annual Meeting of the American Association on Mental Retardation, May 30, 1997, New York.

Koenig, M., & Mulick, J. A. Intensive behavioral treatment for children with autism spectrum disorders. Intermediate workshop [# 1156] presented at the 1997 American Speech and Hearing Association Convention, Boston, October, 1997.

Mulick, J. A. Advancing ABA II: Professional Practice Standards. Invited Panel: "The Future of the Treatment of Behavior Disorders", Chair Dr. Michael Hemmingway, 24th Annual Convention of the Association for Behavior Analysis, Orlando, FL, May 22-26, 1998.

Mulick, J. A. Toward a functional analysis of ethical codes. Paper presented at the 25th Annual Convention of the Association for Behavior Analysis, Chicago, May 27-30, 1999.

Mulick, J. A. Economic and work distribution factors in behavior analyst certification. Paper presented at the 107th Annual Convention of the American Psychological Association, Boston, August 21, 1999.

Mulick, J. A. Invited Address: Systems and Cost Benefits of Treatments of Autism. Research Workshop of the NIH Coordinating Committee and the U. S. Department of Education, Office of Special Education, "Treatments for People with Autism and Other Pervasive Developmental Disorders: Research Perspectives," Neurosciences Center, Bethesda, MD, November 8-9, 1999.

Mulick, J. A. Discussant: Symposium on Countering Rigidity-Evolutions in discrete trial teaching. Presented at the 26th Annual Convention of the Association for Behavior Analysis, Washington, DC, May 26-30, 2000.

Schreck, K. A., Metz, B., Mulick, J. A., & Smith, A. Making it fit: A provocative look at models of early intensive behavioral intervention for children with autism. Poster presented at the 26th Annual Convention of the Association for Behavior Analysis, Washington, DC, May 26-30, 2000.

Mulick, J. A. Clinical, legal and ethical issues in behavioral treatment for autism: Preparing for educational due process. Paper presented at the 26th Annual Convention of the Association for Behavior Analysis, Washington, DC, May 26-30, 2000.

Mulick, J.A. Practice guidelines: Pervasive Developmental Disorder. Paper presented at the 109th Annual Convention of the American Psychological Association, San Francisco, August, 2001.

Roberts, S., Butter, E., Metz, B., & Mulick, J. A. Gains made through an EIBI program for a child with Hunter's Syndrome and autism. Poster presented at the 28th Annual Convention of the Association for Behavior Analysis, Toronto, May 24-28, 2002.

Mulick, J. A. Unwarranted extensions: Doing things that have to make you ask "Why?" Paper presented at the 110th Annual Convention of the American Psychological Association, Chicago, August 22-25, 2002.

Mulick, J. A., & Letso, S. Essential components of an ABA program. Paper presented at the Working Together conference, New York Academy of Medicine, March 20-21, 2003.

Mulick, J. A., & Lazarowski, E.   Effective evaluations and recommendations for educational advocacy. Paper presented at the Working Together conference, New York Academy of Medicine, March 20-21, 2003.

Mulick, J. A. Symposium Chair: Preliminary reports from the Ohio autism recovery project. Paper presented at the 111th Annual Convention of the American Psychological Association, Toronto, August 7, 2003.

Mulick, J. A.   APA Division 33 MR diagnostic scheme: Implications for eligibility and legal protection. Paper presented at the 111th Annual Convention of the American Psychological Association, Toronto, August 7, 2003.

Mulick, J. A. Fads and research based interventions. First Annual Applied Research and Intervention Conference. Organization for Autism Research, Key Bridge Marriott, Arlington, VA, October 24-25, 2003.

Mulick, J. A. Keynote Address: Efficacy of treatments and their outcomes. Third Annual Conference of the Commonwealth Autism Service, Sheraton West, Richmond, VA, March 3-6, 2004.

Mulick, J. A. Cost effectiveness of early intervention. Third Annual Conference of the Commonwealth Autism Service, Sheraton West, Richmond, VA, March 3-6, 2004.

Spinks, D. E., Kahng, R. D., Mulick, J. A., Salvy, S. J., & Pinnock, N. J. (2004).   Self-injurious behavior following utilization of the Self-Injurious Behavior Inhibiting System (SIBIS) with an autistic child.  Poster presented at the National Conference on Child Health Psychology, Charleston, SC.

Mulick, J. A. Lingering thoughts of Jacobson: A pattern complex. Memorial tribute presented at the 14th Annual Conference of the New York State Association for Behavior Analysis, Saratoga Springs, NY, October 14-15, 2004.

Mulick, J. M. (2004). Invited Address: The effects of early intensive behavioral intervention for children with autism. Presented at the 14th Annual Conference of the New York State Association for Behavior Analysis, Saratoga Springs, NY, October 14-15, 2004.

Mulick, J. A. Preparing for due process. Paper presented at the 2004 Applied Autism Research and Intervention Conference of the Organization for Autism Research, Arlington, VA, October 29-30, 2004.

Rodriguez, V., Mulick, J. A., & Butter, E. The confounding effects of stimulus size on a duration-based measure of preference. Poster presented at the 31 Annual ABA Convention, Chicago, IL, May 27-31, 2005.

Mulick, J. A. A tribute to John Jacobson: Publication Impact. Panel discussion presented at the 31 Annual ABA Convention, Chicago, IL, May 27-31, 2005.

Mulick, J. A. Jacobson Memorial Symposium: Critical Thinking in MRDD. Presented at the 113th Annual Convention of the American Psychological Association, Washington, DC, August 18-21, 2005.

Mulick, J.A. Neurophysiological Basis for Effective Behavioral Treatment. 2006 Annual Applied Research and Intervention Conference. Organization for Autism Research, Hilton Towers, Arlington, VA, October 27-28, 2006.

Mulick, J. A. Symposium (Chair & presenter): Outrageous Developmental Disabilities Treatments – Findings From A Graduate Semnar. Presented at the 115th Annual Convention of the American Psychological Association, San Francisco, August 17-20, 2007.

**Continuing Education Presentations**

Mulick, J. A. Behavioral assessment and treatment. In S. R. Schroeder (organizer) Pharmacological and behavioral management in mental retardation and developmental disabilities. A special course presented at the 112th Annual Meeting of the American Association on Mental Retardation, Washington, D.C., May 29, 1988.

Mulick, J. A. 1) Early intervention in behavioral problems, and 2) Current controversies in behavior management. In a special course entitled "Update on Mental Retardation," at the 10th Annual Child Development Center Symposium (APA, AMA, AAFP, and Nursing CEU credit: 9 hours), The Alton Ochsner Medical Foundation, November 30—December 1, 1990, New Orleans, LA.

Mulick, J. A. & Dewitt, M. B. Managing care for vulnerable infants. Presentation at the Ohio Family and Children First Conference. Columbus, OH, October 23-24, 1996.

Mulick, J. A. Early intervention for autism. Presentation to MCH sponsored Collaborative Office Rounds and Education, Children's Hospital, Columbus, November 7, 1996.

Mulick, J. A. Behavior analysis methods in developmental disabilities. Presentation at Gunderson Lutheran Medical Center symposium "Developmental Disabilities: Challenge, tools future agenda" (CME and CEU credits, WI), Rasmus Center, Gunderson Lutheran Hospital, La Crosse, WI, October 10, 1997.

Mulick, J. A. Accommodating the educational needs of autistic children.  Presentation at School Psychology Update Conference (CME, CEU credits, OH nursing, education, psychology) Children's Hospital, Columbus, OH, February 20, 1998.

Mulick, J. A. Early diagnosis and treatment of autism.  Grand Rounds presentation (CME credit), Reid Hospital, Richmond, IN, October 28, 1998.

Mulick, J. A. Satellite teleconference on dual diagnosis: MRDD (CME, CEU credit), Recorded in Albany, NY and broadcast live: Thursday, March 4, 1999.

Mulick, J. A., & Schreck, K. A.  Behavioral Treatment of Autism:  Evidence for an Early Intervention Effect.  Invited Workshop (Psychology CEU credit), Annual Meeting of the Ohio School Psychology Association,  Akron Hilton, May 5 (1-4:00 PM), 1999.

Mulick, J. A. Class and comorbidity in early intensive behavioral treatment of autism: The case for mainstreaming a cottage industry. Second European Congress: Mental Health in Mental retardation, Brunel University, Uxbridge, London, UK, September 8-11, 1999.

Jacobson, J.W. & Mulick, J.A.  Cost-benefit of behavioral and fad treatments for autism spectrum disorders: What have you got to lose? (NY Psychology CEU) Association for Science in Autism Treatment, Conference 2000, New York City, March 9-10, 2000).

