UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

CHARLES BRYANT, individually and as next friend and guardian of D.B., *et al.*,

      Plaintiffs,

v.

NEW YORK STATE EDUCATION DEPARTMENT, *et al.*,

      Defendants.

No. 8:10-CV-36 (GLS / RFT)

---

## DECLARATION OF AVA GEORGE

I, Ava George, upon my own personal knowledge, hereby depose and declare the following:

1. I am the mother and a legal guardian of B.G.

2. B.G. is a 13 year-old boy from New York who suffers from Autism, Mental Retardation, Impulse Control Disorder (NOS), and a severe behavior disorder that causes him to engage in dangerous and disruptive behavior.

3. B.G. is currently receiving behavior modification treatment and special education at the Judge Rotenberg Educational Center, Inc. ("JRC") in Canton, Massachusetts.

4. B.G. has a long history of engaging in aggressive, destructive, disruptive, noncompliant and self-injurious behavior, including: hitting himself and banging his head on hard surfaces, such as a marble table; hitting, biting, kicking, and scratching me and his younger brother, teachers, and fellow students; destroying school property; and taking off all of his clothes in class.

5. B.G. has pulled his sleeping brother out of bed in the middle of the night and hit him repeatedly. To keep us safe, my other son and I have slept in my room at night and locked the bedroom door.

6. B.G.'s treatment prior to JRC included: home aides and attendants; a sensory tent for aggressive behaviors; 1:1 staffing with a crisis paraprofessional; and a wide variety of other behavioral interventions. B.G. has also been prescribed psychotropic medications in the past including Risperdal, Cogentin, Seroquel, and Clonidine, which can all have serious and sometimes irreversible side effects.

7. B.G.'s placement history includes: the Guild for Exceptional Children; P.S. 396 where B.G. was in the autism section; and other special education programs in New York public schools. At school, B.G. had to be isolated from his classmates at times because he frequently hit them. Caregivers and teachers in both home and school settings have had to call 911 numerous times because of his violent behavior. In addition, B.G. was hospitalized at least twice in the year prior to being admitted to JRC because of aggression (hitting, biting and kicking myself, his brother, his peers, and teachers), health dangerous behaviors (head banging, hitting himself, and running away from supervision) and property destruction (destroying academic materials and "trashing" the living room). Prior treatments were not successful in treating B.G.'s behaviors, and such behaviors have prevented him from making academic progress.

8. B.G.'s prior placements and treatment did not meet his needs. For example, prior to his admission to JRC, B.G. was not toilet trained and had difficulty speaking. A psychiatrist who evaluated B.G. concluded that B.G.'s "school appears to be unable to handle him. He has not met any of the goals set forth in his IEP [Individualized Education Program] …. and he can no longer be maintained in his home setting." Psychiatric Evaluation by Dr. Richard Donn,

{K0403793.4}

Adjunct Professor of Clinical Psychiatric at New York University School of Medicine, dated July 25, 2008, a copy of which is attached hereto as Exhibit 1.

9. School officials recommended that B.G. be placed in a highly supervised, round the clock, residential treatment setting. Although I received a list of potential residential schools, none of them accepted B.G. except for JRC.

10. A residential placement was recommended for B.G., but no other school accepted him. Because he was not receiving an appropriate education and because I could not safely keep him at home, I placed B.G. at JRC for special education and behavior modification treatment. JRC was found to be an appropriate placement for B.G. by an Impartial Hearing Officer and B.G. was admitted to JRC on September 12, 2008.

11. Since his admission to JRC, B.G. has been on a positive-only behavior modification treatment plan. B.G. is no longer on any psychotropic medications. JRC has been able to keep B.G. safe through the use of one-to-one staffing and by placing him in an alternative learning classroom or in a one-to-one conference room with an aide when needed and through the use of behavior contracts. Despite these safety measures, B.G. still exhibits severe problematic behaviors and has been unable to participate in any academic field trips, leisure trips with his peers, or home visits on the weekend.

