UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

Charles Bryant, individually and as next friend and guardian of D.B., *et al.*,

        Plaintiffs,

v.

NEW YORK STATE EDUCATION DEPARTMENT, *et al.*,

        Defendants.

No. 8:10-CV-36 (GLS / RFT)

---

## **DECLARATION OF CHANIN HOUSTON-JOSEPHAT**

I, Chanin Houston-Josephat, upon my own personal knowledge, hereby depose and declare the following:

1.    I am the mother and legal guardian of A.J.

2.    A.J. is a 15 year-old girl from New York who suffers from Autism, Mental Retardation and a severe behavior disorder that causes her to engage in dangerous and disruptive behaviors.

3.    A.J. is currently receiving behavior modification treatment and special education at the Judge Rotenberg Educational Center, Inc. ("JRC") in Canton, Massachusetts.

4.    A.J. has a long history of engaging in aggressive, destructive, disruptive, noncompliant, and self-injurious behavior, including: picking at her gums resulting in bleeding; using her finger nails to slice her tongue and continuing to do so even after it has begun to bleed; intentionally having a bowel movement without utilizing the toilet; using profanity inappropriately; disrobing in public; climbing on furniture; and, becoming physically aggressive towards others, including many unprovoked aggressive outbursts.

5. A.J.'s treatment prior to her admission to JRC included: special education in self-contained classrooms, 1:1 staffing, speech services, occupational therapy services, and a wide variety of other behavioral interventions, as well as the prescription of anti-psychotic and other psychotropic drugs including Abilify, Klonipin, Seroquil, Risperdal, Thorazine, Topomax and Zyprexa, all of which can have serious side effects.

6. A.J.'s placement history includes enrollment in a program for Autistic children at the age of 3 followed by public school placements in New York, Massachusetts, Michigan and Georgia where she received special education services. A.J. has been placed in self-contained classrooms staffed with teachers and paraprofessionals and has received speech and occupational therapy as well as in-home consultations.

7. At the age of 11, A.J. was admitted to the emergency room at Montefiore Hospital because she had become very violent at school toward both staff and herself and could not be controlled. She was then transferred to Elmhurst Hospital Center where she remained hospitalized for almost a year until her admission to JRC.

8. While she was at Elmhurst Hospital Center A.J. required one-to-one observation for most of her hospitalization, had many aggressive outbursts and would take off all her clothes and run down the hallways.

9. Prior treatments were not successful in treating A.J.'s behaviors, and such behaviors have prevented her from making academic progress.

10. A.J.'s prior placements and treatment did not meet her needs. A.J.'s last placement prior to JRC was at the in-patient unit at Elmhurst Hospital Center. A.J. was initially placed at the hospital by the New York City Department of Education and A.J.'s school district and Committee for Special Education ("CSE"). A.J.'s application for residential placement was

{K0406230.3}

sent to twelve (12) different schools while she was at Elmhurst and at least ten (10) of these schools – and possibly all of them – rejected her, except for JRC.

11. JRC was placed on A.J.'s Individualized Education Program ("IEP") and she has been admitted to JRC since March 8, 2007.

12. Since her admission to JRC, A.J. has been on a positive-only behavior modification treatment plan. A.J. is no longer on any psychotropic medications. JRC has been able to keep A.J. safe by providing one-to-one staffing, placement in a classroom with a high staff-to-student ratio and by placing her at a residence that is staffed to be able to handle her problematic behaviors. Despite these safety measures, A.J. still exhibits severe problematic behaviors and has been unable to participate in academic or community field trips with other students.

13. Since her admission to JRC, A.J. has hit, grabbed, pinched, head-butted and kicked others at JRC; thrown feces; pulled staff members' hair; spat at others; bitten staff; scratched a staff member's face, neck and chest; removed her own clothing at inappropriate times; banged her head on objects; thrown herself to the floor; and hit herself.

14. A.J.'s severe problematic behaviors interfere with her ability to make meaningful academic progress.

15. During the time period when A.J. was hospitalized at Elmhurst and the school district was seeking a new placement for her, Ms. Elise Klonsky, of the New York City Department of Education, was responsible for sending A.J.'s referral packet to the schools. During that time, I decided that I wanted A.J. to attend JRC. Ms. Klonsky told me that JRC was not an approved school. She also told me that JRC uses "aversive therapy" or "shock therapy" which she characterized as abuse. Based on Ms. Klonsky's descriptions I came to believe that if

A.J. were to attend JRC she would be strapped to a table and shocked. I was advised by a social worker at the hospital that if I still wanted A.J. to attend JRC, I could write a letter requesting that JRC not utilize aversive therapy with my daughter. I know now that I was misinformed by Ms. Klonsky. However, because I was misinformed about JRC and aversive therapy at the time, on January 23, 2007, I wrote and signed a letter reflecting the misinformation I had been given and requesting that aversive therapy not be used with A.J. A copy of the letter is attached hereto at Exhibit A.

