

THE STATE EDUCATION DEPARTMENT / THE UNIVERSITY OF THE STATE OF NEW YORK / ALBANY, NY 12234

OFFICE OF VOCATIONAL AND EDUCATIONAL SERVICES FOR INDIVIDUALS WITH DISABILITIES
STATEWIDE COORDINATOR FOR SPECIAL EDUCATION
Room 1624 One Commerce Plaza • Albany, NY 12234     Telephone (518) 402-3353   Fax: (518) 473-5769
www.vesid.nysed.gov/specialed/

May 16, 2008

Dr. Matthew Israel
Executive Director
Judge Rotenberg Educational Center
240 Turnpike Street
Canton, MA  02021

Dear Dr. Israel:

The purpose of this letter is to inform you of findings of noncompliance with Judge Rotenberg Educational Center's (JRC's) written policies and procedures relating to behavioral interventions pursuant to the Regulations of the Commissioner of Education. Section 200.22(f)(8) requires that each school that proposes to use aversive interventions pursuant to a child-specific exception submit its policies and procedures consistent with section 200.22 to the New York State Education Department (NYSED) for approval prior to the use of such interventions. Only those schools with policies and procedures approved by NYSED on or before June 30, 2007 shall be authorized to use such interventions.

The June 30, 2007 deadline has been extended to allow JRC to demonstrate compliance through corrective actions without sufficient result. The extension of deadlines cannot be continued indefinitely. NYSED has identified a significant number of JRC's policies and procedures on behavioral interventions that do not comply with legal standards, some of which were identified as early as July 2006, have been identified in correspondence dated June 30, 2006, June 8, 2007, July 2, 2007, October 10, 2007 and October 25, 2007 and remain in noncompliance.

By **July 1, 2008**, JRC must comply with the corrective actions identified herein and submit its revised policies and procedures to NYSED**.** Failure to do so will result in action to revoke JRC's approval to accept admissions of New York State (NYS) students pursuant to our authority in sections 4401(2)(h), 4403(3) and 4407(3) of the Education Law and sections 200.7(a)(3) and 200.7(c)(6) of the Regulations of the Commissioner of Education. Should we need to take such action, JRC will receive notice pursuant to section 200.7(a)(3)(ii).

The findings of continuing noncompliance with JRC's written policies and procedures that must be corrected are detailed below. In those instances where NYSED's



review of JRC's written policies has noted compliance, final approval will be made based on a site review of JRC's implementation of these policies.  While the findings reference some of the January 2008 site review findings, others will be discussed in a subsequent letter.  I express great concern, however, that again during our last site review, JRC's operation of its behavioral and educational program was altered when the site review team arrived.  Of particular note, JRC staff and students informed NYSED staff that, upon arrival of our reviewers, the students' educational demands were lowered, more administrative staff were present than usual, fewer restraints were being employed and that the mats that are used for restraints of students, as well as some of the students, were moved from their regular program setting to the gymnasium.  Upon our next site review of JRC, I insist that regular programming continue as usual so that we may ascertain the true nature of compliance by JRC.

1. **JRC fails to comply with the Regents prohibition on the use of aversive intervention by continuing to use mechanical restraints for students who do not have child specific exceptions for the use of aversive interventions pursuant to sections 19.5 and 200.22 of the Regulations of the Commissioner of Education.**  [8NYCRR sections 19.5(b), 200.22(b)(3), 200.22(c) and 200.22(f)(2)(ii))].

JRC states that it will continue to use mechanical restraints as an "emergency intervention" even for NYS students for whom there has been no child specific exception for the use of aversive interventions.  The Regulations of the Commissioner of Education prohibit the use of mechanical restraints for NYS students except as authorized through the child-specific exception process in section 200.22(e).  Use of mechanical restraints as an emergency intervention is not allowed.

JRC has submitted written policies which define aversive interventions and the exceptions to what would be considered an aversive intervention, in a manner that directly conflicts with NYS regulations by stating that the definition of aversive intervention "*does not include such interventions as …mechanical restraint, as indicated in the student's individualized education program (IEP) applied in an emergency situation to protect the safety of the student and others in the environment including helmets…*"  JRC's definition of aversive interventions as used with NYS students must comply with and be consistent with the term as defined in section19.5(b) of the Regulations of the Commissioner of Education.

JRC's response to NYSED's corrective action letter of October 2008 indicates that JRC proposes to have Committees on Special Education (CSEs) include the use of mechanical restraints on the IEPs of students with disabilities for emergency interventions.  It would be a violation of the Regulations of the Commissioner of Education for NYS school districts to include the use of mechanical restraints in students' IEPs except as provided for in section 200.22(e).  During the January 2008 site review by NYSED, mechanical restraints were being used on NYS students for whom there is no NYS child-specific exception for the use of such devices.

