

THE STATE EDUCATION DEPARTMENT / THE UNIVERSITY OF THE STATE OF NEW YORK / ALBANY, NY 12234

OFFICE OF VOCATIONAL AND EDUCATIONAL SERVICES FOR INDIVIDUALS WITH DISABILITIES
STATEWIDE COORDINATOR FOR SPECIAL EDUCATION
Room 1624 One Commerce Plaza • Albany, NY 12234         Telephone (518) 402-3353   Fax: (518) 473-5769
www.nysed.gov

March 23, 2009

Dr. Matthew Israel
Executive Director
Judge Rotenberg Educational Center
240 Turnpike Street
Canton, MA  02021

Dear Dr. Israel:

    Upon review of your October 10 and 29, 2008 submissions, the New York State Education Department (NYSED) finds that the Judge Rotenberg Educational Center (JRC) continues to have written policies and procedures inconsistent with New York State (NYS) regulations sections 19.5(b) and 200.22.  Section 200.22(f)(8) of the Regulations of the Commissioner of Education requires that each school that proposes to use aversive interventions pursuant to a child-specific exception submit its policies and procedures consistent with section 200.22 to the Department for approval prior to the use of such interventions.  Only those schools with policies and procedures approved by the Department on or before June 30, 2007 shall be authorized to use such interventions.  Despite repeated extensions of the deadline to have compliant policies and procedures, JRC has failed to do so.

    NYSED has been working with JRC since June 2007 to address JRC's noncompliance with NYS requirements.  Evidence of compliance submitted by JRC in response has been inadequate to satisfactorily demonstrate resolution of compliance issues identified in letters dated December 27, 2006, February 23, 2007, March 26, 2007, April 11, 2007, May 30, 2007, June 8, 2007, October 10, 2007, May 16, 2008 and September 17, 2008.  On June 20, 2008, I provided you with a list of technical assistance resources.  On July 1, 2008, NYSED staff met with you and three of your program staff to clarify and discuss JRC's continuing noncompliance and the corrective actions necessary to reach compliance.  Following that meeting, I summarized those clarifications in a letter dated July 2, 2008 and provided many resources to you for technical assistance.  Upon review of your July 16, 2008 letter, NYSED provided further clarification in September 2008 and requested a complete copy of JRC's revised policies.  In October 2008, JRC submitted its response to required corrective actions, and included a complete set of its written policies and procedures with revisions to comply with NYS requirements highlighted.  With this response, JRC did not submit to NYSED some of the policies it had previously submitted in response to compliance issues.



Based upon a review of JRC's written policies as submitted in October 2008, NYSED finds that JRC has failed to demonstrate correction of noncompliance. In addition to the findings of continuing noncompliance noted below, other issues of noncompliance were found upon review of JRC's written policies as submitted in October 2008. These other issues will be identified, with corrective actions, in a separate letter.

1.  **JRC's written policies continue to authorize JRC staff to provide aversive consequences to students for behaviors other than the specific self-injurious and/or aggressive behaviors that threaten the physical well being of the students or that of others.**

    *Applicable regulation:* *8 NYCRR sections 200.22(e)(1) and 200.22(f)(2)(vi). Aversive interventions shall be considered only for students who are displaying self-injurious and/or aggressive behaviors that threaten the physical well being of the student or that of others, and only to address such behaviors. The use of aversive interventions shall be limited to those self-injurious or aggressive behaviors identified for such interventions on the student's IEP.*

    Findings:

    a) While JRC's October 10, 2008 letter states that JRC has revised its policy to state that JRC will limit its use of aversive interventions with NYS students to self-injurious or aggressive behaviors that threaten the physical well-being of the student or that of others, its actual written policies ("Plan for Educational Services" and "Additional Requirements for the use of Court-Authorized Supplementary Aversive Therapy with New York State School-Aged Students") indicate that JRC will use aversive interventions to treat "<u>health dangerous</u> [emphasis added] and/or aggressive behaviors that threaten the physical well being of the student or that of others . . ." The definition of the term "health dangerous" was deleted from the written policy; however, JRC continues to identify specific behaviors for individual students included under the broad category "health dangerous" that include shaped down or earlier forms of the behavior or antecedents for the behavior, attempts and threats to execute the behavior, or the initial response and any intermediate responses in the chain of behaviors that leads to the action itself, which could include behaviors other than self-injurious or aggressive behaviors that threaten the physical well-being of the student or that of others such as "urination and defecation," "faking a seizure" and "verbal threats," NYSED finds JRC's policies inconsistent with NYS requirements.

