

**THE STATE EDUCATION DEPARTMENT** / THE UNIVERSITY OF THE STATE OF NEW YORK / ALBANY, NY 12234

OFFICE OF VOCATIONAL AND EDUCATIONAL SERVICES FOR INDIVIDUALS WITH DISABILITIES
STATEWIDE COORDINATOR FOR SPECIAL EDUCATION
Room 1624 One Commerce Plaza  •  Albany, NY 12234          Telephone  (518) 402-3353    Fax:  (518) 473-5769
www.nysed.gov

June 1, 2009

Dr. Matthew Israel
Executive Director
Judge Rotenberg Educational Center
240 Turnpike Street
Canton, MA  02021

Dear Dr. Israel:

On March 23, 2009, the New York State Education Department (NYSED) provided written 30-day notice to the Judge Rotenberg Educational Center (JRC) that it would impose enforcement actions pursuant to section 200.7(c)(6) of the Regulations of the Commissioner of Education for failure to comply with 8 NYCRR §200.7(f)(8).  JRC has had notice since 2007 of its compliance responsibilities in this regard.  This written enforcement notice was provided after numerous compliance notifications to JRC on these same issues.  NYSED is required by federal regulation to take appropriate enforcement actions when a school fails to correct compliance within one year.

On April 22, 2009, attorneys for JRC submitted a response, pursuant to 8 NYCRR §200.7(a)(3)(ii), to NYSED's March 23, 2009 notification of impending enforcement action. In JRC's April 22, 2009 response, it states that the "alleged violations and deficiencies set forth in the March 2009 notification do not exist," yet it enclosed revised policies for review by NYSED requesting that NYSED approve its revised policies and procedures and withdraw the March 2009 notification or withdraw the March 2009 Notification and give JRC "reasonable time to cure whatever alleged violations or deficiencies ... remain."  While JRC's letter makes clear to NYSED that JRC continues its pattern of responses that demonstrate a lack of deference to the rules promulgated by the Board of Regents and despite the fact that JRC has not conceded any noncompliance, it did submit new and/or revised policies to address the findings of noncompliance. NYSED has reviewed the individual compliance responses submitted by JRC on April 22, 2009 and NYSED's findings with regard to each issue are identified below.

1. **JRC's written policies continue to authorize JRC staff to provide aversive consequences to students for behaviors other than the specific self-injurious and/or aggressive behaviors that threaten the physical well being of the students or that of others. JRC's written policies do not comply with 8 NYCRR §200.22(e)(1) and 200.22(f)(2)(vi).**



Upon receipt of notice of impending enforcement action unless such policies were revised to comply with New York State (NYS) regulatory requirements, JRC submitted a response to NYSED dated April 22, 2009 stating that "no violation or deficiency exists," claiming that NYSED has "misinterpreted" JRC's policies "to create noncompliance where none exists." NYSED does not accept JRC's arguments that its prior policies were in compliance with NYS Regulations.

Despite its arguments, JRC did submit a new written policy for NYS students entitled "Additional Requirements for the Use of Court-Authorized Supplementary Aversive Therapy (Aversive Interventions) with New York State School-Aged Students (NY Students)" in which it states that JRC will use aversive interventions only for self-injurious and/or aggressive behaviors that threaten the physical well-being of the student or that of others and only where aversive interventions have been recommended by the Committee on Special Education (CSE). NYSED accepts JRC's policy on this issue, on the condition that there is no other inconsistent policy at JRC that would provide any exception to this rule. Consistent with JRC's revised written policies regarding this compliance issue, it is our understanding that JRC will not be recommending to school districts that the individualized education programs (IEPs) include the use of aversive interventions for behaviors other than the self-injurious and/or aggressive behaviors that threaten the physical well-being of the student or that of others. It is also our understanding that JRC will not identify behaviors as "self-injurious" or "aggressive" to include other behaviors that JRC has referred to as "shaped-down" versions of the behavior(s) or incipient behaviors in the chain of behaviors. Please note that NYSED continues to comply with the court order for the preliminary injunction to this regulatory requirement for student plaintiffs in <u>Alleyne v NYSED</u>.

JRC's website, which is its public representation of its written policies must be consistent with its actual policies and demonstrate compliance with State requirements. To do otherwise is to mislead the public. JRC stated in its April 22, 2009 response that its website language will be revised to state "No JRC policy authorizing treatment with aversive interventions for behaviors other than aggression, self-abuse or property destruction shall apply to school aged students from New York State." This proposed website revision is inconsistent with NYS requirements by inclusion of "property destruction" and must be revised. It is JRC's responsibility and NYSED's expectation that JRC will revise its public presentation of its policies on JRC's website to be consistent with NYS requirements and submit periodic evidence of current website postings related to these regulations. I note that as of May 31, 2009, JRC's website had not been revised as promised in JRC's April 22, 2009 letter.

**2. JRC fails to comply with the Regents prohibition on the use of aversives by continuing to use mechanical restraints for students who do not have child specific exceptions for the use of aversive interventions pursuant to sections 29.5(b) and 200.22(e) of the Regulations of the Commissioner of Education.**

Upon receipt of notice of impending enforcement action unless such policies were revised to comply with NYS regulatory requirements, JRC submitted a response, dated April 22,

2009, in which it states that "no violation or deficiency exists."  NYSED does not accept JRC's arguments that its prior policies were in compliance with NYS regulations.  Despite its arguments, JRC did submit new policies to comply with NYS requirements as follows:

- "JRC Policy on Supports and Health-Related Protections For NY State School Aged Students"
- "JRC Policy on Emergency Restraint - for NY State School Aged Students Living at Residences Licensed by the Massachusetts Department of Early Education and Care"
- "JRC Policy on Emergency Restraint - for NY State School Aged Students Living at Residences Licensed by the Massachusetts Department of Mental Retardation"
- "JRC Policy on Transport Restraint for NY State School Aged Non-Substituted Judgment Students"
- "JRC Policy on Transitioning NY State School Aged Students in Restraint," "Additional Requirements for the Use of Court-Authorized Supplementary Aversive Therapy (aversive behavioral interventions) with New York State School Aged Students (NY Students)"
- "JRC Plan for Educational Services for NY State School Aged Students"

NYSED accepts JRC's revised written policies on this issue, on the condition that there are no other inconsistent policies at JRC that would provide any exception to this rule.  Please note that NYSED provides an exception for Alleyne v NYSED student plaintiffs pursuant to the preliminary injunction.

**3.  JRC's written policies continue to authorize staff to combine the simultaneous use on a student of a physical or mechanical restraint device with another aversive intervention beyond that authorized through the Alleyne v NYSED preliminary injunction in direct violation of 8 NYCRR §200.22(f)(2)(ix) and 200.22(d)(1).**

Upon receipt of notice of impending enforcement action unless such policies were revised to comply with NYS regulatory requirements, JRC submitted a response, dated April 22, 2009, in which it states that "no violation or deficiency exists."  NYSED does not accept JRC's arguments that its prior policies were in compliance with NYS regulations or that NYSED failed to raise compliance issues with JRC's written policies.

Despite its arguments, JRC did submit new policies to comply with NYS requirements. JRC submitted a revised "JRC Policy on Supports and Health-Related Protections for NY State School Aged Students" that states that "JRC may use supports or health-related protections with its students when such supports or health related protections are medically necessary for the treatment or protection of the student" and a revised "Policy on Additional Requirements for the Use of Court Supplemental Aversive Therapy (aversive behavioral interventions) with New York State School-Aged Students (NY students)" that removed the previous exception to this rule.  NYSED accepts these revised policies on the condition that there are no other inconsistent policies at JRC that would provide any exception to this rule.

On May 28, 2009, I received a "supplement" to JRC's April 22, 2009 letter stating that JRC had construed "mechanical restraints" to exclude supports and health-related protections. The purpose of this letter is unclear.  If JRC is having difficulty interpreting health supports from mechanical restraints, it should review my July 2, 2008 letter to Matthew Israel in which I further clarified that soft helmets for the prevention of injuries during seizures or therapeutic arm splints for students with severe self-injurious behaviors or restraints necessary during medical procedures would not be considered "mechanical restraints" for the purpose of this regulation.

4. **JRC's written policies authorize the Human Rights Committee to appoint subcommittees and to provide recommendations without all of the required members present.  For NYS students, all the required members must be present in order for the Human Rights Committee to meet the NYS required membership pursuant to 8 NYCRR §200.22(f)(3)(ii).**

Upon receipt of notice of impending enforcement action unless such policies were revised to comply with NYS regulatory requirements, JRC submitted a response, dated April 22, 2009, in which it states that "no violation or deficiency exists."  NYSED does not accept JRC's arguments that its prior policies were in compliance with NYS regulations or that NYSED failed to raise compliance issues with JRC's written policies.

Despite its arguments, JRC did submit a new policy to comply with NYS requirements entitled "JRC Procedures Followed by JRC's Human Rights Committee for New York State School Aged Students" and revised other policies that provided exceptions to the regulatory requirement.  NYSED accepts these revised written policies upon the condition that there are no other inconsistent policies at JRC that would provide any exception to this rule.   Note that JRC is currently out of compliance with its policy and 8 NYCRR § 200.22(f)(3)(iii) for not conducting the required quarterly meetings to monitor the school's behavior intervention program for New York State students being considered for or receiving aversive interventions to ensure the protection of legal and human rights of individuals.  NYSED expects that JRC will immediately take steps to come into compliance with this policy.

5. **JRC has failed to demonstrate that aversive interventions are administered by appropriately licensed professionals or certified special education teachers or under the direct supervision and direct observation of such staff in direct violation to 8 NYCRR §200.22(f)(4).**

Upon receipt of notice of impending enforcement action unless such policies were revised to comply with NYS regulatory requirements, JRC submitted a response, dated April 22, 2009, in which it states that "no violation or deficiency exists."  NYSED does not accept JRC's arguments that its prior policies were in compliance with NYS regulations or that NYSED failed to raise compliance issues with JRC's written policies.

On this issue, JRC has not submitted any revised policy or written plan to demonstrate good faith that it complies or intends to comply with this regulatory requirement.  Instead it

argues why it disagrees with the regulatory requirement and presents irrelevant, misleading and out of context information to "support" its arguments.  NYSED has been very clear with JRC as to the actions it must take to reach compliance on this issue, as documented below:

- On March 26, 2007, NYSED responded in writing to JRC answering questions posed to NYSED in an email from JRC dated January 11, 2007 regarding this requirement.
- On June 8, 2007,  NYSED notified JRC in writing that its policies do not comply with the §200.22(f)(4) supervision requirement and that JRC's "certification" of individuals based on their participation in a JRC training program can not substitute for the licensure/certification requirements of the Regulations.
- On July 6, 2007, JRC submitted a response to NYSED stating that it believes there are no legal requirements that individuals applying aversive consequences be licensed or certified.
- On October 10, 2007, NYSED again notified JRC in writing that it must ensure the appropriate supervision and training required pursuant to 8 NYCRR §200.22(f)(4).
- On October 14, 2007, JRC submitted its written response to NYSED, continuing its noncompliance with this requirement.
- On March 17, 2008, NYSED received a copy of a final report from the Disabled Persons Protection Commission (DPPC) for DPPC Case Numbers 76157; 76158; 76229; and 77059 for an incident that occurred on August 26, 2007 (copy enclosed). This report documents the failure of JRC's policies, procedures, supervision and video surveillance system to protect students from inappropriate administration of aversive interventions.  In this documented incident, four student victims were identified, one of whom received 77 inappropriate electric shock consequences while strapped to a four-point board restraint for over a three hour period.
- On May 16, 2008, NYSED again notified JRC in writing that it had not demonstrated that aversive interventions are administered by appropriately licensed professionals or certified special education teachers or under the direct supervision and direct observation of such staff.  NYSED required JRC to submit a written corrective action plan identifying the steps and proposed time period in which to meet this regulatory requirement.
- On July 1, 2008, NYSED staff met with JRC staff and provided clarification to this regulation.  NYSED offered to review a list of license titles that JRC proposed to use to meet this requirement.  JRC and NYSED staff discussed various options that were acceptable and not acceptable to NYSED for JRC to comply with this requirement.
- On July 10, 2008, in an appeal before the Second Circuit in Alleyne v NYSED, plaintiffs' motion for a preliminary injunction enjoining enforcement of 8 NYCRR § 200.22(f)(4) was denied.  NYSED was ordered to abstain from taking action which would change the placement or treatment of the student plaintiffs without providing at least thirty days notice, to all parties and the court, in the absence of a true emergency situation. (see Case 1:06-cv-00994-GLS Document 203 Filed 07/11/2008).   NYSED has strictly complied with that order.
- On July 14, 2008, JRC responded in writing to NYSED on this issue indicating that "JRC believes that its existing practices and procedures – bolstered by its extensive video monitoring system … ensure that aversive interventions are administered safely,

appropriately, and in compliance with § 200.22(f)(4)." While it stated that it "continues to recruit additional certified special education teachers, licensed psychologists and other personnel to work at JRC," it failed to indicate how such certified and licensed personnel would be responsible to administer the aversive intervention or provide the direct supervision and direct observation of such staff. Therefore, in its July 14, 2008 response, JRC provided no evidence that it would take any steps to meet this regulatory requirement.

