# MANDATE

UNITED STATES COURT OF APPEALS
FOR THE
SECOND CIRCUIT

_____

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 20th day of August, two thousand twelve.

Before: DENNIS JACOBS,
    *Chief Judge,*
   RICHARD C. WESLEY,
    *Circuit Judge,*
   RICHARD J. SULLIVAN,
    *District Judge.**

_____

| | |
|---|---|
| CHARLES BRYANT, individually and as next friend and guardian of D.B., AVA GEORGE, individually and as next friend and guardian of B.G., CHANIN HOUSTON-JOSEPHAT, individually and as next friend and guardian of A.J., LISA HUGHES, individually and as next friend and guardian of J.R., CARMEN PENA, individually and as next friend and guardian of G.T., VIVIAN PRESLEY, individually and as next friend and guardian of D.P., JAMIE TAM, individually and as next friend and guardian of S.T., | JUDGMENT<br><br>Docket No.: 10-4029 |

   Plaintiffs-Appellants,

   v.

NEW YORK STATE EDUCATION DEPARTMENT, DAVID M. STEINER, in his capacity as Commissioner of the New York State Education Department, THE NEW YORK STATE BOARD OF REGENTS,

   Defendants-Appellees.

_____

The appeal in the above captioned case from a judgment of the United States District Court for the Northern District of New York was argued on the district court's record and the parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is AFFIRMED in accordance with the opinion of this court.

MANDATE ISSUED ON 10/11/2012

For The Court:

Catherine O'Hagan Wolfe,
Clerk of Court

_____

\*       The Honorable Richard J. Sullivan, United States District Judge for the Southern District of New
York, sitting by designation.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

10-4029-cv
Bryant v. N.Y. State Educ. Dep't

1              **UNITED STATES COURT OF APPEALS**
2
3                    **FOR THE SECOND CIRCUIT**
4
5                      August Term, 2011
6
7
8    (Argued: October 21, 2011    Decided: August 20, 2012)
9
10                   Docket No. 10-4029-cv
11
12   - - - - - - - - - - - - - - - - - - - - - - - x
13
14   **CHARLES BRYANT, individually and as next friend**
15   **and guardian of D.B., AVA GEORGE, individually**
16   **and as next friend and guardian of B.G., CHANIN**
17   **HOUSTON-JOSEPHAT, individually and as next**
18   **friend and guardian of A.J., LISA HUGHES,**
19   **individually and as next friend and guardian of**
20   **J.R., CARMEN PENA, individually and as next**
21   **friend and guardian of G.T., VIVIAN PRESLEY,**
22   **individually and as next friend and guardian of**
23   **D.P., JAMIE TAM, individually and as next**
24   **friend and guardian of S.T.,**
25
26                  **PLAINTIFFS-APPELLANTS,**
27
28              **- v. -**
29
30   **NEW YORK STATE EDUCATION DEPARTMENT, DAVID M.**
31   **STEINER, in his capacity as Commissioner of the**
32   **New York State Education Department, THE NEW**
33   **YORK STATE BOARD OF REGENTS,**
34
35                 **DEFENDANTS-APPELLEES.**
36
37   - - - - - - - - - - - - - - - - - - - - - - - x
38       Before:       JACOBS, Chief Judge, WESLEY, Circuit
39                     Judge, and SULLIVAN, District Judge.[1]

_____

       [1] The Honorable Richard J. Sullivan, United States
District Judge for the Southern District of New York,
sitting by designation.

1    Plaintiffs--the parents and/or legal guardians of seven

2  children with disabilities, who bring this suit on behalf of

3  themselves and the children--appeal the judgment of the

4  United States District Court for the Northern District of

5  New York (Sharpe, J.), dismissing their suit for failure to

6  state a claim upon which relief can be granted, and denying

7  their motion for a preliminary injunction.  Plaintiffs seek

8  equitable relief preventing New York from enforcing a

9  prohibition on the use of aversive interventions, which are

10  negative consequences or stimuli administered if a child's

11  disruptive behavior impedes the child's education.

12    We conclude that prohibiting one possible method of

13  dealing with disorders in behavior, such as aversive

14  intervention, does not undermine a child's right to an

15  individualized, free and appropriate public education, and

16  that New York's law represents the State's considered

17  judgment regarding the education and safety of its children

18  that is consistent with federal education policy and the

19  United States Constitution.

20    The judgment of the district court is affirmed.  Judge

21  Sullivan has filed a separate opinion in which he concurs in

22  part and in part dissents.

2

```
 1                          Michael P. Flammia, Eckert Seamans
 2                          Cherin & Mellott, LLC, Boston, MA.
 3                          (Jeffrey J. Sherrin, O'Connell and
 4                          Aronowitz, P.C., Albany, NY, and
 5                          Meredith H. Savitt, Law Office of
 6                          Meredith Savitt, P.C., Delmar, NY, on
 7                          the brief), for Plaintiffs-
 8                          Appellants.
 9
10                          Andrew B. Ayers, Assistant Solicitor
11                          General (Barbara D. Underwood,
12                          Solicitor General, Benjamin N.
13                          Gutman, Deputy Solicitor General, on
14                          the brief), for Eric T. Schneiderman,
15                          Attorney General of the State of New
16                          York, for Defendants-Appellees.
17
18  DENNIS JACOBS, Chief Judge:
19
20      Plaintiffs--the parents and/or legal guardians of seven
```

21  children with disabilities, who bring this suit on behalf of

22  themselves and the children--appeal a judgment of the United

23  States District Court for the Northern District of New York

24  (Sharpe, J.), dismissing their suit for failure to state a

25  claim upon which relief can be granted, and denying their

26  motion for a preliminary injunction.  Plaintiffs seek

27  equitable relief preventing the New York Board of Regents

28  ("Board of Regents"), the New York State Education

29  Department ("Education Department"), and the Commissioner of

30  the Education Department (David M. Steiner, in his official

31  capacity) from enforcing a prohibition on the use of

32  aversive interventions.  Aversive interventions are negative

33  consequences or stimuli administered to children who exhibit

3

1    problematic and disruptive behavior that impedes their
2    education.
3         Plaintiffs contend that New York's prohibition of
4    aversive interventions undermines their children's right to
5    a free and appropriate public education ("FAPE"), which is
6    guaranteed by federal law.  We conclude that the State's
7    prohibition of one possible method of reducing the
8    consequences of a child's behavioral disability does not
9    undermine the child's right to a FAPE or prevent
10   administrators from enacting an individualized plan for the
11   child's education.
12        Plaintiffs also contend that the State's prohibition
13   violates the children's constitutional rights and the
14   Rehabilitation Act of 1973 because the prohibition is
15   arbitrary and oppressive, the product of gross misjudgment
16   by State policymakers, and an infringement on the
17   individualized assessment and treatment of students with
18   disabilities.  We conclude that New York's law represents a
19   considered judgment by the State of New York regarding the
20   education and safety of its children that is consistent with
21   federal education policy and the United States Constitution.
22        Affirmed.