Mulick, J. A., ABA: Intensive Early Intervention for Young Children with Autism. (IN CME credit) Lutheran Hospital of Indiana, Fort Wayne, IN, March 18, 2000.

Mulick, J. A., Autism Update. (3 CEUs for Speech Pathologists) Presentation at Continuing Education Conference for Speech Pathologists, Franklin County MRDD Board, April 5, 2000.

Mulick, J. Planning treatment approaches for children with pervasive developmental disorder.  Presentation at 2000 Infant/Family Mental Health Conference (2 CEUs) Columbus, OH, September 21, 2000.

Jacobson, J.W. & Mulick, J.A. Cost-benefit of behavioral and fad treatments for autism spectrum disorders: What have you got to lose? (CAL ABA  CEU) Association for Science in Autism Treatment, Conference 2001, SanDiego, March 8-10, 2001).

Mulick, J.A. Translating biomedical, behavioral and neuro-scientific research into effective treatment of persons with autism: Behavioral issues. (CAL ABA  CEU) Panel presented at the Association for Science in Autism Treatment, Conference 2001, SanDiego, March 8-10, 2001).

Mulick, J. A. Diagnosing the autistic disorders I: Processes of growth and development. Presentation at the 2002 National Autism Symposium, Kansas City Downtown Marriott, MO, April 12, 2002.

Mulick, J. A. Everybody's an expert: A primer on evaluating interventions for children with autism Part I – Science and evidence. Keynote Address presented at the 2002 National Autism Symposium, Kansas City Downtown Marriott, MO, April 12, 2002.

Mulick, J. A.   Effectiveness of Behavioral Therapy. In D. Coury, Topic Symposium: Advances in Etiology, Imaging and Treatment presented at the Pediatric Academic Societies' Annual Meeting, Baltimore, MD, May 4-7, 2002.

Mulick, J. A., & Butter, E. M. Aggression, Causes and Cures. Presentation at the annual Angel of Autism Conference (BCBA CEU 1), Wilkes-Barre PA, April 24-26, 2002.

Butter, E. M., & Mulick, J. A.  Etiology, Functional Assessment, & Treatment of Self-Injurious Behavior. Presentation at the annual Angel of Autism Conference (BCBA CEU 1), Wilkes-Barre PA, April 24-26, 2002.

Butter, E. M., & Mulick, J. A.  Educational Advocacy. Presentation at the annual Angel of Autism Conference (BCBA CEU 1), Wilkes-Barre PA, April 24-26, 2003.

Mulick, J. A. Fads and Controversies in Behavior Analysis. Invited Address: Annual Meeting of the Pennsylvania Association for Behavior Analysis (BCBA, PSYCH CEU 1.5), College Park, PA, April 2, 2004.

Mulick, J. A. Keynote Address: Characteristics of good evaluations for children with Autistic Spectrum Disorders. First Annual Conference of the FEAT of Rhode Island (EDU CEU 1.5). Warwick, RI, April 28-29, 2004.

Mulick, J. A. Closing Keynote Address: Fads and Controversies in Autism. Milestones Presented at Second Annual Conference: Behavior Strategies for School, Home, and Community (Social Work, PSY 1 CEU). Cleveland, OH, June 21-22, 2004.

Mulick, J. A. An ethical guide to diagnosis and assessment of children with autism. Workshop presented at the 14th Annual Conference of the New York State Association for Behavior Analysis (BCBA CEU 2.0), Saratoga Springs, NY, October 14-15, 2004.

Mulick, J. A. Psychosocial treatment of autistic spectrum disorders. Keynote Address presented at the Fourth Biennial Niagara Conference on Evidence Based Treatments for Childhood and Adolescent Mental Health Problems (PSYCH, SW CEU 1), Queen's Landing Inn and Conference Resort, Niagara-on-the-Lake, Ontario, Canada, July 21-23, 2005.

Butter, E., & Mulick, J. A. Manualized treatment of behavior problems in autistic children. Workshop presented at the Fourth Biennial Niagara Conference on Evidence Based Treatments for Childhood and Adolescent Mental Health Problems (PSYCH, SW CEU 3), Queen's Landing Inn and Conference Resort, Niagara-on-the-Lake, Ontario, Canada, July 21-23, 2005.

Mulick, J. A. Understanding Effective Early Behavioral Intervention for Autism, (CEU 3, Canadian social service and disability workers) 7th ABA Conference of Manitoba Families for Effective Autism Treatment,  Canad Inn - Polo Park, Winnipeg, Canada, November 3 and 4th, 2005.

Mulick, J. A. Solving Dangerous and Difficult Problems with Behavior Analysis, (CEU 3, Canadian social service and disability workers), 7th ABA Conference of Manitoba Families for Effective Autism Treatment,  Canad Inn - Polo Park, Winnipeg, Manitoba, Canada, November 3 and 4th, 2005.

Mulick, J. A. Keynote Address: Autism and Neuroplasticity, (CEU 1, Behavior Analysis Certification Board), Connecticut Center for Child Development "Going Beyond Expectations" Conference, Crown Plaza Hotel, Hartford-Cromwell, CT, October 4-6, 2005.

Mulick, J. A. Invited Presentation: Fads and Pseudoscience in Autism Treatment: Why can't people tell the difference between the pros and the cons? (CEU 1, Behavior Analysis Certification Board), Behavior Analysis Association of Michigan's 20th Annual Convention, McKenny Union, Eastern Michigan University, March 23-24, 2006.

Mulick, J. A. Keynote Address: Fads, Fashion and Science in Autism Treatment, (CEU 1, Behavior Analysis Certification Board, American Psychological Association, Division of Human Services Management Corporation, Early Intervention Training of Massachusetts), The Cambridge Center's Northeast Conference on Autism: Evidence-Based Practices, Hoagland-Pincus Conference Center, Shrewsbury, MA, April 7, 2006.

Mulick, J. A. Keynote Address: Autism and Neuroplasticity, (CEU 1, Behavior Analysis Certification Board), Connecticut Center for Child Development "Going Beyond Expectations II" Conference, Courtyard Marriot, Shelton, CT, November 16-17, 2006.

**GRANTS AND CONTRACTS**   (as principal investigator, co-principal investigator and grant proposal author or co-author, or project director)

**Currently Active**

2003-current   Subcontract PI with Ohio State University Research Foundation, Research Unit for Pediatric Psychopharmacology (Autism) – Psychosocial Interventions (NIMH contract U10 MH66768). Supervision of Behavior Therapy component in manualized treatment experiment, ($65,000.00 approx. p/a) Ohio State site. Release time: 10% to 0.05% FTE.

1984 - current   Contract between Children's Hospital-Psychology and Heinzerling Memorial Foundation for supervision and training of a postdoctoral psychology Fellow in general consultation and assessment services ($25,000 p/a). Release Time: 10% FTE.

**Past Funding**

1974   NIMH Predoctoral Research Fellowship (MH58062): "The use of positive reinforcement to suppress behavior during extinction. ($5,800)

1979   Rhode Island Hospital Guild:  Grant to purchase microprocessor based data collection equipment for field use. ($4,954)

1979 – 1983   Contract with Rhode Island Department of Mental Health, Retardation and Hospitals to provide behavioral consultation to the Dr. Joseph H. Ladd Center through supervised pre and postdoctoral UAP trainees. (Total funds: $66,000)

| 1980 | Rhode Island Developmental Disabilities Council Training Grant: Symposium on "Parent–Professional Partnerships in Developmental Disability Services: Foundations and Prospects." ($9,500) |
|---|---|
| 1982 | ESEA Title I Grant (subcontract): "Ecological Evaluation of a Special Education Program." ($3,328) |
| 1985 | Heinzerling Memorial Foundation: Computerized Language and Learning Center. ($50,000) |
| 1985 | Children's Hospital Research Foundation: "Psychological components in pediatric burn pain." (with K. Tarnowski and T. R. Linscheid, $17,800) |
| 1986 | NIMH Training and Demonstration: "Training in Community Management of EDMR Children." (with D. Hammer, $282,000) |
| 1990 - 1992 | NICHD Research (Subcontract from Program Project # HD 23042-02/03, Project 2, George Breese, Ph.D., PI, University of North Carolina, Chapel Hill) "Clinical Neuropsychiatry and Psychopharmacology of SIB" ($110,000). Release Time: 15% FTE (Note: 10% overlapped with Heinzerling service contract above). (Continued through November 30, 1992) |
| 1994-1995 | Cocaine abusing mothers. Subcontract to provide pediatric care and developmental assessment (PI, Prof. Bernard, OSU, Psychiatry and Nursing) from OSU Research Foundation, USPHS, Maternal and Child Health Bureau. Release Time: 5% FTE. |
| 1986-1997 | Psychologist, Core Faculty, MCHB Fellowship Training in Behavioral-Developmental Pediatrics (D. Coury, PI). Release Time: 15% FTE (percent time has gradually decreased since initial year of award from 40% to current level to accommodate level funding). |
| 1999 | With Kimberly A. Schreck (Postdoctoral Psychology Fellow). "Confirmatory validation of the Behavioral Evaluation of Disorders of Sleep (BEDS) scale." ($8000.00) Grant from Children's Hospital Research Foundation. |
| 2001- 2003 | Factors related to retention of home based workers in early intensive behavioral intervention programs for children with autism. Children's Hospital Research Foundation ($449). |
| 2001- 2004 | A clinical sample of long-term outcomes for children with autism who received early intensive behavioral intervention. Children's Hospital Research Foundation ($1900). |