12. Since his admission to JRC, B.G. has hit, kicked, and scratched JRC staff. He has also grabbed staff, ripped their clothing, and broken their glasses.

13. B.G.'s severe problematic behaviors interfere with his ability to make meaningful academic progress.

14. B.G.'s clinician at JRC has informed me that, in his opinion, the least restrictive and most effective treatment for B.G. would be a behavior modification treatment plan with the

{K0403793.4}

addition of aversive interventions, including the Graduated Electronic Decelerator ("GED") device, to treat his aggressive, destructive, major disruptive, health dangerous, and non-compliant behaviors. I have been informed about the nature of the aversive interventions and their proposed use with my child and have provided JRC with my written consent to add aversive interventions to B.G.'s treatment plan to address his severe problematic behavior. Additionally, before treating B.G. with aversive interventions, JRC will seek the approval of a Human Rights Committee, a Peer Review Committee, B.G.'s school district and a Massachusetts Probate Court judge. In addition, B.G. will be represented by a court-appointed attorney to protect his interests in the Probate Court proceeding.

15. I have been informed by B.G.'s clinician at JRC that, under the regulations of the New York State Education Department, 8 N.Y.C.R.R. § 200.1 *et seq.* ("NYSED Regulations"), my child cannot have access to this potentially life-saving treatment, even though: (1) I have consented to it; (2) it is recommended by B.G.'s treating clinician at JRC; and, (3) B.G. has been physically examined by a physician, who has found no medical reason why B.G. should not receive this treatment. I have also been informed that the NYSED Regulations reduce the effectiveness of aversive interventions by restricting their use in a manner not supported by the professional literature. The NYSED Regulations also require submission of the proposed treatment plan to an unqualified panel who will never examine B.G., will never speak to me about B.G., and will only do a paper review of B.G.'s treatment needs. In addition, the NYSED Regulations impose a ban on the use of aversive interventions after June 30, 2009, which means that aversive interventions cannot be added to B.G.'s IEP and treatment plan. I do not want B.G.'s treatment at JRC to be subject to the NYSED Regulations.

16. I believe that JRC's behavior modification treatment program, including aversive interventions such as the GED to address his aggressive, destructive, major disruptive, health dangerous, and non-compliant behaviors, is necessary to treat B.G.'s severe problematic behaviors. The addition of aversive interventions to B.G.'s program at JRC is his only chance to receive an education and make social and behavioral progress, and to develop a rewarding relationship with his family. No other treatment has been successful at providing B.G. with the opportunity to make meaningful academic and social progress and contribute to his community. B.G. should not be deprived of the opportunity to have this treatment. No other school can provide B.G. with the opportunity to make more progress than he is making at JRC, and no other school will accept my son. The addition of aversive interventions to his program at JRC will help B.G. to make meaningful behavioral and educational progress.

17. B.G. is currently at risk of further physical harm. If his behaviors are not treated properly, they could result in permanent physical disfigurement, massive pharmacological intervention and associated side effects, frequent physical and mechanical restraint, severe injury to others, incarceration, institutionalization, or even death. B.G. needs aversive interventions to protect him against this physical harm and to provide him access to a program and services that can help him make meaningful behavioral and educational progress.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND ACCURATE.

Executed on: December 4, 2009        s/ Ava George
                                     Ava George

{K0403793.4}

# EXHIBIT 1

C.1

Richard Donn, M.D.
Diplomat, American Board of Psychiatry and Neurology
Adjunct Professor of Clinical Psychiatry
N.Y.U. School of Medicine
23 Valley Road
Thornwood, N.Y. 10594
Tel 914 769-4628
July 25, 2008                    N.Y.S. License ███

Psychiatric Evaluation

B██ G██
███
Brooklyn, N.Y. ███
Date of Birth ███
Phone ███
Medical Hx
Negative
Current medications:
Seroquel 200 mg po bid/ 400 mg po qhs
Clonidine 0.2 mg po tid
Benadryl 50 mg o qhs prn
Allergies
None

Informants:
The Patient's mother A██ G██
NYC Department of Education IEPS ███
NYC Functional Behavioral Assessment ███
AHRC Records dated ███

B██ G██ is a 12 yo AA males of West Indian descent who lives with his mother and 6 year old brother in Brooklyn N.Y.