16. Since A.J. has been admitted to JRC I have visited her many times and have become very familiar with the programs offered there. I have learned about the use of aversive interventions at JRC and have discussed aversive interventions with A.J.'s clinician at JRC. A.J.'s clinician at JRC has informed me that in his opinion the least restrictive and most effective treatment for A.J. would be a behavior modification treatment plan with the addition of aversive interventions, including the Graduated Electronic Decelerator ("GED") device, to treat her aggressive, destructive, major disruptive, health dangerous, and noncompliant behaviors. I have been informed about the nature of the aversive interventions and their proposed use with my child and have provided JRC with my written consent to add aversive interventions to her treatment plan to address her severe problematic behavior. Additionally, before treating A.J. with aversive interventions, JRC will seek the approval of a Human Rights Committee, a Peer Review Committee, A.J.'s school district, and a Massachusetts Probate Court judge. In addition, A.J. will be represented by a court-appointed attorney to protect her interests in the Probate Court proceeding.

17. I have been informed, by A.J.'s clinician at JRC, that under the regulations of the New York State Education Department 8 N.Y.C.R.R. § 200.1 *et seq.* ("NYSED Regulations"),

my child cannot have access to this potentially life-saving treatment, even though: (1) I have consented to it; (2) it is recommended by A.J.'s treating clinician at JRC; and, (3) A.J. has been physically examined by a physician who has found no medical reason why A.J. should not receive this treatment. I have also been informed that the NYSED Regulations reduce the effectiveness of aversive interventions by restricting their use in a manner not supported by the professional literature. The NYSED Regulations also require submission of the proposed treatment plan to an unqualified panel, who will never examine A.J., never speak to me about A.J., and will do only a paper review of A.J.'s treatment needs. In addition, the Regulations impose a ban on the use of aversive interventions after June 30, 2009, which means aversive interventions cannot be added to A.J.'s IEP and treatment plan. I do not want A.J.'s treatment at JRC to be subject to the NYSED Regulations.

18.     I believe that JRC's behavior modification treatment program, including aversive interventions such as the GED, to address A.J.'s aggressive, destructive, major disruptive, health dangerous, and noncompliant behaviors, is necessary to treat A.J.'s severe problematic behaviors, and is her only chance to receive an education and make social and behavioral progress, as well as to develop a rewarding relationship with her family. No other treatment has been successful at providing A.J. with the opportunity to make meaningful academic and social progress and contribute to her community. A.J. should not be deprived of the opportunity to have this treatment. No other school can provide A.J. with the opportunity to make more progress than she is making at JRC and no other school has accepted my daughter. The addition of aversive interventions to her program at JRC will help A.J. make meaningful behavioral and academic progress.

19. A.J. is currently at risk of further physical harm. If her behaviors are not treated properly, they could result in permanent physical disfigurement, massive pharmacological intervention and associated side effects, frequent physical and mechanical restraint, severe injury to others, institutionalization, or even death. A.J. needs aversive interventions to protect her against this physical harm and provide her with access to a program and services within which she can make meaningful behavioral and educational progress.

{K0406230.3}

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND ACCURATE.

Executed on: December 10, 2009          <u>s/ Chanin Houston-Josephat</u>
                                        Chanin Houston-Josephat

# EXHIBIT 1

→ ESCM   ☒002/002

January 23, 2007

To Whom It May Concern:

During a conversation with Ms. Elise Klonsky it was brought to my attention that in concern of my daughter's behavioral issues, she was considering sending my daughters' package to a school in Massachusetts whose program used "Aversive Therapy".

Although Ms. Klonsky did not reveal the name of the school she had in mind, I want it to be known that I will in no way ever allow or consider any facility or school to subject my daughter to any type of Aversive Therapy. This I am adamant about.

I believe aversive therapy amounts to cruel and unusual punishment. We don't allow shock therapy on prisoners, and yet we condone this barbaric practice on children.

If the program Ms. Klonsky spoke of can help my daughter then I do not have a problem with them receiving her package and observing Aquene with the ovastanding that if their program is right for her and they have a vacancy that at no time will aversive therapy be applied. I am also concerned that, from my own research of course, it has been brought to my attention that this school does NOT use medication to modify or help the children regain their composure but opts instead for this Aversive Therapy. My daughter has been taking medication since she was 3 years old and I am deeply concerned about the changes that would have to be made for her to attend a program of this nature.

Please keep me informed as to any decisions regarding this situation. Thank you for your time.

Sincerely,
C▇▇. H▇▇▇, Mother of A▇▇▇