Page 1 of the submitted "JRC Policy on Emergency Restraint" states that "*these policies on emergency restraint do not apply to: (1) individuals for whom JRC has obtained a substituted judgment plan authorizing restraint.*"  This exception is unclear, since it may be

2

possible for an emergency situation to arise with a student who also receives restraint as an aversive intervention.

JRC's policy on "Emergency Restraint (DMR)" is inconsistent with NYS regulations in that it indicates that JRC may use mechanical restraint devices with any student for whom JRC has received a waiver from DMR and that the restraint of these students will continue to be considered an emergency restraint and "all emergency restraint rules apply."

JRC states that its "hierarchy of safety procedures" for students suspended to the residence includes requiring the student to sit on a four-point restraint board. The policy does not indicate that such an intervention applies only to NYS students for whom the CSE has authorized the use of mechanical restraints as part of its child-specific exception on the use of aversive interventions. The use of mechanical restraint cannot be used as an emergency intervention.

JRC continues to decline to revise its written policies and practices to comply with the Regents' restrictions on the use of mechanical restraints in section 19.5(b) of the Regulations of the Commissioner of Education. JRC's policies continue to include reference to the use of mechanical restraints for NYS students as an emergency intervention. Inclusion of the use of mechanical restraint as an emergency intervention in a NYS student's IEP is a violation of the Regulations of the Commissioner of Education. JRC may only use aversive intervention procedures if such interventions are recommended by the CSE consistent with the student's IEP and behavioral intervention plan as determined by the CSE (section 200.22(f)(2)(ii)). Except as provided in section 200.22(e), a behavioral intervention plan cannot include the use of aversive interventions (section 200.22(b)(3)).

On February 20, 2008, I again communicated the NYSED requirement regarding the use of mechanical restraints in a telephone call to Glenda Crookes to ensure a clear understanding by JRC of this requirement.

With regard to students for whom JRC has been using transportation restraints, JRC has provided NYSED with a list of NYS students for whom the use of special transportation safety restraints are recommended on their IEPs. JRC has also notified NYSED that it is working with NYS CSEs to consider other students for such special transportation. At the request of JRC, NYSED first granted an extension to the corrective action date for this compliance issue until February 15, 2008 with exceptions for further time on a child-specific basis where NYSED was provided with written notification by February 15, 2008 that the CSE has a scheduled meeting subsequent to such date. On February 20, 2008, JRC was provided an additional extension until March 30, 2008 to notify NYSED that the CSE has a scheduled meeting subsequent to such date for the purpose of discussing special transportation safety restraints. On March 30, 2008, JRC submitted a status report and was notified by me by telephone that I provided an additional extension until April 30 for JRC to submit a list of students with transportation restraints on their IEPs. While JRC may continue to work with CSEs to determine which students will need transportation restraints, JRC must, effective upon the date of receipt of this letter:

3

- use transportation restraints only with those students who have such recommendations on their IEPs; and
- ensure that such restraints are used <u>only</u> for the transportation of the student or as necessary to transfer the student to and from the building. JRC has no authorization to continue the use transportation restraints after the student has entered the building.

**Corrective Actions:**

- JRC must cease use of mechanical restraints* with NYS students except as authorized through child-specific exception and as specified on students' IEPs as developed by the NYS school districts' CSEs in conformance with Part 200 requirements. (*Exception for interventions medically necessary for the treatment or protection of the student as described in my August 11, 2006 letter to you.)

- JRC must revise its policies and practices relating to the use of mechanical restraints for students on an "emergency basis" and ensure such policies limit the use of mechanical restraints for students with a child specific exception for the use of aversive interventions to those students for whom movement limitation is authorized on the student's IEPs and only for the identified behaviors.

- JRC's "hierarchy of safety procedures" used at the residences during "alternative educational strategies" placements (see compliance finding #4) must be revised to clearly indicate that the use of a four-point board or other mechanical restraint cannot be used as an emergency intervention and can only be used with NYS students for whom the CSE has authorized the use of mechanical restraints as part of its child-specific exception on the use of aversive interventions consistent with the student's behavioral intervention plan.

- JRC must submit its revised policy regarding the use of transportation restraints for NYS students and submit a list of NYS students for whom special transportation safety restraints are authorized by their IEPs and the specific transportation restraints recommended on the IEPs by the due date of the corrective action and quarterly thereafter.

- If JRC believes that it cannot appropriately and safely manage a student's behavior given allowable interventions, such student should be referred back to the NYS CSE for recommendation to an alternate placement.