    b) JRC's website, even as of the date of this letter, continues to state that students at JRC can be punished with the GED (graduated electronic decelerator) for behaviors other than aggression, self-abuse or property destruction and does not specify that this policy does not apply to NYS students.

   c) While NYSED recognizes the exception to this requirement for Alleyne student plaintiffs during the period of the preliminary injunction, there are students receiving aversive interventions at JRC who are not Alleyne student plaintiffs.

**2. JRC fails to comply with the Regents prohibition on the use of aversives by continuing to use mechanical restraints for students who do not have child specific exceptions for the use of aversive interventions pursuant to sections 19.5(b) and 200.22(e) of the Regulations of the Commissioner of Education.**

*Applicable regulation:* *8 NYCRR section 200.7(b)(8)(i). Aversive interventions prohibited. (i) Except as provided in section 200.22(e) . . ., an approved private school serving school age students with disabilities . . . is prohibited from using aversive interventions to reduce or eliminate maladaptive behaviors of students.*

Findings:

a) JRC's written policies provide an exception for use of mechanical restraints for <u>emergency interventions</u> for Alleyne plaintiffs where the court did not provide this injunctive relief. The court's preliminary injunction ordered that NYSED be preliminarily enjoined from the enforcement of 8 NYCRR §200.22(f)(2)(vi) (limiting the use of aversives to aggressive and self-injurious behavior) and 8 NYCRR §200.22(f)(2)(ix) (prohibiting the combined use of aversive interventions with mechanical restraints), *only for* those named Student Plaintiffs identified in the September 1, 2006, amended complaint who: (1) have a current IEP that expressly permits Level III aversives, and that permitted Level III aversives on June 23, 2006; (2) have a current behavioral intervention plan that specifies the aversive intervention appropriate for each targeted behavior; and (3) have a current Massachusetts Probate Court order that authorizes the use of Level III aversives, and had such an order in effect on June 23, 2006.

b) JRC's written Policy on "Health Related Support Devices" inappropriately authorizes JRC to determine, without agreement by the Committee on Special Education (CSE), that students need mechanical restraints and transportation restraints on an "emergency basis" as health-related support devices. JRC's October 10, 2008 response states that physicians at JRC will determine whether the use of transportation restraint is necessary for certain NYS students. As stated in my September 17, 2008 letter to you, neither JRC nor a physician, including a physician under the employment or under contract with JRC, may unilaterally determine the educational or behavioral supports a student needs. These decisions rest with the CSE. *Note: This finding does not apply to the use of supports or health-related protections that are solely necessary for the student to achieve proper body position, balance or alignment, prevent re-injury during the time an injury is healing, prevent infection of a condition for which a student is being treated and enable staff to evacuate a student who is not capable of evacuation. It also does not apply to supports or health-related protections*

*ordered by a physician or other qualified technician during a specific medical or dental procedure.*

c) JRC's written policies are internally inconsistent and provide exceptions to NYSED regulations that are not allowable. While the JRC "Policy on Emergency Restraint" (DMR and EEC) (revised July 31, 2008) states that, "emergency mechanical restraint is not to be used on school-aged students from NY State," it also states that the policy on emergency restraint does not apply to "transportation restraint" and "supports and health related protections."

d) While the JRC "Policy on Transport Restraint for Non-Substituted Judgment Students" states that, "*Pursuant to New York regulations transport restraint will not be used with New York School age students who do not have transport restraint in his/her IEP*," the policy also states "*JRC may employ transport restraint even when not in the IEP if, during the school day or prior to any transport situation, a student exhibits or shows the possibility of exhibiting behaviors that are reasonably likely to be a danger to self or others*." This exception is not acceptable.