- On September 17, 2008, NYSED notified JRC in writing of its continuing noncompliance with this Regulation and provided JRC with a recommendation as to how it can minimally meet compliance in this area. Specifically, NYSED stated that "For each residence and educational setting (school building) in which NYS students who have a child specific exception for the use of aversive interventions reside or attend, JRC must have on site at least one appropriately licensed or certified professional observing and directly supervising the use of aversive behavioral interventions. While this could be done through video monitoring of different rooms in the residence or school, the professional staff person must be physically located in the same building as the students. Video monitoring must ensure proximity of the professional to the actual delivery of the aversive intervention to the extent that it would allow the professional to intervene expeditiously if necessary. JRC must submit its hiring plan and its documentation of recruitment. While this plan may be implemented incrementally, JRC must provide a monthly update to NYSED with full compliance not later than January 1, 2009." JRC failed to submit a plan to meet these requirements and failed to provide a monthly update on its progress to come into compliance with this requirement.

- On October 10 and 25, 2008, JRC submitted its revised policies, failing to submit any evidence or a plan that appropriately licensed professionals or certified special education teachers would be employed to provide direct supervision and direct observation of staff providing aversive interventions with NYS students.

- On March 23, 2009, NYSED again notified JRC of its continuing noncompliance with this requirement.

JRC's April 22, 2009 response simply reiterates its previous plan, even though NYSED had received confirmation from the Massachusetts oversight agencies that it had not approved JRC's proposed alternative living situation for NYS students and that NYSED had made it clear in its March 23, 2009 response that NYSED did not approve JRC's proposal to meet compliance on this issue. JRC provided no plan or policy as required, and failed to submit the status or timetable of its hiring efforts. Further, JRC did not specify how any certified and licensed personnel it is seeking to hire would be responsible to administer the aversive intervention or provide the direct supervision and direct observation of such staff to meet the regulatory requirement. Therefore, NYSED will proceed with its enforcement action pursuant to section 200.7(c)(6) for noncompliance with this regulatory requirement.

**6. JRC's written policies and training to staff are inadequate to assess and address collateral effects of the use of aversive interventions and to prepare staff to**

Upon receipt of notice of impending enforcement action unless such policies were revised to comply with NYS regulatory requirements, JRC submitted a response to NYSED dated April 22, 2009 stating that "no violation or deficiency exists," claiming that NYSED has "misinterpreted" JRC's policies "to create noncompliance where none exists."   NYSED does not accept JRC's arguments that its prior policies were in compliance with NYS Regulations.

Despite its arguments, JRC did concede that aversive interventions have the potential for long-term collateral effects and has submitted a revised written policy for NYS students entitled "Procedures to Facilitate the Assessment of Possible Collateral Effects."  NYSED accepts JRC's policy on this issue, on the condition that there is no other inconsistent policy at JRC that would provide any exception to this rule.  NYSED urges JRC to seek technical assistance on this issue from trauma experts, such as those on the list NYSED provided to JRC, to ensure its procedures are adequate and appropriate for its continuing and, in most cases, multi-year treatment of students with consequences that are intended to inflict a high level of pain and discomfort to the student.

**7. JRC failed to submit documentation that it provides annual training to its staff on the minimum topics required by 8 NYCRR §200.22(f)(4).   Regulations require training be provided on a regular, but at least annual basis, which must include, but not be limited to, training on eight topics identified in the regulations.**

Upon receipt of notice of impending enforcement action unless such policies were revised to comply with NYS regulatory requirements, JRC submitted a response, dated April 22, 2009, in which it states that "no violation or deficiency exists."  NYSED does not accept JRC's arguments that its prior policies were in compliance with NYS regulations.    Despite its arguments, JRC did concede that aversive interventions have the potential for long-term collateral effects and has submitted a revised written policy entitled "Annual Training on Minimum Topics Required by 8 NYCRR section 200.22(f)(4)."   NYSED accepts JRC's revised policy on this issue with the full expectation that the policy be immediately implemented.

**8. JRC's policies authorize its staff to make changes in the behavior management procedures for <u>Alleyne v NYSED</u> student plaintiffs without recommendation by the CSE, which is inconsistent with 8 NYCRR §200.22(f)(2)(ii) which states that aversive intervention procedures may be used only if such interventions are recommended by the CSE consistent with the student's IEP and behavioral intervention plan as determined by the CSE.**

Upon receipt of notice of impending enforcement action unless such policies were revised to comply with NYS regulatory requirements, JRC submitted a response, dated April 22, 2009, in which it states that "no violation or deficiency exists and NYSED's finding is incorrect."   NYSED does not accept JRC's arguments that its prior policies were in

compliance with NYS regulations. Despite its arguments, JRC has revised its written policy to no longer authorize its staff to make changes in its use of aversive behavior management procedures for NYS students without a recommendation from the CSE for NYS students. NYSED accepts JRC's policy on this issue, on the condition that there is no other inconsistent policy at JRC that would provide any exception to this rule.

In summary, based on review of JRC's April 22, 2009 resubmission of its written policies, NYSED finds JRC's revised written policies to now be in compliance with its written policies related to issues 1-4 and 6-8 as identified above. Any further revisions to JRC's written policies and procedures must be immediately provided to NYSED and are subject to NYSED's review and approval to ensure compliance with NYS regulations. NYSED expects that these approved policies will be immediately and fully implemented, replacing the previous noncompliant policies. NYSED finds, however, that JRC is in continuing noncompliance with 8 NYCRR §200.22(f)(4), which requires that aversive interventions are administered by appropriately licensed professionals or certified special education teachers or under the direct supervision and direct observation of such staff.

I also note that in my March 23, 2009 letter to you, I required you to immediately provide NYSED the names of each NYS student for whom it cannot provide an appropriate educational and residential program consistent with NYSED regulations, and to submit documentation to NYSED that JRC has requested the CSE for each such student to seek an alternative placement. This action was required in response to JRC's October 2008 response to NYSED in which JRC indicated that, without the use of mechanical restraints for transportation, it would be unable to meet the needs of certain students given the distance of JRC residences from its educational program. JRC did not respond to this directive. Therefore, this letter also serves to confirm that JRC agrees it can provide an appropriate residential and educational program for all currently enrolled NYS students in full compliance with NYS regulations.

If you have any questions with regard to this compliance notice, please contact me.

Sincerely,

James P. DeLorenzo

Enclosure

c:      Rebecca H. Cort
        Louise DeCandia
        Kelly Munkwitz
        Dr. Jean McGuire
        Jeffrey Sherrin
        Michael Flammia

# JUDGE ROTENBERG CENTER

*A behavioral school for children and adults...*

**RECEIVED**

March 17, 2008

APR 02 2008

STATEWIDE
SPECIAL EDUCATION

Dr. Jean McGuire
Assistant Secretary
Office of Disability Policy & Programs
One Ashburton Place
11th Floor
Boston MA 02108

Dear Dr. McGuire,

At the request of the Massachusetts Department of Mental Retardation, I have attached the final report from the Disabled Persons Protection Commission for DPPC Case Number: 76157; 76158; 76229 & 77059. In response to this incident, JRC has taken several steps to improve supervision of staff, internal safeguards and continues to work with its licensing agencies to implement improvements. Please feel free to contact me if you have any questions.

Sincerely,

Tanya Chiarella
Regulations Officer

CONFIDENTIAL
NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229  & 77059

## M.G.L. c. 19C / 118 CMR  Investigation Report

**Alleged Victim:** ▰▰▰▰▰▰

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION. UNLESS DULY AUTHORIZED/OR PERSONALLY IDENTIFIABLE INFORMATION IS ADEQUATELY REDACTED, FURTHER DISTRIBUTION OF THIS DOCUMENT, OR A COPY OF SAME, BY YOU TO OTHERS COULD RESULT IN LEGAL PENALTIES.

---

**Allegation Investigated:**  A call was placed to the AL V's residence, operated by AL AB8 (the agency).  The caller instructed staff, AL AB1, to deliver 77 electric skin shocks to the AL V, and told him that these were approved consequences.  They were not approved.  In addition to the AL AB1, there were five other staff working in the residence that night, AL AB3, AL AB4, AL AB5, AL AB6 and AL AB7.  AL AB2 was assigned to watch the DVR monitors of the home that evening.  Despite the training and safeguards provided by AL AB8, none of the other AL ABS was able to prevent AL AB1 from delivering unauthorized skin shocks, over a three hour period.[1]

---

**M.G.L. c. 19C / 118 CMR Conclusion:**
Based on information gathered by the Investigator during the investigation of DPPC case #s 76157, 76158, 76229 & 77059 there is sufficient evidence to conclude that AL V, ▰▰▰▰ ▰▰▰▰, was seriously injured as the result of an act and/or omission by his caretakers, AL AB1, ▰▰▰▰  AL AB2, ▰▰▰▰ L AB3, ▰▰▰▰ AL AB4, ▰▰▰ AL AB5, ▰▰▰▰ AL AB6, ▰▰▰▰ AL AB7, ▰▰▰ and AL AB8, Judge Rotenberg Center (JRC), therefore abuse as defined by M.G.L. c. 19C and/or 118 CMR is **substantiated**.

---

**What is the serious physical and/or serious emotional injury sustained by the ALV?**
Although the AL V is court-authorized to receive electric skin shocks for identified problem behaviors, on the night of 8/26/07, he was given 77 skin shocks that were not in response to the actual behaviors for which the court authorized the use of electric skin shocks. These skin shocks left him with several reddened spots on his abdomen. The AL V was also emotionally upset by the incident, as evidenced by his physically aggressing towards staff after they attempted to take him to the four-point board to restrain him while they gave him the last 70 skin shocks. The conduct by the AL V represented a significant decompensation in his behavior; the AL V had not displayed any aggressive behaviors in months, and had not been given the consequence of the skin shock since last October (2006). In addition, the day following the incident, the AL V told I-15 that he was "still somewhat scared" and angry.

---

[1] Allegations regarding acts or omissions of care resulting in serious physical and/or serious emotional injury to I-3 and I-12 were also reported to the Disabled Persons Protection Commission (DPPC); due to the age of I-3 and I-12 these allegations were referred to the Department of Social Services (DSS).

Form Revised 5/1/2006

CONFIDENTIAL

NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229  & 77059

**How was the serious physical and/or serious emotional injury sustained by the ALV caused by the act and/or omission of the AL AB?**

A telephone caller directed the AL AB1 to deliver the skin shocks to the AL V and he did so without questioning it. AL ABS 3, 4, 5, 6 and 7 were present and did not stop the actions of the AL AB1. AL AB2 should have been watching the DVR monitors of the home, but was not for more than three hours, which allowed the action of AL AB1 and inaction of AL ABS 3, 4, 5, 6 and 7 to continue unabated. AL AB8 allowed some of the AL ABS to work double and triple shifts[2], staffed the shift in question with three awake-overnight staff who had worked only months at the agency and had policies in place that allowed direct care staff to be supervised and directed over the telephone by off-site monitors. That the AL ABS 1, 2, 3, 4, 5, 6 and 7 were not following AL AB8's policies completely at the time of the incident does not diminish the AL AB8's responsibility, because some of the AL ABS specifically noted their inaction was due to fear of being negatively "evaluated" by AL AB8. Specifically, AL AB4 noted that if staff were "evaluated" they could be terminated and that for failure to follow DVR instructions they could be suspended from shifts or they could lose evaluation points; AL AB8's written list of staff infractions and corresponding consequences confirms this. Also, that AL ABS 1, 3, 4, 5, 6, and 7 were all not following AL AB8's policies suggests that it is more likely than not that AL AB8's training of staff is not effective. Likewise the fact that AL AB8's training of staff was not effective in preventing injury does not diminish the responsibility of AL ABS 1, 3, 4, 5, 6 and 7, as the events took place over a three hour period. More likely than not, it is the combined actions or inactions of AL ABS 1, 2, 3, 4, 5, 6, 7 and 8 that caused the injury to the AL V.

---

**Protective Service Actions Taken and/or Recommended (required when abuse is substantiated):**

Administrative staff of JRC took remedial action, beginning on 8/26/07, as these reported events came to light. AL ABS 1, 2, 3, 4, 5, 6, and 7 were immediately suspended without pay (all of these staff were later terminated). The AL V and I-3 were taken off their Graduated Electronic Decelerator (GED) devices, and seen by a physician and their JRC clinician[3]. AL V and I-3 were also moved to another JRC residence. Administrative staff notified all residential staff via e-mail and phone call that they should not accept any unusual instruction from anyone without contacting her directly and never to accept instruction over the phone to administer an aversive consequence to students regardless from whom the staff believed the instruction to be coming. Administrative staff reported the incident to police and the Disabled Persons Protection Commission (DPPC) on 8/26/07. They also reported the incident to R-7, who interviewed the AL V on 8/27/07, and who told I-15 that he would report the events to R-8, of the Bristol County Probate Court.