4

1                              **BACKGROUND**

2                                   **I**

3         The Individuals with Disabilities Education Act ("the

4    IDEA") "is the most recent Congressional enactment in 'an

5    ambitious federal effort to promote the education of

6    handicapped children.'"   <u>Walczak v. Fla. Union Free Sch.</u>

7    <u>Dist.</u>, 142 F.3d 119, 122 (2d. Cir. 1998) (quoting <u>Bd. of</u>

8    <u>Educ. v. Rowley</u>, 458 U.S. 176, 179 (1982) (interpreting the

9    Education for All Handicapped Children Act, which was

10   subsequently amended and renamed the IDEA)).   The IDEA

11   provides federal funds to states that "develop plans to

12   assure all children with disabilities the right to a free

13   appropriate public education."   <u>Id.</u> (internal quotation

14   marks omitted).   The IDEA requires that each child receive,

15   at least annually, an individualized education program

16   ("IEP")[2] detailing "special education and related services"

17   tailored for the particular needs of the child, 20 U.S.C.

18   § 1401(9), that are "reasonably calculated to enable the

---

[2] The IEP is "a written statement that [<u>inter</u> <u>alia</u>] 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'"   <u>D.D. v. N.Y.C. Bd. of</u> <u>Educ.</u>, 465 F.3d 503, 507-08 (2d Cir. 2006) (quoting <u>Honig v.</u> <u>Doe</u>, 484 U.S. 305, 311 (1988)); <u>accord</u> 20 U.S.C. § 1414(d)(1)(A) (defining IEP).

5

1  child to receive educational benefits," <u>Rowley</u>, 458 U.S. at

2  207.

3

4                                  **II**

5       The facts are taken from the well-pleaded factual

6  allegations of the complaint, <u>Bell Atl. Corp. v. Twombly</u>,

7  550 U.S. 544, 555, 570 (2007), and from information of which

8  this Court can take judicial notice, <u>see</u> <u>Taylor v. Vt. Dep't</u>

9  <u>of Educ.</u>, 313 F.3d 768, 776 (2d Cir. 2002) (determining that

10 a reviewing court can consider the complaint, documents

11 attached to the complaint, documents incorporated by

12 reference in the complaint, and public records when

13 considering a motion to dismiss).

14      Plaintiffs are the parents or legal guardians of seven

15 children, each of whom has a long history of severe behavior

16 problems, including aggressive, self-injurious, destructive,

17 and non-compliant behavior.  These behavioral disabilities

18 cause the children to engage in behaviors such as: yanking

19 out their own teeth, attempting to stab themselves, tying

20 ropes around their necks, scratching themselves, banging

21 their heads on walls and other things, and assaulting

22 teachers and staff members.  These behaviors have impeded

23 their education and development.

24      Plaintiffs have tried a number of measures to treat and

25 educate these children, including: special education, day

                                 6

1    and residential programs, psychiatric hospitalization,

2    counseling, physical restraints, paraprofessional support,

3    home instruction, sensory tents, positive-only programs of

4    behavioral modification, and anti-psychotic and other

5    psychotropic medications.  None has been successful, and the

6    children continue to pose physical risks to themselves and

7    others.  As a result, they have been foreclosed from public

8    schools and private institutions or confined in psychiatric

9    wards and detention centers.  Each child's IEP now suggests

10   they receive residential special-education services.

11   Accordingly, each child is enrolled at the Judge Rotenburg

12   Educational Center, Inc. ("JRC") in Massachusetts.

13        JRC provides residential, educational, and behavioral

14   services to individuals with severe behavioral disorders,

15   and is often a placement of last resort for those who have

16   proven resistant to other forms of psychological and

17   psychiatric treatment.  Although JRC is out of state, the

18   children are permitted to attend under a New York law that

19   allows New York students with disabilities who are unable to

20   obtain an appropriate education in-state to attend an out-

21   of-state facility that, in the judgment of the Education

22   Department, can meet the needs of the child.  N.Y. Educ. Law

23   §§ 4407(1)(a), 4401(2)(f), (h).

24        At JRC, each student starts with a non-intrusive,

25   positive-only, treatment program in which students receive

7

1  rewards (e.g., treats, video games, music, field trips) for
2  maintaining positive behaviors, including learning.  The
3  complaint alleges that these positive-only measures are
4  effective for most of JRC's school-age students.  For other
5  students, JRC may also employ negative-consequence
6  interventions known as aversives or aversive interventions.

7      According to the complaint, aversive interventions have
8  been used to deal with behaviors that pose significant
9  dangers to the student or others, or significantly interfere
10  with a student's education, development, or appropriate
11  behavior.  The techniques aim to stop the behavior and
12  thereby enable the student to receive an appropriate
13  education, to enjoy safety and well-being, and to develop
14  basic skills for learning and daily living.  The complaint
15  alleges that aversive interventions have helped many JRC
16  students to participate in activities with peers and helped
17  some to attend college, join the armed forces, obtain
18  employment, and go on extended family visits.

19      The types of aversive interventions used by JRC include
20  helmets with safeguards that prevent removal, manual and
21  mechanical restraints, and food-control programs.  But,
22  according to the complaint, JRC's "principal form" of
23  aversive intervention is electric skin shock, in which a
24  low-level electrical current is applied to a small area of
25  the student's skin (usually an arm or a leg).  The shock

1    lasts approximately two seconds, and is administered, on

2    average, less than once a week.   The complaint alleges that

3    severe problematic behavior decreases with this regime, thus

4    alleviating an impediment to academic progress.   Possible

5    side effects include temporary redness or marking, which

6    clears up within a few minutes (or a few days at most), and

7    a rare occurrence of blistering.

8        Clinicians have opined that it is necessary to

9    supplement these children's ongoing educational and

10   treatment programs with aversives.   However, none of the

11   children has yet received an IEP that authorizes such

12   interventions.

13

14                              **III**

15       The Education Department, which is governed by the

16   Board of Regents, regulates educational services and

17   programs for New York residents.   See N.Y. Educ. Law

18   § 4403(3).   It promulgates "regulations concerning standards

19   for the protection of children in residential care from

20   abuse and maltreatment," id. § 4403(11), and periodically

21   inspects, reports on, and "make[s] recommendations

22   concerning instructional programs or special services for

23   all children with handicapping conditions who reside in or

24   attend any . . . state financed . . . social service

25   facilities, youth facilities, health facilities, [or] mental

                                9

1    health, mental retardation and developmental disabilities

2    facilities," id. § 4403(4).