## UNIVERSITY and DEPARTMENT SERVICE

| 1984 | Faculty Consultant, Behavioral Medicine Clinic, Nisonger Center, The Ohio State University. |
|---|---|

| | |
|---|---|
| 1984 – 1986 | Member, Child Development Education Committee, Department of Pediatrics, The Ohio State University.  Participated in three presentations in the "Essentials of Development II" series. |
| 1986–1995 | Member, Research Fellowship Committee, Department of Pediatrics, The Ohio State University. |
| 1990-1993 | Member, Library Council of the University Senate representing the College of Medicine, The Ohio State University (elected by the Faculty Council for a 3–year term). |
| 1992-1995 | Member, Committee on University Bookstores of the University Senate, The Ohio State University (elected by the Faculty Council for a 3–year term). |
| 1993 | Member, Stipends Committee, Mental Retardation and Developmental Disabilities Area Representative, Department of Psychology, The Ohio State University. |
| 1993-1997 | Member, Behavioral and Social Sciences Human Subjects Review Committee, The Ohio State University. |
| 1999-2000 | Alternate representative, College of Medicine, Faculty Senate, The Ohio State University. |
| 2007-2010 | Alternate representative, College of Medicine, Faculty Senate, The Ohio State University. |
| 2006-2009 | Member at Large, Executive Committee, Ohio State University Conference, American Association of University Professors. |

## PROFESSIONAL AND COMMUNITY SERVICE

| | |
|---|---|
| 1984 | Keynote Speaker:  "Parent–Professional Partnerships."  Central Ohio Down's Syndrome Association, April, 1984. |
| 1984 | Lecturer, Babysitter Training Project, Columbus Children's Hospital, Spring and Summer Quarters. |
| 1984 | Guest Speaker, "Time–out and dealing with the angry child," Ohio Child Conservation League. |
| 1984 | Workshop on Administrative considerations in the establishment of treatment programs for self–injurious behavior.  Central Ohio Training Consortium, November, 1984. |

1985    "Social learning and family stress in behavior management of children with chronic illness." Paper presented at Conference on Coping with Chronic Illness, University Hilton Inn, Columbus, September 10, 1985.

1986    Workshop on treatment of self–injurious behavior. Central Ohio Training Consortium, April, 1986.

1986    Workshop on behavior modification principles and procedures. Central Ohio Training Consortium, The Ohio Nisonger Center, Columbus, Ohio, May 16, 1986.

1986    Workshop on management of severe behavior disorders. Gallipolis Developmental Center, Gallipolis, OH, July 31, 1986.

1986    "Organizational structures for treatment maintenance for SIB" Fall workshop of the Consortium for Health Education in Appalachia, Ohio, Gallipolis, Ohio, November 13, 1986.

1987    "Psychological assessment," Workshop on cerebral palsy for the East Central Ohio Special Education Regional Resource Center, Columbus, April 9, 1987.

1987    "Managing self–injurious behaviors: Trends in research and treatment" Department of MR/DD Behavior Modification Fall Conference, Dublin, Ohio, October 9, 1987.

1988    "Community services for EDMR children." Ohio Department of Mental Health, Case Management Workshop. Hyatt Capitol South, Columbus, OH, May, 1988.

1988    Keynote Address: "Self–injurious behavior and normalization — revisited." The Third Annual Fall Behavior Modification Conference, The Ohio Department of MR/DD, Columbus, OH, December 9, 1988.

1990    Invited Address: "Early Intervention: Opportunities for Psychologists." Opening meeting of the 1990-1991 lecture series of the Central Ohio Psychological Association, Touchstone Cafe, November 14, Columbus, OH.

1991    Roundtable Panel Discussion: Issues in Treating Challenging Behaviors. Chair: Richard M. Foxx. Presented at the 99th Annual Convention of the American Psychological Association, San Francisco, August 16-20, 1991.

1995    Invited Address: Intensive Early Intervention for Autism. Central Ohio Autism Society. October 31, 1995, Columbus, OH.

1997    Member, Committee on Academic Misconduct, The Ohio State University.

| | |
|---|---|
| 1996 | In-service Lecture on "Behavioral Treatment of Autism", The Childhood League, February 28, 1996, Columbus OH. |
| 1996-current | Division 33 Federal Advocacy Coordinator representative to the Annual State Leadership Conference of the Practice Directorate, American Psychological Association, March , 1996- (Annual), Washington DC. |
| 1996 | Workshop: "Behavior, ADD, & Self-Esteem." Presented for the Parent Mentor Program of the Coshocton City Schools, Coshocton, OH, November 14, 1996. |
| 1997 | Panel Five:  "Autism Spectrum Disorders: Collaborative Issues Among Professionals to Meet the Needs of Children and Parents." Presented at the 51st Annual Convention of the Ohio Speech and Hearing Association, Columbus OH, March 3-5. |
| 1997 | Faculty Mentor, Annual Meeting of the MCHB Behavioral Pediatrics Training Programs, Baltimore, MD, April 10-12, 1997. |
| 1998 | Presenter:   Columbus  Public  Schools  In-service  Presentation  [school psychologists and speech pathologists] "Early diagnosis and treatment of autism-spectrum disorders," May 22, 1998, 12:00-4:00 p.m., Northgate Training Center, Columbus, OH. |
| 1998 | Presenter:  Reid Hospital Community Education Program, "Early Behavioral Treatment of Autism," October 27, 1998, 7:00-9:00 pm, Richmond, IN. |
| 1996-2000 | Expert Reviewer, American Psychological Association Dissertation Research Award Program. |
| 1998-2002 | Member & Vice President, Board of Directors, Association for Science in Autism Treatment. |
| 2000 | Presentation on Autism Treatment. Licking County Parent to Parent, E. S. Wyant School (2 hours), April 6, 2000. |
| 1999 | Chair,  Edgar  Doll  Award  Committee,  Division  33  of  the  American Psychological Association. |
| 1999-current | Member, Council of Representatives (legislative body which is functionally the board of directors), American Psychological Association, elected to represent Division 33 (Mental Retardation and Developmental Disabilities). Reelected in 2003. |
| 2000 | Panel Member, *Comprehensive Planning for Autism Spectrum Disorder.* Ohio Department of Education & Great Lakes Area Regional Resource Center, August 14-15, 2000, Worthington Holiday Inn, Worthington OH. |

68

| | |
|---|---|
| 1998-2000 | Expert witness (*without charge*), Auton et al v. The Attorney General of British Columbia, Supreme Court of British Columbia. |
| 2001 | Lecture: *How Children Learn to Talk*.   Lecture presented at the monthly meeting of Central Ohio Families for Effective Autism Treatment. Upper Arlington, OH, March 15, 2001. |
| 2000 | Lecture: Applied Behavior Analysis and Autism. Geisinger Health System, Wilkes-Barre, PA, October 20, 2001. |

69

# CURRICULUM VITAE
*Updated January 2008*

*Name:*    Ron Van Houten, Ph.D.

*Telephone:*    Office: 269  387 4471; cell 269 929 2609
FAX:   269 387 4550

*Present Position:*

Professor of
Psychology

Psychology
Department

Western
Michigan University

Kalamazoo,
Michigan
49008

*Education:*    BA    1968  - State University of New York at
Stony Brook

MA    1969  - Psychology, Dalhousie
University

PhD    1972  - Psychology, Dalhousie
University

*Major Area:*    Behavioral Psychology and Human Factors

*Specific Interests:*    Behavioral Safety, Traffic Safety, Police Enforcement, Behavioral
Community Psychology, Educational Psychology, Disabilities and
Travel.