B██ is unable to speak but was observed for approximately 1 hour and 15 minutes. His mother provided the following history:

B██ was born on ███. The pregnancy was uncomplicated and full term. The delivery was uncomplicated. The patient's grandmother cared for the boy during the first few years of his life and when he was about 14 months of age noted that he was not responding to responding to his family either verbally or physically.

The child was taken to his PCP who referred the family to a neurologist. His mother was told that he was not developing normally and that a MRI demonstrated that his brain was "abnormal" (his mother can not specify in what way it was abnormal)\

The patient never developed speech, never was able to be toilet trained and never interacted with peers. He was fascinated with straps & pieces of newspaper. He was enrolled in an early intervention program but made little progress.

By the time he was old enough to attend regular school he was placed in a special education program but his mother reports that his IEP goals were never met.

The pt required a lot of attention because of his inability to toilet himself or respond to verbal directives. He began to develop rocking motions and self-injurious behaviors (falling to the ground & head banging).

As B██ entered puberty his self-injurious behaviors intensified and he began striking out at peers, school staff, and his mother and younger brother. He was particularly sensitive to being told no. If prevented from doing something he would strike out at whoever was about.

This behavior became so violent and frequent that emergency services were called on numerous occasions and he was brought frequently to hospital emergency rooms for observation and calming.

Records provided by the school are replete with comments such as "several melt downs today", "removed his pants, shorts and pampers", "attempted to hit peers and staff"

The school began to place a tent besides his desk and he developed the habit of retreating to the tent and sleeping throughout the school day. His sleep wake patterns reversed and his mother was forced to remain awake throughout the night to prevent him from striking out at her or his younger brother (on several occasions he threw his brother from his bed or struck him with his fists for no apparent reason)

B⬛'s mother was authorized 7 day per week home attendant coverage but in her words "the aids come once and never want to return because of his behavior"

Ms G⬛ states that B⬛ had no interest in television. He will listen on occasion to music but does not hum or attempt to sing along. He has no friends and is disinterested in human contact with either peers or adults.

His mother reports that he seems disturbed by light and will turn off the lights in a room if permitted to do so.

B⬛ has a case manager and is followed at AHRC. He has been tried on numerous medications without any apparent effect.

Ms G⬛ has been urged to consider placement for her son since he was 6 years of age but has been determined to keep him at home if at all possible. Unfortunately the increase in incidence of self-injurious behaviors and striking out has forced her to reconsider this option because of concerns for the safety of herself and he youngest child.

Mental Status Examination

B⬛ is a well developed 12 year old who was neatly dressed but wearing diapers under his outer clothing. He avoided any direct eye contact and was unable to speak. He would retrieve toys from the shelves in my office and examine them and then lose interest. He frequently would get up and sit in a comfortable chair and rock violently back and forth.

On occasion he would permit the aid that accompanied him to massage his head or shoulders but would suddenly get up and examine the toys or start to rock.

At no time did he pay any special attention to his mother who remained in the room.

Impression
Axis I
Pervasive Developmental Disorder
R/o autism
Axis II
Severe Mental retardation
Axis II
Nothing acute
Axis IV
Extremely low frustration tolerance
Axis V
14
Recommendations:

B⬛ is a severely impaired young man who is unable to speak and has extremely low frustration tolerance. He has been tried on a number of psychotropic medications without effect.

His self-injurious behaviors and assaultiveness have escalated since puberty. His school appears to be unable to handle him. He has not met any of the goals set forth in his IEP and he is permitted to sleep for most of the day in a tent set up along side his desk. His mother is fearful for her safety and the safety of his younger brother and he can no longer be maintained in his home setting.

It is recommended that he be placed in a highly supervised, round the clock, residential treatment setting.