2. **JRC's policies indicate that JRC will not limit the use of aversive interventions to those self-injurious or aggressive behaviors identified for such interventions on the student's IEP and only for students who are displaying self-injurious and/or aggressive behaviors that threaten the physical well being of the student or that of others and only to address such behaviors.** [8NYCRR sections 200.22(e)(9), 200.22(f)(2)(ii) and 200.22(f)(2)(vi)] [Note: exception for Alleyne student plaintiffs given]

JRC has responded that it has modified its policy to identify the specific behaviors in the IEPs of those NYS students whose treatment includes aversive interventions, but that it

4

will continue to identify those categories of behaviors targeted for aversive interventions. The policy that states that JRC will identify "social/emotional goals and objectives indicating the target behavior categories and any particular devices or services, including interventions, accommodations or other program modifications, to be used to address the behavior categories and aversive conditioning devices where the aversive intervention includes the use of such device," is inconsistent with NYS regulations because it provides broader authorization for the use of aversives in the student's IEP than NYS regulations allow. This policy and practice are not acceptable.

Categories do not provide a sufficient enough description of the behavior to be targeted through aversive interventions. A greater degree of specificity is required as to the nature of the actual behavior(s) that may be substantially similar to the identified behavior likely to emerge for that particular student. For example, a student's targeted self-injurious behaviors could be identified to include behaviors such as head banging, poking one's eyes, self-induced vomiting, self-biting or other similar behaviors. The targeted behaviors cannot, however, include antecedent behaviors, attempts or threats to execute the behavior and the initial and any intermediate responses in the chain that lead to the behavior. Such behaviors must be addressed using other methods.

JRC revised its policy to remove incipient and shaped-down versions of students' behaviors in its definitions of aggressive and health dangerous behaviors (except for named plaintiffs in the Alleyne court order). However, it then improperly "redefined" the terms to include attempts and threats to execute the behavior, antecedents for the behavior and the initial response and any intermediate responses in the chain of behaviors that leads to the action itself. As such, JRC has exhibited a purposeful disregard for NYS regulations that state that "use of aversive interventions shall be limited to those self-injurious or aggressive behaviors identified for such interventions on the student's IEP" and the requirement that CSEs may include the use of aversive interventions, consistent with section 200.22(e), only for students who are displaying self-injurious and/or aggressive behaviors that threaten the physical well being of the student or that of others and only to address such behaviors.

**Corrective Actions:**

- JRC must revise its policies to ensure that its use of aversive interventions is limited to targeted self-injurious and aggressive behaviors and it must revise its definition of such terms to eliminate any reference to the use of aversive interventions for attempts and threats, antecedents for the behavior and the initial response and any intermediate responses in the chain of behaviors that leads to the action itself.

- JRC must include a policy that identifies other behavioral methods that will be used to address the early forms of the behavior that do not include the use of aversive interventions.

5

3. **JRC's policy of obtaining parent consent for use of aversives upon admission and prior to the recommendation of NYS CSEs interferes with the CSE's responsibilities to comply with sections 19.5(b) and 200.22(e) of the Regulations of the Commissioner of Education.** [8NYCRR section 200.22(e)]

JRC states that it will "consider aversive behavioral interventions if such interventions are recommended by the CSE consistent with the student's IEP and behavioral intervention plan as determined by the CSE." However, it states on page 3, #9 of the "JRC Plan for Educational Services" that "… JRC may not be able to accept the student without parent and district approval for court authorized procedures … JRC requires the parent's signature and acceptance of all documents as a condition to JRC's agreeing to accept the student for placement should the school district recommend JRC as the placement."

**Corrective Action:**

JRC's "Plan for Educational Services" and other relevant policies must clearly state that JRC will not seek written parent consent for the use of aversive interventions prior to a CSE recommendation to include a recommendation for such behavioral interventions on the student's IEP. Any consideration of the use of aversive interventions must occur through the IEP development process with the CSE.

4. **JRC's use of "alternative strategies" settings is not in compliance with regulations that govern time out removals, change in class placement or suspension. Students placed in "alternative strategies" settings are not given appropriate instructional programming by qualified teachers and remain in these settings for lengthy periods of time (sometimes several months).** [8NYCRR sections 200.6, 200.22(c) and Part 201]

JRC states that its use of "alternative educational strategies" does not include the use of time-out rooms. It further indicates that it provides instruction to students in the setting specified on their IEPs and that "in almost all applicable cases," the CSE specifies the use of "alternative educational strategies" in the student's IEP, and that for other students, JRC states that it "provides a written incident report to the CSE." CSEs are required to recommend special education programs and services only from the list of options in section 200.6 of the Regulations of the Commissioner of Education, which does not include an option for "alternative educational strategies." Because JRC's "alternative educational strategies" are really a change in the setting, they must be characterized as (1) assignment of the student to an alternate special class; or (2) placement of the student in a time-out room; or (3) in-school or out-of-school suspension. The appropriate regulations governing each of the above must be followed.

Since students are placed in classrooms deemed "alternative strategies" for extended periods of time during the school day, NYSED considers these settings to be the student's special class placement. Therefore, JRC's policy that states that the student's regular special education teacher "visits" the student", "supervises the work of the aide(s) who are in the room at all times," and that the role of the teacher is to "assign" the student work is not in compliance with sections 200.6(b) and (h) and therefore is not acceptable. If the

6

student is being temporarily assigned to a different special class, then that special class must meet the requirements of section 200.6, including the assignment of a full-time certified special education teacher.  Under NYS regulations, teacher aides may, under supervision, perform non-instructional duties only, such as assisting in physical care tasks or assisting in correction of tests.