e) The JRC "Policy on Transitioning Students in Restraint" states that, "*New York school age students may not be placed in mechanical restraint without a child specific exception in his or her IEP. Any other exception to [sic] will be communicate in writing on the student's current status*." This statement seems to be an incomplete sentence and, as such, is unclear as to the exception to the prohibition of mechanical transportation restraints for New York State students. However, it appears to authorize one. Any exception to NYS's prohibition on the use of mechanical restraints, except as otherwise authorized by NYS regulation or the preliminary Court injunction for specific Alleyne student plaintiffs, is unacceptable.

f) The JRC "Policy on Supports and Health-Related Protections" states that, "*JRC may use supports or health-related protections with its students <u>as necessary</u>* [emphasis added] *and that, in addition, health-related protections may be ordered by a physician or other qualified technician if absolutely necessary during a specific medical or dental procedure for the student's protection during a time that a condition undergoing treatment pursuant to that clinician's order exists.*" The policy states that these supports and health related protections are not "emergency restraint" or "aversive behavioral interventions." The policy then goes on to state that JRC may use supports or health-related protections with its students in order to "*permit the student to participate in ongoing activities . . .*" The statements in this policy that authorize JRC staff to make determinations as to the use of mechanical restraints that would be considered "supports or health-related protections" and to do so at their discretion for the student to "participate in ongoing activities" are unacceptable as they provide broad authority for use of mechanical restraints beyond the Regents exception for interventions medically necessary for the treatment or protection of the student.

g) JRC's policy "Additional Requirements for the use of Court-Authorized Supplementary Aversive Therapy . . . with New York State School-Aged Students" (exhibit J of JRC's October 10, 2008 letter) defines aversive behavioral intervention inconsistent with 8 NYCRR section 19.5(b) as not including *"transportation restraint . . . and interventions medically necessary for the treatment or protection of the student to include mechanical restraints, health related supports or other similar interventions*." JRC's reinterpretation of NYSED regulations is unacceptable.

h) On pages 2 and 3 of the "Levels of Student Status," it states that, "for safety reasons, students are required to transition around the building in a *supportive guide* as well as carry their restraining bag during all transitions." The term "supportive guide" is undefined, but implies a mechanical restraint device of some type since the policy describes the students as being "in" such devices. This policy must be revised to add a definition of "supportive guide" and to clearly state that NYS students would not be required to carry their restraint bag nor may they be placed in any type of movement limitation, including a "supportive guide," except through a child-specific exception for movement limitation as an aversive intervention.

i) In paragraph C of the JRC Plan for Educational Services, "Notification of Significant Regression," the policy implies that JRC can unilaterally require transport restraint with a student that otherwise does not have such transport restraint as part of the IEP. This is an unacceptable exception and must, for NYS students, be removed from all of JRC's policies.

3. **JRC's written policies continue to authorize staff to combine the simultaneous use on a student of a physical or mechanical restraint device with another aversive intervention beyond that authorized through the Alleyne preliminary injunction.**

    *Applicable regulation:* *8 NYCRR section 200.22(f)(2)(ix).  No program may combine the simultaneous use on a student of a physical or mechanical restraint device with another aversive intervention.*

    Findings:

    a) The JRC "Policy on Supports and Health-Related Protections," which authorizes JRC staff to use supports or health-related protections with its students "as necessary" and simultaneous use of a mechanical restraint and aversives when JRC determines a student needs a health-related device at the same time an aversive is to be administered, is in direct violation of NYSED's prohibition of the combined use of restraint and aversive interventions [8 NYCRR section 19.5(b)].

b) The JRC "Policy on Additional Requirements for the use of Court-Authorized Supplementary Aversive Therapy . . . with New York State School-Aged Students" (exhibit J of JRC's October 10, 2008 letter) states, "*JRC will not use an aversive behavioral intervention with any NYSED student while he/she is in physical or mechanical restraint.  However, JRC may use aversive behavioral interventions with a student if he or she is in a Health Related Support device.*" Because of the findings as documented in compliance issue #2(c), (d) and (f) above, NYSED finds that this policy provides an unauthorized exception to NYSED's prohibition on the simultaneous use of mechanical and aversive interventions.