Initially, JRC suspended the use of the GED in all but two of its 36 residential programs, where students with life-threatening or potentially self-maiming behaviors were living. On an interim

---

[2] Staff often volunteer for the sleep-aide shifts that are between their other scheduled shifts.
[3] JRC's website notes that they use the term *clinician* to refer to a person with a masters or doctoral degree in psychology or allied field.

Form Revised 5/1/2006

CONFIDENTIAL

NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229 & 77059

basis, those two residences had supervision by an on-site clinician[4]. As of 9/21/07, JRC had installed in-residence DVR monitoring systems in five residential programs, and assigned experienced staff to monitor those in-residence stations[5]. R-2's report notes that "use of the GED device will only be resumed for a residence after the In-Residence DVR station and monitor is in place."

Since this incident, the DVR monitoring office is now specifically **not** authorized to call staff to direct them to administer GED applications. New policy states, "DVR is not authorized to call staff and instruct them to consequate GED behaviors or authorize GED application increments."

JRC has increased the number of monitoring staff by fifteen and has instituted a designated supervisor for each shift, who will have the responsibility to assign duties to other staff and ensure that they are carrying out these duties. The supervisor will perform random checks on the DVR Monitors, by checking the DVR monitoring software after a shift to ensure that the DVR Monitor viewed the screens for all of the residences and cameras to which they are assigned. The DVR Monitors' shifts will now overlap by 30 minutes, so that paperwork can be completed without interrupting the monitoring. The overnight monitoring staff will now send daily reports to administrators about the shift that has ended.

JRC has instituted a verification process for all incoming calls to their residences. There will now be a list of approved numbers, and if the number is not on that list, or comes from a blocked number, the call will not be accepted. The phone numbers to the residences were changed and are now all unpublished numbers.

JRC has plans to retrain all direct care staff on exercising independent judgment. Specifically, JRC wants direct care staff to be alert to the possibility of others impersonating supervisors and to ensure that staff will never follow any direction from any superior if it is not in keeping with JRC policy. JRC has identified certain senior staff members whom employees may call to report anything that seems out of the ordinary, "at any time, without any fear of disciplinary action."

JRC has instituted a new position of Overnight School Supervisor, and hired two of its experienced staff to fill it. Each shift, one of these two staff supervises all overnight activities of the school, and her duties include conducting unannounced visits to the residences, supervising the DVR office, the In-Residence Monitors and the Overnight Scheduler.

In addition to the above changes which have been instituted by JRC on its own, it is further recommended that the following actions be taken:

1) That JRC clinical staff revise the process of giving GED consequences, so that delays between identified problem behaviors and consequences are slight, if at all, and that the person delivering the consequence has actually seen the problem behavior.

---

[4] This Investigator was told that a staff clinician was assigned to sleep at one of these two residences, and that the residences were close enough to one another that this clinician could provide on-site authorization for GED use.
[5] During the 8/26/07 incident DVR monitoring staff were located at a separate centralized location.

CONFIDENTIAL

NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229  & 77059

2)  That JRC develop policies that will ensure that no shift at a residence is staffed with only new staff, that every shift will have access to trained supervisory staff, and that no shift will be run by a staff person on probation, or similar disciplinary action.

3)  That JRC meet with its licensing agencies to ensure that policies regarding restraint documentation are in keeping with all state and federal guidelines (regardless of whether there is court authorization for said restraints).

4)  That JRC follow all recommendations made in investigation reports on the 8/26/07 incident completed by the Department of Social Services (DSS) and the Department of Early Education and Care (EEC).

5)  That JRC, DSS and the AL V's local school district work together to find AL V an appropriate alternate placement, and ensure that he gets appropriate therapeutic counseling related to this incident.

6)  That a copy of this investigation report be shared with funding agencies for AL V, I-3 and I-12, as well as with the Executive Office of Health and Human Services (EOHHS), DSS, EEC, the Department of Mental Retardation (DMR) and the Bristol County Probate Court.

7)  That JRC work with DPPC, DMR, DSS, EEC and any other investigatory agencies to develop a policy to ensure that all evidentiary material requested during an investigation is delivered and/or preserved as requested by investigators.

8)  That JRC work with EOHHS and all of JRC's funding and licensing agencies to set up an independent, external panel to periodically review current policies and continued use of aversive therapies, including the GED.   This panel should meet with experts as needed and review current literature to ensure that all use of aversive therapies is in keeping with current standards of practice.

---

**Alleged Victim (AL V) Name:**
**Address:**

**Date of Birth:**
**Social Security Number:**
**Disability:**                          Behavior Disorder
**Guardian Information:**
Name:
Address:
Telephone Number:
**Agencies Providing Services to AL V:**        DSS, Silverlake Regional School District
**Type of Services Received by AL V:**          Residential and School Placements
**Pertinent information regarding the Alleged Victim:**  The AL V had a "brain bleed" at birth, accompanied by seizures during his first two days of life.  The AL V received special education services and testing completed in 2005 showed his IQ to be in the range of borderline

Form Revised 5/1/2006

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229  & 77059

NOT A PUBLIC RECORD

intelligence, however his records note that he may have a higher potential, and I-10 notes that the AL V has full adaptive functioning.  Although the AL V has had multiple psychiatric diagnoses at different times in his life, he is presently diagnosed with ▓▓▓▓▓▓ and ▓▓▓ ▓▓▓▓▓▓▓▓  The AL V has a history of problem behaviors, which include "aggressive, health dangerous, destructive, disruptive, impulsive, noncompliant, and sexually inappropriate behaviors." He began his treatment at Judge Rotenberg Center on 3/23/06.

**Previous reports of abuse involving the Alleged Victim:** ▓▓▓▓▓▓

---

**Alleged Abuser (AL AB1) Name:** ▓▓▓▓▓▓▓▓▓▓▓
**Address:**
**Telephone Number:**
**Date of Birth:**
**Social Security Number:**
**Relationship to Alleged Victim:**          direct care staff of residential/school program
**Employer:** *(Name, Address, Telephone)*      Judge Rotenberg Center (JRC)
                                                240 Turnpike Street, Canton, MA  02021

**Is the Alleged Abuser a Caretaker for the AL V?**      Yes
**Pertinent information regarding the Alleged Abuser1:** ▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓ (but was considered less senior than AL AB3 due to completing his training at a later date).  His position at the time of the incident was Mental Health Assistant[6].
**Previous reports of abuse involving the Alleged Abuser1:** ▓▓▓▓▓▓

---

**Alleged Abuser (AL AB2) Name:** ▓▓▓▓▓▓
**Address:**
**Telephone Number:**
**Date of Birth:**
**Social Security Number:** ▓▓▓▓▓
**Relationship to Alleged Victim:**          quality control staff of residential/school program
**Employer:** *(Name, Address, Telephone)*      Judge Rotenberg Center (JRC)
                                                240 Turnpike Street, Canton, MA  02021

**Is the Alleged Abuser a Caretaker for the AL V?**      Yes
**Pertinent information regarding the Alleged Abuser2:** ▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓ He had previously held titles of Mental Health Assistant and Residential Supervisor, but at the time of the incident, his title was Quality Control/Monitor[7].  His role on the evening of the incident was reviewing digital video footage of AL AB8's residential facilities,

---

[6] JRC Policy describes this position as follows: "This is a direct care, entry-level position, responsible for a variety of duties relating to and primarily concerned with implementing the students' treatment and educational programs. These direct care individuals provide the basic staff coverage necessary for the maintenance of the school, residential, and workshop programs...This position reports to the Teachers, Weekend Coordinators, Residential Supervisors, Workshop Coordinator and Monitoring/QC staff."

[7] JRC Policy describes this position as follows: "The QC staff is responsible for a variety of duties relating to viewing classroom/residential activity. QC staff assures optimum staff performance and student progress...This position reports to Director of Residences."

Form Revised 5/1/2006

NOT A PUBLIC RECORD

including the Stoughton residence ███████████████     A review of the AL AB2's personnel
documents██████████████████████████████████████████████████████████████

**Previous reports of abuse involving the Alleged Abuser2:** ██████████

---

**Alleged Abuser (AL AB3) Name:**          ██████████████████████████████
**Address:**                              ██████████████████████████████
**Telephone Number:**                     ██████████████████████████████
**Date of Birth:**                        ██████████████████████████████
**Social Security Number:**
**Relationship to Alleged Victim:**        direct care staff of residential/school program
**Employer:** *(Name, Address, Telephone)*  Judge Rotenberg Center (JRC)
                                          240 Turnpike Street, Canton, MA  02021

**Is the Alleged Abuser a Caretaker for the AL V?**      Yes
**Pertinent information regarding the Alleged Abuser3:** █████████████████████
████████████████████but was considered more senior than AL AB1 due to completing his training
at an earlier date).  His position at the time of the incident was Mental Health Assistant.  He was
also acting as the supervisor for the overnight shift, because he was the most senior of the awake
overnight staff.  The AL AB3 indicated that he had worked only one other shift as a supervisor.
A review of the AL AB3's personnel  documents████████████████████████████████
█
**Previous reports of abuse involving the Alleged Abuser3:** █████████████████

---

**Alleged Abuser (AL AB4) Name:**          ██████████████████████████████
**Address:**                              ██████████████████████████████
**Telephone Number:**                     ██████████████████████████████
**Date of Birth:**                        ██████████████████████████████
**Social Security Number:**
**Relationship to Alleged Victim:**        direct care staff of residential/school program
**Employer:** *(Name, Address, Telephone)*   Judge Rotenberg Center (JRC)
                                          240 Turnpike Street, Canton, MA  02021

**Is the Alleged Abuser a Caretaker for the AL V?**      Yes
**Pertinent information regarding the Alleged Abuser4:** ██████████████████████
█████████████████His title at the time of the incident was Weekend Supervisor[8]; however, at
the time of the incident the AL AB4 was not working in that capacity, but was working a "sleep-
aide[9]" shift.
**Previous reports of abuse involving the Alleged Abuser4:** ████████████

---

[8] JRC Policy describes this position as follows: "This is a direct care, supervisory position, responsible for a variety
of duties relating to and primarily concerned with implementing the student's (sic) treatment and educational
programs at the residential homes and for ensuring that all overnight duties at the residence are carried out …This
position reports to the case managers and monitors/QC."
[9] This shift, which is a voluntary one for staff, means he could sleep overnight so long as the residence was without
incident, but that if there was a situation the awake-overnight staff could not handle, he would be called upon to
help.

CONFIDENTIAL
NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229  & 77059

**Alleged Abuser (AL AB5) Name:**
**Address:**
**Telephone Number:**
**Date of Birth:**
**Social Security Number:**
**Relationship to Alleged Victim:**     direct care staff of residential/school program
**Employer:** *(Name, Address, Telephone)*   · Judge Rotenberg Center (JRC)
· 240 Turnpike Street, Canton, MA  02021

**Is the Alleged Abuser a Caretaker for the AL V?**     Yes
**Pertinent information regarding the Alleged Abuser5:** 
He had been a Mental Health Assistant until approximately three weeks before the incident when he became a High Crisis/Intervention Specialist[10]; however, at the time of the incident the AL AB5 was not working in that capacity, but was working a "sleep-aide" shift.
**Previous reports of abuse involving the Alleged Abuser5:**

---

**Alleged Abuser (AL AB6) Name:**
**Address:**
**Telephone Number:**
**Date of Birth:**
**Social Security Number:**
**Relationship to Alleged Victim:**     direct care staff of residential/school program
**Employer:** *(Name, Address, Telephone)*     Judge Rotenberg Center (JRC)
240 Turnpike Street, Canton, MA  02021

**Is the Alleged Abuser a Caretaker for the AL V?**     Yes
**Pertinent information regarding the Alleged Abuser6:** 
His title was Mental Health Assistant; however, at the time of the incident the AL AB6 was working a "sleep-aide" shift.  A review of the AL AB6's personnel documents

**Previous reports of abuse involving the Alleged Abuser6:**

---

**Alleged Abuser (AL AB7) Name:**
**Address:**
**Telephone Number:**
**Date of Birth:**

---

[10] JRC Policy describes this position as follows: "This is a direct care position responsible for a variety of duties. Their primary responsibility is assisting with crisis students and students in crisis. These direct care individuals provide support, training, correction, and redirection for the staff working directly with the students in the crisis classrooms and residences. …This position reports to the Monitoring staff."