3        In 2006, the Board of Regents promulgated a regulation

4    prohibiting schools, including "approved out-of-state day or

5    residential schools" (such as JRC), from using aversive

6    interventions.  N.Y. Comp. Codes R. & Regs. tit. 8,

7    § 19.5(b)(1) (2012).  The regulation defines an "aversive

8    intervention" as an intervention "intended to induce pain or

9    discomfort to a student for the purpose of eliminating or

10   reducing maladaptive behaviors," such as the contingent

11   application of painful, intrusive, or similar stimuli or

12   activity.  Id. § 19.5(b)(2).[3]

---

[3] In full, the regulation defines "aversive
intervention" as
    an intervention that is intended to induce pain or
    discomfort to a student for the purpose of eliminating
    or reducing maladaptive behaviors, including such
    interventions as:
        (i)      contingent application of noxious,
                 painful, intrusive stimuli or activities;
                 strangling, shoving, deep muscle squeezes
                 or other similar stimuli;
        (ii)     any form of noxious, painful or intrusive
                 spray, inhalant or tastes;
        (iii)    contingent food programs that include the
                 denial or delay of the provision of meals
                 or intentionally altering staple food or
                 drink in order to make it distasteful;
        (iv)     movement limitation used as a punishment,
                 including but not limited to helmets and
                 mechanical restraint devices; or
        (v)      other stimuli or actions similar to the
                 interventions described in subparagraphs
                 (i) through (iv) of this paragraph.

N.Y. Comp. Codes R. & Regs. tit. 8, § 19.5(b)(2) (2012).

10

1        A child-specific exemption allows pre-approved

2    aversives to be administered in exceptional cases in the

3    three school years following the enactment of the

4    prohibition (2006-2007, 2007-2008, 2008-2009), and a

5    grandfather clause provides "that a student whose IEP

6    includes the use of aversive interventions as of June 30,

7    2009"--three years after the enactment of the prohibition--

8    "may be granted a child-specific exception in each

9    subsequent school year . . . ."  N.Y. Comp. Codes R. & Regs.

10   tit. 8, § 200.22(e).

11       Neither exception applies to the children in the

12   instant case because the initial three years of limited

13   aversive interventions has now ended, and none of these

14   children had an IEP that authorized aversives prior to June

15   30, 2009.

16

17                          **DISCUSSION**

18       Plaintiffs raised below and press on appeal numerous

19   challenges to New York's prohibition of aversive

20   interventions and seek declaratory and injunctive relief

21   preventing its enforcement.  Specifically, Plaintiffs

22   contend that New York's regulation violates: [1] the IDEA;

23   [2] the Rehabilitation Act of 1973; and [3] the Due Process

24   and Equal Protection clauses of the United States

25   Constitution.

1        The district court granted Defendants' motion to

2   dismiss all those claims for relief.  We review that

3   decision de novo, "construing the complaint liberally,

4   accepting all factual allegations in the complaint as true,

5   and drawing all reasonable inferences in the plaintiff[s']

6   favor."  Chambers v. Time Warner, Inc., 282 F.3d 147, 152

7   (2d Cir. 2002).  Although all factual allegations in the

8   complaint must be assumed true for the purposes of a motion

9   to dismiss, this principle is "inapplicable to legal

10  conclusions" and "'formulaic recitation[s] of the elements

11  of a cause of action.'"  Ashcroft v. Iqbal, 556 U.S. 662,

12  678 (2d Cir. 2009) (quoting Twombly, 550 U.S. at 555).  To

13  survive a motion to dismiss, a complaint must allege "enough

14  facts" to "raise a right to relief above the speculative

15  level" and "state a claim to relief that is plausible."

16  Twombly, 550 U.S. at 555, 570; accord id. at 555 n.3.

17       In addition to dismissing Plaintiffs' complaint under

18  Rule 12(b)(6), the district court also denied Plaintiffs'

19  motion for a preliminary injunction.  We review that ruling

20  for abuse of discretion.  Ashcroft v. Am. Civil Liberties

21  Union, 542 U.S. 656, 664 (2004); Malletier v. Burlington

22  Coat Factory Warehouse Corp., 426 F.3d 532, 537 (2d Cir.

23  2005).  "A district court abuses its discretion when (1) its

24  decision rests on an error of law . . . or a clearly

25  erroneous factual finding, or (2) its decision--though not

12

1    necessarily the product of a legal error or a clearly

2    erroneous factual finding--cannot be located within the

3    range of permissible decisions." <u>Mullins v. City of New</u>

4    <u>York</u>, 626 F.3d 47, 51 (2d Cir. 2010) (internal quotation

5    marks omitted; ellipsis in original).

6

7                                   I

8         A standing question has arisen.  While this appeal was

9    pending, the Massachusetts Department of Developmental

10   Services promulgated a regulation that governs JRC (as a

11   school in the Commonwealth), and bars it from using some

12   aversives on these children and others.

13        The Massachusetts regulation, 115 Mass. Code Regs.

14   5.14 (2012), prohibits the use of certain aversive

15   interventions--including "contingent application of physical

16   contact aversive stimuli such as spanking, slapping, hitting

17   or contingent skin shock," <u>id.</u> 5.14(3)(d)1.; <u>see also</u> <u>id.</u>

18   5.14(3)(d)--unless the child had a court-approved treatment

19   permitting the use of aversives before September 1, 2011

20   (which none of the children at issue in this case had).  The

21   Massachusetts regulation permits other aversive

22   interventions--including "[c]ontingent application of

23   unpleasant sensory stimuli such as loud noises, bad tastes,

24   bad odors, or other stimuli which elicit a startle

25   response," and "delay of [a] meal for a period not exceeding

                                 13

1    30 minutes," id. 5.14(3)(c)1.c.-d.--if they are contained in

2    the student's written behavior modification plan and if that

3    behavior modification plan meets certain special

4    requirements.  See id. 5.14(4)(c).

5        Because certain aversive interventions, such as the

6    electric skin shock--the "principal form" of aversive

7    intervention used by JRC--are no longer permitted in

8    Massachusetts, Defendants contend that Plaintiffs' claims

9    are moot.  We disagree.

10       First, the question is not one of mootness.  New York's

11   prohibition on aversive interventions remains in effect and

12   applicable to these children.  Accordingly, the case and

13   controversy is not moot.  Cf. Lamar Advertising of Penn, LLC

14   v. Town of Orchard Park, 356 F.3d 365, 375-76 (2d Cir. 2004)

15   (explaining that, in the case of a statute or regulation, a

16   claim usually becomes moot when a statute or regulation is

17   amended).

18       The question is whether Plaintiffs retain standing, for

19   which: [1] "the plaintiff must have suffered an injury in

20   fact" that is both "concrete and particularized" and "actual

21   or imminent, not conjectural or hypothetical"; [2] "there

22   must be a causal connection between the injury and the

23   conduct complained of" such that the injury is "fairly

24   traceable to the challenged action of the defendant"; and

25   [3] "it must be likely, as opposed to merely speculative,

14

1    that the injury will be redressed by a favorable decision."

2    Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)

3    (internal quotation marks, citations, brackets, and ellipsis

4    omitted).  Defendants contend that redressability has been

5    foreclosed by Massachusetts' new regulation.

6         We conclude that a decision favorable to Plaintiffs

7    would likely redress their injury for several reasons.