*Administrative Experience:*

Chairman of the Psychology Department Mount Saint Vincent University 1979-82

**Summary**

Dr. Van Houten is the Chair of the TRB Pedestrian Committee, A member of the National Committee for Uniform Traffic Control Devices. He has conducted numerous studies in the area of Traffic Safety. He has developed many successful countermeasures to improve pedestrian safety and helped develop elements of the *Click it or Ticket* program in North Carolina. He has also worked in the area of speeding and impaired driving. He recently completed a large FHWA study in Miami Dade and is beginning a large study for NHTSA on reducing night time pedestrian crashes.

## Clinical

Rolider, A., Axelrodi, S. & Van Houten, R. (1998). Don't speak behaviorism to me: How to clearly and effectively communicate behavioral Interventions to the general public. *Child and Family Behavior Therapy.* 20, 39-56.

Smith, E.A., & Van Houten, R. (1996). A Comparison of the Characteristics of Self-Stimulatory Behaviors in "Normal" Children and Children With Developmental Delays. *Research in Developmental Disabilities. 17,* 253-268.

Ducharme, J.M. & Van Houten, R. (1994). Operant Extinction in the Treatment of Severe Maladaptive Behavior: Adapting Research to Practice, *Behavior Modification, 18, 139-170.*

Van Houten, R. (1993). The Use of Joggers Wrist Weights to Reduce Self-Injury Maintained by Sensory Reinforcement. *Journal of Applied Behavior Analysis.* 26, 197-203.

Stewart, G., Van Houten, R. & Van Houten, J. (1992). Increasing Generalized Social Interactions in Psychotic and Mentally Retarded Residents Through Peer Mediated Therapy. *Journal of Applied Behavior Analysis, 25,* 335-339.

Ingemey, R. & Van Houten, R. (1991). The use of delayed prompts to promote spontaneous speech in an autistic child. *Journal of Applied Behavior Analysis, 24,* 591-596.

Van Houten, R. (1991). What's the Function of a Misnomer. *The Behavior Analyst, 211-212.*

Rolider, A., Cummings, A., & Van Houten, R. (1991) Side effects of therapeutic punishment on academic performance and eye contact of two developmentally handicapped adults. *Journal of Applied Behavior Analysis. 24,* 763-773.

Rolider, A., Williams, L., Cummings, A., & Van Houten, R. (1991). The use of a brief movement restriction procedure to eliminate severe inappropriate behavior. *Behavior Therapy and Experimental Psychiatry, 22,* 23-30.

Van Houten, R., Axelrodi, S., Bailey, J.S., Favell, J. Foxx, R.M., Iwata, B.A. & Lovaas, O.I. (1989) The Right to Effective Treatment. *Journal of Applied Behavior Analysis, 21*, 381-384. Treatment. (Simultaneous publication in the *Behavior Analyst). 21*, 381-384.

Houlihan, M. & Van Houten, R. (1989). Behavioral Treatment of Hyperactivity: A Review and Overview, *Education and Treatment of Children, 12*, 265-275.

Van Houten, R. and Rolider, A. (1988). Recreating the scene: An effective way to provide delayed punishment. *Journal of Applied Behavior Analysis, 21*, 187-192.

Rolider, A. & Van Houten, R. (1988). The use of response prevention to eliminate daytime thumb sucking.   *Child and Family Behavior Therapy.10*, 135-142.

Van Houten, R. and Rolider, A. (1988). *Reprimand Assessment Scale.* In M. Herson & A. Bellack (eds.). *Dictionary of Behavioral Assessment Techniques.* New York: Pergamon Press.

Van Houten, R. (1987). Comparing treatment techniques. A cautionary note. *Journal of Applied Behavior Analysis, 20,* 109.

Rolider, A., and Van Houten, R. (1986). Effects of degree of awakening and the criterion for advancing awakening on the treatment of bed wetting. *Educational Treatment of Children, 9,* 135-141.

Rolider A. and Van Houten, R. (1985). Movement suppression timeout and undesirable behavior in psychotic and severely developmentally delayed children. *Journal of Applied Behavior Analysis, 18, 275-288.*

Rolider, A. and Van Houten, R. (1985). Suppressing Tantrum Behavior in Public Places Through the Use of Delayed Punishment Mediated by Audio Recordings. *Behavior Therapy, 16,* 181-191.

Rolider, A. and Van Houten, R. (1985). Treatment of Constipation-Caused Encopresis by a Negative Reinforcement Procedure. *Journal of Behavior Therapy & Experimental Psychiatry, 16,* 67-70.

Van Houten, R. and Rolider, A. (1984). The use of response prevention to eliminate nocturnal thumb sucking. *Journal of Applied Behavior Analysis, 17,* 509-520.

Rolider, A., Van Houten, R. & Chlebowski, I. (1984). Effects of a stringent vs. lenient awakening procedure on the efficacy of the dry bed procedure. *Child and Family Behavior Therapy. 6 ,*1-17.

Rolider, A. and Van Houten, R. (1984).  Training parents to use extinction to eliminate night-time crying by gradually increasing the criteria for ignoring crying. *Education and Treatment of Children, 7,* 119-124.

Rolider, A. and Van Houten, R. (1984).  The effects of DRO alone and DRO plus reprimands on the undesirable behavior of three children in home settings. *Education and Treatment of Children, 7,* 17-32.

## Education

Van Houten, R. (1993).  Rote vs. rules: A comparison of two teaching and correction strategies for teaching basic subtraction facts. *Education and Treatment of Children.* 16, 147-159.

Van Houten, R. & Van Houten, J. (1991).  The effects of breaking new spelling words into small segments on the spelling performance of students with learning disabilities. *Journal of Behavioral Education, 1,* 399-411.

Van Houten, R. & Rolider, A. (1990).  The use of color mediation techniques to teach number identification and single digit multiplication problems to children with learning problems. *Education and Treatment of Children, 13,* 216-225.

Van Houten, R. & Rolider, A. (1989).  An analysis of several variables influencing flash card instruction.  *Journal of Applied Behavior Analysis, 22,* 111-118.

Bryant-Armstrong, S., McNeil, Mary E., & Van Houten, R. (1988)  A principal's in service training package for increasing teacher praise. *Teacher Education and Special Education.* 11, 79-94.

Bourque, P., Dupuis, N. and Van Houten, R. (1986). Public posting in the classroom: Comparison of posting names and coded numbers of individual students. *Psychological Reports, 59,* 295-298.

Jones, D.B. and Van Houten, R. (1985).  The use of daily quizzes and public posting to decrease the disruptive behavior of secondary school students. *Education and Treatment of Children.* 8, 91-106.

Rolider, A., Van Houten, R., Pierre, M., Molcho, M. and Ylevitch, L. (1985).  The effects of a comprehensive feedback component on the preparation of preservice educators. *Teacher Education and Special Education, 8,* 17-24.

Rolider, A., Siedentop, D. and Van Houten, R. (1984).  Effects of enthusiasm training on subsequent teacher enthusiastic behavior. *Journal of Teaching Physical Education, 3,* 47-59.

73

Rolider, A., Cooper, J. and Van Houten, R. (1984). Effects of modelling, instruction and grade incentive, on supportive verbalizations among peers in a college physical education class. *Journal of Teaching Physical Education, 3*, 44-50.

Bourque, P., Boucher, D., Dupuis, N. and Van Houten, R. (1984). L'affichage en classe: Une analyse des effects de compe~tition inter-classe. *Revuee de Modification du Comportement, 8*, 13-18.

Whyte, B., Van Houten, R. and Hunter, W. (1983). The Effects of Posting on Teachers' Performance of Supervision Duties. *Education and Treatment of Children, 6*, 21-28.

Van Houten, R., Nau, P.A., MacKenzie-Keating, S., Sameoto, D., and Colavecchia, J.B. (1982). An analysis of some variables influencing the effectiveness of reprimands. *Journal of Applied Behavior Analysis, 15*, 65-83.

Van Houten, R. and Little, G. (1982). Increased response rate in special education children following an abrupt reduction in time limit in the absence of a token economy. *Education and Treatment of Children, 5*, 23-32.

Van Houten, R. and MacLellan, P. (1981). A comparison of the effects of performance feedback and sentence combining instruction on student T-unit length. *Education and Treatment of Children, 4*, 17-33.

Van Houten, R. and LaiFatt, D. (1981). The effects of public posting on high school biology test performance. *Education and Treatment of Children, 4*, 217-226.

Nau, P.A., Van Houten, R., and O'Neil, A. (1981). The effects of feedback and a principal mediated timeout procedure on the disruptive behavior of junior high school students. *Education and Treatment of Children, 4*, 101-113.