JRC states that it allows for special class age ranges of four years, which is contrary to NYS regulations.  Section 200.6(h)(5) of the Regulations of the Commissioner of Education requires that the chronological age span of students placed in a special class cannot exceed 36 months (not four years as JRC allows), except that there are no chronological age range limitations for groups of students placed in special classes as described in section 200.6(h)(4)(iii) and for students ages 16 and older.

JRC further states that "[a]ny time a student remains at the residence during the academic day due to behavior, JRC's Policy on Discipline and Suspension is followed."  However, page 5 of the "Alternative Educational Strategies" policy states that, "The clinician shall keep the student at the residence if the student has been suspended from attending school **or** [emphasis added] if the student has engaged in a recent act of serious aggression, self-abuse, destructive or noncompliance or threatening statements or other conduct which demonstrates that it would be unsafe to transport the student to the school building."  Such policy provides discretion to the student's clinician to determine on a daily basis whether the student is ready to return to school.  JRC states that the Executive Director or his designee has the discretion to administer discipline to students.  NYS Education Law section 3214 and Part 201 of the Regulations of the Commissioner of Education establish that only the trustees or board of education of any school district, a superintendent of schools, a hearing officer or a building principal, as appropriate, may impose a suspension for discipline reasons.  Therefore, the Executive Director, acting as the school superintendent, may not allow a student's clinician to suspend a student from school.  In addition, a suspension of a student must be for a specified period of time and, while the Executive Director who is acting as the school superintendent for purposes of administering the suspension could issue a suspension that allows the clinician discretion to return the student earlier than the maximum suspension period, it is not permissible for the clinician to have such discretion to extend the suspension period without affording the student his or her due process through the required suspension procedures.

During the January 8-11, 2008 site visit, NYSED staff confirmed the lack of instructional programming, absence of qualified teachers and long periods of stay (sometimes several months) of students in the alternative settings.  We also found records of students in such settings informing school districts that such students could be considered suspended and informing CSEs to include alternative settings on the students' IEPs.

**Corrective Actions:**

- JRC's "alternative strategies" policies, which really are changes in a student's educational setting, must be revised to ensure that the (1) assignment of the student to an alternate special class; or (2) the placement of the student in a time-out room; or (3) the in-school or out-of-school suspension of a student are consistent with NYS

7

regulations governing each of the above, as applicable; and must not include policies to recommend the CSE include "alternative strategies" in an IEP that would provide broader authority for use of time-out rooms or suspensions than provided for in federal and NYS law and regulation.

- Since students are placed in classrooms deemed "alternative strategies" for extended periods of time, NYSED considers these as the student's special class placement. Therefore, during a student's placement in an "alternative educational strategy" setting, JRC must ensure that students are receiving instruction by appropriately qualified personnel, which cannot include instruction provided by teacher aides.

- JRC must revise its policies to reflect the NYS regulatory requirements for chronological age ranges of NYS students in special classes.

- JRC must revise its suspension procedures to ensure that out-of-school suspensions are ordered only by the trustees of the board of education, the superintendent of schools or a hearing officer designated for this purpose, or a school principal, as appropriate, and that the student's clinician does not have broad authority to suspend or to extend the period of the student's suspension from school. JRC must ensure that federal and State procedures for the suspension of each student is appropriately followed and documented.

5. **JRC's policies and staff training are insufficient to demonstrate that emergency physical interventions are used only in situations in which alternative procedures and methods not involving the use of physical force cannot reasonably be employed and that they are not used as a punishment or as a substitute for systematic behavioral interventions that are designed to change, replace, modify or eliminate a targeted behavior.** [8 NYCRR sections 200.22(d) and 200.22(f)(4)]

JRC's "Tutorial on Behavioral Principles" indicated that it is "required by NYSED Regulations on Aversives." The tutorial is insufficient to address the topics which the Board of Regents determined to be essential information for staff. In particular, the tutorial section D regarding assessment of collateral effects of the use of aversive interventions does not reflect the importance of the need for sensitivity and diligent assessment of what could be serious unintended collateral effects on a student's emotional, psychological and physical health. JRC's tutorial for staff significantly minimized the importance of these health and safety measures.

While the regulations do not specify the number of hours necessary to cover the topics listed in section 200.22(f)(4), it is expected that the program would make a good faith effort to meaningfully provide staff with the essential knowledge and skills to meet the intent of the regulations. JRC's one-hour training of new direct care staff on the topics required by NYS regulations is insufficient to prepare staff providing aversive interventions to implement behavioral intervention plans for students with complex behavioral issues.

8

JRC submitted a copy of a training curriculum approved by DMR.  However, JRC did not submit, as requested, documentation that DMR approves of the manner in which JRC employs physical restraints as described in its written policies.