**4.    JRC's written policies authorize the Human Rights Committee to appoint subcommittees and to provide recommendations without all of the required members present.  For NYS students, all the required members must be present in order for the Human Rights Committee to meet the NYS required membership.**

*Applicable regulation:* *8 NYCRR section 200.22(f)(3)(ii).  Each Human Rights Committee shall be comprised of individuals not employed by the school or agency, which shall include at least one licensed psychologist with appropriate credentials in applied behavior analysis; one licensed physician, physician's assistant or nurse practitioner; one registered dietician or nutritionist; one attorney, law student or paralegal; and one parent or parent advocate and may include not more than two additional individuals selected by the school or agency. In addition, when the purpose of the Human Rights Committee meeting includes a review of an individual New York State student's program, a representative of the school district or agency placing the student in the program and a representative of the department shall be invited to participate.*

Findings:

a) In JRC's "Procedures Followed by JRC's Human Rights Committee" paragraph 12, it states that the Committee may appoint subcommittees and in paragraph 16, the policy references a quorum for voting purposes.  A Human Rights Committee meeting for NYS students must include all of the members required by NYS Regulations.

b) On page 10 of the JRC "Policy on Emergency Restraint (DMR)" it states the responsibilities of "A subcommittee of JRC's own Human Rights Committee."  A Human Rights Committee meeting for NYS students must include all of the members required by NYS Regulations.

5.  **JRC has failed to demonstrate that aversive interventions are administered by appropriately licensed professionals or certified special education teachers or under the direct supervision and direct observation of such staff.  [8 NYCRR section 200.22(f)(4)]**

    *Applicable regulation:  8 NYCRR section 200.22(f)(4).  Supervision and training requirements.  Aversive interventions shall be administered by appropriately licensed professionals or certified special education teachers in accordance with Part 80 of this Title and sections 200.6 and 200.7 of this Part or under the direct supervision and direct observation of such staff.*

    Findings:

    a) JRC did not submit any evidence or a plan that appropriately licensed professionals or certified special education teachers would be employed to provide direct supervision and direct observation of staff providing aversive interventions to NYS students.

    b) JRC's plan to establish Residential Living Quarters in the school building on Turnpike Street in Canton has not been approved by the Massachusetts oversight agencies.  Regardless, JRC's plan for an alternative living situation with a "licensed nurse on duty" failed to address how placing students in these alternative living quarters would meet this regulatory requirement.  JRC proposed this despite my letter to you of March 26, 2007 in which I clearly stated that a licensed practical nurse (LPN) would not be considered to be an appropriately licensed professional for this purpose.

    c) JRC states it created two new positions of "overnight school supervisors" to be filled by two of JRC's Programming Department staff and describes other changes to its staffing and DVR monitoring.  However, JRC failed to indicate the license or certification of these individuals and how they meet the NYSED requirement.  JRC's response that the administration of aversives is "reported to" the nurse and the overnight school supervisor so they are "immediately aware of all critical incidents" is insufficient.  While these additional staff persons may serve to provide more quality assurance and safer use of aversives than JRC has demonstrated in the past, it still does not meet the NYSED regulation that aversive interventions be administered by appropriately licensed professionals or certified special education teachers or under the direct supervision and direct observation of such staff.  [8 NYCRR section 200.22(f)(4)]

    d) JRC implies in its October 2008 response that JRC does not need to meet this regulatory requirement for Student Plaintiffs in the Alleyne action, despite the fact that there is no preliminary injunction of 8 NYCRR section 200.22(f)(4).

6. **JRC's written policies and training to staff are inadequate to assess and address collateral effects of the use of aversive interventions and to prepare staff to implement behavioral intervention plans for students with complex behavioral issues. [8 NYCRR section 200.22(f)(4) and 200.22(f)(7)(i)]**

   *Applicable regulation: 8 NYCRR section 200.22(f)(4)(iv). Training shall be provided on a regular, but at least annual basis, which shall include, but not be limited to, training on assessing and responding to the collateral effects of the use of aversive interventions including, but not limited to, effects on a student's health, increases in aggression, increases in escape behaviors and/or emotional reactions; and 8 NYCRR section 200.22(f)(7) Progress monitoring. (i) The program shall provide for ongoing monitoring of student progress, including the collection and review of data and information. Such information shall include reports on the assessment of and strategies used to address any indirect or collateral effects the use of aversive interventions may be having on the student, including, but not limited to, increases in aggressive or escape behaviors, health-related effects and/or emotional reactions.*