Form Revised 5/1/2006

NOT A PUBLIC RECORD

**Social Security Number:** ████████████

**Relationship to Alleged Victim:**     direct care staff of residential/school program

**Employer:** *(Name, Address, Telephone)*     Judge Rotenberg Center (JRC)

240 Turnpike Street, Canton, MA  02021

**Is the Alleged Abuser a Caretaker for the AL V?**     Yes

**Pertinent information regarding the Alleged Abuser7:** ████████████████████████

████████████ His position at the time of the incident was Mental Health Assistant.  A review of the AL AB7's personnel documents ████████████████████████████

████████████████████████████████████████████████████████████████

**Previous reports of abuse involving the Alleged Abuser7:** ████████████████████

| | |
|---|---|
| **Alleged Abuser8 (AL AB8) Name:** | Judge Rotenberg Center (JRC) |
| **Address:** | 240 Turnpike Street, Canton, MA  02021 |
| **Telephone Number:** | 781-828-2202 |
| **Date of Birth:** | n/a |
| **Social Security Number:** | n/a |
| **Relationship to Alleged Victim:** | residential/school program |
| **Employer:** *(Name, Address, Telephone)* | Judge Rotenberg Center (JRC) |
| | 240 Turnpike Street, Canton, MA  02021 |

**Is the Alleged Abuser a Caretaker for the AL V?**     Yes

**Pertinent information regarding the Alleged Abuser8:**     JRC provides a residential and educational program where students receive 24-hour intensive behavioral treatment, comprised of positive programming, and if deemed necessary, aversive procedures. One of these aversive procedures is the subject of this report.  It is an electrical stimulation device manufactured by JRC, called the Graduated Electronic Decelerator (GED). This device is remotely activated by staff, after they observe the occurrence of a identified problem behavior, which is noted in a student's behavior plan to have been court-authorized for GED treatment. When activated, the GED delivers a brief (two-second) application of a skin-shock to the surface of the student's skin. The specific GED device worn by the AL V and I-3 was a GED-IV, which delivers a stronger skin shock, approximately twice as powerful as the standard GED, according to JRC.

**Previous reports of abuse involving the Alleged Abuser8:**  Several.

| Individuals Interviewed or Contacted by Investigator: | | | |
|---|---|---|---|
| **Name and Position** | **Agency** | **Date** | **Redaction Code** |
| ██████████ <br> *Alleged Victim* | Judge Rotenberg Center (JRC) | 8/30/07[1] | AL V |
| ██████████ | Judge Rotenberg Center (JRC) | several | I-1 |
| Robert Duke, <br> *Patrolman* | Stoughton Police Department | | R-1 |
| Jennifer Adams, <br> *Placement Liaison* | Silverlake Regional School District (SRSD) | 9/5/07* | I-2 |

NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229  & 77059

| | | | |
|---|---|---|---|
| James Nolan, *Special Investigator* | MA Department of Social Services (MA DSS) | several | C-1 |
| Angela Goss, *Investigator* | MA Department of Early Education and Care (EEC) | several | C-2 |
| ████████████ | N/A | 8/30/07[3] | I-3 |
| Peggy Stypula, *Social Worker and I-4's Guardian* | Alexandria, VA Division of Social Services (VA DSS) | 8/30/07[2], 9/6/07[2] | C-3 |
| Kristen Russo, *Social Worker* | Alexandria, VA Division of Social Services (VA DSS) | 8/30/07[2] | C-4 |
| ████████████ | Judge Rotenberg Center (JRC) | 9/10/07[2] | AL AB1 |
| ████████████ | Judge Rotenberg Center (JRC) | 8/30/07[2] +, 9/7/07* | AL AB2 |
| ████████████ | Judge Rotenberg Center (JRC) | 8/31/07[2] | AL AB3 |
| ████████████ | Judge Rotenberg Center (JRC) | 8/31/07[2] | AL AB4 |
| ████████████ | Judge Rotenberg Center (JRC) | 8/31/07[2] | AL AB5 |
| ████████████ | Judge Rotenberg Center (JRC) | 8/31/07[2] | AL AB6 |
| ████████████ | Judge Rotenberg Center (JRC) | 9/13/07[2] | AL AB7 |
| Judge Rotenberg Center (JRC) | Judge Rotenberg Center (JRC) | | AL AB8 |
| ████████████ | Judge Rotenberg Center (JRC) | 8/30/07[2] + | I-4 |
| ████████████ | Judge Rotenberg Center (JRC) | 8/30/07[2] + | I-5 |
| ████████████ | N/A | 9/5/07* | I-6 |
| ████████████ | Judge Rotenberg Center (JRC) | 9/6/07[2] + | I-7 |
| ████████████ | Judge Rotenberg Center (JRC) | 9/6/07[2] + | I-8 |
| ████████████ | Judge Rotenberg Center (JRC) | 9/6/07[2] + | I-9 |
| ████████████ | Judge Rotenberg Center (JRC) | 9/7/07[2] + | I-10 |
| ████████████ | Judge Rotenberg Center (JRC) | 9/7/07[2] ° | I-11 |
| ████████████ | Judge Rotenberg Center | | R-2 |

Form Revised 5/1/2006

CONFIDENTIAL

NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229  & 77059

| | | | |
|---|---|---|---|
| | (JRC) | | |
| | Judge Rotenberg Center (JRC) | 10/1/07# + | I-12 |
| | Judge Rotenberg Center (JRC) | 9/10/07² + | I-13 |
| | Judge Rotenberg Center (JRC) | 9/10/07² + | I-14 |
| Marty Kenney, *Area Director* | MA Department of Social Services (MA DSS) | 9/12/07* | I-15 |
| | Judge Rotenberg Center (JRC) | | R-2 |
| | Office of Chodirker, Rocket, Snyder & Heller | | R-3 |
| | Judge Rotenberg Center (JRC) | 9/27/07+ | I-16 |
| | Judge Rotenberg Center (JRC) | 9/27/07+ | I-17 |
| | Judge Rotenberg Center (JRC) | | R-4 |
| | Judge Rotenberg Center (JRC) | | R-5 |
| | Judge Rotenberg Center (JRC) | | R-6 |
| | | | R-7 |
| Judge Elizabeth LaStaiti, *Probate Court Judge* | Bristol Probate Court | | R-8 |
| Tpr. Brenda Watts, *State Trooper* | State Police Detective Unit | | R-9 |
| Tpr. Julie Sabota, *State Trooper* | State Police Detective Unit | | R-10 |
| Dr. Matthew Israel, *Executive Director* | Judge Rotenberg Center (JRC) | | R-11 |
| | Judge Rotenberg Center (JRC) | | R-12 |

*Redaction Code Key*
AL V – Alleged Victim (required)
AL AB – Alleged Abuser
I - Denotes person interviewed during this investigation
C - Denotes person contacted for collateral or expert/professional opinion.
R - Denotes person referred to in the report that was not questioned.
* - Denotes telephone interview

Form Revised 5/1/2006

CONFIDENTIAL
NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229  & 77059

¹ - Denotes interview conducted by Investigator and C-2
² - Denotes interview conducted by Investigator, C-1 and C-2
³ - Denotes interview conducted by C-1, C-2, C-3, and C-4 (but not this Investigator)
° - Denotes R-2 present for interview
+ - Denotes I-1 present for interview
# - Denotes interview conducted by Investigator and C-1

**Pertinent Information regarding the Site of Abuse:**  The residential program ▓▓▓▓▓▓
▓▓▓▓▓▓ in Stoughton is a multi-level seven bedroom house with a large living/dining room
area off the kitchen, a recreation room in the basement, and a separate "in-law" type of
apartment across the entry foyer from the main living area.

**Physical / Other Evidence:**
-Copies of digital photographs taken by I-13 on 8/26/07 are in the investigation file (two of AL
V's abdomen, four of I-3's upper arms, and three of I-3's lower legs)
-DVR footage from 8/26/07 of the Stoughton residence was viewed by this Investigator, C-1 and
C-2, with I-1 at JRC (Although a copy of this footage and footage of the DVR monitoring room
at 250 Turnpike Street in Canton was requested by this Investigator, JRC declined to provide
one. This is not in keeping with past practice between JRC and the DPPC. The reason given by
I-1 was that JRC did not want any possibility of the images getting into the media.  This
Investigator requested that JRC preserve a copy of all DVR footage incorporating all camera
angles of both facilities, so that any further reviews of the incident, including an investigation by
R-9 and R-10, would have access to this video and audio footage. This Investigator later learned
from R-9 that said DVR images were not preserved by JRC.)

**Documents Reviewed:**          DPPC
                                 -Database
                                 -Intakes 76157, 76158, 76229, 76160, 77059, 77071 & 77072
                                 -Copy of e-mail from JRC Evaluations Department dated 6/12/07
                                  (sent to DPPC anonymously prior to this investigation)
                                 -Correspondence from AL AB2, undated

                                 **Stoughton Police Department**
                                 -Incident Report # 07-758-OF

                                 **Department of Social Services**
                                 -Critical Incident Report, dated 8/26/07

                                 **Judge Rotenberg Center**
                                 -Personnel Files of AL AB1, AL AB2, AL AB3, AL AB4,
                                   AL AB5, AL AB6, and AL AB7
                                 -Preliminary Report of I-4
                                 -Notice of Corrective Actions Dated 9/5/07
                                 -AL V's Student File
                                 -AL V's Program Description, dated 8/31/07
                                 -AL V's Program Changes
                                 -AL V's Proposed Behavior Modification Treatment Plan, dated 3/21/06
                                 -AL V's Decree of Permanent Guardianship, dated 9/19/06
                                 -AL V's Proposed Amended Behavior Modification Plan, dated 9/12/06

Form Revised 5/1/2006

CONFIDENTIAL

NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229  & 77059

-AL V's Recording Sheets, dated 8/25/07 and 8/26/07
-Weekly Chart of AL V's GED Applications
-Daily and Weekly Charts of AL V's Behaviors
-I-3's Program Description, dated 8/31/07
-I-3's Decree of Permanent Guardianship, dated 7/11/06
-I-3's Proposed Amended Behavior Modification Plan, dated 8/2/07
-I-3's Recording Sheets, dated 8/25/07 and 8/26/07
-I-12's Recording Sheets, dated 8/25/07 and 8/26/07
-R-3's Medical Reports for AL V and I-3, dated 8/27/07
-E-mail correspondence from Nursing Dep't dated 8/26/07
-AL V's Body Check Notes, Week 7/23/07-7/29/07
-AL AB2's e-mail correspondence Re. End of Shift 8/25/07,
    dated 8/27/07
-DVR Audit Report of Stoughton Residence for 8/26/07
-JRC Notification Procedures, prior to 8/26/07 and as of 8/27/07
-JRC Policy and Procedure on Court-Authorized Supplementary
    Aversives (Level II & III Interventions)
-JRC Policy on Personal Telephone Calls and Cell Phones
-JRC Policy on Staff/Student Interactions
-JRC Policy on Inappropriate Conversations
-JRC Employee Code of Conduct
-JRC Policy on Evaluating Staff
-Student Rules
-Basic Training Manual Chapters 1-6
-Quality Control Job Description
-High Crisis/Intervention Specialist/ Program Staff II Job Description
-Overnight Supervisor/ Program Staff II Job Description
-Mental Health Assistant/ Program Staff II Job Description
-List of Residences, with number of cameras in each
-Diagram of Stoughton Residence
-Final Investigation Report and Corrective Action (by R-2)
-Changes to Improve Supervision and Staff Performance
  (dated 10/5/07)
-Daily Schedules (dated 8/20/07 to 8/26/07)
-Written Notes of R-12 on DVR footage of 8/26/07
-Staff Infraction List (with consequences per offense)

**Bristol County Probate Court (files related to AL V**
-Proposed Behavior Modification Treatment Plan, filed 3/24/06
-Bond of Temp/Perm Guardian, filed 3/24/06
-Motion for Appointment of Temporary Guardian with Authority
    to Monitor Behavior Modification Treatment Plan, filed 3/24/06
    (signed as allowed for 90 days by R-8 on 4/4/06)
-Motion to Waive Filing Fees, filed 3/24/06
-Motion to Extend, Nunc Pro Tunc, Order on Temporary
    Guardianship, filed 8/3/06 (signed on 8/22/06)

Form Revised 5/1/2006

CONFIDENTIAL
NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229  & 77059

-Affidavit of ███████████, dated 9/15/06
-Medical Certificate-Guardianship, filed 3/24/06
-Temporary/Permanent Guardianship of Person, filed 3/24/07
-Findings of Fact and Rulings of Law on Motion for Appointment
    of Temporary Guardian with Authority to Monitor Administration
    of Behavior Modification Treatment Plan (signed by R-8 on 4/4/06)
-Decree of Temporary Guardianship (signed by R-8 on 4/4/06)
-AL V's Proposed Amended Behavior Modification Plan, dated 9/12/06
-Findings of Fact and Rulings of Law on Petition for Appointment
    of Permanent Guardian with Authority to Monitor Administration
    of Behavior Modification Treatment Plan (signed by R-8 on 9/19/06)
-AL V's Decree of Permanent Guardianship (signed by R-8
    on 9/19/06)
-Motion for Funds for Independent Examination (signed 2/26/07)
-Affidavit of ████████████, dated 10/29/07
-Findings of Fact on Treatment Plan Review (signed by R-8
    on 10/30/07)
-Order (In Re. [AL V]) (signed by R-8 on 10/30/07)
-Medical Certificate-Guardianship, filed 11/15/07

**Summary of Facts:**

**Background on AL V**

The AL V was placed at Judge Rotenberg Center (JRC) on 3/23/06 for treatment of identified
problem behaviors including, "aggressive, health dangerous, destructive, disruptive, impulsive,
noncompliant, and sexually inappropriate behaviors." The placement was funded jointly by DSS
and the Silverlake Regional School District. The placement was consented to by I-6, who
became the AL V's legal guardian after the AL V turned 18 (that there be a guardian in place
was a condition of JRC's allowing the placement, according to I-15).