8    First, if Plaintiffs prevailed, the children could receive

9    the aversives that the new Massachusetts regulation

10   continues to permit; whereas the New York regulation

11   prohibits *all* aversives for these children, the

12   Massachusetts regulation does not.  Compare N.Y. Comp. Codes

13   R. & Regs. tit. 8, § 19.5(b), with 115 Mass. Code Regs.

14   5.14(3)(c), (3)(d).  True, electric skin shocks are the

15   "principal form" of aversive interventions used by JRC; but

16   if Plaintiffs prevail, the children may be able to receive

17   other aversives at JRC.

18        Second, Defendants erroneously assume that if these

19   children are unable to receive aversive interventions at

20   JRC, they will be unable to obtain aversives anywhere.  The

21   complaint seeks an injunction preventing Defendants' from

22   enforcing New York's prohibition on aversives and a

23   declaration that the prohibition violates the U.S.

24   Constitution and federal law.  The prayer for relief is not

25

15

1   limited to treatment at JRC or in Massachusetts; JRC is not

2   mentioned in the prayer for relief.

3        As all the parties concede, no facility other than JRC

4   is *currently* treating New York children with aversive

5   interventions.  But this is hardly surprising since New York

6   largely bans the use of aversive interventions.  If New

7   York's prohibition was declared invalid, it is "likely" that

8   other facilities in New York would provide aversives.  <u>See</u>

9   <u>Lujan</u>, 504 U.S. at 561 (internal quotation marks omitted).

10  It is also likely that these children could go to a facility

11  in another state.  <u>See</u> N.Y. Educ. Law §§ 4407(1)(a),

12  4401(2)(f), (h) (providing that New York students with

13  disabilities who cannot obtain an appropriate education in

14  New York may attend an out-of-state facility that the

15  Education Department determines can meet the child's

16  needs).[4]

17        Finally, Plaintiffs would have standing to challenge

18  the New York prohibition even if, as Defendants argue, the

_____

    [4] A number of other states have substantially limited
or outright prohibited the use of aversive interventions in
schools and with students.  <u>See</u> Cal. Educ. Code
§ 56520(a)(3); 22 Pa. Code § 14.133(e); Mont. Admin. R.
10.16.3346(4); N.C. Gen. Stat. § 155C-391.1(b)(2), (h); Nev.
Rev. Stat. § 388.5265; Wash. Admin. Code § 392-172A-03125;
22 Va. Admin. Code. § 40-151-820; N.H. Code Admin. R. Ed.
§§ 1113.04, 1113.06; D.C. Code §§ 38-2561.03(b)(1), 38-
2561.01.  However, there is no indication that these
children would not be able to attend a school in some other
state that could provide them aversive interventions, if
necessary.

1    Massachusetts law would be an additional impediment to

2    aversive interventions for these children.  First,

3    Plaintiffs are prevented by issues of personal jurisdiction,

4    service, and venue from challenging the Massachusetts and

5    New York prohibitions in a single lawsuit; but their need to

6    invalidate the Massachusetts regulation would not deprive

7    them of standing to challenge the regulation in New York.

8    See Khodara Envt'l, Inc. v. Blakey, 376 F.3d 187, 194-96 (3d

9    Cir. 2004) (as amended) (Alito, J.); accord Lamar Adver. of

10   Penn, 356 F.3d at 374 (holding that the plaintiff had

11   standing to challenge a law blocking its posting of certain

12   advertising even though the plaintiff had not sought a

13   permit, which was an additional impediment to the

14   advertising).  Second, Plaintiffs' claimed injury is not (as

15   Defendants contend) that these children are unable to obtain

16   aversives generally, but rather that the New York

17   prohibition prevents them from receiving aversives.  Viewed

18   properly, Plaintiffs can obtain redress in this litigation:

19   authority to obtain aversive interventions under New York

20   law.  Accordingly, Plaintiffs continue to enjoy standing

21   because a favorable judgment would make it "likely" that

22   they could ultimately obtain the treatment they seek.  See

23   Lujan, 504 U.S. at 561 (internal quotation marks omitted).

1                                **II**

2       Two types of claims lie under the IDEA: [1] a

3  procedural claim challenging the State's compliance with the

4  procedures set forth in the IDEA, and [2] a substantive

5  claim challenging whether the IEP is reasonably calculated

6  to enable the student to receive educational benefits.  <u>See</u>

7  <u>Walczak</u>, 142 F.3d at 129.[5]  Plaintiffs assert both kinds of

8  claim.

9

10                               **A**

11      Plaintiffs' procedural claim is that prohibiting

12  aversive interventions prevents these children from

13  obtaining a truly *individualized* education program because

14  they are categorically barred from getting an IEP that

_____

[5] An IEP sets out in writing, <u>inter</u> <u>alia</u>, (1) the
child's present levels of academic achievement and
functional performance; (2) the short-term academic and
functional objectives; (3) the measurable annual goals for
the child, including academic and functional goals; (4) the
specific educational and related services to be provided to
the child and the extent to which the child will be able to
participate in general educational programs and curriculum;
(5) the transition services needed for the child to leave
the school setting; (6) the projected commencement for and
duration of proposed services; and (7) objective criteria
and evaluation procedures and schedules for determining, on
at least an annual basis, whether academic and functional
objectives are being achieved.  20 U.S.C. § 1414(d)(1)(A).
The IEP is developed by a school official qualified in
special education, at least one special education teacher,
at least one general education teacher, other qualified
individuals, the child's parents, and (where appropriate)
the child.  <u>Id.</u> § 1414(d)(1)(B).

18

1    includes aversive interventions without regard to their

2    individual needs.  See D.D. v. N.Y.C. Bd. of Educ., 465 F.3d

3    503, 511 (2d Cir. 2006) (explaining "that the right to a

4    free appropriate public education [FAPE] is afforded to each

5    disabled child as an individual").

6         Nothing in New York's regulation prevents

7    individualized assessment or precludes educators from

8    considering a wide range of possible treatments.  The

9    regulation prohibits consideration of a single method of

10   treatment without foreclosing other options.  In so doing,

11   the regulation follows the goals and emphasis of the IDEA.

12   See 20 U.S.C. § 1400(c)(5)(F) ("Almost 30 years of research

13   and experience has demonstrated that the education of

14   children with disabilities can be made more effective by

15    . . . positive behavioral interventions and supports"); 64

16   Fed. Reg. 12406, 12589 (Mar. 12, 1999) ("[T]he primary focus

17   must be on ensuring that the behavioral management

18   strategies in the child's IEP reflect the [IDEA's]

19   requirement for the use of positive behavioral interventions

20   and strategies to address the behavior that impedes the

21   learning of the child or that of other children.").[6]

---

[6] See also 20 U.S.C. § 1411(e)(2)(C)(iii) (allowing
states to reserve federal funding "[t]o assist local
education agencies in providing positive behavior
interventions and supports"); id. § 1414(d)(3)(B)(i)
(providing that the IEP team should "consider the use of
positive behavioral interventions and supports, and other

19

1    Although the IDEA does not prohibit alternatives such as

2    aversives, <u>see</u> 20 U.S.C. § 1414(d)(3)(B)(i), it cannot be

3    said that a policy that relies on positive behavioral

4    interventions only is incompatible with the IDEA.