Van Houten, R. and Nau, P.A. (1980). The effects of two types of peer comments on the use of paragraphing in written composition by elementary school children. *Child Behavior Therapy, 2*, 55-63.

Gallant, J., Sargeant, M. and Van Houten, R. (1980). Teacher determined and self-determined access to science activities as a reinforcer for task completion in other curriculum areas. *Education and Treatment of Children, 3*, 101-111.

Van Houten, R. and Nau, P.A. (1980). A comparison of the effects of fixed and variable-ratio schedules of reinforcement on the behavior of deaf children. *Journal of Applied Behavior Analysis, 13*, 13-21. Also reprinted in *Directions, 19, 2*.

Van Houten, R. (1980). The Performance Feedback System: Generalization. *Child Behavior Therapy*, 1979, *1*, 219-236. Also reprinted in *Therapies for Children with School Behavior Problems*, 1980, Jossey-Bass, Inc.

Van Houten, R. (1979).  Validation: The Social Evaluation of Standards of Competency for Target Behaviors. *Journal of Applied Behavior Analysis, 12,* 581-591.

Van Houten, R. (1978).  Normative data:  A comment. *Journal of Applied Behavior Analysis, 11,* 110.

Van Houten, R. and Van Houten, J. (1977).  The performance feedback system in the special education classroom.  An analysis of public posting and peer comments. *Behavior Therapy, 8,* 366-376.

Van Houten, R. and McKillop, C. (1977).  An extension of the effects of the performance feedback system with secondary school students. *Psychology in the Schools, 14,* 480-484.

Van Houten, R. and Thompson, C. (1976) The effects of explicit timing on math performance. *Journal of Applied Behavior Analysis, 9,* 227-230.

Van Houten, R., Hill, S. and Parson, M. (1975).  An analysis of a performance feedback system:  The effects of timing and feedback, public posting and praise upon academic performance and peer interaction. *Journal of Applied Behavior Analysis, 8,* 449-457.

Van Houten, R. and Sullivan, K. (1975).  Effects of an audio cueing system on the rate of teacher praise.    *Journal of Applied Behavior Analysis, 8,* 197-201.

Van Houten, R., Morrison, E., Jarvis, R. and MacDonald, M. (1974).  The effects of timing and feedback on compositional response rate in elementary school children. *Journal of Applied Behavior Analysis, 7,* 547-555.

Van Houten, R., Morrison, E., Barrow, B. and Wenaus, J. (1974).  The effects of daily practice and feedback on the acquisition of elementary math skills. *School Applications of Learning Theory*

## Traffic Safety - Community Papers

Rantz, W.G., Dickinson, A.M., Sinclair, G.A., & Van Houten, R. (in press). The Effect of Feedback on the Accuracy of Checklist Completion During Instrument Flight Training. Journal of Applied Behavior Analysis.

Shurbutt, J., Van Houten, R. & Turner, S. (in press). An Analysis of the Effects of Stutter Flash LED Beacons to Increase Yielding to Pedestrians Using Multilane Crosswalks. Transportation Research Record.

75

Malenfant, J.E.L, & Van Houten, R.  (2008).  Observations of how drivers fasten their seatbelts in relation to various startup tasks.  Accident Analysis and Prevention. 40, 309-314.

Van Houten, R., Ellis, R. and Kim, J.L. (2007). The Effects of Varying Minimum Green on the Percentage of Pedestrians Waiting to Cross with the WALK Signal at Midblock Crosswalks. Transportation Research Record.  In press.

Ellis, R., Van Houten, R. and Kim, J.L. (2007). In-Roadway "Yield to Pedestrians Signs": Placement Distance and Motorist Yielding.  Transportation Research Record.  In press.

Van Houten, R., Van Houten, J. & Malenfant. J.E. Louis. (2007).  The Effects of a Comprehensive Helmet Safety Program on Bicycle Helmet Use. Journal of Applied Behavior Analysis.

Lebbon, A. R., Austin, J., Van Houten, R., & Malenfant, L. E. (2007). Evaluating the effects of traffic on driver stopping and turn signal use at a stop sign: A systematic replication. Journal of Organizational Behavior Management. 27, 27-35.

Van Houten, R., Ellis, Sanda, J. & Kim, J.L (2006). Pedestrian push button confirmation increases call button usage and compliance.  Transportation Research Record. No. 1982, 99-103.

Williams, M.D., Van Houten, R., & Blasch, B.B.  (2006).  Recognition distance of pedestrian traffic signals by individuals with low vision.  Journal of Rehabilitation Research and Development.

Van Houten, R., & Seiderman, C. (2005)  How pavement markings influence bicycle and motor vehicle positioning: A case study in Cambridge, MA.  Transportation Research Record. No. 1939.  3-14. Lead Article

Williams, M.D., Van Houten, R., Ferroro, J., & Blasch, B.B. (2005) Field comparison of two types of accessible pedestrian signals.  Transportation Research Record. No. 1939. 91-98.

Van Houten, R., Malenfant, J.E.L., Zhao, N., Ko, Byungkon, & Van Houten, J.J.  (2005). Evaluation of two methods of prompting drivers to use specific exits on conflicts between vehicles at the critical exit. Journal of Applied Behavior Analysis. 38, 289-301.   Lead Article

Van Houten, R., Malenfant, J.E.L., Austin, J., & Lebbon, A.  (2005).  The Effects of a Seatbelt-Gearshift Delay Prompt on the Seatbelt Use of Motorists Who Do Not Regularly Wear Their Seatbelt, Journal of Applied Behavior Analysis, 38, 196-203

Sherry Huybers, Ron Van Houten, & J. E. Louis Malenfant (2004). Reducing conflicts between motor vehicles and pedestrians: The separate and combined effects.. Journal of Applied Behavior Analysis,. 37, 445-456.

Van Houten, R. & Malenfant, J.E.L. (2004). Effects of a driver enforcement program on yielding to pedestrians.. Journal of Applied Behavior Analysis,. 37, 351-363

Van Houten, R. McCusker, D. Huybers, S., Malenfant, J.E.L., & Rice-Smith, D. (2003). An examination of the use of advance yield markings and fluorescent yellow green RA 4 signs at crosswalks at with uncontrolled approaches. *Transportation Research Record 1818*, p. 119-124.

Malenfant, J.E.L.,Van Houten, R., Jonah, B. (2002). A study to measure the incidence of driving under suspension in the Greater Moncton area, *Accident Analysis and Prevention, 34*, p. 439-447.

Van Houten, R. & Retting, R.A. (2001). Increasing Motorist Compliance and Caution at Stop Signs *Journal of Applied Behavior Analysis, 34, 185-193.*

Van Houten, R., Malenfant, J.E., & Steiner, R. (2001). Scanning 'eyes' symbol as part of the WALK signal: Examination across several intersection geometries and timing parameters. *Transportation Research Record 1773.* 75-81.

Van Houten, R., Blasch, B. & Malenfant, JEL (2001). Use of Animated Eyes in Pedestrian Signals Increases WALK Sign Recognition Distance of Low Vision Pedestrians. *Journal of Rehabilitation Research and Development., 38, 443-448.*

Van Houten, R., McCusker, D., and Malenfant, J.E.L. (2001). Reducing motor vehicle-pedestrian conflicts at multilane crosswalks with uncontrolled approach. *Transportation Research Record 1773.* p 69-74.

Van Houten, R. & Malenfant, J.E.L. (2000). ITS Animated LED Signals Alert Drivers to Pedestrian Threats, *ITE Journal, 71, p. 42-47.*

Van Houten, R., Van Houten, J., Malenfant, J.E., & Andrus, D. (2000). Use of animated EYES to prompt motorists leaving indoor parking garage to look for pedestrians. *Transportation Research Record.* No. 1674, 57-60.

Retting, R.A., & Van Houten, R. (2000). Safety Benefits of Advance Stop Lines at Signalized Intersections: Results of a Field Evaluation. *ITE Journal.* 70, 47-54.

Van Houten, R., Retting, R.A., Farmer, C.M., Van Houten, R. & Malenfant, J.E.L. (2000). Field evaluation of a leading pedestrian interval signal phase at three suburban

Intersections. *Transportation Research Record. No 1734,* p. 86-91. National Academy Press.

Wells, J. Malenfant, J.E.L., Williams, A., & Van Houten, R. (2000). Use of Community Program to Increase Seat Belt Use Among Shopping Center Patrons in Charlotte, North Carolina. *Journal of Safety Research, 31,* p. 93-99.