While JRC submitted a revised policy which states that alternative procedures not involving the use of physical force are attempted prior to implementing emergency restraint, JRC further states that staff must implement the pre-planned behavioral approaches for each student.  The training provides information on de-escalation procedures (e.g., "prompting and reinforcing appropriate behaviors once an emergency situation arises" and "when to consider use of emergency physical interventions.")  However, JRC's actual direction to its staff is to disregard that aspect of the training and its policy to attempt alternative procedures not involving the use of physical force, by requiring staff to implement the "pre-planned set of behavior modification consequences" even if it includes restraint, absent the use of de-escalation attempts.

JRC's policies state that JRC uses "programmed opportunities" to provide "unfair consequences" for the student.  As such, the policy does not promote controlling the antecedents to diminish the likelihood that a student's negative behavior would occur.  JRC's use of physical restraint of a student as a result of the student's reaction to the "programmed opportunity" is inconsistent with JRC's stated policy that JRC "employs all available and reasonable methods to minimize the use of restraints."

JRC incorrectly states that section 100.2(l)(1)(i)(g) of the Regulations of the Commissioner of Education does not apply to approved private schools.  Section 200.7(b)(3) of the Regulations of the Commissioner of Education explicitly states that *"An approved private school…shall develop a code of conduct policy.  The content of such policy shall be consistent with the provisions of section 100.2(l)(1)(i)(a)-(d), (f)-(g) of this Title.  The discipline of students with disabilities attending any school governed by this section shall be consistent with Part 201 of this Title."*

During student interviews conducted by NYSED staff during the January 8-11, 2008 site visit, several students reported that staff pinched them during restraints.

**Corrective Actions:**

- JRC must submit documentation that DMR has approved JRC's policies and procedures on physical restraints, including the manner in which staff physically restrain students as described in its written policies (JRC Policy on Emergency Restraint (DMR)).  NYSED defers approval of the manner in which JRC physically restrains students to DMR.

- JRC must submit documentation to NYSED on the steps it will take to minimize its use of physical restraints with students, using strategies that do not include the use of aversive interventions.

- JRC's written policy must be revised to clarify that the waiver from the Massachusetts DMR for use of certain forms of restraints does not apply to NYS students.

9

- JRC must review the students' allegations regarding the pinching of students during restraints and submit the results of such review to NYSED.

- JRC must develop and submit a code of conduct policy consistent with the provisions of section 100.2(l)(1)(a)-(d) (copy enclosed).

- JRC must delete any written indication on its "Tutorial on Behavioral Principles" and any implications in its provision of such tutorial, that NYS endorses the information provided in this tutorial.  The tutorial was neither developed nor approved by NYSED.  While the topics addressed in the tutorial are NYS required, the manner and extent to which JRC addresses them has not been deemed appropriate by NYSED.

6. **JRC's written policies and training to staff are inadequate to assess and address collateral effects of the use of aversive interventions and to prepare staff to implement behavioral intervention plans for students with complex behavioral issues.** [8NYCRR section 200.22(f)(4) and 200.22(f)(7)(i)]

JRC's written policies and training to staff (Section D of its "Tutorial on Behavioral Principles") are inadequate to assess and address collateral effects of the use of aversive interventions because they do not provide meaningful professional development and do not establish assessment procedures and standards that reflect the importance of the need for sensitivity and diligent assessment of what could be serious unintended collateral effects on a student's emotional, psychological and physical health.  JRC's tutorial does not provide staff with meaningful direction on how to detect health related, psychological and/or emotional effects, including subtle effects.  The tutorial directs staff to note any such effects as a "Therapy Note" and does not require notification to the student's clinician and parent/guardian.  The direction to staff is to note "unusual or unexpected effects" without any indication of what these might be and how such effects might manifest themselves (e.g., nightmares, loss of appetite, startle responses, insomnia, diminished concentration, confusion, etc.).

While JRC's written response to the corrective action indicated that JRC will address the collateral effects by conducting more frequent reviews of students where collateral effects from the use of aversive interventions are noted, the only manner in which JRC indicated it would address such collateral effects is in the area of increases in escape behavior, for which it indicated it would continue to provide aversive consequences to the student for such behaviors.

JRC's policies and training do not acknowledge peer-reviewed and widely accepted research, which indicate that repeatedly inflicted physical and emotional pain on a child can result in physical and psychological effects, including nightmares, intrusive thoughts, avoidance behaviors, marked startle responses, mistrust, depression, flashbacks of panic and rage, anger, hyper-vigilance, and insensitivity to fatigue and pain; and that these effects can have serious long-term negative consequences to healthy child development.  JRC's policies and practices to, for example, provide aversive consequences to students for symptoms related to depression such as expressing suicidal thoughts and to ignore

10

concerns expressed by students about their behavioral plan or implementation combined with the lack of provision of counseling other than behavioral counseling, are directly incompatible with the program's ability to assess and address such collateral effects.