   Findings:

   a) NYSED continues to find JRC's policies dismissive of this important issue. In the introduction to JRC's written procedures to assess and address collateral effects, it states, "*the minimal and very infrequent risks of collateral effects that are described below must be weighed against the extraordinary benefits that Level III procedures provide to students.*" The procedures describe two types of risk - physical and psychological/behavioral. Under physical, the procedures give the examples of "*temporary skin redness, which clears up within a few minutes or a few days at most, and the extremely rare possibility that a small blister may appear.*" Under psychological/behavioral risks, JRC's response states that, "*The psychological/behavioral risks that might be associated with GED Level III procedures include anxiety (nervousness, tensing muscles) during the period between the occurrence of the behavior and the occurrence of the programmed consequence and escape responses. Escape behaviors may involve an increase in aggression, attempting to remove the device or otherwise interfering with administration of the application. Such escape and interfering responses are also treated with the GED so that the skin shock can be applied as designed . . . The potential physical risks associated with movement limitation procedures may include the following: abrasions, chafing, redness of the skin and consequences of struggling with staff. There are no particular psychological/behavioral risks associated with movement limitation other than temporary frustration that the student may experience during the period of movement limitation.*" While these procedures direct attention to some of the immediate physical and/or emotional effects of an aversive consequent, they do not direct staff's attention for assessing the longer term collateral effects. In addition, this policy, which authorizes staff to administer the GED for escape and interfering responses, is inconsistent with the requirement that such

Page 8

      interventions be used only for the self-injurious or aggressive behaviors identified for such use in the student's IEP.

    b) Rather than direct staff to be vigilant and well trained in assessing and assuring that health and other potential effects are identified and appropriately addressed, the procedures lead staff to look only for the immediate physical and reactive responsive to a Level III aversive (and in some cases to administer the GED for certain reactions).  In contrast to JRC's prior submission, these procedures do not provide even a limited list of some behaviors to look for, and it continues to fail to provide any specifics to its procedures as to how to do so, especially in an environment when students are consequated for talking to staff, pleading for changes to their plans and even for behaviors related to depression.

    c) JRC indicated it has ceased using the behavioral tutorial, but it failed to submit other evidence of how it meets this training requirement.

    d) JRC's "In-service Training Policy" does not include a training title related to the assessment and response to collateral effects of aversive interventions.

**7.** **JRC failed to submit documentation that it provides annual training to its staff on the minimum topics required by 8 NYCRR section 200.22(f)(4).**

*Applicable regulation:*  *(4) Supervision and training requirements.  Aversive interventions shall be administered by appropriately licensed professionals or certified special education teachers in accordance with Part 80 of this Title and sections 200.6 and 200.7 of this Part or under the direct supervision and direct observation of such staff.  Training shall be provided on a regular, but at least annual basis, which shall include, but not be limited to, training on:*
*(i)   safe and therapeutic emergency physical restraint interventions;*
*(ii)  data collection of the frequency, duration and latency of behaviors;*
*(iii) identification of antecedent behaviors and reinforcing consequences of the behavior;*
*(iv) approaches to teach alternative skills or behaviors including functional communication training;*
*(v)  assessment of student preferences for reinforcement;*
*(vi) assessing and responding to the collateral effects of the use of aversive interventions including, but not limited to, effects on a student's health, increases in aggression, increases in escape behaviors and/or emotional reactions;*
*(vii) privacy rights of students; and*
*(viii) documentation and reporting of incidents, including emergency restraints and injuries.*

Findings:

In JRC's written policy, "Pre-Service Training and JRC Policy on Pre-Service and In Service Training," it lists training topics that all of its direct care staff must complete and an in-service training program by training topics for all staff. These training sessions do not meet the 8 NYCRR section 200.22(f)(4) requirement that training must be provided on the minimum topics required. While some of these topics appear to be covered in the training (e.g., privacy training), not all are identified by title.