To supplement their treatment of the AL V, JRC sought and was granted a mechanical-restraint
waiver from the Department of Mental Retardation, which became effective on 3/23/06 (and
which was to be in effect for a year from that date). A court-authorized behavior plan[11] later
went into effect on 4/4/06, which allowed for clinical staff to devise behavioral treatment plans
that used mechanical-restraint and aversive consequences. On 4/4/06 the use of aversive
consequences in the form of the Graduated Electronic Decelerator IV (GED IV) was added as a
treatment modality for the AL V. The categories of behavior to receive this consequence were
identified as Aggressive Behavior (including, but not limited to, "physical aggression towards
others (to include attempts)," "verbal threats to be aggressive," "verbal or written sexual
comments," "sexually touch[ing] others" and "out of bed without permission"); Destroying
Behavior (including, but not limited to, "property destruction to include attempts," "throw[ing]

---

[11] Bristol Probate Court documents show that R-8 presided over cases related to the AL V's guardianship and
behavior modification treatment plans.

Form Revised 5/1/2006

NOT A PUBLIC RECORD

objects," and "verbal threats to destroy"); Health-Dangerous Behavior (including, but not limited to, "runaway," "attempts to runaway," "leave a supervised area," "harm self," and "verbal threats to harm self"; Major Disruptive Behavior (including, but not limited to, "yell," and "swear"; and Non-Compliant Behavior (including, but not limited to, "refuse to follow staff directions" and "any attempt to remove GED device." Other categories, Educational and Socially Interfering Behavior and Inappropriate Verbal Behavior, were to be treated with lesser consequences. A component of the AL V's treatment plan allowed for what JRC staff called "latency," or delayed consequences. I-10 was the AL V's clinician at the time of the incident. I-10 explained that the length of delay for each student is based on "cognitive factors" and the student's ability to pair the consequence with the prior behaviors. The clinician's approved period of time delay for the AL V was two hours. Any delayed consequences beyond that time frame were to have additional approval from the AL V's clinician.  The behaviors to be treated, their consequences and the latency limits are all clearly defined in the AL V's daily recording sheet packet[12] for the day in question. I-10 described that "latency" or delayed consequences were supposed to be used for isolated incidents, noting that students ideally should get consequences as quickly as possible after exhibiting one of the identified behaviors.  When questioned about the AL V's cognitive abilities and the use of delayed consequences, I-10 noted that the AL V's abilities had not been accurately captured with testing and that the AL V had full adaptive functioning skills.

I-10 also noted that, in addition to the approval needed for delayed consequences beyond the specified time frame, clinicians were to be notified after each set of 10 GED consequences that were given in 24 hour period.  I-10 provided this Investigator with a copy of a chart of the AL V's total GED applications (per week) for his entire stay at JRC. This chart showed the AL V receiving few GED consequences, approximately 10 during his entire stay, prior to this incident. The AL V reported, and I-10 confirmed, that the AL V had not received GED consequences for his behaviors since October of 2006 (I-10 noted that the graph showed GEDs in April of 2007, but upon further review stated that this was found to be an error). I-10 also noted that the GED is typically not used with restraints and that the GED at times "prevents restraints."

I-6 reported that he had been "totally happy" with the JRC placement until the 8/26/07 incident, noting that it was in this program that the AL V had shown the "most improvement" and the AL V had done "better than in any other placement." I-15 concurred with this assessment, noting that the AL V had "changed dramatically" while in this placement and that he would likely be able to move to a less restrictive program in the future.

## Background on Residential Staff

The AL V had lived in the JRC Stoughton residence since 7/31/07.  This residence has the capacity for 12 male students, but it was not full at the time of the incident. On 8/26/07, the AL V, I-5, I-3, I-11 and I-12 were among the students at the JRC Stoughton Residence.  I-3 shared a bedroom with I-11, and I-12 shared the separate apartment's bedroom with R-4 (who was

---

[12] JRC's Basic Training Chapter 1 notes that "Recording Sheets list all of the components of a student's program as well as provide a place to record such information as how the student did with his/her daily routine, behaviors exhibited, contracts passed, etc."

Form Revised 5/1/2006

CONFIDENTIAL
NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158, 76229 & 77059

reported not to have returned to the program as expected after a recent trip home). Other students were in the residence at the time, but they were not directly involved in the incident.

After midnight on 8/26/07, there were six staff working at the Stoughton Residence, AL AB1, AL AB3 and AL AB7 were awake-overnight staff, and AL AB4, AL AB5 and AL AB6 were sleep-aide staff (which meant that they could sleep overnight so long as the residence was without incident, but that if there was a situation the three awake-overnight staff could not handle, they would be called upon to help).

Of the awake-overnight staff, the AL AB1 ████████████████████████████ had begun his shift at 10:00 p.m. on 8/25/07, and was scheduled to work until 8:00 a.m. on 8/26/07. He had also worked the prior day, 8/24/07, at this residence, from 4:00 p.m. until 8:00 a.m. On 8/23/07, AL AB1 had called in sick for his shift. AL AB3 (████████████████████████ ████████ was scheduled to work as an awake-overnight staff from 4:00 p.m. on 8/25/07 until 8:00 a.m. on 8/26/07. In addition, AL AB3 had worked in this residence from 11:00 p.m. on 8/24/07 until 8:00 a.m. on 8/25/07. The third awake overnight staff, AL AB7 ████████ ████████████████████████, was scheduled to work from 4:00 p.m. on 8/25/07 until 8 a.m. on 8/26/07. He had also worked in that residence from 5:00 p.m. on 8/24/07 until 8:00 a.m. on 8/25/07.

Of the asleep-overnight staff, the AL AB4 (who had worked at the agency since January 2006) was scheduled to work the sleep-aide shift from 11:00 p.m. on 8/25/07 to 8:00 a.m. on 8/26/07. He had been working in the residence from 4:00 p.m. on 8/24/07-- beginning with a 4:00-11:00 p.m. shift, then a sleep-aide shift from 11:00 p.m. to 8:00 a.m., then from 8:00 a.m. to 11:00 p.m. on 8/25/07, when he began a second sleep-aide shift. AL AB5 ████████████████████████ ████████) had worked the same hours as AL AB4 from 8/24/07 through 8/26/07. AL AB7 ████████████████████████████████████ was scheduled to work from 4:00 p.m. on 8/25/07 to 8:00 a.m. on 8/26/07. AL AB7 had also worked in this residence from 5:00 p.m. on 8/24/07 until 8:00 a.m. on 8/25/07.

### Background on Supervisory Residential Staff

AL AB3 was assigned to be the supervisor of the overnight shift, something he indicated that he had learned only that evening. AL AB3 indicated that he was chosen to be the supervisor as he was the most senior of the three awake-overnight staff (due to the absence of another staff), though he had begun his employment at JRC only two months earlier and had received no specialized training to be a supervisor. AL AB3 indicated he had acted as a supervisor once before. The essential duties of the Mental Health Assistant and Overnight Supervisor positions are similar; the main difference is that the supervisor is expected to have more experience, and that the Mental Health Assistants report to the Supervisor. Both positions report to Monitoring/Quality Control staff, who are expected to have even more experience.

Form Revised 5/1/2006

CONFIDENTIAL
NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229  & 77059

## Background on Monitors/Quality Control Staff

Three staff were scheduled to work as Monitors/Quality Control staff on the overnight shift ending on 8/26/07, AL AB2, I-7 and I-9. These staff worked in the Monitoring Office at 250 Turnpike Street in Canton. That room is equipped with telephones and several video monitors, which are able to display images from the cameras in the residential and school buildings of JRC. On the overnight shift, these three staff were watching digital video footage from the 36 JRC residences, which are equipped with 487 camera views. The Stoughton residence has 21 camera views. AL AB2 had primary responsibility for viewing this residence. I-7 had primary responsibility to view the female residences; AL AB2 and I-9 split the male residences. I-9 had worked in the Stoughton residence from 4:00 p.m. – 12:00 a.m. that night.

According to I-14, ████████████████████████████████ the main duty of the Monitoring/Quality control staff (who are also referred to as DVR staff) is quality control. I-14 explained that these staff are to click through all camera views in all residences assigned to them to ensure that students are receiving optimum services and staff are receiving appropriate support. In addition to accessing video footage of students and direct care staff, the DVR staff are able to pull up students' program information on their monitors (which is necessary for them to verify whether an individual student's program is being followed).

## Graduated Electronic Decelerator (GED) Policies

JRC uses a combination of accelerating consequences (ACs) and decelerating consequences (DCs) to treat students with problem behaviors. The ACs are given for behaviors that treating clinicians want to increase and most often are in the form of verbal praise, such as, "good making eye contact" or "good keeping your hands away from your head." The DCs are given for behaviors that the treating clinicians want to decrease, and they take various forms depending on the individual student's plan. These plans can direct staff to consequate an identified behavior by ignoring it as a DC. They can also direct staff to consequate an identified behavior by pinpointing it with a verbal "no." JRC training documents direct staff to use a specific phrase when pinpointing behaviors, "*Student's name*, No, *name of behavior*." There are also court-authorized DCs such as, movement limitation (restraint) or the Graduated Electronic Decelerator (GED). These DC's are also called aversives. The GED consequence is only used for students whose guardians consent and who have court-authorized behavior plans for its use. The GED consequence is given with a pinpoint about the behavior for which it is being given.

According to JRC's basic training documents given to staff, "The GED is an electronic shock device that when activated by a transmitter will deliver a two second localized skin shock to the student. The GED and battery are carried in a fanny pack around the student's waist, GED jacket, or in a back pack. An electrode is connected to the GED device by a telephone type cable. The electrode is run under the student's clothing to the approved areas on the student's body.
The transmitter is attached to a plastic holder with a door called a sled and is hung on a staff member's waist."

Form Revised 5/1/2006

NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229  & 77059

The training documents note that approved areas for GED electrodes are as follows:

"•Palm of hand
•Sole of foot
•Outer thigh
•Inner thigh
•Outer arm
•Inner arm
•Outer forearm
•Inner forearm
•Torso (but never over the spine or the heart)
•Calf
•Lower back
•Upper quadrant of the buttocks."

Most often, however, the electrodes are placed on legs, arms or torsos. Each student's daily recording sheets will note the identified behaviors and the corresponding consequences, as well as where each student's electrodes are to be placed. Typically a related verbal pinpoint follows the GED application.

The basic training documents note the steps for staff delivering GED consequences as follows: "1) The staff observes the actual inappropriate behavior. Staff gets the recording sheet and sled (ensuring that they belong to the correct student). Attempt to be as discreet as possible and hold the sled out of view of the student as much as possible.
2) Before administering the GED, look carefully at the top/back/front of the sled to find the name of the correct student. Confirm with another staff member PRIOR to administering a GED application: Name on the recording sheet, behavior exhibited, the consequence, name on the sled.
3) Press the button on the transmitter down with your finger for at least one full second.[13]"

The process of confirming with a second staff person is referred to as "verifying," however, only one of the staff needs to have seen the behavior. I-4, who had been working at the program for over a year, noted that in his experience there were times when the staff who saw the behavior was a DVR monitoring staff (who had viewed the behavior from a remote video monitor). He described that at times a direct care staff person can be with many students and may not be able to see all of them at once. I-4 noted that he had been called on the telephone in the past by DVR monitoring staff who directed him to consequate behaviors. At the time of the 8/26/07 incident there was no policy in place to prevent consequating behaviors at the direction of the remotely-located DVR monitoring staff. R-1's report notes that R-11 told him on 8/26/07 that "such punishments are not usually authorized over the telephone, but occasionally do occur."

---

[13] This is how the policy read as of September 2007; it had changed slightly in emphasis from a prior policy, but the actions to be taken were the same. A prior policy reads, "Before administering a GED, look carefully at the top/back/front of the plastic holder to find the name of the correct student. Confirm with another staff member: Name on the recording sheet, behavior exhibited, the consequence, name on the remote before administering the GED."

Form Revised 5/1/2006

CONFIDENTIAL
NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229  & 77059

A packet of information on each student and his/her treatment plan is generated daily, and this packet instructs staff how behaviors are to be consequated. This packet, which is commonly referred to as a "recording sheet," is also used to keep records of consequences given and to record progress of the student throughout the day.

The AL V's recording sheets for 8/25/07 and 8/26/07 listed certain behaviors within the categories of Aggression, Destruction, and Health Dangerous as ones that could be consequated with the GED. They also noted that the AL V was approved for "latency," stating, "If there is more than a two hour delay in [AL V's] GED consequence, please call his clinician for approval to give GED consequence." The recording sheets noted that the AL V would have two GED devices, one placed on his left leg and one on his right leg.