5         Plaintiffs argue that, because the regulation

6    eliminates one possible method from the students' IEP, it

7    amounts to a predetermination that violates the procedural

8    guarantees of the IDEA, as explained in <u>Deal v. Hamilton</u>

9    <u>Cnty. Bd. of Educ.</u>, 392 F.3d 840 (6th Cir. 2004).  However,

10   there is a distinction between a policy that affects

11   individual cases on a categorical basis (such as the policy

12   at issue here) and a local predetermination that rejects

13   preemptively a measure that is permitted as a matter of

14   state law.

15        In <u>Deal</u>, a school district refused to consider a

16   particular teaching approach.  <u>Id.</u> at 845-46.  The Sixth

17   Circuit concluded that foreclosure of a program without

_____

strategies, to address" "behavior [that] impedes the child's
learning or that of others"); <u>id.</u> § 1454(a)(3)(B)(iii)(I)
(allowing states to use federal grants to train educators in
methods of "positive behavioral interventions and supports
to improve student behavior in the classroom"); <u>id.</u>
§ 1462(a)(6)(D) (authorizing the Secretary of Education to
enter into contracts with entities to ensure training in
"positive behavioral supports."); <u>id.</u> § 1465(b)(1)(B)-(C)
(permitting the Secretary of Education to support effective,
research-based practices through training educators in
"positive behavioral interventions and supports" and
"effective strategies for positive behavioral
interventions").

20

1    regard for its effectiveness was a procedural violation of

2    the IDEA because it deprived the parents of meaningful

3    participation in the IEP process.  Id. at 857.  We need not

4    pass on the reasoning of Deal because unlike the instant

5    challenge to a statewide prohibition enacted by a state

6    government, Deal involved a challenge to an unofficial

7    district policy involving a particular child's specific IEP

8    as to which the parents had a statutory right of input, 20

9    U.S.C. § 1414(d)(1)(B).

10        The distinction is significant.  See Alleyne v. N.Y.

11   State Educ. Dep't, 691 F. Supp. 2d 322, 333 n.9 (N.D.N.Y.

12   2010) (distinguishing between authorities considering

13   predetermination in IEPs and the promulgation of statewide

14   regulations).  "The IDEA was enacted to assist states in

15   providing special education and related services to children

16   with disabilities . . . not [to] usurp the state's

17   traditional role in setting educational policy."  Taylor,

18   313 F.3d at 776-77.  "Congress did not prescribe any

19   substantive standard of education" in the IDEA.  J.D. v.

20   Pawlet Sch. Dist., 224 F.3d 60, 65 (2d Cir. 2000).  Instead,

21   the IDEA "'incorporates state substantive standards as the

22   governing federal rule' if they are consistent with the

23   federal scheme and meet the minimum requirements set forth

24   by the IDEA."  Taylor, 313 F.3d at 777 (quoting Mrs. C. v.

25   Wheaton, 916 F.2d 69, 73 (2d Cir. 1990)).

1    Moreover, Plaintiffs' interpretation of the IDEA would

2  effectively strip state governments of the ability to adopt

3  statewide policy because it is impossible to consider each

4  student's circumstances before adopting statewide policy.

5  For this reason, New York collects input--by parents,

6  professionals, and the public--when the Education Department

7  publishes a proposed regulation and an opportunity is

8  afforded for notice and comment.  <u>See</u> N.Y. State Register,

9  Rule Making Activities, Nov. 15, 2006.

10    In this case, New York adopted the ban of aversives

11  only after the Education Department made site visits,

12  reviewed reports, and considered complaints from parents as

13  well as school districts and others raising concerns about

14  aversive techniques.  <u>Notice of Emergency Adoption &</u>

15  <u>Proposed Rulemaking</u>, N.Y. State Educ. Dep't, June 20, 2006.

16  It concluded that aversive interventions are dangerous and

17  may backfire and that positive behavioral interventions are

18  sufficiently effective to provide a FAPE.   <u>Id.</u>

19    The prohibition therefore represents a considered

20  judgment; one that conforms to the IDEA's preference for

21  positive behavioral intervention.  <u>See, e.g.</u>, 20 U.S.C.

22  § 1400(c)(5)(F).  (Another such New York policy is the long-

23  standing bar on corporal punishment.  <u>See</u> N.Y. Comp. Codes

24  R. & Regs. tit. 8, § 19.5(a).)  The IDEA does not

25  categorically bar such statewide regulations that resolve

22

1    problems in special education; otherwise, the IDEA would be

2    transformed from a legislative scheme that preserves the

3    states' fundamental role in education to one that usurps the

4    role of the states.  Cf. Rowley, 458 U.S. at 208 (explaining

5    that "Congress' intention was not that the [IDEA] displace

6    the primacy of States in the field of education, but that

7    States receive funds to assist them in extending their

8    educational systems to the handicapped").[7]

9        In sum, New York's regulation prohibits only

10   consideration of a single method of treatment without

11   foreclosing other options.  Nothing in the regulation

12   prevents individualized assessment, predetermines the

13   children's course of education, or precludes educators from

14   considering a wide range of possible treatments.  Therefore,

15   the district court correctly dismissed the procedural IDEA

16   claim.

17

18                            **B**

19       Plaintiffs contend that the prohibition on aversive

20   interventions is a substantive violation of the IDEA because

21   aversives are necessary to control the severe behavioral

---

[7] Plaintiffs direct our attention to Kalliope R. v.
N.Y. State Dep't of Educ., 827 F. Supp. 2d 130 (E.D.N.Y.
2010), which concerned the State's foreclosure of a
particular intensive teaching technique.  Kalliope, however,
is an interlocutory opinion, never appealed, that relied on
Deal.

1    disorders that undermine the children's education.

2    Plaintiffs allege that a positive-only program is effective

3    with 70% of students but that each of these children fall

4    within the 30% who are not sufficiently treated with

5    positive-only interventions.

6         For many of the reasons discussed above, Plaintiffs

7    cannot state a substantive IDEA claim.  The prohibition on

8    aversive interventions does not prevent these students from

9    obtaining an IEP specifically aimed at providing them an

10   appropriate education.  Moreover, the Education Department

11   has decided to focus its special-education programs on

12   positive-only behavioral interventions, which is the clear

13   (although not exclusive) methodology favored by the IDEA.

14        Even if we assumed that permitting these children to

15   receive aversive interventions would help them fulfill their

16   potential, Plaintiffs' substantive claim would still fail.

17   The "IDEA does not require states to develop IEPs that

18   'maximize the potential of handicapped children.'"  Walczak,

19   142 F.3d at 132 (quoting Rowley, 458 U.S. at 189); accord

20   Rowley, 458 U.S. at 197-98 & n.21.  The IDEA "guarantees"

21   only that students with disabilities are provided an

22   "'appropriate' education, not one that provides everything

23   that might be thought desirable by loving parents."