Van Houten, R, Retting, R.A., Van Houten, J., Farmer, C.M. & Malenfant, J.E.L. (1999). The Use of Animation in LED Pedestrian Signals to Improve Pedestrian Safety. *ITE* Journal, 69, 30-38.

Sarkar, S. Van Houten, R., & Moffat, J. (1999). Using License Manuals to Increase Awareness About Pedestrian Hazards at Intersections: Missed opportunity for Educating Drivers. *Transportation Research Record 1674,* 49-56

Van Houten, R., Healey, K. Malenfant, J.E., & Retting, R.A. (1999). Use of signs and symbols to increase the efficacy of pedestrian activated flashing beacons at crosswalks. *Transportation Research Record.* No. 1638, 92-95.

Van Houten, R., Malenfant, L. Van Houten, J., & Retting, R.A. (1998). Auditory Pedestrian Signals Increase Pedestrian Observing Behavior and Reduce Conflicts at a Signalized Intersection. *Transportation Research Record,* No. 1578, 20-22.

Retting, R.A., Van Houten, R., Malenfant, L., Van Houten, J. & Farmer, C.M. (1996). Special signs and pavement markings improve pedestrian safety. *ITE Journal,* 66, 28-35.

Malenfant, L., Wells, J.K., Van Houten, R. & Williams, A.F. (1996) The use of feedback to increase observed daytime seat belt use in two cities in North Carolina. *Accident Analysis and Prevention. 28,* 771-777.

Van Houten, R., Van Houten, J. & Malenfant, L. (1994). The Effects of Low Alcohol Beverages on Alcohol Consumption and Impairment. *Behavior Modification, 18,* 481-489.

Nau, P.A., Van Houten, R., & Rolider, R. (1993). The Failure of Feedback on Alcohol Impairment to Reduce Impaired Driving. *Journal of Applied Behavior Analysis,* 26, 361-367.

Van Houten, R. & Malenfant, L. (1992).  The Influence of signs prompting motorists to yield 50 feet (15.5 m) before marked crosswalks on motor vehicle-pedestrian conflicts at crosswalks with pedestrian activated flashing lights.  *Accident Analysis and Prevention, 24,* 217-225.

Malenfant, L. and Van Houten, R. (1989).  Increasing the percentage of drivers yielding to pedestrians in three Canadian cities with a multifaceted safety program. *Health Education Research. 5,* 274-279.

Van Houten, R. (1988).  The effects of advance stop lines and sign prompts on pedestrian safety in crosswalk on a multilane highway.  *Journal of Applied Behavior Analysis. 21,* 245-251.

Malenfant, L.E. and Van Houten, R. (1988). The effects of a nighttime seatbelt enforcement on seatbelt use by tavern patrons:  A preliminary analysis.  *Journal of Applied Behavior Analysis. 21,* 271-276.

Van Houten, R. and Van Houten, F. (1987).  The effects of a specific prompting sign on speed reduction. *Accident Analysis and Prevention, 19,* 115-117.

Malenfant, L., Van Houten, R., Hall, R.V. and Cahoon, G. (1985). The use of public posting, prompting and police enforcement procedures to increase driver yielding and pedestrian signalling at marked crosswalks. *Journal of Police Science and Administration, 13,* 295-302.

Van Houten, R., Malenfant, L. and Rolider, A. (1985).   Increasing Driver Yielding and Pedestrian Signalling with prompting, feedback and enforcement.  *Journal of Applied Behavior Analysis, 18,* 103-115.

Van Houten, R., Rolider, A., Nau, P.A., Freidmann, R., Becker, M., Chalodovsky, I. and Scherer, M. (1985). Large-scale Reductions in Speeding and Accidents in Canada and Israel:  A Behavioral Ecological Perspective. *Journal of Applied Behavior Analysis, 18,* 87-93.

Scherer, M., Freidmann, R., Rolider, A. and Van Houten, R.  (1985).  The Effects of Saturation Enforcement Campaign on Speeding in Haifa, Israel.  *Journal of Police Science and Administration, 12,* 425-430.

Van Houten, R. and Nau, P.A. (1983).  Feedback intervention, and driving speed:  A parametric and comparative analysis. *Journal of Applied Behavior Analysis, 16,* 253-281.

Nau, P.A. and Van Houten, R. (1981-82).  The effects of prompts, feedback and an advertising campaign on the use of safety belts by automobile drivers in Nova Scotia. *Journal of Environmental Systems, 11,* 351-361.

Van Houten, R., Nau, P.A. and Merrigan, M. (1981).  Reducing elevator energy use:  A comparison of posted feedback and reduced elevator convenience. *Journal of Applied Behavior Analysis, 14*, 377-387.

Van Houten, R. and Nau, P.A. (1981).  A comparison of public posting the increased police surveillance on highway speeding. *Journal of Applied Behavior Analysis, 14*, 261-271.

Van Houten, R. and Nau, P.A. (1980).  An Analysis of Public Posting in Reducing Speeding Behavior on an Urban Highway. *Journal of Applied Behavior Analysis, 13*, 383-395.

Van Houten, R., Nau, P.A. and Smith, R.C. (1980).  Reducing Speeding Through Community Feedback.       *R.C.M.P. Gazette, 42*, 1-2.

Van Houten, R., Nau, P.A. and Smith, R.C. (1980).  Psychology and The Control of Speeding. *Canadian Police Chief, 69*, 16-18.

Van Houten, R. Nau, P.A. & Marini, Z., (1980) An analysis of public posting in reducing speeding behavior on an urban highway. *Journal of Applied Behavior Analysis, 13*, 383-395.

## Experimental Analysis of Behavior

Rudolph, R.L. and Van Houten, R. (1977).  Auditory stimulus control in pigeons:  Jenkins and Harrison, 1960, revised. *Journal of the Experimental Analysis of Behavior, 27*, 327-330.

Van Houten, R. and Rudolph, R. (1972).  The development of stimulus control with and without a lighted key.  Journal of *Experimental Analysis of Behavior, 18*, 217-222.

Van Houten, R., Seraganian, P. and Rudolph, R. (1972).  Airflow as a discriminative stimulus with pigeons.       *Journal of the Experimental Analysis of Behavior, 17*, 99-105.

Rudolph, R.L., Van Houten, R. and Maddox, J. (1971).   Conditional peak shifts in the pigeon. *Psychonomic Science, 23*, 255-256.

Van Houten, R. and Rudolph, R. (1971).  Summation of punishment suppression. *Journal of the Experimental Analysis Behavior, 15*, 117-121.

Hudston, R. and Van Houten, R. (1970).  A cartridge for running long variable-interval tapes. *Journal of Experimental Analysis of Behavior, 14*, 165-166.

80

Van Houten, R., O'Leary, K.D. and Weiss, S.J. (1970). Summation of conditioned suppression. *Journal of the Experimental Analysis of Behavior, 13,* 75-81.

## BOOKS:

Zegeer, C.V., Stutts, J., Huang, H., Cynecki, M.J., Van Houten, R., Alberson, B., Pfefer, R., Yaacov, Z., Neuman, T.R., Slack, K.L., Hardy, K.K. (2004). AASHTO Strategic Highway Safety Plan Volume 10: A guide for reducing collisions involving pedestrians. Transportation Research Board, Washington, D.C.

Van Houten, R. (1998) *How to Use Prompts.* Austin, TX; Pro Ed. Publishers.

Van Houten, R. & Axelrodi, S. (1993) *Behavior Analysis and Treatment,* New York: Plenum

Green, B., Winnett, R.A., Van Houten, R., Geller, E.S. & Iwata, BA. (1987). *Behavior Analysis in the Community 1968-1986* (Edited Readings) Lawrence, Kansas, Society for the Experimental Analysis of Behavior.

Van Houten, R. (1980). *Learning Through Feedback.* New York: Human Sciences Press.

Van Houten, R. (1980). *How to Motivate Others Through Feedback.* Austin, TX, Pro. Ed. Publishers. Translated into French by Normand Bedard.

Van Houten, R. (1980). *How to Use Reprimands.* Austin, TX, Pro. Ed. Publishers.

Van Houten, R. & Hall, R.V. (2001). *Managing Behavior: Measuring Behavior.* Austin, TX, Pro. Ed. Publishers.

## Book Chapters

Van Houten, R. (1994). *The Right to Effective Behavioral Treatment.* In L.Hayes, G. Hayes, S. Moor, & Ghezzi (Eds.) *Ethical Issues in Developmental Disabilities,* Concept Press.

Van Houten, R. (1994) *Teaching Children with Learning Problems.* In W. Heward & R. Garner (Eds.) *Focus on Measurably Superior Instruction,* Brooks/Cole Publishing Company.