**Corrective Action:**

JRC must revise its policies, procedures and practices, including its training to staff, consistent with the regulations that emphasize the importance of providing meaningful approaches to assess and address the collateral effects of aversive interventions. If JRC needs assistance in doing so, NYSED will identify trauma specialists who can assist JRC to develop a meaningful plan to implement this requirement.

7. **JRC's policies are not consistent with the requirement that aversive interventions be used in conjunction with other related services, as determined by the CSE, such as verbal or other counseling services, speech and language therapy and/or functional communication training** [8NYCRR sections 200.22(f)(2)(iii); 200.4(d)(4)(i) and 200.6(e)]. **JRC fails to provide speech and language therapy by appropriately licensed and certified individuals.** [8 NYCRR section 200.6(a)]

A proposed placement of a student with a disability must offer the instruction and services recommended in the student's IEP [8 NYCRR section 200.6(j)(2)(iii)]. Section 300.325 of the Code of Federal Regulations (34 CFR) requires the school district to develop an IEP for a child before placing the child in or referring the child to a private school. Section 300.119 requires the student's placement be based on the IEP. The proposed school program must be capable of implementing the student's IEP as written, upon referral to the school. Contrary to the above requirements, JRC indicated on page 15 of its November 30, 2007 response to NYSED that "JRC will inform the CSE, as part of the IEP development process, about the services that JRC can and cannot provide." JRC further states that it "cannot admit a student if it cannot provide services, including counseling or other related services, in the student's IEP." Its practice, however, is to seek elimination of related services recommendations on students' IEPs to conform to what is available at JRC, rather than implement the IEP recommendations that led to the student's referral for a residential school placement.

JRC has provided written assurance in its policies that speech and language therapy provided by a licensed speech and language pathology assistant is provided under the direction and supervision of a licensed speech-language pathologist consistent with Massachusetts licensing requirements. JRC further assured NYSED that it is providing the required instructional services to meet the individual language needs of each student with autism. At the time of the January 8-11 site review visit, there was no licensed speech-language pathologist employed by JRC who was providing direction and supervision of the speech and language pathology assistant.

**Corrective Actions:**

- Consistent with NYSED's private school approval process, JRC must submit a written notification to NYSED that identifies which related services JRC can and will provide to students admitted to its program.

- JRC must submit its plan for hiring a speech and language pathologist that describes how it is meeting the supervision requirement in the interim and must notify NYSED of the name and licensing status of the speech and language pathologist when hired.

8. **JRC's policies are insufficient to fully demonstrate that it: uses aversive interventions at the lowest intensity for the shortest duration and period of time that is effective to treat the problem behavior; employs strategies that increase the effectiveness of mild levels of aversive interventions; and that in the event the aversive intervention fails to result in a suppression or reduction of the behavior over time, alternative procedures are considered that do not include increasing the magnitude of the aversive intervention** [8NYCRR sections 200.22(f)(2)(vii) and 200.22(f)(4)(vii)]

JRC's revised policy "Additional Requirements for the Use of Court-Authorized Supplementary Aversive Therapy (aversive behavioral intervention) with New York State School-Aged Students" indicates that the student's clinician will consider using alternative procedures prior to increasing the magnitude of the aversive intervention in the event that treatment with an aversive behavioral intervention does not result in the suppression or reduction of a severe problematic behavior, after the student has been treated with aversive intervention for one year. Waiting one year to consider adding nonaversive interventions to a student's behavioral intervention plan is inconsistent with section 200.22(f)(2)(vii), which requires the school and CSE to conduct ongoing progress monitoring of a student's program and behavioral intervention plan, which must include serious consideration of alternative interventions that do not include aversive interventions.

JRC's policy on considerations to minimize the use of aversive interventions includes "adding physical restraint." Since use of physical restraint as a consequence would be an aversive intervention, this is an inappropriate alternative strategy.

**Corrective Actions:**

- JRC's policies must be revised to consider changes to a student's IEP and behavioral intervention plan through ongoing progress monitoring and reviews. These reviews should routinely include serious and in-depth consideration and discussion of interventions to address the behavior(s) of the student that do not include aversive interventions. Such considerations should not be left solely to the individual student's clinician, but rather should be brought to the CSE.

- JRC should seek consultation on employing strategies to minimize the use of aversive interventions. Upon request, NYSED will provide JRC with names of experts who could assist JRC with this compliance issue.

9. **JRC has not demonstrated that it uses aversive interventions consistent with peer-reviewed research based practices and that the magnitude, frequency and duration of any administration of aversive stimulus from an aversive conditioning device has been shown to be safe and effective in clinical peer-reviewed studies.** [8NYCRR section 200.22(f)(v) and (viii)]

JRC has submitted a plan to NYSED that identifies specific actions and timelines to subject its use of electrical shock and other noxious stimuli to peer-reviewed research study. However, consistent with the federal interpretation of the term "peer-reviewed research" the plan does not identify that the research will be reviewed by qualified and independent reviewers to ensure that the quality of the information meets the standards of the field before the research is published.