8. **JRC's policies authorize its staff to make changes in the behavior management procedures for Allenye student plaintiffs without recommendation by the CSE.**

   *Applicable Regulation:* Aversive intervention procedures may be used only if such interventions are recommended by the CSE consistent with the student's IEP and behavioral intervention plan as determined by the CSE. [8 NYCRR section 200.22(f)(2)(ii)]

   Finding:

   JRC's "Policy on Notification of Changes in Behavior Management Procedures" states that, "in the case of students who are 21 or under and from New York, no change in aversive intervention procedures will be made unless the change has been recommended by the CSE consistent with the student's IEP and behavioral intervention plan as determined by the CSE" but goes on to provide an exception for students from New York whose parent or guardian is a plaintiff in a federal lawsuit against NYSED and who has obtained relief from this requirement as part of a temporary restraining or permanent injunction. In the court's preliminary injunction, the Court ordered that NYSED be preliminarily enjoined only from the enforcement of 8 NYCRR §200.22(f)(2)(vi) (limiting the use of aversives to aggressive and self-injurious behavior) and 8 NYCRR §200.22(f)(2)(ix) (prohibiting the combined use of aversive interventions with mechanical restraints), *only for* those named Student Plaintiffs identified in the September 1, 2006, amended complaint who: (1) have a current IEP that expressly permits Level III aversives, and that permitted Level III aversives on June 23, 2006; (2) have a current behavioral intervention plan that specifies the aversive intervention appropriate for each targeted behavior; and (3) have a current Massachusetts Probate Court order that authorizes the use of Level III aversives, and had such an order in effect on June 23, 2006. The court did not provide an injunction that would permit JRC to unilaterally change the student's IEP outside of the CSE process.

In summary, based on the above outstanding compliance issues in JRC's written policies and pursuant to its authority in 8 NYCRR section 200.7(c)(6), effective 30 calendar days from the date of this letter, JRC's approval to accept new admissions of NYS students is revoked. You may respond to this notice of revocation of approval to accept

new admissions of New York State students by submitting a written reply, in accordance with 8 NYCRR section 200.7(a)(3)(ii) (copy enclosed), along with any supporting material, to me within 30 calendar days of this notice. Your reply should respond to the findings specified in this notice, present the program's position and provide information which the program believes is pertinent to the case. A request for a hearing to review a proposed decision to revoke new admissions may be made in writing to me, as Commissioner's designee, within 10 calendar days of receipt of this notice. You must immediately notify any school districts for which you are currently considering placement of new students of the pending termination of approval to accept New York State students.

Effective the date of this letter and until such date as JRC's written policies receive approval by NYSED, JRC must not initiate the use of aversive interventions with any NYS students who are not currently receiving aversive intervention pursuant to the child-specific exception process in section 200.22(e) of the Regulations of the Commissioner of Education. NYSED will notify the CSE for each NYS student currently enrolled at JRC, including those receiving aversive interventions, of NYSED's determination that JRC does not have policies and procedures relating to behavioral interventions that comply with the State's requirements. However, NYSED will not require that JRC cease the use of aversive interventions for NYS students unless there is a change to the students' IEPs to recommend discontinuation of the use of aversive interventions.

In addition, you must immediately provide NYSED the names of each NYS student currently placed at JRC for whom it cannot provide an appropriate educational and residential program consistent with NYSED regulations, and submit documentation to NYSED that JRC has requested the CSE for each such student to seek an alternative placement. This action is required in response to JRC's October 2008 letter to NYSED that implied that without the use of mechanical restraints for transportation, JRC is unable to meet the needs of certain students given the distance of JRC residences from its educational program.

If you have any questions with regard to this notice, please contact me.

Sincerely,

James P. DeLorenzo

Enclosure

c:   Rebecca H. Cort
     Dr. Jean McGuire, Massachusetts Department of Mental Retardation
     Andrea Maislen, Massachusetts Department of Mental Retardation

**200.7 Program standards for education programs for students and preschool students with disabilities being educated in private schools and State-operated or State-supported schools.**

(a) *Approval of private schools for students with disabilities funded pursuant to article 89 of the Education Law.*

(1) General.

(i) Private schools and special-act school districts for students with disabilities, including summer schools, shall be eligible for approval by the commissioner to receive public funds for the education of students with disabilities, provided such schools meet the criteria in this Part.

(ii) Facilities of educational programs located outside the continental United States shall not be eligible for approval.

(iii) Reimbursement rates shall be calculated according to New York State statutes and applicable regulations for all approved private schools, including out-of-state schools and for special-act school districts. However, the commissioner may accept reimbursement rates for out-of-state schools calculated by the state in which the school is located, provided those rates have been approved by the state in which the school is located.