JRC Notification Procedures regarding GEDs stated the following at the time of the incident, regarding the number of GED applications within a 24-hour period: "Staff must notify a member of the Monitoring Department whenever a student receives ten GED applications and at each increment of ten GED applications thereafter. Monitoring will notify the student's case manager and treating Clinician and Assistant to the Director for Programming. Once a student has reached 30 GED applications, staff may not give the student any more GED applications until receiving approval from the student's Clinician." "If a GED device must be removed from a student for any reason, the staff must notify the Monitoring Department …Monitoring will notify the student's case manager and Clinician.[14]"

JRC Policy and Procedure on Court-Authorized Supplementary Aversives (Level II & III Interventions) notes that, "Every JRC staff member who is responsible for implementing a student's treatment plan undergoes a two-week intensive pre-service training period, which is mandatory. In addition, there is a monthly mandatory in-service training for all staff. Advanced training is available and encouraged. In-service training is constant and ongoing, using, among other procedures, the following: (1) feedback is provided to staff by those monitoring the implementation of treatment procedures through the television monitors in each classroom and video monitoring at the residences; (2) observations are made in the classroom and residences, feedback is given by the supervisors, including the quality control supervisor(s); (3) a system is in place (PIO/PC system) in which supervisees and supervisors provide positive and negative feedback for desired and undesired staff performance; and (4) formal evaluations of all direct-care staff performances are conducted every two weeks[15]."

JRC's website lists several safeguards in place for the use of the GED. These safeguards include, but are not limited to the following: that JRC is specially certified every two years by the Department of Mental Retardation to be able to use aversives; that parents/guardians give written, informed consent before aversives are used;  that treatment plans which describe use of the GED are written by JRC clinicians; that there is a medical pre-approval (to include a psychiatrist, cardiologist or neurologist if these are indicated by the student's history); that there

---

[14] Since the 8/26/07 incident, this policy has changed. Now the designated supervisor must notify the student's clinician, who in turn notifies Monitoring and others. The policy now specifically states, "DVR is not authorized to call staff and instruct them to consequate GED behaviors or authorize GED application increments."

[15] These evaluations are comprised of positive and negative points earned by the staff during the time period and are based on a 100 point numerical scale.

Form Revised 5/1/2006

CONFIDENTIAL

NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229  & 77059

is a peer review of these plans by other clinicians at JRC; that there is a JRC human rights committee review of these plans; that court-authorization is sought prior to the use of the plans, and annually thereafter; and that JRC clinicians oversee the use of the plans.

## Other Relevant Policies and Background Information

JRC Policy on Evaluating Staff describes that all staff are able to give PCs (performance credits) or BCs (behavior credits) to other staff in recognition of good or exceptional performance. They are all also able to give PIOs (performance improvement opportunities) to other staff. PIOs could result in disciplinary actions, including "retraining; probation; suspension; termination." In addition to this, "Every two weeks the members of the Evaluation Department evaluate each employee's performance. These evaluations are based on Staff Assessment [supervisor completes this for each staff for each shift], End of Shift forms, Performance Credits, Behavior Credits, Performance Improvement Opportunities, tardiness, absences, as well as any disciplinary actions." The evaluations are given as a number, on a 100 point scale.

In addition to the PCs and PIOs, JRC uses Program Opportunities with staff and students. These are commonly referred to as "program ops." An example of one used with a student is found on the AL V's recording sheets—"Staff will apologize for accidentally bumping into, stepping on [AL V's] belongings etc. (not physically bumping into him, but his posseions (sic) ). The criterion for passing this programmed opportunity is for [the ALV] to accept the staffs' (sic) apology without any further comments about the incident. This will be done twice a day. [AL V] will receive a 10 minute break for passing this program op. He will lose 10 minutes from his next LTD[16] break if he fails it." All staff interviewed were aware of program ops. I-14 indicated that these were used with staff when areas of weakness were found and that sometimes students were included in the use of program ops with staff. I-14 stated that program ops are "carefully selected and applied training" tools. An example of this given by I-14 was program ops to deal with the issue of inappropriate staff and student interaction, in which students might be asked to attempt to engage staff in personal social conversations. Students interviewed were also aware of program ops. I-11 indicated that he does not participate in the staff program ops because he thinks they are "wrong." He gave an example of program ops used with students-- that staff ask students personal questions or that staff offer a student a snack that was not earned. Ironically, the AL AB1's personnel documents indicate that he was given a performance credit on 8/10/07, when he passed a programmed opportunity and "correctly described how to administer a GED."

JRC Policy on Staff/Student Interaction directs that staff should not be engaging in "social conversations" with students. The policy notes, "The primary goal of direct care staff members is to carry out the treatment/education program exactly as JRC has designed it. In order to achieve this goal and avoid any behavior that is either inappropriate or detrimental to the student's treatment; (sic) social conversations for the purpose of this policy are defined as: any conversations other basic (sic) social greetings or acknowledgements that are not necessary to the safety or well being of the student or implementation of the students (sic) educational and behavior programs."

---

[16] LTD stands for "less than a day," and refers to a behavioral contract for that time period.

Form Revised 5/1/2006

CONFIDENTIAL

NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229  & 77059

Prior to the 8/26/07 incident, this Investigator's agency was anonymously sent a copy of a 6/12/07 e-mail from the Evaluations Department at JRC. It appears to have been sent to all staff, and the subject heading is "High Risk Students." It reads, "A number of JRC students have successfully plotted, planned, and manipulated staff into engaging in inappropriate conversations/interactions. This, in turn, has hindered their progress; both behaviorally and educationally. These students have been categorized as 'High Risk' students. Any staff member that engages in a social conversation/interaction or does a personal favor for the following 'High Risk' students may be subject to disciplinary action up to and including termination." It goes on to list AL V, I-5, I-11 and R-4, among others. I-17 indicated that that this e-mail was sent to all program and clinical staff. He indicated that it was a revision of a prior list that had been sent to staff in response to students having been found in possession of contraband items. The revision was deemed necessary as some students had left the program and some had changed residences. I-17 indicated that the direction given was still to be in effect on 8/26/07.

JRC Employee Code of Conduct notes that "employees are expected to interact in a pleasant and respectful manner with their co-workers." "All employees should comply with all reasonable directives given by their supervisors. Inappropriate responses may include, but are not limited to: being unreceptive to constructive criticism, insubordination (refusing to perform a work-related task), or demonstrating any of the aforementioned inappropriate verbal, written or physical behavior in response to assigned tasks or change in assignments." The Employee Code of Conduct also specifically directs staff that "hanging up the telephone" could be considered an inappropriate action.

The Student Rules note that "Students may not ask staff to page/Nextel or find their casemanager, clinician or other administrative staff, with the exception of human rights concerns, which should be communicated to the appropriate staff in writing if the student is able. Students
may write an appointment request to see their case manager, clinician or other administrative staff, unless otherwise stated in their program."

## Events of 8/26/07

On 8/26/07, at approximately 2:00 a.m., a call was placed to the Stoughton residence. According to AL AB1, he answered the phone, as AL AB3 was taking a short break. AL AB1 stated that the male caller identified himself as "Arthur" from "DVR.[17]" The caller asked AL AB1 if he was the supervisor and how the shift was going, and the AL AB1 reported he told him "so far, so good." The AL AB1 stated that he told the caller that he would get the supervisor, but the caller told him not to do this. AL AB1 said that the caller told him that there had been behaviors before the overnight shift that needed consequences. AL AB1 said that the caller mentioned the 9:00 hour.

AL AB1 said that the AL AB3 had gotten up at this point, so he handed the phone to him. AL AB1 indicated that the AL AB3 introduced himself to the caller, but that he then handed the phone back to the AL AB1. AL AB1 reported that he was told to give the AL V two GEDs for

---

[17] Although there was a DVR staff person named "Arthur," he was not working on 8/26/07.

NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229  & 77059

behaviors at the 9:00 hour.  AL AB1 could not recall the behaviors specifically mentioned, but AL AB1 stated that he got the AL V's recording sheet and looked at it.  AL AB1 said that they were GED consequated behaviors.  The AL AB1 did not mention that the AL V's recording sheets directed there to be one GED consequence for one distinct behavior.

DVR footage of the incident[18] confirms that AL AB1 was on the phone speaking to the caller and that AL AB3 was present at the onset of the events (contrary to AL AB3's testimony that he was not aware of the events initially).  R-2's investigation report indicates that staff stated that they did not follow the verification process because the caller stated that he had "pre-verified" the GEDs with ▮▮▮▮▮▮▮▮, I-10, and ▮▮▮▮▮▮▮ I-4 and R-5.  AL AB1 is seen approaching the AL V's room with the sled to give the AL V's GED.  The AL AB1 delivered GED consequences to AL V while he was in bed.  Though the AL V reported that he had not received the skin shocks delivered in his bedroom, due to his disabling the effectiveness of the contact points by putting clothing between them and his skin, he does appear to startle when they are given.  The AL V told this Investigator and I-15 that he was awake when he got the first consequences, as he had gotten up to go to the bathroom.  AL AB1 reported that he had awoken the AL V prior to giving the GED, but this did not appear to be the case.

AL AB1 can not be heard clearly on the DVR of the incident, but he seemed to say that the GEDs were for "sexual comments in the 9:00 hour."  This is a behavior for which the AL V is to be consequated with the GED, per his program; however too much time had passed (more than two hours) for staff to be able to deliver the consequence appropriately per the AL V's program.  After these initial GEDS, on the DVR footage, the AL V is heard saying, "after two hours you have to call [I-10]."  Someone is also heard saying that the caller was "not a QC...it can't be."  Despite this AL AB1 continues attempting to give AL V GED consequences.  The AL V says that he "got three GEDs for nothing" and "this isn't DVR."  He asks AL AB3 to "rotate" his GED electrodes (a process that should occur after each GED consequence, and once every waking hour, per policy of JRC).  AL V further tells AL AB3 that he had "better talk to 'em" because "this man" is "doing the wrong thing."

AL AB1, while still on the phone, and consulting no other staff, is seen attempting to give additional GEDS to the AL V, but there seem to be issues with the functioning of the device.  In testimony, AL AB1 said that the battery was beeping.  He stated that the caller directed him to move closer to try to deliver the consequences and stated that he had the impression that the caller could see him when the caller said this.

The caller directed AL AB1 to get a torso device (another GED) to put on the AL V because it was not clear that the AL V's leg devices were working.  In DVR review, it appeared that the AL V heard this discussion, because the AL V says that staff "can't put me on the torso, you have to give me another leg."  While AL AB1 is seen going off to locate the device, the AL V is seen speaking to AL AB3, saying "get on the phone and find out what is going on...they have to call my clinician."

---

[18] R-12's notes of his review of DVR footage differ slightly in detail from this Investigator's notes of DVR footage review, but follow the same general progression of events.  R-12 and this Investigator did not view the footage together, and the footage no longer exists, so further clarification can no longer be sought.

Form Revised 5/1/2006

CONFIDENTIAL
NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229  & 77059

As staff is attempting to fulfill the caller's wishes, the AL V says, "call [I-4]," noting that her number is "in that book" and that if staff would "call that number all this stuff will be straightened." The AL V states that he "haven't did (sic) any of these behaviors."

When AL AB1 returns to the AL V, at about 2:42 a.m., the AL V aggresses towards AL AB1 in the bedroom end of the hallway. AL AB3 and AL AB7 are at the common area end of the hallway. AL AB6 stated that he had been sleeping on the L-shaped couch at the other end of the hallway and that he was woken when AL AB1 ran by him asking for help. AL AB6 stated that when he woke up, the AL V was at the other end of the hallway holding the batteries to his GED in his hands (the GED device is attached to a battery pack with phone jack wires, which can be pulled out). AL AB6 said that the AL V stated that he had gotten (GED) applications in his sleep. AL AB3 is heard explaining to the other staff, "it's DVR man," and questioning why someone would just call and give direction like that. AL AB7 is heard saying, "it's DVR man, that's what they do."

AL AB4 and AL AB5, who had been sleeping in other parts of the house, were also awakened by the commotion. They reported that when they got to the hallway area, the AL V had GED batteries in his hands, which he appeared to be holding as weapons. According to AL AB1, he told the caller what was going on, and the caller directed staff to restrain the AL V, and take him to the four-point board in the recreation room (rec room). AL AB1 stated that he gave the phone to more experienced staff, but that the caller kept asking to be put back on the phone with AL AB1. AL AB4 confirmed that AL AB4 got on the phone at one point, when AL AB3 asked him to talk to DVR, but that the caller told AL AB4 to give the phone back to AL AB1. AL AB4 indicated that he did not ask for further clarification about the incident because it appeared to be a crisis, and during a crisis you do "not ask what happened if you were not there" at the time. AL AB4 stated that he had tried to reason with the AL V, asking him to put the batteries down. AL AB4 stated that the caller told the staff that they would be "evaluated[19]" if they were not able to get the AL V on the four-point board.

When interviewed later by this Investigator, AL AB4 indicated that they "needed jobs" so they "had to do it." He stated that if they were "evaluated" they could be terminated and that for failure to follow DVR instructions they could be suspended from shifts or they could lose evaluation points; a JRC written list of staff infractions and corresponding consequences confirms this. AL AB4 told this Investigator that he did not initially question the situation, because when he woke up the AL V "had GED behavior." During his interview, days after the incident, AL AB4 said he still believed that the instructions had come from DVR, stating he believed it was DVR because they said it was DVR. AL AB5 noted that DVR staff are senior and they are "managing the house." He said that he had been "evaluated" in the past once for attempting to give a newer staff direction about how to handle a situation. AL AB5 stated in this instance he was told that he was "insubordinate" for "arguing" with the other staff. AL AB5 stated that "whoever is in charge is responsible for everything." The AL AB5 indicated that he had worked there for over three years, and had never known of there to be a call made from someone pretending to be DVR. He stated he had no reason to think that it was not DVR and "we don't question DVR."