24   Walczak, 142 F.3d at 132 (internal quotation marks omitted).

25   A state satisfies its obligation to provide a free

                              24

1   *appropriate* public education if it "provide[s] a disabled

2   child with meaningful access to an education" even if the

3   state "cannot guarantee totally successful results." <u>Id.</u> at

4   133 (citing <u>Rowley</u>, 458 U.S. at 192); <u>accord</u> <u>Rowley</u>, 458

5   U.S. at 195 (explaining that the IDEA "imposes no clear

6   obligation upon recipient States beyond the requirement that

7   handicapped children receive some form of specialized

8   education").

9       Defendants provide these students with meaningful

10  access to education opportunities by authorizing and funding

11  their specialized education and behavioral modification

12  treatment at an out-of-state residential facility that has

13  expertise in treating children with severe behavioral

14  disorders.  Aversive interventions may help maximize the

15  children's potential, but the IDEA does not require such

16  measures.[8]

17      Moreover, we decline Plaintiffs' invitation to review

18  and second guess New York's education policy.  Although the

19  IDEA provides for some judicial review, "the Supreme Court

20  has cautioned[] . . . that this 'independent' review 'is by

21  no means an invitation to the courts to substitute their own

─────────────────

        [8] Significantly, none of these students received an IEP
that authorized use of aversive interventions before the
enactment of the regulation in 2006 or during the
grandfathering period when a child-specific exception was
available.

notions of sound educational policy for those of the school authorities they review.'"  See Walczak, 142 F.3d at 129 (quoting Rowley, 458 U.S. at 206).  We will not "simply rubber stamp" the decisions of the states and locals, but we must be "mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005) (internal quotation marks omitted); accord Rowley, 458 U.S. at 207 ("[C]ourts must be careful to avoid imposing their view of preferable educational methods upon the States.").

There is an ongoing debate among the experts regarding the advantages and disadvantages of aversive interventions and positive-only methods of behavioral modification.  The judiciary is ill-suited to decide the winner of that debate. See Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 383 (2d Cir. 2003) (as amended) (reversing a district court decision finding IEPs inadequate because the district court "impermissibly chose between the views of conflicting experts on a controversial issue of educational policy").

Our deference to the Education Department's decision is further justified in this instance because New York adopted the regulation after the Education Department obtained information raising concerns regarding the potential health

26

1    and safety implications of aversives.  See Notice of

2    Emergency Adoption & Proposed Rulemaking, N.Y. State Educ.

3    Dep't, June 20, 2006.  The Education Department was

4    concerned that aversive interventions can result in

5    "aggressive and/or escape behaviors" and can foster the

6    development of "negative attitudes toward [one's] self and

7    school programs," id.--concerns raised by reports and

8    complaints by parents, school districts, and others.  One

9    such source of concern was a lawsuit alleging abuse at JRC,

10   see Nicholson v. New York, 872 N.Y.S. 2d 846 (Ct. Cl. 2008),

11   which prompted a site visit on which the Education

12   Department "identified significant concerns for the

13   potential impact on the health and safety of New York

14   students," see Notice of Emergency Adoption & Proposed

15   Rulemaking, N.Y. State Educ. Dep't, June 20, 2006.  This

16   Court is not institutionally suited to now second guess the

17   policy decision made by experts charged with formulating

18   education policy in New York.  See Cerra, 427 F.3d at 192.

19        Because Plaintiffs have not and cannot allege that

20   these children have been deprived of a FAPE, they cannot

21   prevail on their substantive IDEA claim.[9]

_____

[9] The dissent concludes that a reasonable justification
for preventing use of aversive therapies cannot be located
in the record.  We respectfully disagree.  But even if there
were no express justification, some justifications are
implicit in the policy.

27

1                              **III**

2        In addition to their procedural and substantive IDEA

3   claims, Plaintiffs also assert a claim under the

4   Rehabilitation Act.  Section 504 of the Rehabilitation Act

5   provides: "No otherwise qualified individual with a

6   disability . . . shall, solely by reason of her or his

7   disability, be excluded from the participation in, be denied

8   the benefits of, or be subjected to discrimination under any

9   program or activity receiving Federal financial assistance

10   . . . ."  29 U.S.C. § 794(a).

11        To establish a prima facie case under the

12   Rehabilitation Act, a plaintiff must allege: [1] that he or

13   she is a person with disabilities under the Rehabilitation

14   Act, [2] who has been denied benefits of or excluded from

15   participating in a federally funded program or special

16   service, [3] solely because of his or her disability.  See

17   Mrs. C., 916 F.2d at 74.  Plaintiffs, however, do not argue

18   that the regulation banning aversive interventions denies

19   them benefits on the basis of disability: The regulation

20   applies to all students, regardless of disability.[10]

        [10] Plaintiffs also cannot state a Rehabilitation Act
   claim for discrimination against people with disabilities
   who are students.  See J.D., 224 F.3d at 70.  Under the
   Rehabilitation Act, states receiving federal funds must
   "'provide a free appropriate public education to each
   qualified handicapped person.'"  Id. (quoting 34 C.F.R.
   § 104.33(a)).  This obligation can be satisfied by, inter
   alia, providing the student an IEP.  34 C.F.R.

                              28

1    Plaintiffs contend, however, that they state a claim

2  under Rehabilitation Act because New York's ban on aversives

3  was promulgated in bad faith or is the result of gross

4  mismanagement.  See Wegner v. Canastota Cent. Sch. Dist.,

5  979 F. Supp. 147, 152 (N.D.N.Y. 1997) (relying on Brantley

6  v. Indep. Sch. Dist. No. 625, 936 F. Supp. 649, 657 (D.

7  Minn. 1996) (citing Monahan v. Nebraska, 687 F.2d 1164,

8  1170-71 (8th Cir. 1982))).  We have never held that such a

9  claim exists under the Rehabilitation Act, but even assuming

10  that it does, Plaintiffs' complaint fails to state such a

11  claim.

12    Plaintiffs' allegations of bad faith and gross

13  mismanagement are refuted by the facts (of which we have

14  taken judicial notice) that the Education Department [1]

15  investigated the matter before offering the regulation for

16  public comment and [2] received the public's comments before

17  promulgating the regulation.  See Notice of Emergency

18  Adoption & Proposed Rulemaking, N.Y. State Educ. Dep't, June

19  20, 2006; N.Y. State Register of Rule Making Activities,

20  Nov. 15, 2006.

21    Plaintiffs' response that bad faith or gross

22  mismanagement is manifest because there is no scholarly

---

§ 104.33(b)(1).  As explained previously, the prohibition on
aversives does not prevent educators from implementing IEPs
for these children nor does it preclude their receipt of a
FAPE.