Van Houten, R., Rolider, A., Malenfant, L.E., & Van Houten, J. (1994). *The Prevention of Brain Injuries by Improving Safety Related Behaviors*, in MA Finlayson, and S. H. Garner (Eds.) *Brain Injury Rehabilitation*, Baltimore: Williams and Wilkins.

Rolider, A. & Van Houten, R. (1993). *The Interpersonal Treatment Model*, In Van Houten & Axelrodi (Eds). *Behavioral Analysis and Treatment*, New York:Plenum.

Shook, G.L., & Van Houten, R. (1993). *Insuring the Competence of Behavior Analysts*, In Van Houten & Axelrodi (Eds). *Behavioral Analysis and Treatment*, New York:Plenum.

Van Houten, R. & Rolider, A. (1992). Treatment of Self Injury Based on Teaching Compliance and/or Brief Restraint. In L. Matson N. Singh, & J.K. Luiselli (eds.) *Assessment Analysis, and Treatment of Self-injury*. New York: Springer-Verlag, Inc.

Van Houten, R. & Rolider, A. (1991). Applied Behavior Analysis. In J. Matson & J. Mulick (eds.) *Handbook of Mental Retardation*. New York:Plenum.

Rolider, A. & Van Houten, R. (1990). The role of reinforcement in reducing inappropriate behavior: Some myths and misconceptions. In A. Repp & N. Singh (eds.) *Perspectives on the Use of nonaversive interventions for persons with developmental disabilities*. Illinois: Sycamore.

Van Houten, R. (1990). Autism. In J. Matson (ed.) *Handbook of Behavior Modification with the Mentally Retarded*. New York:Plenum.

Van Houten, R. (1984). Setting up Performance Feedback Systems in the Classroom. In Heward, W.L., Herron, T.E., Hill, D.S. & Trap-Porter, J. *Behavior Analysis and Education*, Columbus, Charles E. Merrill.

Van Houten, R. (1983). Punishment: From the animal laboratory to the applied setting. In J. Apsche and S. Axelrodi (eds.), *The Effects of Punishment on Human Behavior*. New York: Academic Press.

Van Houten, R. (1983). Are social reprimands effective? In J. Apsche and S. Axelrodi (eds.), *The Effects of Punishment on Human Behavior*. New York: Academic Press.

## *Published Proceedings*

Van Houten, R. & Malenfant, J.E.L. (1999). Pedestrian Safety Research in Canada. In C. Zegeer (Ed). *FHWA Consensus Report on Pedestrian Safety Research*. U.S.D.O.T.

82

Van Houten, R. & Malenfant, J.E. L. (1998). Community Norms and Risk Taking Behavior.  In Risk-Taking Behavior and Traffic Safety.  Washington, D.C.; N.H.T.S.A.

Van Houten, R., and Malenfant, J.E. Louis. (1993).  A multifaceted approach to reduce risk taking behavior by road users.  *Proceedings of the University of Michigan Symposium on Risk Taking Behavior & Traffic Safety.*  University of Michigan Medical Center- University of Michigan Transportation Research Institute.

Van Houten, R., Nau, P.A. and Jonah, B. (1985).  Effects of feedback on impaired driving. *Ninth Conference on Alcohol, Drugs and Traffic Safety.*  National Highway Traffic Safety Administration, Washington, D.C.

Van Houten, R. and Nau, P.A. (1983).  A behavioral approach for reducing highway speeding.  In Miller, C. *Proceedings of the First Canadian Multi disciplinary Conference on Highway Safety.*

## BOOK REVIEWS:

Van Houten, R.  A review of Behavior Modification for the Classroom Teacher for *Education and Treatment of Children.*

## PAPERS PRESENTED

I have presented hundreds of papers at conferences with many given by invitation.  I have made invited presentations for the Association for Behavior Analysis, the American Psychological Association, the Society of Automotive Engineers, and Institute of Transportation Engineers.  I have made numerous presentations for the Transportation Research Boards.

## PROFESSIONAL ACTIVITIES:

Chairman Pedestrian Committee, Transportation Research Board, National Research Council Washington, D.C.  (The Transportation Research Board is part of the National Academy of Sciences).

Director of the Society for the Experimental Analysis of Behavior 1998-

Director of the Society for the Experimental Analysis of Behavior 1984-1991

Vice President and Vice Chair of the Board of Directors of the Society for the Experimental Analysis of Behavior 1988-1989

Member of Pedestrian Committee, Transportation Research Board, National Research Council Washington, D.C.  (The Transportation Research Board is part of the National Academy of Sciences).

Member of the Bicycle Technical Committee of the National Committee on Uniform Traffic Control Devices. (Organization responsible for setting standards for signs, signals, and pavement markings used on U.S. highways).

Member of the Canadian National Committee on Uniform Traffic Control. (Organization responsible for setting standards for signs, signals, and pavement markings used on Canadian highways.

Member of the Research Committee of the U.S. National Committee on Uniform Traffic Control Devices.

Chairman Papers Committee Pedestrian Committee, TRB. (as chairman I am action editor for papers submitted to *Transportation Research Record*).

Member ITE Committee on Accessible Crosswalks For Persons with Visual Impairment. (This committee will set standards for devices designed to help the blind cross the street).

Member of Committee to Draft Highway Safety Manual for the Transportation Research Board.

Member of Committee to Draft Highway Safety Design Manual for the Transportation Association of Canada.

Member Nova Scotia Road Safety Advisory Committee. (This committee advises the Minister of Transportation on safety countermeasures).

Member of Nova Scotia Road Safety Advisory Committee, Pedestrian Committee

Chairman Innovative Technologies Work Group of the Nova Scotia Road Safety Advisory Committee

Research Consultant Surrey Place Centre, Toronto  1988-1990

Research Consultant Chodoke McMaster Hospital, Head Injury Program 1992

Member of the Advisory Board of the Atlantic Institute of Criminology 1988-

Chairman of the Committee on the Right to Effective Treatment.  Association for Behavior Analysis 1985-1988

Member Premier, Task Force on Impaired Driving,  1984-1986.

Member of the Minister's Committee on Highway Safety, 1980-1982

Director of the Nova Scotia Safety Council 1982-1984

Member of the Nova Scotia Medical Advisory Committee on Driver Licensing  1982-

Member of the Organizing Committee, Program Subcommittee and Chairman of the Papers Committee of the First Canadian Multi disciplinary Highway Safety Conference 1982

EDITORIAL EXPERIENCE:

Member of the Editorial Board of Behavioral Interventions.  1992-

Member of the Editorial Board of the Journal of Behavioral Education.  1990-

Member of the Editorial Board of Behavioral Rehabilitation of Head Injury.  1990-

Member of the Editorial Board of the Journal of the Experimental Analysis of Behavior. 1991-1994

Associate Editor, Journal of Applied Behavior Analysis, 1984-1987

Member of the Editorial Board of the Journal of Applied Behavior Analysis, Sept. 1976-Jan. 1980; Sept. 1981-Sept. 1983, Sept 91-

Guest Associate Editor, Journal of Applied Behavior Analysis, 1983

Guest reviewer for the Journal of Applied Behavior Analysis, 1974-1976; 1980

Associate Editor, Education and Treatment of Children, Sept. 1980 to Sept. 1983

Action Editor for Pedestrian Papers Transportation Research Record, 1997-

Member of the Editorial Board of Education and Treatment of Children, 1984-

Guest Associate Editor, Education and Treatment of Children, 1979-1980

Guest reviewer, Education and Treatment of Children, 1978-1980

Member of the Editorial Board of Research in Developmental Disabilities, 1987-

Member of the Editorial Board of the Journal of Behavior Research of Severe Developmental Disabilities, 1980-1982

Member of the Professional Material Review Panel of Educational Technology, 1981-

Guest reviewer for Behavior Therapy, 1975-

Guest reviewer for Child and family Behavior  Therapy, 1981-

Guest reviewer for the <u>Journal of Behavior Therapy and Experimental Psychiatry</u> 1986-

Guest reviewer for the <u>Canadian Journal of Behavioral Science</u>, 1981-

Guest reviewer for the <u>Journal of Community Psychology</u>, 1981-

Guest reviewer for <u>Behavioral Assessment</u>, 1981-

Reviewer for Canada Council, 1975-1980

Guest reviewer for <u>Accident Analysis and Prevention</u>, 1991-

Guest reviewer for <u>Psychological Reports</u>, 1992-

*AWARDS*:

**Fellow of the Association for Behavior Analysis International.** Conferred in 2007

**Award for Research Excellence 2003** Awarded by Mount Saint Vincent University. This award is given to a faculty member who has made a significant contribution to research.  Only one award is given per year.