JRC has not submitted a plan to demonstrate that its use of aversive conditioning devices, including the magnitude, frequency and duration of any administration of the aversive stimulus from the aversive conditioning devices, are reported to be safe and effective in clinical peer-reviewed studies.

JRC's web site includes information that it is developing a new aversive device.

**Corrective actions:**

- JRC must submit evidence of peer-reviewed research which includes evidence that JRC's publications of aversive interventions were reviewed by qualified and independent reviewers before the research is published.

- JRC must submit documentation that its use of aversive interventions, including the magnitude, frequency and duration of its aversive conditioning devices are supported by peer-reviewed research.

- JRC must submit information on its plan to develop a new aversive device and evidence of approval/review by the Food and Drug Administration and peer reviewed research prior to use with NYS students.

10. **JRC has not demonstrated that aversive interventions are administered by appropriately licensed professionals or certified special education teachers or under the direct supervision and direct observation of such staff.** [8NYCRR section 200.22(f)(4)]

JRC's December 14, 2007 response states, "Neither section 200.22(f)(4) nor any federal or New York State law or regulation requires an individual to hold a license or certification in order to administer aversive interventions, or to supervise their administration," when in fact, section 200.22(f)(4) reads as follows:  "*Supervision and training requirements. Aversive interventions shall be administered by appropriately licensed professionals or certified special education teachers in accordance with Part 80 of this Title and sections 200.6 and 200.7 of this Part or under the direct supervision and direct observation of such staff….*"

13

**Corrective Action:**

JRC's policies and practices must be revised to implement this regulatory requirement. JRC must provide a written corrective action plan identifying the steps and proposed time period in which to meet this regulatory requirement.

**Other Findings:**

**8 NYCRR section 200.22(a)** – Functional Behavioral Assessments (FBA) - JRC has submitted a revised "Policy on Functional Behavioral Assessments" that states that an FBA that meets the requirements of the Regulations of the Commissioner of Education will be completed for each student enrolled at JRC. There are no corrective actions regarding JRC's written policies on FBAs. JRC's implementation of its written policies is under review.

**8 NYCRR section 200.22(b)** – Behavioral Intervention Plan - JRC submitted a revised written policy "JRC Plan for Educational Services" to indicate that a behavioral intervention plan that meets the requirements of the Regulations of the Commissioner of Education will be developed based on the results of the FBA. Please note that #3 on page 13 of the "JRC Plan for Educational Services" includes an incorrect citation in the second sentence. The correct citation is section 200.22(e). There are no corrective actions regarding JRC's written policies on behavioral intervention plans pursuant to section 200.22(b). JRC's implementation of its written policies is under review.

**8 NYCRR section 200.22(f)(7)** – Progress Monitoring - JRC submitted a revised policy on incident reports. However, JRC's stated policy of providing certain information to the Human Rights Committee is inconsistent with its practices, since the NYS representative on the Human Rights Committee has not received such reports. JRC must revise its policies and practices to assure it provides the NYS representative on the Human Rights Committee and the school district representatives of NYS students with copies of all restraint, incident and other reports at the same time they are provided to other members of the Human Rights Committee for NYS students being discussed at the Human Rights Committee meetings.

As stated on page two of this letter, JRC must comply with the corrective actions identified herein and submit its revised policies and procedures to NYSED not later than July 15, 2008. If you have any questions or would like to meet to discuss JRC's steps for the correction of noncompliance, please contact me.

Sincerely,

James P. DeLorenzo

Enclosure
c:  Rebecca H. Cort
    Dr. Jean McGuire

to help students who exhibit any attendance, academic, behavioral or adjustment problems, to educate students concerning avoidance of child sexual abuse, and to encourage parental involvement.

(ii) In grades 7-12, the guidance program shall include the following activities or services:

(*a*)   an annual review of each student's educational progress and career plans, with such reviews to be conducted with each student individually or with small groups by personnel certified or licensed as school counselors;

(*b*)   instruction at each grade level to help students learn about various careers and about career planning skills conducted by personnel certified or licensed as school counselors, or by classroom teachers in cooperation with school counselors;

(*c*)   other advisory and individual or group counseling assistance to enable students to benefit from the curriculum, to help students develop and implement postsecondary education and career plans, to help students who exhibit any attendance, academic, behavioral or adjustment problems and to encourage parental involvement, provided that advisory assistance shall be provided by teachers or counselors, or by certified teaching assistants under the supervision of counselors or teachers, and that such individual or group counseling assistance shall be provided by certified or licensed school counselors or by certified or licensed school psychologists or certified or licensed school social workers in cooperation with school counselors; and

(*d*)   the services of personnel certified or licensed as school counselors.