(iv) Private schools seeking initial approval to be reimbursed with public funds shall have access to sufficient capital or other financial resources, other than revenues expected from New York State or local school districts, to cover all operating, property maintenance, leasing or purchase costs during the year of conditional approval.

(2) Approval of private schools for reimbursement with public funds.

(i) Conditional approval for private schools shall be limited to a period of one school year, or the period of time required to complete approval, and will be based on:

(a) submission of program information forms and after September 8, 1995, the submission of documentation of regional need and sufficient evidence to establish that the proposed program will serve only those students who, because of the nature or severity of their disability, would require a separate facility;

(b) submission of budget or financial statement information, including evidence that the school has enough capital or other financial resources, other than State or local sources of revenue, to be able to operate for at least one year;

(c) a fire safety check by the New York State Division of Fire Prevention and Control for in-state private schools, and a State or local fire safety check for out-of-state schools;

(d) for schools operating as corporate entities, evidence of the following:

(1) for in-state not-for-profit schools, a charter or application for a charter from the Board of Regents, incorporating a school authorized to provide special education services;

(2) for in-state for-profit schools, approval by the commissioner of the school's incorporation for the provision of special education; or

(3) for out-of-state schools, a license or charter from the state education agency of the state in which the school is located;

(e) at least one onsite program review visit by program or fiscal staff of the Education Department; and

(f) submission for approval of the school's procedures regarding behavioral interventions, including, if applicable, procedures for the use of aversive interventions.

(ii) Final approval of schools which have had conditional approval:

(a) will be based on at least two site visits by program or fiscal staff of the Education Department during the year of conditional approval; and

(b) will take effect as of the date a final approval letter is issued by the commissioner, or his designee.

(3) Denial or termination of private school approval. Private schools may be

denied approval or removed from New York's list of private schools approved for reimbursement with public funds, or such approval may be terminated according to the following procedure:

(i) The commissioner or his/her designee will notify the school in writing of the reasons why denial or termination of approval is necessary, including a list of program or financial deficiencies and violations of State and Federal law or regulations which the commissioner believes to exist at the schools.

(ii) Schools may reply to the commissioner's notification within 30 days, addressing the commissioner's statement of reasons, indicating whether deficiencies or violations exist, what steps may be taken to correct conceded deficiencies or violations, and the time period in which deficiencies or violations will be corrected. If no reply is received, termination will be effective 30 days from the date of receipt of the commissioner's notification.

(iii) Requests for a hearing to review a proposed decision to deny or terminate approval may be made to the commissioner's designee. The request shall be made in writing to the commissioner's designee within 10 business days of receipt of a notice of removal from the list.

(iv) Schools may be removed from the approved list five business days after written notice by the commissioner indicating that there is a clear and present danger to the health or safety of students attending the school, and listing the dangerous conditions at the school, including, but not limited to, evidence that an approved private school is using aversive interventions to reduce or eliminate maladaptive behaviors of students without a child-specific exception provided pursuant to section 200.22(e) of this Part or that an approved private school is using aversive interventions in a manner inconsistent with the standards as established in section 200.22 (f) of this Part.

(b) *Operation and administration of private schools and State-operated and State-supported schools.*

(1) Parents of students attending schools governed by this section shall not be asked to make any payments in lieu of, in advance of or in addition to, State, school district or county payments for allowable costs for students placed according to New York State procedures.

(2) The confidentiality of pupil records at schools governed by this Part shall be maintained, and parental access to such records shall be permitted, in a manner comparable to that required of school districts pursuant to section 200.2(b)(6) of this Part.

(3) Code of conduct. An approved private school, a State-operated school, and a State-supported school shall develop a code of conduct policy. The content of such policy shall be consistent with the provisions of section 100.2(l)(1)(i) (a)-(d), (f)-(g) of this Title. The discipline of students with disabilities attending any school governed by this section shall be consistent with Part 201 of this Title.

(4) The length of the school day shall be comparable to that required by section 175.5 of this Title. The school day shall include instructional services and related services, as required, but shall not include transportation.