---

[19] This is the term that is used when one staff gives feedback about another at JRC. All staff are formally evaluated every two weeks, and given a score based on the feedback (see footnote 15).

Form Revised 5/1/2006

CONFIDENTIAL
NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229  & 77059

The DVR footage showed and staff stated that the situation in the hallway with the AL V was a stand-off, with the AL V at one end of the hall, and the staff at the other. Speaking to AL AB5 (whom students call "Elephant") and AL AB3, the AL V said "I've got mad respect for the two of you…Elephant, you gotta do something." Staff was heard talking about someone having called and said to give GEDs to AL V for something earlier in the day (despite most of the staff having worked earlier that day, they did not question this). The AL V is heard saying, "Y'all can give me some, when you get these [batteries] outta my cold, dead fingers."

AL AB3 is heard saying, "I gotta admit, taking someone else's GED off to put on another student…something you can't do." AL AB4 is heard saying, "that's the job…you can't be talking like that…you don't want to be saying that." The stand-off continues for several minutes, while staff appeared to be conferring on how to handle the situation. Appearing to refer to DVR, the AL V is heard saying, "they're sending mad people over here and I don't care…[if]…one person calls my clinician because [I-10] ain't going for this." The AL V is also heard saying, "who's on the telephone…does anybody know, man?"

He also is heard saying, "let me talk to DVR, then I'll go down [to the rec room] and you can shock me all you want" and saying to AL AB5, "Elephant, you and me go way back…when have you ever known someone to call and give GED's over the phone." Speaking of another student, I-3 (a minor, who was also injured by unauthorized GEDs that the same caller directed be given to him[20]), the AL V is heard saying that staff "gave my homey eight GEDs while he was sleeping," noting that this was "not right." The AL V suggested to staff that they "do what you do with our phone calls." (When students receive phone calls staff are to call back the person to verify that they are who they indicated they are, since students are only allowed to talk to certain people.) About AL AB1, the AL V is heard saying, "why does he have the phone, he's a 'white tag' (the color of the name tag lanyard indicates length of service and rank/function of staff, with white showing that staff has worked three months or less)." AL AB6 told this Investigator that the students were all talking and giving their views during the incident, but that he'd only been working in the residences for three weeks and for all he knew they could be lying.

Despite the AL V's statements to staff, the stand-off continued for nearly half an hour. Staff then restrained the AL V in the hall, and escorted him downstairs to the rec room. Staff is seen getting the four-point restraint board out, and the AL V is heard saying, "that's not for me; you know I can't go on the board." Discussion is heard among the staff as to whether the AL V is supposed to be prone or supine on the restraint board. The AL V was compliant with staff at this point and was not acting aggressively. He even stated to AL AB1, who was still holding the phone, "let them know I'm being compliant." The AL V was put on the board and a torso device was applied to him, despite his recording sheets noting his GED placements to be on his legs.

Most staff were present in the room as the restraint process began. The first of the rec room GEDs is given, without a pinpoint for the behavior, which is contrary to JRC protocol. There is some discussion and question as to whether the device had worked properly. AL AB1 told this

[20] The allegations of abuse and neglect of I-3 were investigated by DSS, as they have jurisdiction in cases of alleged abuse of minors. EEC, which licenses residential facilities for students under 22, also investigated the incident.

Form Revised 5/1/2006

CONFIDENTIAL
NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229  & 77059

Investigator that the caller directed him to have staff pull the strap of the device tighter and make sure the electrode was closer to the AL V[21]. During his interview, AL AB1 indicated that this direction made it seem to him that the caller was watching the events on a monitor. The AL V was given a 2nd GED with a pinpoint for physical aggression. The AL V then is heard asking, "let them rotate me." A 3rd GED was given with the same pinpoint, then a 4th. The staff was again directed to pull the strap tighter, and the AL V is heard saying, "Mister, I can't breathe." Staff are seen speaking to one another, and heard saying, "let him see it." It appeared that staff then moved out of the way, so that the camera would have a view of the AL V's torso. GEDs 5, 6, and 7 were given, but staff was heard counting aloud at 4. The AL V is heard saying, "just keep dealing them." AL AB4 rotated the electrode. Staff is again directed to pull the strap tighter, and AL V is heard saying again, "I can't breathe." When the 8th GED was given, the AL V is heard saying, "that time I got it, you heard it, it did fire." A 9th GED was given, and on the audio of the DVR footage an audible sob is heard, but it does not appear to be from the AL V. Staff is heard saying that the AL V was to get two more GEDs for property destruction. The AL V is heard saying to staff, you "have to rotate me."

AL AB3 left the room at this point. He told this Investigator after the first "6 or 7, 7 or 8" were given he left because he thought he would "either cry or throw up" if he stayed in the room. The 10th GED was given for property destruction, then the 11th. After this the AL V asked for water (which staff does bring him, they also bring a tissue to wipe his nose). The 12th GED was given for swearing. Then after a 13th GED, the AL V is seen to shake slightly and to begin to breathe heavily. GEDs 14 and 15 were given with no pinpoints for behaviors. At this point, the staff count of the total is heard to be only 9. AL AB1 is heard asking the caller, "altogether how many is it?" AL AB1 then is heard to indicate 8 for noncompliance, 7 for verbal threats, 3 more for swearing. The AL V is heard saying that he will count now, since there are 18 more to do. As previously mentioned, the AL V's plan calls for a single GED consequence for a single behavior. It should be noted that the staff present (other than AL AB1) had been with the AL V earlier in the day and should have known whether he had these behaviors, however no staff is seen questioning the caller's directions at this point.

GEDs 16 and 17 were given without behavioral pinpoints; 18 was given for swearing, 19 was given with the accompanying pinpoint, "no refusing to follow staff directions." The AL V responded to this with "yes, sir." 20 was given with no pinpoint; 21 again for refusing to follow direction. AL AB4 attempted to rotate the AL V's electrodes again. GED 22 is given for refusing to follow direction, as is 23 and 24. Staff then rotated the electrodes. GED 25 was given for this as well, 26 and 27 had no pinpoints, 28 was given for verbal threats, and then the 29th was without pinpoint. Someone was heard directing, "rotate him." The 30th was given for verbal threats, the 31st without pinpoint. The electrodes were rotated. The 32nd and 33rd were given without pinpoints. Someone stated, "now rotate." The 34th and 35th were given for attempting to remove [the GED] device. The 36th GED was given without pinpoint; after this AL AB4 rotated the electrodes. The 37th was given for attempting to remove device, as were the 38th and 39th. The 40th was given with no pinpoint. The 41st was given for "aggressive posturing," as were the 42nd, 43rd, 44th, 45th, 46th and 47th. The electrodes were rotated after the 42nd. GEDs 48 and 49 were given with no pinpoints.

---

[21] The electrodes need to be in contact with skin to deliver the consequences. It is unclear from a review of DVR footage if the device did not work, or if the caller was leading the AL AB1 to believe that the device did not work.

Form Revised 5/1/2006

NOT A PUBLIC RECORD

At this point, about 20 minutes have passed, and the AL V is heard saying to AL AB1, "can you ask...can I have them in the morning, because I'm really tired." There was no response to this. GEDs 50, 51, 52 and 53 were given for "verbal threats to destroy." At this point the AL AB1 was heard counting the total number as 42. GEDs 54 through 58 were all given for verbal threats to destroy. At this point the count was 47. AL AB1 had previously mentioned 60 as the total to be given, and the AL V is heard saying "thirteen left." GEDs 59 through 68 were given for yelling. Someone states, "two more." Then GEDs 69 and 70 were given, and then the AL V was taken off the restraint board and put in "transport restraints.[22]" (Staff and AL V had been counting to 60, but DVR footage actually showed 70 GEDs given to the AL V in the rec room, in addition to the 7 that had been given, or attempted, upstairs.) Staff are then directed to take the AL V to the 2nd bed in the "apartment." This bed was left vacant by R-4's not returning to the program. AL AB4 went with the AL V, as he was directed to be his one-to-one staff. The AL AB4 told this Investigator that prior to taking the AL V off the restraint board in the rec room, the caller asked that staff how the AL V's skin looked. AL AB4 said that when staff said that the skin was red, the AL V yelled, "very red." Describing the AL V after the GEDs were completed, AL AB1 said, "he was done, there was no more to him."

The AL V was left in the transport restraints to sleep. While in bed, the AL V is heard reporting that his mouth is dry, his blood-pressure is racing and he is sweating. He is heard saying he feels like he can't breathe, noting that he has high blood pressure and that he feels like he is "about to have a stroke." No staff took action.

The AL V was only seen by nursing staff later in the day, when he arrived at the school building.[23] I-13, ███████, told this Investigator that he heard from I-11 that someone had called the house and said they were DVR staff and gave GEDs to AL V and I-3 (a minor student). I-13 indicated that he heard this from I-11 around 8:45 or 9:00 a.m. on 8/26/07, when I-11 came to him to get "finger sticks." I-11 told I-13 that the GEDs were given when the students were sleeping, and when they were on the four-point restraint board. I-13 saw the AL V and I-3. He took photographs of the affected areas on each student and of marks on I-3's upper arms.[24] I-3 told him that he was in pain, so I-13 gave him ice, Motrin, and Silvadine burn ointment (for what I-13 called a stage 2 ulcer on I-3's leg). I-13 indicated that the AL V did not mention the symptoms he had complained about earlier (dry mouth, trouble breathing, heart racing, etc.). I-13 noted that the AL V had some reddened areas on his torso, but that the skin was not broken. The AL V told I-15 on 8/27/07 that he was "physically OK (sic) but that he was still somewhat scared and agrry (sic)."

AL V and I-3 were also taken to a see a physician, R-2, the following day. R-2 documented that he had seen the AL V for "apparent inappropriate GED applications to lower abdomen and R calf." R-2 documented "pt feels fine," "stable medically," "skin irritation will resolve." He described and drew a diagram of multiple spots at sights of GED applications. Regarding I-3, R-

---

[22] These restraints were Velcro-fastened arm and leg cuffs.
[23] Though it was a Sunday, weekend day programming is held at the school building rather than at the residence.
[24] I-13 documented these arm marks as bruises in his e-mail that day, but when interviewed he did state that they "could be GED" marks, but that they were "still more severe than usually" seen. I-13 also said about these marks that they were "not uncommon for restraint, but for GED uncommon."

Form Revised 5/1/2006

CONFIDENTIAL
NOT A PUBLIC RECORD

2 also documented that he was "stable medically;" R-2 noted "small irritated/minimally burned area L calf." According to C-2, I-3 was also later seen at Children's Hospital.

I-13 was asked about the body checks that were to have been done daily on all students who are on the GED IV. He reported that these are usually done on weekdays, but on weekends, at least for the last two-three months, it had depended on staffing. This Investigator asked to see the last GED IV body check for the AL V prior to this incident. The last such completed check was dated for Tuesday of the week of 7/23/07-7/29/07. I-16 reported that nursing staff saw the AL V daily to give him medicine for his high blood pressure, so he would have had the opportunity to speak to them. I-16 indicated that the nursing staff conducting the checks focused on the students who were not as high functioning.

In the course of events on 8/26/07, in addition to what happened to the AL V, I-3 also received unauthorized GED applications at the behest of the same caller. I-3 received a total of 28 or 29 GEDs, mostly to his legs. He received the first of these GEDs while he was sleeping. AL AB7 described having heard someone wake up with a scream. As with the AL V, the caller directing staff to give the consequences mentioned behaviors that were noted on the I-3's recording sheets, such as, "glaring at others" and "speaking over staff and students."[25]   Review of DVR footage shows, the staff did not rotate the electrodes after each application, and that I-3 complained of leg pain and was visibly limping, but that none of the staff sought immediate attention for these symptoms. After I-3 received the first GEDs in his room, ██████████, I-11 is heard saying, "that's somebody else…you gotta make sure…DVR." I-11 described to this Investigator that he was screaming loudly that it was not DVR. He stated that he heard the caller tell the AL AB1 to pinpoint him for this. He also heard the caller say that he (I-11) would get bonus points for staying out of the crisis. I-11 thought that it might have been a "program op" for staff. The AL AB3 described that while the GEDs were being given to I-3 on the four-point board in the rec room, he took his cell phone into the bathroom (because staff are not allowed to have cell phones on their person when they are working) and tried to call some of the numbers from "the sheet on the wall." AL AB3 said that his cell phone reception was poor and he was unable to reach anyone. AL AB7 described that it was "horrible to watch" I-3 getting the GEDs on the four-point board.