1    support for banning aversives is similarly refuted by the

2    Education Department's citation to scholarly literature

3    discussing the dangers of aversives and the benefits of

4    positive-only treatment.  See Notice of Emergency Adoption &

5    Proposed Rulemaking, N.Y. State Educ. Dep't, June 20, 2006.

6    In any event, such a dispute (regarding which education

7    policy is the most scientifically sound and effective

8    approach that is least likely to present health, safety, and

9    moral and ethical concerns) is best left for resolution by

10   the policymakers and education administrators, not the

11   judiciary.  See Cerra, 427 F.3d at 192; see also Rowley, 458

12   U.S. at 206-07; Walczak, 142 F.3d at 129.

13

14                              IV

15       In addition to their statutory claims, Plaintiffs also

16   contend that New York's prohibition of aversives deprives

17   them of their constitutional rights to substantive and

18   procedural due process and equal protection.  Each claim is

19   addressed in turn.

20

21                              A

22       Plaintiffs contend that the ban on aversive

23   interventions deprives these children of substantive due

24   process.  Plaintiffs cannot prevail on such a claim because

30

1    there is no substantive due process right to public

2    education.

3         "[T]he Due Process Clause of the Fourteenth Amendment

4    embodies a substantive component that protects against

5    'certain government actions regardless of the fairness of

6    the procedures used to implement them.'"   Immediato v. Rye

7    Neck Sch. Dist., 73 F.3d 454, 460 (2d Cir. 1996) (quoting

8    Daniels v. Williams, 474 U.S. 327, 331 (1986)).   In

9    examining whether a government rule or regulation infringes

10   a substantive due process right, "the first step is to

11   determine whether the asserted right is 'fundamental,'"--

12   i.e., "implicit in the concept of ordered liberty, or deeply

13   rooted in this Nation's history and tradition," Leebaert v.

14   Harrington, 332 F.3d 134, 140 (2d Cir. 2003) (internal

15   quotation marks omitted).   Where the right infringed is

16   fundamental, the regulation must be narrowly tailored to

17   serve a compelling government interest.   Immediato, 73 F.3d

18   at 460.   Where the right infringed is not fundamental, "the

19   governmental regulation need only be reasonably related to a

20   legitimate state objective."   Id. at 461.

21        The right to public education is not fundamental.

22   Handberry v. Thompson, 446 F.3d 335, 352 (2d Cir. 2006)

23   (citing Plyler v. Doe, 457 U.S. 202, 221 (1982); San Antonio

24   Indep. Sch. Dist. v. Rodriquez, 411 U.S. 1, 35 (1973)).

25   Thus, even if Plaintiffs alleged that these children were

31

1    unable to receive a public education at all because they can

2    no longer receive aversives, the bar on aversive

3    interventions would still comport with due process if it was

4    reasonably related to a legitimate government objective.

5    The regulation rises to that low threshold because it serves

6    a legitimate government objective: preventing students from

7    being abused or injured by aversive interventions.

8         Realizing that there is no fundamental right to public

9    education, Plaintiffs contend they have been deprived of the

10   substantive due process because the ban on aversives is

11   arbitrary and capricious (because, as Plaintiffs argue,

12   aversives are effective and there is no scientific support

13   for banning them).  This argument is addressed above.

14   Moreover, we decline Plaintiffs' invitation to engage in

15   policymaking decisions that are best left to the political

16   branches.  See Cerra, 427 F.3d at 192.  In any event, safety

17   and ethical concerns as well as the potential for abuse

18   suffice to establish that New York's prohibition is not

19   arbitrary and capricious--even if, as Plaintiffs contend,

20   aversives are the best and, perhaps, only way to effectively

21   treat these children's severe behavior disorders.

22

23

24

25

1                                    **B**

2        Plaintiffs' procedural due process claim largely

3   duplicates the procedural IDEA claim and fails for the same

4   reasons.

5        A procedural due process claim is composed of two

6   elements: (1) the existence of a property or liberty

7   interest that was deprived and (2) deprivation of that

8   interest without due process.  See Narumanchi v. Bd. of

9   Trustees, 850 F.2d 70, 72 (2d Cir. 1988).  As a general

10  matter, Plaintiffs may have a property interest in public

11  education.  See Handberry, 446 F.3d at 353 (discussing New

12  York law).  The prohibition on aversives, however, does not

13  prevent these children from obtaining a public education,

14  even if, as Plaintiffs allege, these children would receive

15  a *better* education if aversive interventions were permitted.

16       Instead, Plaintiffs contend that they have an interest

17  in individualized assessments under the IDEA and that this

18  interest is undermined by the prohibition on aversive

19  interventions.  This claim mirrors the procedural IDEA claim

20  and fails for the same reason: Plaintiffs have not alleged

21  that the prohibition on aversive interventions prevents an

22  individualized assessment, education, or treatment of these

23  children.  The prohibition merely removes one possible form

24  of treatment from the range of possible options.  Each child

25  is still able to receive an education plan that is tailored

                                     33

1    to his or her specific needs in all other respects.

2        In addition, this claim fails because Plaintiffs do not

3    possess a property interest in any particular type of

4    education program or treatment.  See Handberry, 446 F.3d at

5    352.  Plaintiffs contend that their property right

6    originates in the IDEA but, given the IDEA's strong

7    preference for positive behavioral intervention, see, e.g.,

8    20 U.S.C. § 1400(c)(5)(F), the IDEA does not create a

9    property interest in the possible receipt of aversive

10   interventions as part of an IEP.

11

12                              C

13       Plaintiffs contend that the prohibition on aversive

14   interventions violates equal protection by treating them

15   differently than other students who had IEPs permitting them

16   to receive aversives before June 30, 2009--the cut-off date

17   for the grandfather clause.

18       Laws that discriminate on the basis of disability are

19   subject to rational-basis review and upheld so long as there

20   is a "rational relationship between the disparity of

21   treatment and some legitimate governmental purpose."  See

22   Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn, 280 F.3d

23   98, 109 (2d Cir. 2001).  And, as explained above, there is

24   at least a rational basis to support the prohibition on

25   aversives.

1    Plaintiffs' contention that the prohibition

2    distinguishes between students with disabilities who had

3    IEPs authorizing aversives prior to June 30, 2009, and

4    students with disabilities who did not have IEPs permitting

5    aversives, does not save the claim.  Classifications that do

6    not "proceed[] along suspect lines . . . must be upheld

7    against equal protection challenge if there is any

8    reasonably conceivable state of facts that could provide a

9    rational basis for the classification." <u>FCC v. Beach</u>

10   <u>Commc'ns, Inc.</u>, 508 U.S. 307, 313 (1993).  Classification on

11   the basis of authorization to administer aversive

12   interventions in a student's IEP is, of course, a non-

13   suspect classification subject to rational basis review.

14   Defendants' decision to grandfather the prohibition of

15   aversives so that students already authorized to receive

16   aversives could continue their treatment easily withstands

17   rational-basis review.  Grandfathering bans aversive

18   interventions without interrupting education programs where

19   aversives were already being used or already authorized to

20   be used.  It also avoids the tremendous labor of replacing

21   the IEPs of all students who had IEPs authorizing aversives.