**Institute of Transportation Engineers 2000 Innovative Intermodal Solutions for Urban Transportation Award.**   Presented at ITE Annual Meeting in Nashville in Aug 2000.

**Solicitor General of Canada Crime Prevention Award 1984.**  (Award given by the Solicitor General of Canada for work in the area of Traffic Safety).

**Certificate of Honourable Mention**, The Royal Society of Arts, 1983.

*GRANTS*:

| | |
|---|---:|
| 2007 Contract NHTSA Reducing Night Pedestrian Crashes | $ 369,697 |
| 2006 Subcontract FHWA Innovative Pedestrian Devices | $ 82,860 |
| 2005 Subcontract on NHTSA NM Pedestrian Enforcement Study | $ 20,000 |
| 2005 Grant from Florida DOT | $ 120,000 |
| 2004 NHTSA grant for Seatbelt Study | $ 150,535 |
| 2004 Grant from Transport Canada | $ 107,824 |
| 2004 Florida DOT 402 Grant | $ 90,000 |
| 2003 Grant from NHTSA | $ 24,265 |
| 2002 Grant from Transport Canada | $ 24,950 |
| 2003 FHWA Grant Pedestrian Safety Eng. And ITS Engineering Ph 2 | $1,000,000 |

2003 Florida DOT 402 Grant

2002 Florida DOT 402 Grant — $ 45,000

2001 FHWA Grant Pedestrian Safety Engineering and ITS Engineering — $ 30,000
2001NHTSA Grant Pedestrian Enforcement Grant — $ 125,000

2001 Research Grant Florida DOT — $ 33,299

2001 Florida DOT 402 Grant — $ 30,555

2000 Florida DOT 402 Grant — $ 36,000

2000 City of Halifax — $ 40,000

1999 Research Grant from General Motors — $ 20,000

1999 City of Moncton — $ 36,000

1998 National Academy of Sciences ITS IDEA Research Grant — $ 10,000
1998 Florida DOT Research Grant — $ 79,500
1999 Florida DOT 402 — $104,145
1998 Insurance Institute for Highway Safety Research Grant — $ 50,000 — $ 25,506

| | |
|---|---|
| 1998 Insurance Institute for Highway Safety Research Grant | $ 22,711 |
| 1997 Transport Canada Research Grant | $ 24,000 |
| 1997 Insurance Institute for Highway Safety Research Grant | $ 18,992 |
| 1997 Insurance Institute for Highway Safety Research Grant | $ 32,282 |
| 1995 Insurance Institute for Highway Safety Research Grant | $ 31,570 |
| 1994 Insurance Institute for Highway Safety Research Grant | $ 51,150 |
| 1994 Alcoholic Beverage Medical Research foundation Grant | $ 53,200 |
| 1990-1992  SHRCC Grant (2 years) | $ 56,250 |
| 1988    Transport Canada Research Grant | $ 9,495 |
| 1988-1990  SSHRC Grant (2 years) | $ 14,605 |
| 1987  City of Fredericton | $ 24,500 |
| | |
| 1985-1987  SSHRC Grant (2 years) | $ 51,240 |
| 1985  City of Moncton and Town of Deippe | $ 36,205 |
| 1984  City of St. John's Newfoundland | $ 34,000 |
| 1982-1983  Contract Department of Transport: | $ 47,000 |
| 1981-1985  SSHRC Grant (3 years) | $ 90,000 |
| 1981-1984  Imperial Oil Grant (3 years) | $ 23,000 |
| 1981-1982  Contract Dept. of Transport, R.C.M.P. | $ 39,600 |
| 1979-1982  Canada Council Grant for: (2 years) | $ 42,486 |
| 1979-1980  Provincial Government: Safety Belt Study | $  1,350 |
| 1978-1979  Canada Council Grant for: | $ 13,660 |
| 1977-1978  Canada Council Grant for: | $ 11,260 |
| 1975-1977  Canada Council Grant for: | $ 12,857 |
| 1973-1975  National Research Council Grant for: | $ 21,000 |

*OTHER RESEARCH ACTIVITIES:*

Member of the President's Committee on Research and Publications 1974-1979
Member of University Subcommittee on the National Research Council 1973-1979
Member of the Consultative Assembly of the Social Science Research Council of Canada 1973-1978
Member of the Social Science Federation of Canada 1977-1988

*LISTINGS:*

Listed in Who's Who in Biobehavioral Sciences 1984-
Listed in Canadian Who's Who 1984-
Listed in Who's Who of World Professors 1977 -
Listed in American Men and Women of Science 1990-

*TEACHING EXPERIENCE:*

I have taught courses in Behavior Modification, Community Psychology, Learning, Behavioral Safety, Skinner's Behaviorism, Grants, Behavioral Treatment, and Social Psychology.

*PROFESSIONAL ORGANIZATIONS:*

Member, Association for Behavior Analysis
Member, Canadian Psychological Association
Member, Transportation Research Board
Co-Chairman of Psychology Section of the Atlantic Provinces Committee on the Sciences, 1978-1982
Member Association of Psychologists of Nova Scotia

## ADJUNCT AND VISITING PROFESSOR STATUS

University of Kansas (Adjunct professor)
University of Florida (Visiting professor)
University of Vermont (Adjunct professor)
Dalhousie University (Adjunct professor)

## CLINICAL EXPERIENCE:

Practicum in Behavior Therapy Techniques with John Winsze, 1971
Provided psychological services, Mount Saint Vincent University, 1971-1973
Provided psychological services at the Abbie Lane Hospital, 1980-1984.

## CLINICAL CERTIFICATION

Registered Psychologist in the Province of Nova Scotia, NSBEP #39
Certificate of Professional Qualifications in Psychology (CPQ) # 1697

## REGISTRATION

Licensed Psychologist in the State of Michigan
Register Psychologist in the Province of Nova Scotia (NSBEP)
Registered with the Canadian Register of Health Service Providers in Psychology.
Association of State and Provincial Boards (ASPPB) Certificate of Qualifications in Psychology

## REFERENCES:

Dr. Saul Axelrod
Department of Special Education
Temple University
Philadelphia, Pennsylvania.
19122

Dr. Fred Harrington
Chairman Psychology until Aug 2002
Mount Saint Vincent University
Halifax, Nova Scotia
B3M 2J6

Dr. Brian Iwata

89

Dept. of Psychology
University of Florida
Gainesville, FL
32611-2250

Dr. Richard Foxx
2349 Forest Hills Dr.
Harrisburg, PA
17112-1087

Appendix 5

From the 2003 APA Ethics code:

## 2. EVALUATION, ASSESSMENT, OR INTERVENTION

2.01 Evaluation, Diagnosis, and Interventions in Professional Context.

(a) Psychologists perform evaluations, diagnostic services, or interventions only within the context of a defined professional relationship. (See also Standards 1.03, Professional and Scientific Relationship.)

(b) Psychologists' assessments, recommendations, reports, and psychological diagnostic or evaluative statements are based on information and techniques (including personal interviews of the individual when appropriate) sufficient to provide appropriate substantiation for their findings. (See also Standard 7.02, Forensic Assessments.)

2.02 Competence and Appropriate Use of Assessments and Interventions.

(a) Psychologists who develop, administer, score, interpret, or use psychological assessment techniques, interviews, tests, or instruments do so in a manner and for purposes that are appropriate in light of the research on or evidence of the usefulness and proper application of the techniques.

(b) Psychologists refrain from misuse of assessment techniques, interventions, results, and interpretations and take reasonable steps to prevent others from misusing the information these tech- niques provide. This includes refraining from releasing raw test results or raw data to persons, other than to patients or clients as appropriate, who are not qualified to use such information. (See also Standards 1.02, Relationship of Ethics and Law, and 1.04, Boundaries of Competence.)

2.03 Test Construction.

Psychologists who develop and conduct research with tests and other assessment techniques use scientific procedures and current professional knowledge for test design, standardization, validation, reduction or elimination of bias, and recommendations for use.

2.04 Use of Assessment in General and With Special Populations.

(a) Psychologists who perform interventions or administer, score, interpret, or use assessment techniques are familiar with the reliability, validation, and related standardization or outcome studies of, and proper applications and uses of, the techniques they use.

(b) Psychologists recognize limits to the certainty with which diagnoses, judgments, or predictions can be made about individuals.

(c) Psychologists attempt to identify situations in which particular interventions or assessment techniques or norms may not be applicable or may require adjustment in administration or inter- pretation because of factors such as individuals' gender, age, race, ethnicity, national origin, religion, sexual orientation, disability, language, or socioeconomic status.