(iii)   Each school district shall develop a district plan which sets forth the manner in which the district shall comply with the requirements of this subdivision. The City School District of the City of New York shall submit a separate plan for each community school district, for the High School Division and for the Special Education Division. Such plan shall be filed in the district offices and shall be available for review by any individual. The plan shall present program objectives, which describe expectations of what students will learn from the program; activities to accomplish the objectives; specification of staff members and other resources assigned to accomplish the objectives; and provisions for the annual assessment of program results. The plan shall be reviewed annually by the school districts, and revisions shall be made as necessary.

(2)   Nonpublic schools.   Each nonpublic secondary school shall provide a guidance and counseling program for students in grades 7-12.

(k)   *Nondiscrimination in curricular and extracurricular activities.*   No student shall be denied membership or participation, on the basis of race, sex, marital status, color, religion, national origin or disability, in any program or activity which is included in a school program of curricular or extracurricular activities, provided that:

(1)   in the case of students with disabilities, such activity shall be appropriate to a student's special educational needs as identified by the committee on special education;

(2)   male and female participation in extraclass athletic activities shall be in accordance with the provisions set forth in section 135.4(c)(7) of this Title;

(3)   a nonpublic school may limit admission to such school to students of a single sex and/or of a single religion or denomination; and

(4)   a nonpublic school controlled by or affiliated with a religious organization may separate students on the basis of sex to the extent that such separation is required by the religious tenets of such organization.

(l)   *School conduct and discipline.*   (1)   Policy on school conduct and discipline.

(i)   On or before January 1, 1986 each school district shall adopt and implement a written policy on school conduct and discipline designed to promote responsible behavior, which policy, and any amendments thereto, shall remain in effect until the adoption of a code of conduct pursuant to paragraph (2) of this subdivision, at which time it shall be deemed to be superseded by such code of conduct. The City School District of the City of New York shall

adopt and implement a separate written policy for each community school district and for central board-administered programs. Such a policy shall be developed locally in consultation with teachers, administrators, other school service professionals, students and parents and shall include:

(*a*) a bill of rights and responsibilities of students which focuses upon positive student behavior, and which shall be publicized and explained to all students on an annual basis;

(*b*) a discipline code for student behavior setting forth prohibited student conduct and the range of penalties which may be imposed for violation of such code, which shall be publicized and explained to all students and provided in writing to all parents on an annual basis. Such code shall describe the roles of teachers, administrators, board of education members, and parents;

(*c*) strategies and procedures for the maintenance and enforcement of public order on school property which shall govern the conduct of all persons on school premises, in accordance with section 2801 of the Education Law and accepted principles of due process of law;

(*d*) procedures within each building to involve pupil service personnel, administrators, teachers, parents and students in the early identification and resolution of discipline problems. For students identified as having a disability, such policy shall include procedures for determining when a student's conduct shall constitute a reason for referral to the committee on special education for review and modification if appropriate of the student's individualized education program;

(*e*) alternative educational programs appropriate to individual student needs;

(*f*) disciplinary measures for violation of the school policies developed in accordance with subparagraphs (ii) and (iii) of this paragraph. Such measures shall be appropriate to the seriousness of the offense and where applicable to the previous disciplinary record of the student. Any suspension from attendance upon instruction may be imposed only in accordance with section 3214 of the Education Law; and

(*g*) guidelines and programs for in-service education programs for all district staff members to ensure effective implementation of school policy on school conduct and discipline.

(ii) The board of education shall adopt such a policy review it on an annual basis and amend it when appropriate. Each school district's policy on school conduct and discipline shall be filed in each school building and shall be available for review by any individual.

(2) Code of conduct.

(i) On or before July 1, 2001, each board of education and board of cooperative educational services shall adopt and provide for the enforcement of a written code of conduct for the maintenance of order on school property and at school functions, as defined in Education Law section 2801(1), which shall govern the conduct of students, teachers and other school personnel and visitors. Such a code shall be developed in collaboration with student, teacher, administrator, and parent organizations, school safety personnel and other school personnel and shall be approved by the board of education, or other governing body, or by the chancellor of the city school district in the case of the City School District of the City of New York. The City School District of the City of New York shall adopt a district-wide code of conduct and each community school district may, upon approval of the chancellor, adopt and implement additional policies, which are consistent with the city school district's district-wide code of conduct, to reflect the individual needs of each community school district. A school district or board of cooperative educational services shall adopt its code of conduct only after at least one public hearing that provides for the participation of school personnel, parents, students and any other interested parties.

(ii) The code of conduct shall include, but is not limited to:

(*a*) provisions regarding conduct, dress and language deemed appropriate and acceptable on school property and at school functions, and conduct, dress and language deemed

bc:    Pat Geary
        Dan Johnson
        Eileen Borden
        Margaret Schepp
        Kate Sugalla
        Mary Ellen Clerkin
        Kelly Munkwitz