(5) Instruction for not less than 180 days each year shall be provided for each student. Approved private schools and State-operated and State-supported schools shall submit calendars of such days in session to the commissioner for approval by July first of the preceding school year. All approved private schools shall comply with the Education Law regarding attendance. Attendance registers shall be available for inspection by appropriate personnel of the contracting school districts, the department, and the school district in which the school is located.

(6) Personnel qualifications and screening procedures. All professional instructional and supervisory personnel at schools governed by this section shall be appropriately certified in accordance with the provisions of Part 80 of this Title and section 200.6 of this Part. All noninstructional personnel at residential schools governed by this section shall be appropriately qualified in accordance with the provisions of section 200.15 of this Part. All persons applying to be employees or volunteers at residential schools governed by this section shall be screened in accordance with the provisions of section 200.15 of this Part.

(7) An approved private school, a State-operated school, or a State-supported school shall conform to all applicable fire and safety regulations of the State and municipality in which it is located. Each such school shall cause an annual inspection to be made in the manner set forth in subdivision 3 of section 807-a of the Education Law. A report of such inspection shall be made upon forms supplied by the commissioner and shall be maintained on file at the school. For schools subject to provisions of section 807-a of the Education Law, the report prepared pursuant thereto shall be deemed equivalent.

    (8) Aversive interventions prohibited.

        (i) Except as provided in section 200.22(e) of this Part, an approved private school serving school age students with disabilities, a State-operated school, or a State-supported school is prohibited from using aversive interventions to reduce or eliminate maladaptive behaviors of students.

        (ii) An approved preschool program is prohibited from using aversive interventions with preschool students with disabilities without exception.

(c) *Additional operational and administrative provisions related solely to private schools.*

    (1) Application. An application shall be made to the commissioner by the board of education for approval of the placement of a student with a disability in an approved private educational facility which has been determined to be the least restrictive environment for the student. An annual application for the continued placement of a student with a disability in such approved facility shall be submitted by the board of education to the department prior to June first preceding the school year for which such continued placement is sought.

    (2) No student with a disability shall be removed or transferred from an approved in-state school without the approval of the school district contracting for education of such student pursuant to section 4402 of the Education Law. No student with a disability shall be removed or transferred from an approved out-of-state school without such recommendation by the committee on special education.

    (3) Educational programs initially approved for reimbursement after September 1, 1981 shall provide instruction to a minimum of 16 students by September 1, 1982.

    (4) An educational progress report on each student, which describes such student's progress toward meeting the annual goals, shall be provided by the approved school to the committee on special education of the referring district or the referring agency at least annually. Other required data and/or reports shall be made available by the private school to the referring district or agency on request.

    (5) Residential schools may provide temporary care for persons over the age of 21 who are receiving transitional care pursuant to section 4402(1)(b)(4)(e) of the Education Law. When an individual receiving transitional care is about

Case 8:10-cv-00036-GLS-RFT   Document 13-14   Filed 03/02/10   Page 17 of 18

Section 200.7                                                                                            Page 6 of 6

to be transferred from a residential school to an adult placement, a transfer plan shall be prepared by the residential school and forwarded to the receiving facility, the individual, and unless the individual objects, the parents, guardian or other family members prior to the transfer. The transfer plan shall include any information necessary to facilitate a safe transfer such as specific problems, a schedule for administering medications and behavior unique to the individual. In the event an individual receiving transitional care at a residential school is considered to adversely affect the health, safety or welfare of children residing in the facility, notification may be made by the residential school to the State Education Department to determine the need to discontinue the transitional placement.

(6) Policies and procedures relating to the use of aversive interventions. Not later than August 15, 2006, a private school that proposes to use or to continue to use aversive interventions in its program shall submit its written policies and procedures on behavioral interventions to the department. Only those private schools with policies and procedures that are approved pursuant to section 200.22(f)(8) of this Part on or before June 30, 2007 shall be authorized to use such interventions with New York State students. Failure to comply with the provisions of this paragraph may result in revocation of approval to accept new admissions of New York State students or termination of private school approval pursuant to paragraph (a)(3) of this section.

bc:    Patricia J. Geary
       Daniel Johnson
       Eileen Borden
       Ellen Ganon
       Kathleen Surgalla
       Mary Ellen Clerkin
       Kelly Munkwitz