I-11 indicated that he was called by a student (whom he refused to name, but whom others described as R-4) who told him that he had called the house that night, and that AL V and I-3 "got what they deserved." I-11 said that the caller had I-11's home number and that he had called I-11's sister and asked her to call I-11 (as she is approved to do so). I-11 indicated that I-11 had not seen other students' recording sheets, but that he knew what behaviors they got pinpointed for. I-11 stated, "who wouldn't." The AL V said that he had seen other students' recording sheets and program descriptions when they were "laying (sic) on the counter." I-5 indicated that he had seen recording sheets many times, when they had been left some place. I-10, who was the clinician for AL V, I-3 and R-4 at the time of this incident, reported that he had also received a call from R-4 (on 8/27/07). He stated that R-4 had said to him that he had called the residence the prior day and directed the staff to administer GEDs. I-10 indicated that

---

[25] I-3's recording sheets, like the AL V's, show that the caller mentioned behaviors that were in the court-authorized categories. I-3's recording sheets noted an approved "latency," or delayed consequence time of 24 hours.

CONFIDENTIAL

NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229  & 77059

R-4 had said something to the effect of "I'm funny, huh." I-4's preliminary investigation report notes that at around 5:00 p.m. on 8/26/07, R-4 called the DVR monitoring office, pretending to be I-6. I-4's report states that R-6 recognized R-4's voice, and that R-4 admitted to having called the Stoughton residence "instructing staff to administer the shocks."

When interviewed, AL AB5 indicated that in addition to directing staff to consequate the AL V and I-3 with GEDs, the caller later directed staff to take I-12 from his bed in the apartment to the rec room. The caller directed them to give GEDs to I-12, but I-12 told them he was not on GEDs. Initially I-12 resisted being put on the board, but he eventually allowed staff to do this. Prior to his getting any GEDs, staff learned that the caller, whom they had thought was from DVR monitoring, was not actually from DVR. AL AB5 noted that he became suspicious because the caller was talking about I-12 having behaviors at 9:00 p.m., but he was with I-12 at 9:00 p.m. I-12 also was questioning what behaviors I-12 had. AL AB5 stated he was also concerned because I-12 is from New York, and he stated that students from "New York can't get GEDs on the board." AL AB5 said that he then directed AL AB1 to hang up the phone and call the school, to see if they would tell him the same thing. AL AB5 stated that I-12 did not have behaviors, that he had taken I-12 to bed and that if there were behaviors before then he would have known. AL AB5 stated that in the evening there would have either been a case manager or a DVR staff in the residence. The cordless phone went dead, according to AL AB5, so he went to the kitchen to call DVR monitoring. He called and spoke to I-9, who handed the phone over to AL AB2, who had been the monitor assigned to watch the Stoughton residence that overnight shift. AL AB5 indicated that he asked AL AB2 if they had given instructions to put I-12 on the board and give him GEDs. AL AB5 indicated that AL AB2 responded by saying, "what are you talking about, you called us." AL AB5 said that AL AB2 asked him, "why are you restraining students?" and informed him that if they were restraining students, they should be calling DVR to report this.

AL AB5 indicated that at this point he went down and took I-12 off the four-point restraint board, telling him that he did not know what had happened, but that he should wait. AL AB5 indicated that he then told AL AB4 to take the AL V out of transport restraints. AL AB5 said he directed other staff to tell the students to be calm. He said that AL AB2 then came to the residence and took over the shift. AL AB5 could not believe that this had occurred. He stated that the events of the overnight took three to four hours and that monitoring staff should have seen them. He noted that it would only take monitoring staff fifteen minutes to get to the house. In more than three years at the agency he said that he has never had such an incident occur. AL AB5 said "DVR has very much power;" "if they call you and say A.B.C.D. you have to follow." About the caller, AL AB5 said, it had to be either a student or a staff, that it was someone who knew DVR. AL AB5 said that the only "mistake" the caller made was about the New York student. AL AB5 maintained that DVR only learned of the incident when he made a call and spoke to I-9.

When this Investigator interviewed AL AB2, he described that he was the monitor assigned to watch the Stoughton residence; he described that other than during his break, which he noted to be from approximately 3:30 a.m. to 4:15 a.m., he was viewing the residences assigned to him. AL AB2 stated that only twelve views can be seen on the screen at once, so he has to physically click in and out of different camera views. He stated that it probably took ten to fifteen minutes

· Form Revised 5/1/2006

CONFIDENTIAL
NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229  & 77059

to rotate through all of the camera views. He noted that there were some students who had strict behavior plans and that a view of them had to be up at all times. He said that he had two such students on his list that shift. R-2's investigation report into this incident notes that the AL AB2 acknowledged that it was standard operating procedure to keep at least three camera views of each residence active on the monitors at all times, and that AL AB2 claimed he had been viewing Stoughton camera views, but that "he did not observe, hear or otherwise detect, any unusual activity at the Stoughton Residence" until approximately 5:30 a.m.

This is in contrast to what AL AB2 wrote in his end of shift report "At 4:18 a.m. I started view (sic) rotationally through my houses as usual and it was observed at Stoughton; [I-12] was on the four point (sic) board with all staff surround (sic) him. I call (sic) the residence several times to fine (sic) out while (sic) he was on the restraint board, but the staff refused to pick up the phone. So I decided to wait and view them for about 15 minutes to see if they will conduct a restraint check but I observed they were not and then decided to call again and after numeral (sic) attempt (sic) they finally pick up the phone and it was when (sic) I ask the staff to speak with the shift supervisor." Review of DVR footage shows that I-12 was put on the board after 5:00 a.m., which calls into question the veracity of AL AB2's written statements.

I-4 indicated that when administrators began looking into the incident that morning, all staff told them that they were sure that the caller had been watching them. Since there seemed to be a concern that the computer system may have been entered by an external party, I-4 pulled the DVR audit logs for the Stoughton residence, which showed that the DVR system had been disconnected from the residence from 12:45 a.m. until 4:41 a.m.; meaning that the DVR staff had not clicked on any of those camera views. (I-8 told this Investigator that he called the proprietor of their DVR system and spoke with staff there, who informed him that they did not believe that the system could have been entered from outside the school network, as it would have required an encryption key to view the footage taken. I-8 indicated that the system is the type of security system used by banks.) R-2's report indicates that review of DVR footage of the DVR monitoring room shows that AL AB2 "failed to cycle through views of the several residences which he was responsible for."

When AL AB2 was reached later by phone and told that records indicated he did not click into the views of the Stoughton residence for several hours, he conceded that it might be possible, because he had a lot of residences, noting that when his male co-worker (I-9) was on break, he was covering 22 residences. AL AB2 indicated that he did not think it fair that he was singled out, as neither I-9 nor I-7 had seen the incident either. I-9 indicated that when he did cover for AL AB2 during AL AB2's break, he had not focused on the Stoughton house, as he had worked there (the Stoughton house) from 4:00 p.m. to 11:00 p.m. and knew that the house had been running smoothly then and that all of the students had gone to bed. I-9 indicated that he learned of the Stoughton incident when he answered a call to the monitoring office from the house. A staff person there was asking if the AL V was to be staffed as a one-to-one. I-9 indicated that he passed the phone to AL AB2 then, as AL AB2 had returned from his break.

I-7 told this Investigator that she had returned from her break shortly after 5:00 a.m. and that she saw on AL AB2's monitor that there was a restraint in the rec room of Stoughton, but that the Velcro restraint was used improperly. She stated that AL AB2 seemed to hesitate, that he tried to call the residence, but that it took staff a few minutes to explain what had occurred. She stated that

Form Revised 5/1/2006

NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229  & 77059

the staff at the residence was refusing to speak with AL AB2, and that they could be seen arguing with one another on the monitor, so AL AB2 decided to go there. I-7 informed the weekend supervisor of the incident at about 6:00 a.m. AL AB2 noted that I-7 and I-9 would have been covering the residence when he was on break. I-7 said that when she covers for others she tries to see all of their camera views, but that she may not get to all of them, particularly if there was no "heads-up" from the other staff about a specific residence. Both I-7 and I-9 reported that although they were focused on their own work, they had believed that AL AB2 was doing what he should, and that he appeared to be flipping through the views on his monitor.

AL AB2 may have been flipping through the residences, but records show he did not log into the Stoughton house for hours during the incident, and thus failed to protect the AL V from the GEDs given by AL AB1 at the behest of the caller. Despite concerns expressed by staff to one another and by students to staff, none of the other Stoughton staff on duty (AL ABS 3, 4, 5, 6 and 7) took action in time to prevent the AL V or I-3 from receiving the unwarranted GEDs, or to prevent I-12 from an unwarranted restraint on the four-point board. (It should be noted that while I-12, who is also a minor, incurred no physical injury from the incident, he did report that it left him with nightmares and difficulty sleeping, as he feared it could occur again.)

When asked what they thought could have prevented the incident, several of the direct care staff indicated that different staffing of the shift would have prevented it. AL AB4 indicated that having more senior staff on duty initially, rather than three "white tags[26]" would have made a difference. AL AB5 indicated that some houses with greater needs should be given a priority for staffing, and that if more experienced staff had been on duty when the incident began it would not have turned out as it did. AL AB6 indicated that "having a supervisor who was acting as a supervisor" would have made a difference.

Even though the events of 8/26/07 had never occurred before, AL AB8 was aware of the combined inexperience of the involved staff and the needs of the residents under its care living at the Stoughton house. AL AB8 had designed and provided the training for all of the direct care staff with regard to the GED, yet none of the staff involved called upon the details of that training to question the appropriateness of GEDs that were being given. The direct care staff noted that they had in the past taken direction from DVR and that they all believed the caller to be from DVR. Some of the direct care staff mentioned fear of being "evaluated" negatively by AL AB8 if they did not follow the directives of the caller. It was reported that the caller had even used the term "evaluate" when speaking with staff.   A JRC written list of staff infractions and corresponding consequences indicates that staff could stand to lose evaluation points, be suspended from shifts or have other disciplinary action taken if they did not follow policy. In addition, during the event, students spoke out telling staff that the various GED applications were wrong. AL AB8 had directed staff not to engage in any social conversation/interaction with or do personal favors for certain students (or they could receive disciplinary action), some of these students were the students speaking out (correctly) during the incident.

I-3 and I-12 have been removed from the program.  The AL V is still at the program, but is no longer consequated with the GED. I-15 indicated that DSS will transition him to another program when a suitable placement is found.

---

[26] "White tags" refers to the color of the nametag-lanyard worn by staff working three months or less.

Form Revised 5/1/2006

CONFIDENTIAL

NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229  & 77059

**Additional Findings of Risk**:

1) I-6 was using a name other than that printed on his MA Identification card in his personnel file.  DPPC accessed CORI information specific to the printed name and the AKA name and different results were returned, despite the same date of birth and social security number being given with both names.  This may indicate a weakness in the CORI background check system currently utilized by provider programs.

2)  During the events of 8/26/07, both the AL V and I-3 clearly voiced concerns about their medical condition.  Despite this, and despite visible evidence that I-3 was limping, staff did not notify on-call nursing staff.

3)  The AL V also voiced a request during the events of 8/26/07 that his clinician be contacted, due to concerns that staff were not acting appropriately.  JRC's Student Rules policy clearly states that appropriate staff should be accessed for students when they express a human rights complaint.

**Additional Recommendations and/or Actions Already Completed** (required when additional risk is identified):

1)  As CORI data returned to agencies can be name specific, JRC should institute a policy to ensure that all possible names used by staff are correctly documented on CORI requests (at a minimum the CORI requests should contain the name currently used by the staff and all names on legal documents presented by the staff).

2)  JRC should re-train all staff on their current policy regarding the notification of nursing staff when injury of a student is suspected or detected.

3)  JRC should revise or develop specific policies on human rights for students, and train/re-train staff accordingly.  JRC should also institute an educational program on human rights for all students, as appropriate to students' various levels of understanding.

**MOU Update / Criminal Investigation and Prosecution Status**:

The Stoughton Police Department and the Massachusetts State Police Detective Unit assigned to the Disabled Persons Protection Commission are investigating this incident.  The case has also been referred to the Norfolk County District Attorney's Office for further review.  A copy of this report will be shared with those departments and that office.

Form Revised 5/1/2006

NOT A PUBLIC RECORD

M.G.L. c. 19C / 118 CMR Investigation Report Form
DPPC Case Number: 76157, 76158 , 76229 & 77059

This section must be completed either with electronic signatures at the time of submission or be mailed to the DPPC with original signatures.

Disabled Persons Protection Commission Case Number: 76157, 76158, 76229 & 77059

The undersigned investigator certifies that to the best of their knowledge the information contained in this investigation report is accurate, and the investigation meets the requirements of M.G.L. c. 19C, CMR 118 and all relevant DPPC Procedures.

| Seana Miller | *Seana Miller* | 1/2/08 |
|---|---|---|
| **Investigator Name (print or type)** | **Investigator Signature** | **Date** |
| Emil DeRiggi | *Emil DeRiggi* | 1/3/08 |
| **Supervisor Name (print or type)** | **Supervisor Signature** | **Date** |

Form Revised 5/1/2006

bc:    Patricia J. Geary
       Eileen Borden
       Ellen Ganon
       Kathleen Surgalla
       Mary Ellen Clerkin