22   Plaintiffs argue that the exception authorizing some

23   aversive interventions disproves that the ban was motivated

24   by safety.  Not so.  Although it is true that an outright

25   ban would better protect against any harms from aversives,

35

1    reducing the use of aversives can still provide a benefit by

2    decreasing the number of students subjected to aversive

3    interventions and the harms potentially associated with such

4    interventions.

5        In the end, Plaintiffs' argument is that they disagree

6    with Defendants' policy choice to ban aversive

7    interventions.  As long as Defendants had a rational reason,

8    however, the prohibition must be upheld against an equal

9    protection challenge.  Here, the safety of the students

10   coupled with an attempt to minimize the impact of the

11   prohibition on students already receiving aversives provided

12   a rational basis for the prohibition and the use of a

13   grandfather provision to implement it.

14

15                                  V

16       Plaintiffs contend that the district court erred in

17   denying their request for a preliminary injunction.  Because

18   the district court correctly dismissed the suit, it did not

19   err in denying Plaintiffs' request for a preliminary

20   injunction.  See Monserrate v. N.Y. State Senate, 599 F.3d

21   148, 154 & n.3 (2d Cir. 2010) (holding that a party cannot

22   satisfy the requirements for a preliminary injunction--

23   including "likelihood of success on the merits"--if that

24   party cannot sustain any of its claims for relief).

25

1                          **CONCLUSION**

2        Accordingly, the judgment of the district court is

3   affirmed.

37

**DISSENT**

RICHARD J. SULLIVAN, <u>District Judge</u>, concurring in part and dissenting in part:

I concur in the majority's opinion with regard to Appellants' Rehabilitation Act, Due Process, and Equal Protection claims, but I respectfully dissent insofar as the Court's opinion relates to the dismissal of Appellants' IDEA claims because I believe that Appellants' complaint alleged sufficient facts to survive a motion to dismiss, and because I find that the materials outside the complaint relied on by the majority do not establish, as a matter of law, the reasonableness of the State's ban on aversive interventions.

In dismissing Appellants' complaint, the district court held that "the allegations demonstrate that the NYSED and the Board of Regents explored the available data, studies, and literature before making a reasoned decision that aversives should be generally prohibited." However, nowhere in the opinion did the district court actually cite from the pleadings to support this conclusion. Instead, the district court merely observed that "plaintiffs do not allege that [d]efendants did not <u>consider</u> the use of aversive interventions before adopting § 200.22" and then concluded

that "[t]he [c]ourt is not willing to second guess that policy decision." Id. (emphasis added).

While it is of course true that courts are not to second guess state authorities in matters relating to educational policy, the law is equally clear that federal courts may not merely "rubber stamp administrative decisions" of this kind. Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005). Indeed, this Court has recognized that, notwithstanding "our deferential position with respect to state educational authorities crafting educational policy," "our review must be searching, and we must recognize that even when educational authorities act with the best intentions they may sometimes fall short of their obligations under the IDEA, and courts must then act to ensure compliance with Congress's directives." P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Ed., 546 F.3d 111, 120-21 (2d Cir. 2008) (internal citations omitted). This is particularly the case at the pleading stage, where a plaintiffs' allegations are presumed to be true. See Fed. R. Civ. P. 12(b)(6); ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). Here, the district court's conclusion that the prohibition of aversive

interventions was reasonable is particularly problematic, because Appellants alleged in their complaint that the scientific literature, which the district court mentioned (but did not cite) in its opinion, actually "supports the use of aversive interventions and their vital role in providing a FAPE to students with severe behavior disorders."

The majority affirms the district court's dismissal of Appellants' suit, finding that the prohibition of aversive interventions reflects "a considered judgment by the State of New York regarding the education and safety of its children that is consistent with federal education policy and the United States Constitution."  In reaching this conclusion, the majority relies not on the pleadings or on the district court's opinion, but rather on four pages from the Education Department's Notice of Emergency Adoption and Proposed Rule Making, of which it has taken judicial notice. While the Court can certainly take judicial notice of facts, these four pages, standing alone, are insufficient to justify the district court's dismissal of Appellants' claims at this early stage of the litigation.  Indeed, the first two of those pages simply note the Department's "concerns"

with aversive interventions based on "site visits, reports and complaints filed by parents, school districts and others," Notice of Emergency Adoption & Proposed Rulemaking, N.Y. State Educ. Dep't, June 20, 2006; the latter two merely catalog scientific studies that purportedly support the proposed rule.

Importantly, the scientific studies summarized in the Notice of Emergency Adoption and Proposed Rule Making do not directly call for the prohibition of aversive interventions. To the contrary, these studies presuppose the use and utility of aversive interventions at least in certain contexts and merely set forth "standards" and "strategies to improve an ABI's [aversive behavioral intervention's] effectiveness and acceptability." Id. It is worth noting that of the several studies cited in the Notice of Emergency Adoption and Proposed Rule Making, the two included in full in the record actually describe the need for aversive interventions in certain instances. See Dorothy C. Lerman & Christina M. Vondram, On the Status of Knowledge for Using Punishment: Implications for Behavior Disorders, 35 J. APPL. BEHAV. ANAL., 431, 456 (2002) (noting that "punishment is still sometimes needed to reduce destructive behavior to

4

acceptable levels"); Sarah-Jeanne Salvy et al., <u>Contingent Electric Shock (SIBIS) and a Conditioned Punisher Eliminate Severe Head Banging in a Preschool Child</u>, 19 BEHAV. INTERVENT. 59, 70 (2004) (noting that ABIs "can sometime be necessary, although not sufficient, to eliminate severe and harmful [self-injurious behavior] in the natural environment"). Consequently, I am unpersuaded that the <u>Notice of Emergency Adoption and Proposed Rule Making</u> cited by the majority provides a sufficient basis for upholding the district court's dismissal.

Of course, like the majority, I am "mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." <u>Cerra</u>, 427 F.3d at 192. However, it seems to me that the appropriate course would be to return this action to the district court, which could then review a fuller record, beyond the pleadings, to assess the regulation and its compliance with the IDEA. If my cursory review of the literature in the field is any indication, it seems likely that Appellees will be able to demonstrate that "the regulations represent an informed, rational choice between two opposing schools of thought on

5

the use of aversives," <u>Alleyne v. N.Y. State Educ. Dept.</u>, 691 F. Supp. 2d 322, 333 (N.D.N.Y. 2010), and that Appellants will therefore have difficulty overcoming the "substantial deference" accorded to the review of state policy-making agencies, <u>Wasser v. N.Y. State Office of Voc. & Educ. Servs. for Individuals With Disabilities</u>, 602 F.3d 476, 477 (2d Cir. 2010). Nevertheless, while the outcome may ultimately be the same, it is important that the result be based on a careful assessment of the merits, founded on a well-developed record. In my view, the district court's dismissal – and the majority's affirmance – takes an unnecessary short cut to reach an outcome that cannot be justified at this stage of the proceedings. For these reasons, I respectfully dissent.